**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| LAZAR MACOVSKI, Individually and On Behalf of All Others Similarly Situated, | Case No. 1:20-cv-02581 |
| Plaintiff, | AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| v. | Honorable Matthew F. Kennelly |
| GROUPON, INC., RICH WILLIAMS, and MELISSA THOMAS, | JURY TRIAL DEMANDED |
| Defendants. | |

**TABLE OF CONTENTS**

I.     NATURE OF THE ACTION AND OVERVIEW ................................................. 1

II.    JURISDICTION AND VENUE ............................................................................. 4

III.   PARTIES ............................................................................................................... 5

    A.    Lead Plaintiff ........................................................................................... 5

    B.    Defendants ................................................................................................ 5

IV.    FACTUAL BACKGROUND ................................................................................. 7

    A.    Groupon's Basic Organization .................................................................. 7

    B.    Relevant Dynamics Affecting Groupon's Operations ............................... 8

       1.   Groupon's Recent Customer And Traffic Headwinds ........................... 8

       2.   With Local As Groupon's Core, Defendants Retain Goods Because Of
          Its Ability To Drive Additional Local Business ..................................... 10

       3.   Defendants Identify Increasing Customers' Purchase Frequency As The
          Key To Unlocking Profit Growth ........................................................ 13

       4.   Defendants Identify Select As The Key To Increasing Purchase Frequency,
          And Insist Select Was Doing So Profitably ........................................... 14

       5.   Groupon's Guidance For 2019 Results Of Operations ......................... 18

    C.    Undisclosed Adverse Facts Known to Defendants During the Class Period ............. 20

       1.   In The Second Half Of 2019, Select "Over-Indexed" To Goods And As
          A Result Failed To Generate Local Business Traction Or Profit ......................... 20

       2.   It Becomes "Abundantly Clear" To Defendants Midway Through The
          4th Quarter Of 2019 That Goods Cannot Compete Effectively, Is Being
          Abandoned By Customers, And Is No Longer Driving Meaningful
          Business To Local ............................................................................... 22

       3.   Groupon's Share Price Craters In February 2020 Following Disclosure
          Of The Failure Of Select And Goods, And The Consequent Guidance Miss ...... 23

V.     DEFENDANTS' VIOLATIONS OF THE EXCHANGE ACT ........................................... 24

    A.    Defendants' Material Misstatements and Omissions in Violation of the
       Exchange Act ............................................................................................ 24

       1.   Defendants' July 30-31, 2019 Statements ........................................... 24

2.      Defendants' November 4-5, 2019 Statements ........................................ 30

3.      Williams' December 11, 2019 Statements........................................... 41

4.      Additional Disclosure Duties Imposed By Item 303 Of Regulation S-K............ 44

B.      Defendants' February 18-19, 2020 Disclosures Correct Prior Misstatements and
        Cause the Company's Shares to Lose Nearly Half of Their Remaining Value.......... 46

   1.      Groupon's Poor Fourth Quarter And Full Year 2019 Results ............................ 46

   2.      Defendants' Corrective Disclosures Concerning Goods And Select.................... 47

      a.      Goods ....................................................................... 47

      b.      Select........................................................................ 52

   3.      Groupon Shares Decline Materially Following The February 18-19, 2020
           Corrective Disclosures ...................................................... 53

C.      Additional Allegations Regarding The Individual Defendants' Scienter .................. 54

   1.      The Collapse Of Goods, And Of The Cross-Shopping Benefits Good
           Historically Had Provided To Local, Was Long Monitored By Defendants
           And "Abundantly Clear" To Defendants "Midway Through The Fourth
           Quarter" Of 2019 ......................................................... 54

   2.      Select's Failures To Drive Local Business And Operate Profitably Were
           Evident To Defendants During The Second Half Of 2019 As Select
           Over-Indexed To Goods ........................................................ 55

   3.      Select's Over-Indexing To Goods During The Second Half of 2019, And
           Consequent Unprofitability, Were The Direct And Foreseeable Results Of
           Defendants' Own Actions ...................................................... 56

   4.      Goods And Select Were Core Operations For Groupon....................................... 56

   5.      Defendants' Own Assertions That They Closely Monitored Select
           And Goods . . . ............................................................... 57

   6.      . . . Are Borne Out By The Mastery Of Details Displayed By Defendants
           In The Q2 2019 And Q3 2019 Conference Calls................................... 59

   7.      Defendants Attested To Their Data Driven Decision-Making Frameworks ........ 60

   8.      Executive Terminations Shortly After the Class Period Further Support an
           Inference of Scienter ........................................................ 61

D.      Additional Allegations Regarding Loss Causation.................................... 61

E.      Presumption Of Reliance ............................................................... 62

1. General Allegations ........................................................................ 62

2. Class Period Analyst Reports Reflected And Transmitted Defendants' Misstatements ................................................................................ 64

    a. Analyst Reports Following Defendants' Q2 2019 Statements ...................... 64

    b. Analyst Reports Following Defendants' Q3 2019 Statements ...................... 66

    c. The UBS Upgrade ............................................................................ 67

VI. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE ........................................................... 71

VII. CLASS ACTION ALLEGATIONS ................................................................ 71

VIII. CLAIMS FOR RELIEF .............................................................................. 73

IX. PRAYER FOR RELIEF .............................................................................. 77

X. JURY TRIAL DEMANDED ........................................................................ 78

## TABLE OF DEFINED TERMS

| | |
|---|---|
| Barclays Conference Presentation | Williams' oral presentation concerning Groupon at the December 11, 2019 Barclays Global Technology, Media and Telecommunications Conference, held in the Palace Hotel in San Francisco |
| Class | All persons and entities that purchased or otherwise acquired Groupon securities between July 30, 2019 and February 18, 2020, inclusive, and who were damaged thereby |
| Class Period | July 30, 2019 through February 18, 2020, inclusive |
| Company | Groupon |
| Credit Suisse Q2 Report | August 1, 2019 analyst report on Groupon titled "Investing to Accelerate Subscription Adoption," authored by Credit Suisse analyst Stephen Ju |
| Credit Suisse Q3 Report | November 6, 2019 analyst report on Groupon titled "Turning to Order Frequency and Conversion to Offset Ongoing Traffic Headwinds," authored by Credit Suisse analyst Stephen Ju |
| Defendants | Groupon, Thomas and Williams |
| Exchange Act | Securities Exchange Act of 1934 |
| Goldman | Goldman Sachs & Co. LLC |
| Goods | Groupon's "Goods" business, offering discounted merchandise across multiple product lines, including electronics, sporting goods, jewelry, toys, household items and apparel |
| Groupon | Groupon, Inc. |
| Guidance | $270 million in 2019 adjusted EBITDA, first announced on February 12-13, 2019 and re-affirmed on July 30-31, 2019 and November 4-5, 2019 |
| Individual Defendants | Thomas and Williams |
| Item 303 | Item 303 of Regulation S-K ("Item 303"), 17 C.F.R. §229.303 |
| Lead Plaintiff | Fadi E. Rahal |
| Local | Groupon's "Local" businesses, including multiple product and service subcategories such as events and activities, beauty and spa, health and fitness, food and drink, and home and garden and automotive |
| MD&A | The section in certain Groupon SEC filings, including its filings on Form 10-Q and Form 10-K, titled "Management Discussion and Analysis of Financial Condition and Results of Operations" |
| Q1 2019 Conference Call | May 1, 2019 Groupon conference call with analysts and investors, in connection with Groupon's announcement of Q1 2019 results |
| Q1 Letter | May 1, 2019 letter from Williams to Groupon shareholders |
| Q2 2018 Conference Call | August 3, 2018 Groupon conference call with analysts and investors, in connection with Groupon's announcement of Q2 2018 results |

| | |
|---|---|
| Q2 2019 10-Q | Groupon's Form 10-Q for the second quarter of 2019, filed with the SEC on July 30, 2019 |
| Q2 2019 Conference Call | July 31, 2019 Groupon conference call with analysts and investors, in connection with Groupon's announcement of Q2 2019 results |
| Q2 Letter | July 30, 2019 letter from Williams to Groupon shareholders |
| Q2 2019 Press Release | July 30, 2019 Groupon press release titled "Groupon Announces Second Quarter 2019 Results" |
| Q3 2019 10-Q | Groupon's Form 10-Q for the third quarter of 2019, filed with the SEC on November 4, 2019 |
| Q3 2019 Conference Call | November 5, 2019 Groupon conference call with analysts and investors, in connection with Groupon's announcement of Q3 2019 results |
| Q3 Letter | November 4, 2019 letter from Williams to Groupon shareholders |
| Q3 2019 Presentation | November 4, 2019 Groupon presentation titled "3Q19 Earnings" |
| Q3 2019 Press Release | November 4, 2019 Groupon press release titled "Groupon Announces Second Quarter 2019 Results" |
| Q4 2018 Conference Call | February 13, 2019 Groupon conference call with analysts and investors, in connection with Groupon's announcement of Q4 and full-year 2018 results |
| Q4 2019 Conference Call | February 19, 2020 Groupon conference call with analysts and investors, in connection with Groupon's announcement of Q4 and full-year 2019 results |
| Q4 Letter | February 18, 2020 letter from Williams to Groupon shareholders |
| Q4 2019 Presentation | February 18, 2020 Groupon presentation titled "4Q19 Earnings" |
| Q4 2019 Press Release | February 18, 2020 Groupon press release titled "Groupon Announces Fourth Quarter and Fiscal Year 2019 Results" |
| Randolfi | Michael Randolfi, Groupon's CFO from April 2016 until his August 23, 2019 resignation |
| SEC | Securities and Exchange Commission |
| Select | Groupon's loyalty program, Groupon Select, under which customers paid a $4.99 monthly membership fee and in exchange received various discounts on Groupon purchases (*e.g.*, 25% off Local purchases, 15% off Goods purchases, etc.) and other promotional benefits (*e.g.*, free shipping for Goods) |
| SEM | Search engine marketing |
| SEO | Search engine optimization |
| Thomas | Melissa Thomas, Groupon's interim CFO between August 23, 2019 and February 18, 2020 (and permanent CFO thereafter), and also Groupon's Chief Accounting Officer and Treasurer from November 2018 until approximately February 18, 2020 |

| | |
|---|---|
| UBS Conference Presentation | William's oral presentation concerning Groupon at the March 5, 2020 UBS Global Consumer & Retail Conference |
| UBS Q2 Report | July 31, 2019 analyst report on Groupon titled "Work in Progress; 2020 Is Key for Stock," authored by UBS analyst Eric J. Sheridan |
| UBS Q3 Report | November 5, 2019 analyst report on Groupon titled "Is the Plan Coming Together for 2020?," authored by UBS analyst Eric J. Sheridan |
| UBS Upgrade Report | January 17, 2020 analyst report on Groupon titled "Groupon on Sale," authored by UBS analyst Eric J. Sheridan |
| Wedbush | Wedbush Securities, Inc. |
| Williams | Richard Williams, Groupon's CEO throughout the Class Period (and at all times between November 2015 and March 25, 2020) |

Lead Plaintiff Fadi E. Rahal ("Lead Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Lead Plaintiff, which are alleged upon personal knowledge. Lead Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Groupon, Inc. ("Groupon" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Groupon; (c) review of reports issued by industry and securities analysts; and (d) review of other publicly available information concerning Groupon.

## I.      NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of persons and entities that purchased or otherwise acquired Groupon securities between July 30, 2019 and February 18, 2020, inclusive (the "Class Period"). Lead Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Groupon offers a marketplace that connects consumers to merchants through mobile applications and websites. Groupon has historically operated in three categories: i) Local, which provides experiences, including events and activities, health and beauty, food and drink, home and garden, and automotive; ii) Goods, which includes product revenue from merchandise inventory sold directly to customers and service revenue from third-party merchants who sell products using Groupon marketplaces; and iii) Travel, which offers hotels, airfare and package deals at discounted and market rates.

3.      Local's high gross margins (in the 80%-90%) range made it Groupon's primary profit driver, generating 73% of the Company's consolidated gross profits from only 40% of its consolidated revenues. Goods, by contrast, was a low-margin business. The low margins

prevailing in Goods (mostly in the 10%-20% range, and often less) meant that although Goods generated 55% of Groupon's total revenue, it yielded only 20% of the Company's gross profits. Yet, as Groupon repeatedly explained, Goods, despite the low margins, had value over and above the profits it directly produced, because Goods served to draw new customers to Groupon and drive engagement with the Company's higher-margin Local offerings.  As Groupon CEO Richard Williams explained during the Company's Q4 2018 Conference Call, "**Goods has been a good, solid engagement driver for us over the years**. . .  And our focus with Goods has just been making it more and more efficient and driving more gross profit albeit at lower units and lower overall volume."[1]  This boost to engagement was critical for the Company because prior to and throughout the Class Period, Groupon was experiencing severe "traffic headwinds" in its two of its principal marketing channels (email and search engine marketing).[2]

4.      During the second half of 2019, Groupon sought to further combat its so-called "traffic headwinds" and/or customer attrition by driving repeat customer engagement through a program called Groupon Select.  Groupon Select was a membership program that allowed members to receive, in exchange for a $4.99 monthly fee, various discounts on Groupon products as well as other benefits (detailed below).  The goal of Select was twofold: i) generate substantial increases in customers' purchase frequency; and ii) increase operating profitability, both overall and on a per-unit basis.  In certain respects, Groupon Select was the latest in a line of new big ideas meant to ensure that customers repeatedly turned to Groupon for experiences offered by the Local segment, as opposed to purchasing a one-off, discounted restaurant meal.

5.      During the Class Period, Defendants repeatedly touted the purported success of

---

[1] All emphasis is added unless otherwise noted.

[2] Traffic refers to visitors to Groupon's websites or mobile applications.

Groupon Select in boosting purchase frequency and generating incremental profits, and suggested that this customer engagement strategy was on the cusp of returning the Company to profit growth.

6.     This was not the case.  Select's purported boost to customer purchase frequency, and its purported overall and per-unit profitability, were merely mirages.  As Groupon did not disclose until after the Class Period, the highly touted Select program was in fact "over-indexing" to the Company's Goods segment – *i.e.*, customers had been using Select primarily to make repeat low-margin Goods purchases, rather than higher-margin Local purchases.  Simultaneously and for the same reason, Select had not in fact been profitable:  the discounts and other benefits available to Select members – including a 15% discount on all Goods purchases – entirely erased Groupon's already low margins on Goods purchases, so that Select purchases of Goods generated incremental *losses* rather than profits.  As Defendants acknowledged publicly for the first time in Williams' February 19, 2020 Q4 Letter to shareholders, Select, notwithstanding all of Defendants' positive statements during the Class Period, had failed to "address the core of [Groupon's] product or business model"—*i.e.*, Groupon's *Local* offerings – and would be discontinued.

7.     Compounding this issue, Defendants also did not disclose, until after the Class Period, that the deteriorating performance of Goods had been accompanied by a material diminishment in the business-driving benefits Goods had provided to Local, and had led the Company to decide to exit Goods entirely.  As Williams disclosed in his Q4 Letter, "Midway through the fourth quarter it became **abundantly clear** that we were not competing effectively in Goods.  We saw far fewer customers engage with Goods in the fourth quarter than we anticipated, which impacted overall traffic to our site.  The lower traffic ultimately impeded performance in all of our categories."  Williams further explained, in the same Q4 Letter, that Goods was no longer driving engagement with Local:  "In 2019, we were devoting about 40% of our site impressions to

3

a category that was only delivering about 20% of our gross profit and no longer generating the cross-shopping behavior or customer activation activity to continue to justify this investment. In short, Goods has outlived its role as a business driver and has become a significant drag on our business."

8. Critically, the Company disclosed for the first time in the Q4 Letter that "[o]ur management team and board have been evaluating the role of Goods in our ecosystem **for some time**," and that Groupon had decided to abandon the Goods segment during 2020. Yet, Groupon never previously disclosed that exiting the Goods segment was being considered.

9. During the February 19, 2020 Q4 2019 Conference Call, Williams, discussing the failure of the Select program, admitted that "[t]he program also began over-indexing towards our Goods category in the second half of 2019." This acknowledgement that Select was merely driving customers to Goods contravened Defendants' repeated Class Period statements concerning Select's ability to deliver higher margin, repeat customers. Groupon continued to make these statements throughout the Class Period even though it was "abundantly clear" midway through Q4 2019 that Goods was no longer performing and the Company was considering exiting the segment entirely. To wit, the promise of Select sold to investors was little more than a bag of goods.

10. As a direct result of Defendants' material misrepresentations and omissions, the market was shocked when, on February 18-19, 2020, the Company disclosed this information. Investor confidence in Groupon was shattered and an immediate decline in the price of Groupon shares ensued. On February 19, 2020, Groupon shares fell by $1.35 per share, or more than 44%, on trading volume that was more than 25 times Groupon's average daily trading volume during the Class Period.

## II.    JURISDICTION AND VENUE

11. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange

Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

13.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.  In addition, the Company's principal executive offices are located in this District.

14.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.    PARTIES

### A.    Lead Plaintiff

15.     Lead Plaintiff Fadi E. Rahal, as set forth in the certification previously filed with the Court (ECF No. 17), incorporated by reference herein, purchased Groupon securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

### B.    Defendants

16.     Defendant Groupon is incorporated under the laws of Delaware with its principal executive offices located in Chicago, Illinois.  Groupon's common stock trades on the NASDAQ exchange under the symbol "GRPN."

17.     Defendant Richard Williams ("Williams") was the Company's Chief Executive Officer ("CEO") and Director from November 2015 until approximately March 25, 2020, when Groupon announced a "management transition" in which it informed that Williams was "no longer serving as CEO" but would remain a Company employee.  Prior to joining Groupon in 2011, Williams served in a variety of marketing leadership roles at Amazon.com, Inc. between 2008 and 2011, including most recently as Director, Paid Traffic.  Before becoming CEO of Groupon in 2015, Williams served in a variety of roles: Chief Operating Officer (2015); President, North America (2014-2015); and Senior Vice President, Marketing (2011-2014).

18.     Defendant Melissa Thomas ("Thomas") was the Company's "interim" CFO from August 23, 2019 until February 18, 2020, when she was named permanent CFO.  From November 2018 through approximately February 18, 2020, Thomas also served as the Company's Chief Accounting Officer and Treasurer.  Thomas first joined Groupon in June 2017 as Vice President of Commercial Finance.  Previously, Thomas was Vice President of Finance at Surgical Care Affiliates and spent nearly nine years at Orbitz Worldwide in a variety of positions including Vice President of Finance.  Thomas has also held positions with Equity Office Properties and PricewaterhouseCoopers.

19.     Defendants Williams and Thomas (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and

access to material non-public information, the Individual Defendants knew, or were reckless in disregarding, that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements and omissions of fact pleaded herein, as well as others that may be revealed as such with the benefit of further investigation and discovery.

## IV.  FACTUAL BACKGROUND

### A.  Groupon's Basic Organization

20.  During the Class Period, Groupon operated under two geographical segments (North America and International) and three product categories:  Local, Goods and Travel.

21.  The Local business was Groupon's original business, and by far the most significant contributor to Groupon's financial success, generating nearly 60% of the Company's total gross billings and more than 70% of its total gross profits.  Local comprised multiple product and service subcategories, including events and activities, beauty and spa, health and fitness, food and drink, and home and garden and automotive, and included offerings from local as well as national merchants.  Local product/service sales generally involve a customer's purchase of a voucher through one of Groupon's online marketplaces that can be redeemed with a third-party merchant for specified goods or services (or for discounts on specified goods or services).  Groupon earns service revenues from such transactions – in effect, commissions for selling goods or services on behalf of third-party Local merchants.  Although Groupon's Local inventory historically concentrated on "deep discount" offers, Groupon more recently sought to expand its inventory through a "full funnel" approach that included moderate discount and market rate offers as well.

22.  Groupon's Goods business offered discounted merchandise across multiple product lines, including electronics, sporting goods, jewelry, toys, household items and apparel.  Groupon

operated its Goods business on both a "first party" model, whereby Groupon earned product revenue from transactions in which it sold merchandise from its inventory directly to customers, and on a "third party" model, in which Groupon earned service revenue from transactions in which third-party merchants sold products to customers through Groupon's marketplaces.  The Company stated on its Q4 2018 Conference Call that only 12% of its offers came from third parties.

23.     Groupon's Travel business includes discount and market rate offers for hotels, airfare and package deals covering both domestic and international travel.

24.     During 2017 and 2018, Goods generated approximately 31% of Groupon's gross billings and 56% of Groupon's total revenues, but only 20% of Groupon's gross profits.  Local, on the other hand, generated approximately 58% of Groupon's gross billings, 40% of Groupon's total revenues and 73% of Groupon's gross profits.  These results are summarized in Table 1, which reproduces figures from the Form 10-K for 2018 that Groupon filed with the SEC on or around February 12, 2019:

| TABLE 1 | | |
|---|---|---|
| | **2018** | **2017** |
| Goods % of Total Gross Billings | 31.1% | 32.0% |
| Goods % of Total Revenues | 55.5% | 56.8% |
| Goods % of Total Gross Profits | 20.0% | 19.4% |
| | | |
| Local % of Total Gross Billings | 58.2% | 57.2% |
| Local % of Total Revenues | 40.2% | 38.9% |
| Local % of Total Gross Profits | 72.8% | 73.0% |

**B.     Relevant Dynamics Affecting Groupon's Operations**

**1.     Groupon's Recent Customer And Traffic Headwinds**

25.     Groupon acquired and retained customers through traffic to its websites and mobile applications.  Groupon's business model originally centered on offering a limited number of discounted product or service offers ("deals"), via an email-based "push" model (*i.e.*, daily deal

emails sent to Groupon subscribers). However, the efficacy of this push model waned as technology and consumer habits evolved, leading Groupon to develop more extensive online "pull" marketplaces, where customers could come to Groupon's website and mobile application to search and browse for deals on goods and services.

26.     Prior to and during the Class Period, approximately two-thirds of Groupon's traffic derived from direct customer visits to Groupon's websites and mobile applications (the "pull" model), with one-third coming from two "push" sources: (1) the Company's own direct email marketing, which generated approximately 20% of the Company's traffic, and (2) third-party search engine marketing ("SEM") (*e.g.*, purchasing advertising on Google), and related search engine optimization ("SEO") efforts (*e.g.*, designing and redesigning the Company's websites in order to increase Groupon's visibility in web search results), which were responsible for approximately 10%-20% of the Company's customer traffic. *See e.g.* Q1 2019 Conference Call, FactSet Transcript at 9-10.

27.     Prior to and during the Class Period, Groupon's active customer count declined.[3] Defendants attributed such declines, and their associated downward pressure on the Company's financial results (*e.g.*, gross billings, revenues, gross profit, adjusted EBITDA) to two primary factors: (1) the Company's strategic decision to focus on customers that offered higher potential for gross profit generation (versus unprofitable customers whose purchases Defendants characterized as "empty calories"); and (2) "ongoing headwinds" from the Company's email and SEM/SEO channels.[4] Specifically, the traffic headwinds were attributable to internet search

---

[3] Active customers declined from 49.5 million as of December 31, 2017 to 48.2 million as of December 31, 2018 and continued to decline to 47.2 million at the end of Q1 2019, 46.2 million at the end of Q2 2019, 45.3 million at the end of Q3 2019, and 43.6 million at the end of Q4 2019.
[4] *See e.g.* Q1 2019 Conference Call, FactSet Transcript at 3 ("In Q1, North America net customers declined 940,000, which reflects that continued optimization of marketing spend toward customers

engines changing their algorithms in a manner that negatively impacted how and where Groupon was displayed in search engine results, as well as email providers designating Groupon emails as promotional or customers designating them as spam, resulting in less traffic and fewer customers.

28.     While such "headwinds" had negative impacts on the Company's financial results, Company executives represented that Groupon's recent strategic initiatives to increase purchase frequency and customer gross profit (such as Select) would substantially blunt those impacts.  For example, former CFO Michael Randolfi ("Randolfi") explained on the February 13, 2019 Q4 2018 Conference Call that traffic headwinds related to email and search issues negatively impacted gross profit to the tune of $100 million in 2018, and that while this trend would continue into 2019, "increases in gross profit per customer should offset a meaningful portion of that customer decline."  *See* Q4 2018 Conference Call, FactSet Transcript at 4; *see* Q3 2019 Letter at 4 ("these initiatives help us offset what amounts to over $100 million of annual traffic headwinds. . .").

### 2.     With Local As Groupon's Core, Defendants Retain Goods Because Of Its Ability To Drive Additional Local Business

29.     Prior to and during the Class Period, Defendants identified Groupon's Local business as the Company's fundamental core.  Local was Groupon's original and largest business,

---

that have a higher potential for long-term gross profit generation and ongoing headwinds from email and SEO traffic."); Q2 2019 Letter, at 1 (". . . we continue to see traffic headwinds, including email and SEO, and are taking actions to buffer them"); Q2 2019 Conference Call, FactSet Transcript at 3 ("In Q2, North America net customers declined by 1 million, which reflects the continued optimization of marketing spend towards customers that have higher potential for long-term gross profit generation and ongoing traffic headwinds, including email and SEO."); Q3 2019 Letter, at 2, 4 ("Traffic continues to be a headwind -- one we're combatting with product enhancements and a focus on purchase frequency. . . every day we see that these initiatives help us offset what amounts to over $100 million of annual traffic headwinds."); Q3 2019 Conference Call, FactSet Transcript at 6-7 ("And a word out on the decline we saw in active customers in North America. This was something that we expected. If you think about the drivers, the key areas there, traffic headwinds which – those are ongoing traffic headwinds that impact customer accounts in North America in particular, as well as the marketing efficiencies that Rich mentioned. Those are really the two largest drivers of the decline in active customer accounts.")

and its greatest opportunity:  even as the addressable market in the U.S. alone exceeded $1 trillion (and in the International arena, possibly twice that), it remained largely untapped and uncaptured by Groupon's competitors.  For example, in his November 4, 2019 Q3 Letter to shareholders, Williams explained:

> **Some things have not changed since Groupon launched 11 years ago.  Local commerce remains a vast opportunity with one of the largest addressable markets anywhere**.  Local merchants still need simple, effective tools to profitably promote their businesses. Customers retain their appetite for surprise, delight and value.
>
> ***
>
> With more than 45 million customers and hundreds of thousands of merchants, we believe our growing inventory of experiences and products that connects our customers to the world around them will allow us to earn a meaningful share of **our addressable market, which we estimate to be north of a trillion dollars.  Even as a market leader with $5 billion in billings in 2018, that market remains largely untapped with a significant opportunity for growth**.

30.    Similarly, as Williams asserted in his opening remarks at the December 11, 2019 Barclays Global Technology, Media and Telecommunications conference:

> [WILLIAMS]: . . . The core of what we do and the core of what Groupon is known for is where we're most differentiated, and that's in our local business.  That's in small business, local services, health and beauty, things to do, food and drink et cetera.  That's the core of our value proposition and the core of our brand and that's where we're investing differentially.  So when you look at our investments in the product and the user experience, the vast majority of that investment, whether it's booking, card-linked, even the things that we've done with our third-party inventory aggregation, that's been centered around that local product, that local value prop where Groupon is the leader, like, we just have a significant head start there, we have the core of our brand, it's built around local discovery and that's where we're looking to differentiate the most over the coming years.

31.    Local was also more profitable than Goods.  Gross margins on Local products were in the range of 80%-90%, far higher than those associated with its first-party Goods business, which averaged 10%-20% (but were in many cases lower or even negative).

32.    Goods, however, provided Groupon with a crucial added value *over and above the*

11

*comparatively limited profits it produced*: namely, Goods served as a substantial business driver for Local by drawing customers to Groupon's platform, where they could view (and purchase) Local offerings. In Defendants' terms, Goods generated "cross-shopping" opportunities for Local and generated significant "customer activation" for Local. As Wedbush Securities, Inc. ("Wedbush") analyst Ygal Arounian explained in a September 13, 2018 analyst report on Groupon, Goods served "as an effective on-ramp for new customers" for the Company's "higher margin" Local business:

> Nearly the entirety of Groupon's goods business in North America is first party goods, in which Groupon sells directly to a customer out of its own inventory. This differs from the rest of Groupon's business where it acts as a third party that brokers transactions between merchants and customers. Groupon's North America first-party goods business carries a much lower gross margin (10-20% range) than its other businesses including local (80-90%), travel (75-85%), and third party goods (75-85%).
>
> **Many of the items sold by Groupon's first-party goods business are actually sold at a lower gross margin than the 10-20% range, with some sold at break-even levels or even at a loss. Historically, Groupon has prioritized the goods business, despite some transactions being near break even or at a loss, as this business has served as an effective on-ramp for new customers to join the Groupon platform and later engage in other higher margin areas of the business**. However, one of the first priorities management put in place was "cutting out" these unprofitable goods transactions ("the empty calories"), which has positively impacted North America gross margins in two ways. First, the gross margin within the North America goods segment itself has improved from roughly 10% in 2015 to what we estimate will be 22% in 2018.
>
> Second, the mix of this lower margin business as percent of total North America revenue declined from 61% in 2015 to what we estimate is 48% in 2018. The result is total North America Gross margin increasing 1800 bps from 39% in 2015 to an estimated 57% in 2018. In addition to the financial benefits, the company also believes the move was necessary to increase the average customer lifetime value (defined in gross profit dollars spent on the platform) as the **lower quality transactions attracted lower frequency and higher churn customers**.

33.    Defendants repeatedly explained that Goods was an integral part of Groupon because of its ability to pull additional customers to Groupon's Local offerings. For example, prior to the Class Period, during a February 13, 2019 conference call to discuss Groupon's financial

results for the fourth quarter and the full year of 2019 (the "Q4 2018 Conference Call"), Wedbush analyst Ygal Arounian asked whether Defendants might consider selling off Groupon's Goods business in order to focus solely on Local. In response, Defendant Williams explained that Goods benefitted Groupon not only through the stand-alone profits it generated, but also served as a "solid engagement driver" for the Company's core Local operations:

> [AROUNIAN] :. . . [H]ow do you view the Goods and Travel segments fitting into the portfolio? Would you ever think of selling the Goods business and becoming leaner and kind of going all-in on Local discovery? Thanks.
>
> [WILLIAMS]: . . . With Goods and Travel, again, a great question. **Goods has been a good, solid engagement driver for us over the years.** We have a different version of Goods than our typical e-commerce competitor. And **our focus with Goods has just been making it more and more efficient and driving more gross profit albeit at lower units and lower overall volume. But we're just trying to build a good quality business there that continues to engage customers and help us bridge to this vision of a broader Local focus marketplace.**
>
>               \*\*\*
>
> So, our Travel product very much fits the local marketplace. Now on both of them, it's a fair question. Would we sell them? I think **the thing to consider about all of our businesses is that they share our customer base. So when we look at it, this is an integrated business at Groupon. Our customers think of these businesses as Groupon**. . . And I think there's a lot of economic opportunity in improving those aspects of it. And that's really where we're focused.

34.     The ability of the Goods business to get customers to engage with the higher margin areas of the Company was critical in light of the above-described customer and traffic headwinds the Company was experiencing.

### 3.     Defendants Identify Increasing Customers' Purchase Frequency As The Key To Unlocking Profit Growth

35.     Although Groupon had been losing customers, partly by design, as discussed above in Section IV.B.1, *supra*, Defendants repeatedly asserted that the most important key to returning Groupon to profit growth was not adding more customers, but rather increasing existing customers' **purchase frequency** – *e.g*., getting Groupon customers to make four, rather than three,

purchases per year.

36.     For example, as Williams stated in his November 4, 2019 Q3 Letter to shareholders:

. . . customer count declines in the quarter reflect our traffic headwind and our focus on increasing customer quality.  **That said, increasing purchase frequency and total unit volume are more important to us at this point than our customer counts, as they unlock the leverage in our model** and an ability to profitably invest in growth as our marketplace evolves.

37.     Williams provided a more expansive explanation on the following day, November 5, 2019, during the Q3 2019 Conference Call, noting to analysts and investors that, "If you think about it in a really simple way, with our roughly 45 million customers that are purchasing call it 3.5 times a year, one incremental purchase is massive, right?  You're talking about 45 million extra units every year. . .  **So, that unlock is really, really significant."**

38.     Likewise, as Williams asserted in his December 11, 2019 Barclays Conference Presentation, "everything that we're doing is geared towards unlocking that extra unit of growth [] which is really about purchase frequency":

[WILLIAMS]:   **One is, we are focused on quality of customer more than anything else.  And the biggest linchpin to quality for us is frequency**. . . [W]ith 45 million folks, what's powerful in this model is the incremental unit, is that our current unit economics -- every incremental unit is hundreds of millions of dollars in gross profit which on our base is very exciting growth if we're able to unlock that.

So everything that we're doing is geared towards unlocking that extra unit of growth and the next unit after that and the unit after that. . . When you unlock that piece, you also create more opportunity in the flywheel, right? So as gross profit per customer increases, so does our ability to go acquire more members into process and into the platform.  **But the core input to that, again, is customer quality, which is really about purchase frequency and gross profit per customer.  So that's everything that we're doing, it's geared to unlocking that**.

### 4.     Defendants Identify Select As The Key To Increasing Purchase Frequency, And Insist Select Was Doing So Profitably

39.     With the principal question facing Groupon thus being, per Defendants, how to increase purchase frequency, Defendants, during the Class Period, represented Groupon's new

"loyalty" program, Groupon Select as the potential answer. Groupon customers who chose to join

Select paid a monthly membership fee ($4.99/month), in exchange for which they received various

discounts on Groupon products as well as other benefits (detailed below). Specifically, Defendants

made two critical and repeated assertions concerning Select: first, that it was generating substantial

increases in purchase frequency; and second, that it was operating profitably, both overall and on

a per-unit basis.

40.     In his July 30, 2019 Q2 Letter to shareholders, Williams spotlighted Select and its

ability to spur purchase frequency:

> Last, while related to our initiative to improve the customer experience, I wanted
> to give some dedicated space to introduce a new program we launched over the last
> few quarters: an exciting new membership product in North America, called
> Groupon Select. Groupon Select amplifies the best of Groupon . . .
>
> . . . Initial indicators are very positive with **significantly improved purchase
> frequency, higher average order value and increased customer propensity to
> search for things to eat, see, do and buy**.

41.     Select's ability to spur purchase frequency led Williams, during the July 31, 2019

Q2 2019 Conference Call on the following day, to characterize Select, and Groupon's investment

in it, as "critical to transforming the business."

42.     An analyst on the Q2 2019 Conference Call, noting that Select's discounts and

incentives (such as free shipping) allowed customers to get 4-5 months of the subscription fee back

with one decent-size purchase, asked if Select negatively impacted margins and if the Company

was subsidizing growth and frequency. In response, the Company asserted that Select was not

only increasing purchase frequency and average order value, but was doing so *profitably*, and

assured that Select would "almost double the average gross profit per customer that we generate

today." Q2 2019 Conference Call, FactSet transcript at 7.

43.     Select's incentives were initially aligned with the Company's strategy to grow

Local. Select initially provided members with a 25% discount on Local purchases, a 10% discount on Travel purchases, tickets and live events, and free shipping on products from Goods. However, on August 6, 2019, Groupon issued a press release titled "Groupon Launches Groupon Select – New Membership Program Providing Access to Exclusive Savings and Insider Perks," which indicated that in addition to the previously offered benefits of membership, Select now offered members a 15% discount on Goods, which was already operating with low to no margins.

44.     Nevertheless, in Williams' November 4, 2019 Q3 Letter to shareholders, and during the Company's Q3 2019 Conference Call on November 5, 2019, Defendants repeatedly told analysts and investors that Select was succeeding on both relevant counts, sparking a 60% increase in purchase frequency (as well as a 20% increase in average order value), and operating profitably (generating "incremental gross profit . . .on membership-related transactions").

45.     In the Q3 Letter, Williams asserted that "we love how Select members continue to behave":

> Finally, I want to provide an update on Groupon Select -- our new membership program in North America that we announced last quarter. . .
>
> It's still very early, but we're pleased with the results to date. We now have more than 260,000 paying Select members, up by over 100,000 in the quarter and nearly 200,000 since the beginning of the year. Membership gains are encouraging, and **we love how Select members continue to behave. Currently, we're seeing a 60 percent increase in purchase frequency and a 20 percent jump in average order value.** Though encouraging, we are still analyzing these early results -- our first small cohorts are barely through their first year with the program -- and we still have work to do to fully build out the infrastructure necessary for Select to run at scale.

46.     During the Q3 2019 Conference Call, Williams and Thomas, in their introductory remarks, described Select as one of Groupon's "key strategic priorities" and described being "really excited" by the "encouraging results" that Select had produced to date, including a 60% boost to purchase frequency:

[WILLIAMS]:  **We are making progress against our key strategic priorities, particularly removing friction from the customer experience, growing membership in our Select program** and expanding our open platform. Ultimately, we believe **success in these areas will help us drive higher purchase frequency, conversion and gross profit growth over the long run**.

***

[THOMAS]:  **We're excited about our Select membership program and are already seeing encouraging results.**  To-date, we have over 260,000 members despite a total third quarter investment that came in slightly lower than the $10 million expectation.  It's still early days, but **we're seeing member acquisition costs payback within six months; and payback has been driven by both the recurring revenue from membership fees as well as incremental gross profit generated on membership-related transactions**.

For modeling purposes, it's important to remember that historically we routinely offered order discounts and some of our merchants participate with us on these discounts.  As a result, the discounts associated with Select memberships are not entirely incremental.  **We are really excited about the early impact we're seeing on purchase behavior.  On average, in the first six months post-enrollment, Select members increased purchase frequency by about 60% and average order values by about 20%.**

We believe these early positive results illustrate our ability to monetize the member-like behavior of our customers and demonstrate the power of our massive Local two-sided marketplace.  By making progress on these fronts, we believe we can unlock the potential of our financial model and deliver long-term gross profit growth and significant adjusted EBITDA.

47.     After an analyst on the Q3 2019 Conference Call asked "why [Select is] gross profit neutral through the end of the year or, I guess, in fourth quarter," Thomas again asserted that Select was operating profitably on a per-unit basis ("earning incremental [gross profit] on the transactions") and overall (with operating profits offsetting investment and development costs for Select):

[THOMAS]:  . . .we are making investments in Select and those do show up in terms of [gross profit], whether it be opportunity, costs, et cetera. However, those are offset by subscription fees that we are collecting. And then **the important part to remember is that we are also earning incremental [gross profit] on the transactions and we're seeing a purchase frequency lift at 60% higher** in that 180-day post-enrollment in the program.

48.     Likewise, during Williams' December 11, 2019 Barclays Conference Presentation, when an analyst asked about Select and "how should we think about [its] unit economics," Williams again assured that Select was not only boosting purchase frequency, but doing so profitably both on a per-unit basis ("we're making money on the units") as well as overall ("the total economics of the program are really compelling"):

> [WILLIAMS]:  So, there is -- one of the things I'd say about Select, so two things. One, I'm most -- **what I'm most excited about with Select is that, the demonstration that we can move purchase frequency up into the right.**  And that's historically I think for many business has been one of the most difficult things, if not, the most difficult thing to do is to move buying behavior and intensify it**.  We're showing with Select with 60% improvement in purchase frequency within the first six months, we're showing we can move that needle**.
>
> ***
>
> The other piece on that program is, yes, **our margins are such that we make money on the units** . . .  **we're making money on the units as well as making money on the membership fees as well.  So the total economics of the program are really compelling**.

### 5.      Groupon's Guidance For 2019 Results Of Operations

49.     Prior to and during the Class Period, in connection with disclosing financial results of operations each quarter, Groupon also provided certain explicit statements – included in Groupon's quarterly results press releases and quarterly results presentations, and also in the opening remarks of Groupon executives during Groupon's quarterly conference calls – specifying certain financial results expected for upcoming periods, referred to as Groupon's "outlook" or financial "guidance."

50.     At all relevant times, the principal guidance that Groupon provided took the form of an annual figure for Adjusted EBITDA.

51.     The guidance for 2019 Adjusted EBITDA was $270 million (the "Guidance").

52.     Groupon first provided the Guidance on February 12-13, 2019, in connection with

18

announcing fourth quarter and fiscal year 2018 results of operations, and thereafter re-iterated and affirmed the Guidance in announcing results of operations for the first quarter of 2019 (on April 30 and May 1, 2019), second quarter of 2019 (on July 30-31, 2019) and third quarter of 2019 (on November 4-5, 2019).

53. Defendants' July 30-31 and November 4-5, 2019 Guidance affirmations were issued in the context of mounting concerns that the Company would fall short of the Guidance. As an analyst noted during the November 5, 2019 Q3 2019 Conference Call, Groupon's financial results through the first three quarters of 2019 left the Company requiring a positive "inflection" during the fourth quarter in order to meet the Guidance. In this context, Defendants' affirmation of the Guidance indicated that such an inflection was materializing.

54. For example, after hosting Groupon CEO Rich Williams and interim CFO/CAO Melissa Thomas for investor meetings the prior week, Wedbush analyst Ygal Arounian issued a September 9, 2019 report stating:

> We see investor concern that Groupon will be challenged to hit FY 2019 guidance, which implies 20%+ EBITDA growth in 4Q. **Management stood by its guidance and the inputs that are driving the inflection point in 4Q, pointing to 2019 investments recouping in 4Q.** While customer decline and traffic headwinds will persist into 2020, Groupon expects the phasing out of investments, Groupon Select ramping, and other key initiatives like universal shopping cart and guest checkout to have more near-term impacts than things like card-linked and bookability. Groupon also expects to see gains in marketing efficiency, and SG&A tailwinds as it enters 4Q19.
>
> ***
>
> Investor confidence in near-term estimates are not particularly high and the need to meet its FY and 2020 EBITDA targets are nearly make or break…. Mr. Williams noted that he sees the product initiatives as being in the first year of a multi-year effort, but is also **fully confident in reaching FY targets** based on some early return on the investments and cost initiatives playing out near-term.

September 9, 2019 Wedbush report, at 3.

55. Likewise, on November 6, 2019, after the Company had reported its 3Q'19 results,

Wedbush analyst Ygal Arounian issued a report stating:

> When Groupon first laid out its 2019 FY EBITDA target of $270mm, it included revenue guidance of $2.4B, and with revenue and GP coming in below expectations through 3Q so far (we now estimate $2.3B for the full year), **there is a big implication that the key initiatives will lead to material improvement in GP and deliver further marketing leverage in 4Q**.
>
> ***
>
> Investor confidence in near-term estimates are not particularly high and the need to meet its FY and 2020 EBITDA targets are nearly make or break…. Mr. Williams noted that he sees the product initiatives as being in the first year of a multi-year effort, but is also **fully confident in reaching FY targets based on some early return on the investments and cost initiatives playing out near-term**.

November 6, 2019 Wedbush report, at 1-2.

### C.    Undisclosed Adverse Facts Known to Defendants During the Class Period

#### 1.    In The Second Half Of 2019, Select "Over-Indexed" To Goods And As A Result Failed To Generate Local Business Traction Or Profit

56.    During the second half of 2019, Defendants were aware of but failed to disclose the known adverse trend that Select was being adopted disproportionately by customers in order to make low-margin Goods purchases, rather than more lucrative Local business purchases – and consequently, that Select was not only failing to drive engagement with the Local business, but was unprofitable for Groupon.

57.    At the end of the Class Period, Defendants publicly revealed on February 18-19, 2020 that Select had failed, and would be discontinued. *See* Section V.B.2.b, *infra*. As Defendants Williams and Thomas then explained, at the root of Select's failure was that fact that, in Defendants' terminology, Select had "over-indexed to Goods" – meaning that Select was being used "disproportionately [by] customers purchasing goods vs. those transacting on our local platform." *Id*. The over-indexing of Select to Goods, Thomas added, had occurred during "the second half of 2019." *Id*.

58.     Customers' disproportionate usage of Select by Goods, rather than Local, during the second half of 2019 was responsible for rendering Select – notwithstanding Defendants' glowing Class Period representations – a triple failure.  First, Select had not been driving meaningful increases in purchase frequency for Groupon's core, *Local* offerings.  Rather, the increases to purchase frequency had largely been circumscribed within Goods, and in fact were precisely the sort of "empty calorie" sales that Defendants had purportedly foresworn, because they generated little, no or negative profits.  Second, and relatedly, because the Goods business had substantially lower profit margins than Local, and because the Select program's benefits (*e.g*., free shipping, additional promotional customer acquisition costs, and a 15% discount on all Goods purchases since at least August 2019) sufficed to erase and reverse the Goods' segment's thinner margins, Select was not profitable for Groupon, either on a unit basis or overall, and was not capable of generating any incremental gross profit growth.  Finally, insofar as it was "abundantly clear" to Groupon by mid-Q4 2019 that Goods was no longer performing and the Company had determined to exit the business, Defendants' discussions regarding the promise of Select were rendered materially misleading.

59.     The omission of this known adverse trend was a material omission in and of itself. In addition, the omission of this known adverse trend rendered the many positive statements concerning Select that Defendants made during the Class Period – such as Defendants' assertions of "meaningful step-ups in purchase frequency" and the oft-repeated "60 percent increase in purchase frequency"  generated by Select (as detailed in Section IV.B.4, *supra* and Section V.A, *infra*) – materially misleading.

> **2. It Becomes "Abundantly Clear" To Defendants Midway Through The 4th Quarter Of 2019 That Goods Cannot Compete Effectively, Is Being Abandoned By Customers, And Is No Longer Driving Meaningful Business To Local**

60.     During the Class Period, Defendants were aware of but failed to disclose the known adverse trends that the Goods business was: (1) unable to compete effectively against other online retailers (*e.g*., in terms of inventory breadth, shipping speed, etc.); (2) consequently, being abandoned by customers; and (3) relatedly and most importantly, no longer serving as a meaningful engagement tool for Local shoppers or generating meaningful Local customer activation**.**

61.     At the end of the Class Period, Defendants revealed on February 18-19, 2020 that Groupon had decided to exit its Goods business in order to focus solely on Local.  As Defendants then explained, the decision was rooted in the competitive deterioration of the Goods business and the related erasure of the cross-shopping / business-driver benefits that Goods had previously provided to Local.  *See* Section V.B.2.a, *infra*.  Defendants had been monitoring these trends "for some time," and, as Defendants explained on February 18, 2019, these trends had become "abundantly clear" to them no later than "midway through the fourth quarter" of 2019.  *Id*.  Indeed, Defendants alluded to a "strategic review" of the Company's business in November 2019, but did not disclose that the Company was considering shuttering a business segment that drove more than 50% of the Company's total revenue.

62.     The omission of these known adverse trends was a material omission in and of itself.  In addition, the omission of these known adverse trends rendered Defendants' Class Period affirmative representations concerning Goods, in the context in which they were made, materially misleading.

        **3.**      **Groupon's Share Price Craters In February 2020 Following Disclosure Of The Failure Of Select And Goods, And The Consequent Guidance Miss**

63.    On February 18, 2020, after the market closed, Defendants announced Groupon's financial results for the fourth quarter and full year of 2019, and held a conference call with analysts and investors on the following day, February 19, 2020, to further discuss Groupon's operations and results.

64.    In their February 18-19, 2020 disclosures, Defendants revealed that Select had failed (*i.e.*, that the boost to purchase frequency had been circumscribed largely to Goods, rather than to the Company's core, higher-margin Local products, and as a result had operated at a loss rather than generating incremental profit), that Goods had failed (*i.e.*, that it was not able to compete effectively, was hemorrhaging customers, and was no longer driving engagement with the Local business), and that as a result of the foregoing Groupon had fallen far short of the Guidance and would be exiting Goods.  Specifically, Williams and Thomas stated:

> [WILLIAMS]:  .  .  .  **Midway through the fourth quarter, it became clear, however, that we were seeing far fewer customers engaged with goods, and it impacted overall traffic to our site. The lower traffic ultimately impeded performance in all of our categories**.  This was particularly notable in November and affected our holiday peak period, when goods engagement has historically been a business driver.
>
> Adding to these challenges, certain conversion initiatives in Select did not deliver on expectations.  Our traffic declines and these other factors, which Melissa will discuss in greater detail, combined to create a headwind that we could not overcome during the fourth quarter.  Before I discuss our strategy, let's touch on Goods.
>
> Our management team and board have been evaluating the role of Goods for some time.  **Our fourth quarter performance and the challenges Goods has posed over the past few years have clarified our path forward**.  Delivering on our growth strategy requires total focus on capturing the local experiences opportunity. **Over time, Goods has become a less meaningful driver of engagement and an increasingly inefficient use of our impressions.**
>
> **It has effectively become a distraction, in which we can no longer compete and that we cannot afford, as it has taken roughly 40% of our impressions to**

**deliver roughly 20% of our gross profit.** This is the crux of our plan to exit Goods.

\*\*\*

[THOMAS]: . . . **Midway through the quarter, however, it became clear that we were not competing well in Goods**, and November performance was particularly poor.

**The lack of engagement with our Goods offering impacted the overall traffic to our site, and ultimately performance in all of our categories**….

**The Select program was expected to be net neutral to gross profit in the fourth quarter. But the program underperformed** due to higher than anticipated customer acquisition costs and a lower than expected number of enrollees converting to paid members. **The program also began over-indexing towards our Goods category in the second half of 2019.**

This, coupled with results in the fourth quarter, led to our decision to discontinue new enrollments in our Select program. . .

65.     In response to these disclosures and during frenzied February 19, 2020 trading, Groupon shares immediately lost approximately 44% of their remaining value. As 155.34 million shares traded on February 19, 2020 (more than 25 times the average daily trading volume during the Class Period), Groupon shares fell $1.35 per share (from their February 18, 2020 closing price of $3.05 per share) to close at $1.70 per share.

## V.    DEFENDANTS' VIOLATIONS OF THE EXCHANGE ACT

### A.    Defendants' Material Misstatements and Omissions in Violation of the Exchange Act

#### 1.    Defendants' July 30-31, 2019 Statements

66.     Following market close on July 30, 2019, Defendants announced Groupon's financial results of operations for the second quarter of 2019, and issued, *inter alia*: (1) a press release titled "Groupon Announces Second Quarter 2019 Results" (the "Q2 2019 Press Release"); (2) a letter to shareholders from Williams (the "Q2 2019 Letter"); (3) a presentation titled 2Q19 Earnings; and (4) a Form 10-Q signed by Randolfi and filed with the SEC (the "Q2 2019 10-Q").

67.     Groupon's results for the second quarter of 2019 featured double-digit percentage

24

declines (versus the year-ago quarter) in most relevant financial and operational metrics, including revenues, gross profits, adjusted EBITDA and total units sold, all of which the Company attributed to the same root cause: "fewer customers and lower traffic."

68.     However, the Q2 2019 Press Release, and to a greater extent the Q2 2019 Letter, framed these financial and operational results within a narrative of improvement and progress on the Company's key strategic goal (increasing customer purchase frequency), driven by Groupon Select.

A.     For example, the Q2 2019 Press Release opened with the following statement from Williams, focusing on purported progress in the Company's key goal of "engaging higher-value customers:"

"With more than 45 million active customers worldwide and more than 200 million mobile downloads, we have built a scalable marketplace to capture the massive local commerce opportunity. **As we sharpen our focus on engaging higher-value customers, we are seeing encouraging progress," said CEO Rich Williams. "Entering the second half of 2019, we remain committed to advancing our key strategic priorities to build the daily habit in local commerce** and delivering value to customers, merchants and stockholders alike."

B.     Similarly, but at greater length and in greater detail, the Q2 2019 Letter began with assertions of purported "progress on the initiatives that we believe lay the foundation for long-term, profitable growth," and continued more specifically to identify Groupon Select as one such initiative that appeared to be successfully answering the Company's key strategic goal by generating "significantly improved purchase frequency, higher average order value and increased customer propensity to search for things to eat, see, do and buy:"

In the second quarter, Groupon continued our relentless focus on becoming the daily habit in local commerce. We are transforming our brand, product and business, and **we are making progress on the initiatives that we believe lay the foundation for long-term, profitable growth** and a new Groupon for consumers, merchants and stockholders alike.

*** *

25

**Last, while related to our initiative to improve the customer experience, I wanted to give some dedicated space to introduce a new program we launched over the last few quarters: an exciting new membership product in North America, called Groupon Select**. Groupon Select amplifies the best of Groupon, offering exclusive deals, great savings, free shipping and more for a monthly subscription fee of $4.99. Select is simply the best way to experience Groupon today, leveraging all of the work we're putting into voucherless while accelerating the savings for which we're best known. And it's only getting better. For example, later this quarter, as we expand our rollout of AMC theaters, we'll begin offering Select members 25% off movie tickets and members-only pricing on Groupon Goods.

**More than 150,000 members have joined the program so far, and it is scaling quickly with both new and existing customers. Initial indicators are very positive with significantly improved purchase frequency, higher average order value and increased customer propensity to search for things to eat, see, do and buy.** It's still early days, but given its promise and pace, we expect to invest more aggressively in Select over the coming quarters.

69.     On the following morning of July 31, 2019, at 10:00 a.m. Eastern Standard Time, Groupon hosted a conference call with analysts and investors to further discuss the Company's financial results and operations (the "Q2 2019 Conference Call").

70.     Randolfi began the Q2 2019 Conference Call by reprising both the poor operational/financial results reported in the Q2 Press Release, and the above-indicated re-framing within a larger narrative of progress on the Company's central strategic goals, with Groupon Select placed front and center. Randolfi represented, *inter alia*, that Select was "scaling very quickly," that Groupon had already enrolled "over 150,000 members in the program," and that Select members were displaying "improved frequency, higher average order value, and increased customer propensity to search on site."

71.     Following these introductory remarks, much of the remainder of the Q2 2019 Conference Call focused on Select. Wedbush analyst Ygal Arounian led off the Select-focused discussion by questioning, in light of Select's substantial discounts and incentives, whether Select could really generate any profit for the Company. Defendants replied by representing that Select

26

would be profitable, both overall, given the monthly membership fees paid by Select members, and also incrementally on a per-unit basis, and that the discounts and benefits offered to Select members still left Groupon positive per-unit profit margins ("we're still earning money on the individual transaction"):

[AROUNIAN]: Okay, great. That's really helpful. **And then I want to ask on Groupon Select.** First, I think you made a comment that you're going to push it into the checkout, and that's going to reduce conversions. So I want to make sure I understood that correctly and why the dynamic works that way.

**And then just like overall kind of philosophically how you think about Select? It's $5 a month, but it drives a lot of incentives. There's a lot of 25% off Local services, free shipping. I spent some time with it. It feels like you can almost get back your $5 a month, or even through kind of one decent-size purchase you can get four to five months of your monthly subscription fee back through that purchase and that discount,** [indiscernible] (17:12) good consumer value.

**And can you just talk about how you think about it? If it scales, can it have a negative revenue margin impact? Are you subsidizing growth and frequency through this initiative at least in the short term as you try to scale it out? Just some thoughts around that would be helpful.** Thanks.

[RANDOLFI]: I'll start, and I'm sure Rich will add additional commentary on this. So, on the conversion path, but first, before I get into that let me just talk about one of the reasons why we've been pushing this over the last quarter or two is, this was something that we started testing early last year, and I would say it's still early days. But what I would also say, **based on our indicators that we've seen so far, the consumer behavior, when someone enrolls in Select is really, really positive. We're seeing meaningful step-ups in purchase frequency, meaningful step-ups in the average order value, and a greater propensity to search. So we're really, really pleased and excited about that.**

And with that, if you think about the economics, you're right. It is a great consumer proposition, and that's the intent and that's by design. **If you think about the math of Groupon Select, we essentially are charging a fee of $4.99 a month, so we will get somewhere between $55 to $60 per customer in gross profit per year**.

**As part of the Select program, you're right that we provide meaningful discounts on a given transaction. There's two things to take into account on that discount per transaction. First, in almost all cases, the discount still is at or below the current take rate. For example, if you look at Local, you look at our current take rate of 32%, 33%, the discount is 25%, so we're still earning money on the individual transaction.**

27

And the other thing I would say with regard to the order discount is, keep in mind, we have many of our transactions today where we already are providing an order discount. So the order discount that we provide in Select at 25% isn't always a true incremental 25% relative to what consumers get today.

**But the way I would think about it is a Select customer should earn us at least that $55 to $60 of gross profit on a per customer basis, if not more, which is almost double the average gross profit per customer that we generate today. So with that, we've continued to lean into it.**

\*\*\*

[WILLIAMS]: Yeah. I think that's right. And just to speak a little bit about the philosophy and where we are on it now, **you asked whether we're thinking about it as a way to subsidize growth and frequency. That's not really how we're thinking about it.**

Ultimately, we're looking for a way to monetize what has historically been member-like behavior in our customer base. So we've had that member-like behavior for years, but we haven't had a member-like monetization model to go along with it. We saw an opportunity to do that and to build that.

And we – really we set a philosophy for the program out of the gate to make it as incredibly compelling as we could, really to drive engagement and frequency and commitment to the platform and to Groupon over time more so than thinking about [ph] in a way as subsidiary of (21:57) growth. **And I think hopefully now as you've heard Mike walk through the economics of the program, you see there's really – there's not a 'subsidy' there** more so than it is just making the core Groupon value prop even more compelling.

And our goal pushing forward is to double down on what you mentioned now, which I think it is compelling today, but as we bring more features in, more partners in, and more unique experiences in, we think we have a program that starts to get into the no-brainer territory, the why wouldn't you territory, that ultimately over time can support higher membership fees.

But today, our focus is entirely gain traction in the program, gain trial in the program, get as many of our customers into the Select experience as we possibly can so that we can continue to add value, share the economics with them, and build those healthier relationships over time.

72. Defendants' above-identified representations in the Q2 2019 Press Release, Q2 2019 Letter and Q2 2019 Conference Call concerning Select – including its purported boost to customer purchase frequency, and its purported incremental profitability to Groupon – were

materially misleading because they omitted to disclose the material adverse facts and trends concerning Select, set forth in Section IV.C.1], *supra* and then known to Defendants (as Defendants later admitted on February 18-19, 2020): that Select, during the second half of 2019, was over-indexing to Goods (*i.e.*, Select was primarily being used to make less profitable Goods, rather than more profitable Local, purchases), and consequently failing to (1) meaningfully boost *Local* purchase frequency, and (2) operate profitably or generate incremental gross profit (as Groupon's thinner profit margins on Goods were turned negative by the discounts and customer acquisition costs accompanying Select).

73.     The Q2 2019 10-Q contained a section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations" (the "MD&A Section") in which Defendants, *inter alia*, presented and analyzed Groupon's results of operations for the second quarter of 2019.  The MD&A Section made multiple references to Groupon Select:

> . . . **We have developed and are testing a number of product enhancements intended to make our offerings easier to use for both customers and merchants and to improve purchase frequency, including cash back offers linked to customer credit cards, booking capabilities and a paid membership program in North America, Groupon Select, which offers greater discounts on our offerings and other benefits**. . .
>
> ***
>
> . . . **We are currently developing and testing a number of product enhancements intended to make our offerings easier to use for both customers and merchants and to improve purchase frequency, including cash back offers linked to customer credit cards, booking capabilities and a paid membership program in North America, Groupon Select, which offers greater discounts on our offerings and other benefits.  We believe that those initiatives may be important drivers for increasing customer purchase frequency and growing our business over time.**  We are currently focusing our efforts on growing customer awareness of those products and scaling the related merchant base.  As such, our gross profit and operating income may be adversely impacted in the near term as we focus more on driving our strategic initiatives.

Q2 10-Q, at 27, 30.

74.     Defendants' above-identified representations in the MD&A Section of the Q2 10-

Q were materially misleading because they omitted to disclose the material adverse facts and trends concerning Select, set forth in Section IV.C.1, *supra* and then known to Defendants (as Defendants later admitted on February 18-19, 2020): that Select, during the second half of 2019, was over-indexing to Goods (*i.e.*, Select was primarily being used to make less profitable Goods, rather than more profitable Local, purchases), and consequently failing to (1) meaningfully boost *Local* purchase frequency, and (2) operate profitably or generate incremental gross profit (as Groupon's thinner profit margins on Goods were turned negative by the discounts and customer acquisition costs accompanying Select).

### 2. Defendants' November 4-5, 2019 Statements

75. Following market close on November 4, 2019, Defendants announced Groupon's financial results of operations for the third quarter of 2019, and issued, *inter alia*: (1) a press release titled "Groupon Announces Third Quarter 2019 Results" (the "Q3 2019 Press Release"); (2) a letter to shareholders from Williams (the "Q3 Letter"); (3) a presentation titled 3Q19 Earnings (the "Q3 2019 Presentation"); and (4) a Form 10-Q signed by Thomas and filed with the SEC (the "Q3 2019 10-Q").

76. Groupon's results for the third quarter of 2019, much like the results for the second quarter of 2019, featured substantial percentage declines (versus the year-ago quarter) in most relevant financial and operational metrics, including revenues, gross profits, adjusted EBITDA and total units sold, all of which the Company attributed to the same root cause: "fewer customers and lower traffic."

77. However, and similarly to the Q2 2019 Press Release and Q2 Letter, the Q3 2019 Press Release and to a greater extent the Q3 Letter framed these financial and operational results within a narrative of improvement and progress on the Company's key strategic goal (increasing customer purchase frequency), driven by Groupon Select.

A.      For example, the Q3 2019 Press Release opened with the following statement from

Williams, re-asserting his faith that the Company had the right strategy in place to fulfill

the promise represented by the vast Local market:

"In the third quarter, we continued to modernize our marketplace for our customers
and focus on positioning Groupon as a leader in local commerce," said Groupon
CEO Rich Williams.  "We believe that the improvements we're making to the
customer experience together with new partnerships that expand the breadth and
depth of our supply will encourage our customers to return to Groupon again and
again to connect to the world around them.  **While we continue to face challenges
from traffic and International macroeconomic conditions, we believe we have
the right strategy in place to deliver on the promise of our marketplace.**  As we
enter the holiday season, we look forward to bringing exciting experiences to our
millions of customers around the world."

B.      Similarly, but at greater length and in greater detail, the Q3 Letter, noting the vast

size and promise of the Local market, and the Company's longstanding traffic

"headwinds," asserted the Company's progress against those headwinds and towards the

promise represented by the Local market, notably through Groupon Select, which had been

successful in generating a "60 percent increase in purchase frequency and a 20 percent

jump in average order value" for customers who became Select members:

**Traffic continues to be a headwind -- one we're combatting with product
enhancements and a focus on purchase frequency**.  Our product and engineering
teams are delivering enhancements at a pace beyond any I've seen during my time
at Groupon -- with an ambitious future roadmap -- but we are not yet moving fast
enough to offset our traffic challenge.

**While we continue to believe we have significant opportunity to grow our
active customer base over the long term, customer count declines in the
quarter reflect our traffic headwind and our focus on increasing customer
quality.  That said, increasing purchase frequency and total unit volume are
more important to us at this point than our customer counts, as they unlock
the leverage in our model and an ability to profitably invest in growth** as our
marketplace evolves. . .

                                        ***

**Finally, I want to provide an update on Groupon Select -- our new membership
program in North America that we announced last quarter.  Groupon has**

**always had membership-like behavior among our customers, and Select seeks to monetize that behavior so that Select customers get the very best deal on Groupon -- and in many cases -- anywhere.**

**It's still very early, but we're pleased with the results to date. We now have more than 260,000 paying Select members, up by over 100,000 in the quarter and nearly 200,000 since the beginning of the year. Membership gains are encouraging, and we love how Select members continue to behave. Currently, we're seeing a 60 percent increase in purchase frequency and a 20 percent jump in average order value**. . .

\*\*\*

**We are making consistent progress. I understand, however, that the improvements we are making are not always easy to see in our quarterly results and as such may not be as immediately meaningful to stockholders as they are to the teams driving them forward every day. Nevertheless, every day we see that these initiatives help us offset what amounts to over $100 million of annual traffic headwinds**. . .

78. On the following morning of November 5, 2019, at 10:00 a.m. Eastern Standard Time, Defendants Williams and Thomas hosted a conference call with analysts and investors to further discuss the Company's financial results and operations (the "Q3 2019 Conference Call").

79. In their opening remarks during the Q3 2019 Conference Call, both Williams and Thomas acknowledged the Company's continuing customer/traffic headwinds and asserted that Groupon, notably through Select, was making progress in overcoming and/or reversing them.

A. For example, in his introductory remarks, Williams stated:

[WILLIAMS]: . . . **In spite of some near-term challenges, the team also delivered on some key initiatives in the quarter as we continue to scale Groupon Select, our new membership product** and launched important product enhancements, including significant improvements to our mobile web experience, focused squarely on reducing friction and improving conversion.

B. In her introductory remarks, Thomas reiterated Williams' themes but with greater concreteness and specificity, depicting Select as the apparent answer to the Company's longstanding customer/traffic declines by generating increased purchase frequency and order value, noting that Select membership "increased purchase frequency by about 60%

32

and average order values by about 20%," and asserting that Select was a *profitable* initiative for Groupon both overall and on a unit basis ("we're seeing member acquisition costs payback within six months; and payback has been driven by both the recurring revenue from membership fees as well as incremental gross profit generated on membership-related transactions."):

[THOMAS]: . . . I'll use my time today to walk you through our key financial highlights, including gross profit and adjusted EBITDA, provide you with a few insights on unit trends which we believe is an important metric to measure our success, update you on our progress with Groupon Select; and after that, we'll open up the call for questions.

Let's start with gross profit. In the third quarter, we delivered gross profit of $278 million. **We are making progress against our key strategic priorities, particularly removing friction from the customer experience, growing membership in our Select program and expanding our open platform. Ultimately, we believe success in these areas will help us drive higher purchase frequency, conversion and gross profit growth over the long run.**

\*\*\*

In Q3, year-over-year Local unit performance for North America improved for the third (sic) [second] sequential quarter and our expectation is for this trend to continue into Q4. In fact, within the third quarter Local unit year-over-year trends strengthened in each month. **We are encouraged by these trends which we believe are an early indicator that our strategic initiatives are beginning to deliver.**

**We're excited about our Select membership program and are already seeing encouraging results.** To-date, we have over 260,000 members despite a total third quarter investment that came in slightly lower than the $10 million expectation. It's still early days, but **we're seeing member acquisition costs payback within six months; and payback has been driven by both the recurring revenue from membership fees as well as incremental gross profit generated on membership-related transactions.**

For modeling purposes, it's important to remember that historically we routinely offered order discounts and some of our merchants participate with us on these discounts. As a result, the discounts associated with Select memberships are not entirely incremental. **We are really excited about the early impact we're seeing on purchase behavior. On average, in the first six months post-enrollment, Select members increased purchase frequency by about 60% and average order values by about 20%.**

We believe these early positive results illustrate our ability to monetize the member-like behavior of our customers and demonstrate the power of our massive Local two-sided marketplace. **By making progress on these fronts, we believe we can unlock the potential of our financial model and deliver long-term gross profit growth and significant adjusted EBITDA**.

80.     The first two questions on the Q3 2019 Conference Call concerned the Company's customer and traffic declines, and what the Company was doing to counter them. In response to these questions, Thomas asserted that the Company's primary focus was on purchase frequency (which Groupon Select increased by 60%), as the Company viewed purchase frequency as the key to unlocking a return to growth, rather than on total customer numbers, and Williams again highlighted Groupon Select, and the 60% boost it had given to purchase frequency, as part of a materializing strategy that was beginning to turn around long-standing customer and unit declines:

> [TOM CAMPION – ANALYST, COWEN & COMPANY]: . . . **The letter talks about fighting traffic headwinds with purchase frequency and product enhancements. Can you just talk about what you're doing to ramp product development and speed up implementation? And just, I guess lastly, any thoughts on the traffic headwinds and whether that might moderate over the next couple quarters?** Thank you.

> [WILLIAMS]: . . . **People were excited about what we're seeing that's really encouraging, as Melissa mentioned, is that you're starting to see our strategy around the product and the investments that we've been making** and it's just a better customer experience started to play its way through the local consumer.

> And I think [ph] in that place (00:19:23) you're seeing things like guest checkout, like universal cart start to make an impact, and we talked about it before. . .

> **Select as well is in there. Melissa mentioned, a 60% increase in purchase frequency is pretty significant, especially over the course of the first six months of membership. So, that's a piece that's absolutely helping as we grow that customer base as well, as small as it is today. So you're really starting to see those pieces through**. . .

81.     During the Q3 2019 Conference Call, two further analysts sought to question Groupon concerning Select's profitability (as had also been asked in the Q2 2019 Conference Call). In response to these questions, Thomas asserted: (1) that Select would have a "net neutral"

impact to Groupon's gross profits during Q4 2019 – which implied that Select was operating profitably, with the subscription fees and operating profits it generated offsetting the cost of the investments the Company was making to develop Select; and (2) further confirming the above, that Select was indeed profitable on a unit-basis ("we are also earning incremental [gross profit] on the transactions and we're seeing a purchase frequency lift at 60% higher. . ."). Specifically:

A.  In response to questions from Michael Ng of Goldman Sachs, Thomas said the following about Groupon's Select program:

And then on your question on Select and the headwinds that we saw in Q3 and what we expect to see in Q4, **what I'd say there is we've been really pleased with the trajectory in terms of our ability to improve member accounts and what we're seeing on the customer side from a frequency standpoint as well as average order values improving.** I'm not going to give specific impacts on Q3, but just to give you a flavor for Q4 what we're expecting to see, we are expecting to continue to invest in acquiring members within the program. But **we expect overall the program to be net neutral impact on [gross profit] in Q4.**

B.  In response to questions from Wedbush analyst Ygal Arounian, Thomas and Williams said the following about Select:

[THOMAS]: **And then on the Select side there, just to give you a little bit of color on why essentially Select is – we expect it to be net neutral in the fourth quarter.** There is a few elements I laid out in my prepared remarks that you need to take into consideration when we think about Select. So, we are making investments in Select and those do show up in terms of [gross profit], whether it be opportunity, costs, et cetera. However, those are offset by subscription fees that we are collecting. **And then the important part to remember is that we are also earning incremental [gross profit] on the transactions and we're seeing a purchase frequency lift at 60% higher in that 180-day post-enrollment in the program.**

**And the third piece I'd call out is that the entire discount is not incremental. So when you take into account what we're earning on the overall program for the members we have in it versus the caps which I mentioned on the call – on my prepared remarks as well, are very reasonable. We don't see it as being a meaningful headwind for us.**

[WILLIAMS]: Right. I think within that you're seeing us in that net neutrality pushing for continued investments, while we're harvesting the benefits that we see. So we're not going to stop investing in the quarter; we're going to continue it. We

35

see opportunity to increase enrollment and participation in the program. **We like what we see in this early stage of development with purchase frequency and that just engagement behavior overall. We're going to continue to lean into that.** If not at any cost, because we're – as I mentioned before and we mentioned a couple of times, we still have some investments to make there on this core infrastructure. And when I say that, it's really integrating it into the core of the Groupon experience.

It's important to remember, Select was an experiment, was a trial that we've iterated on and we continue to develop over time and we are excited by it. But we're excited about it in a way that we're feeling it needs to be part of Groupon. It can't just be the side; the side test for a group of people really needs to be – needs to permeate the Groupon customer experience, which we're starting to see. You're starting to see, if you go to the desktop as an example, you're seeing Select pricing frontend center as a promotional item and as a reminder to our members that they get a unique benefit.

82.     Defendants' above-identified representations in the Q3 Letter and Q3 2019 Conference Call concerning Select – including its purported boost to customer purchase frequency, and its purported incremental profitability to Groupon – were materially misleading because they omitted to disclose the material adverse facts and trends concerning Select, set forth in Section IV.C.1, *supra* and then known to Defendants (as Defendants later admitted on February 18-19, 2020): that Select, during the second half of 2019, was over-indexing to Goods (*i.e.*, Select was primarily being used to purchase low margin Goods products, rather than Local) at a time when Defendants later admitted that it had become "abundantly clear" to them that Groupon was not competing effectively in Goods, to the point where Defendants were planning to exit that business altogether, and that consequently, Select was failing to (1) meaningfully boost *Local* purchase frequency, and (2) operate profitably or generate incremental gross profit (as Groupon's thinner profit margins on Goods were turned negative by the discounts and customer acquisition costs accompanying Select).

83.     Additionally, the MD&A Section of the Q3 2019 10-Q made multiple disclosures concerning Groupon Select and Groupon Goods:

A.      Concerning Select, the MD&A Section of the Q3 2019 10-Q stated:

**Factors Affecting Our Performance**

. . .

*Growing Customer Value*. . . **We expect our new products, such as voucherless offerings and Groupon Select, as well as other enhancements to the customer experience to improve engagement, promote increased purchase frequency and drive customer retention**. . .

*Investing in Growth*. . . **We are currently developing and testing a number of product enhancements intended to make our offerings easier to use for both customers and merchants and to improve purchase frequency, including cash back offers linked to customer credit cards, booking capabilities and Groupon Select.   We believe that those initiatives may be important drivers for increasing customer purchase frequency and growing our business over time. We are currently focusing our efforts on growing customer awareness of those products and scaling the related merchant base.**  As such, our gross profit and operating income may be adversely impacted in the near term as we focus more on driving our strategic initiatives.

*See* Q3 2019 10-Q, at 31, 34.

B.      Concerning Goods, the MD&A Section of the Q3 2019 10-Q presented various financial line item results for the Goods and Local categories – including gross billings, revenues, etc. – for the 3 and 9 months ended September 30, 2019, attributed year-over-year declines in billings, revenues and profits generally to "fewer customers and lower customer traffic" for both Local and Goods, and also added that, in International operations such declines were further attributable to "intense competition in our Goods business":

**Results of Operations**

**Gross Billings**

**Three Months Ended September 30, 2019 and 2018:**

*North America*

North America gross billings were 65.4% and 66.0% of total gross billings for the three months ended September 30, 2019 and 2018.  North America gross billings decreased for the three months ended September 30, 2019 compared with the prior year period **due to fewer customers and lower customer traffic, including traffic**

**from email and SEO.** Those decreases were partially offset by higher gross billings per unit due to a shift in mix of offerings sold.

The above factors also resulted in a decline in total units sold, which decreased to 21.8 million units for the three months ended September 30, 2019, as compared with 25.3 million units in the prior year period.

*International*

International gross billings were 34.6% and 34.0% of total gross billings for the three months ended September 30, 2019 and 2018. International gross billings decreased $35.7 million for the three months ended September 30, 2019 compared with the prior year period, primarily due to weak consumer sentiment in Europe, especially in the United Kingdom, **intense competition in our Goods business,** a $17.0 million unfavorable impact from year-over-year changes in foreign currency rates and lower gross billings per unit due to a shift in mix of offerings sold.

\*\*\*

**Nine Months Ended September 30, 2019 and 2018**:

. . .

*North America*

North America gross billings were 65.5% and 66.1% of total gross billings for the nine months ended September 30, 2019 and 2018. North America gross billings decreased for the nine months ended September 30, 2019 compared with the prior year period **due to fewer customers and lower customer traffic, including traffic from email and SEO.** Those decreases were partially offset by higher gross billings per unit due to a shift in mix of offerings sold.

The above factors also resulted in a decline in total units sold, which decreased to 66.8 million units for the nine months ended September 30, 2019, as compared with 80.0 million units in the prior year period.

*International*

International gross billings were 34.5% and 33.9% of total gross billings for the nine months ended September 30, 2019 and 2018. International gross billings decreased $107.1 million for the nine months ended September 30, 2019 compared with the prior year period, primarily due to weak consumer sentiment in Europe, especially in the United Kingdom, **intense competition in our Goods business**, a $72.3 million unfavorable impact from year-over-year changes in foreign currency rates and lower gross billings per unit due to a shift in mix of offerings sold.

*See* Q3 2019 10-Q, at 35-37.[5]

84.     Defendants' above-identified representations in the MD&A Section of the Q3 2019 10-Q were materially misleading because they omitted to disclose:

A.      the material adverse facts and trends concerning Select, set forth in Section IV.C.1, *supra* and then known to Defendants (as Defendants later admitted on February 18-19, 2020): that Select, during the second half of 2019, was over-indexing to Goods (*i.e.*, Select was primarily being used to make Goods, rather than Local, purchases) at a time when Defendants later admitted that it had become "abundantly clear" to them that Groupon was not competing effectively in Goods, to the point where Defendants were planning to exit that business altogether, and that Select had failed to (1) meaningfully boost *Local* purchase frequency, and (2) operate profitably or generate incremental gross profit (as Groupon's thinner profit margins on Goods were turned negative by the discounts and customer acquisition costs accompanying Select); and

B.      the material adverse facts and trends concerning Goods, set forth in Section IV.C.2, *supra* and then "abundantly clear" to Defendants (as Defendants later admitted on February 18-19, 2020): that Goods was no longer able to compete effectively for customers, and

---

[5] Relatedly, the Q3 2019 Form 10-Q proceeded to present further financial result line items, including revenues (*id*. at 37-40) and gross profits (*id*. at 43-45), with analysis of these line items limited to largely referencing the above-detailed disclosures concerning gross billings. *See e.g. id.* at 38 ("North America revenue . . . for the three months ended September 30, 2019 compared with the prior year period, primarily driven by the decline in transaction volume and gross billings as discussed above. . . International revenue decreased $39.7 million for the three months ended September 30, 2019 compared with the prior year period, primarily driven by lower gross billings as discussed above. . .") and 44 ("The decrease in North America gross profit for the three months ended September 30, 2019 compared with the prior year period reflects a decline in transaction volume and gross billings as discussed above. . .  The decrease in International gross profit for the three months ended September 30, 2019 compared with the prior year period was primarily attributable to lower gross billings as discussed above . . .").

consequently was (1) being abandoned by its customer base, (2) failing to serve as a meaningful business driver for Local, and (3) discontinued by Groupon.

85.     Lastly, Defendants, in the Q3 2019 Press Release, Q3 2019 Presentation, and Q3 2019 Conference Call, reaffirmed the Company's Guidance.

86.     The Q3 2019 Press Release represented, concerning Groupon's "Outlook," that "Groupon continues to expect Adjusted EBITDA of approximately $270 million." Q3 2019 Press Release, at 2. The Q3 2019 Presentation likewise and repeatedly affirmed the Guidance. *See* Q3 2019 Presentation, at 5 ("2019 Guidance of ~$270 million"); 6 (same).

87.     Similarly, during the Q3 2019 Conference Call, Defendants affirmed the Guidance. For example, Defendant Thomas asserted:

> [THOMAS]:  As we move into the fourth quarter, a very important time for us, we expect positive contribution from our conversion initiatives, which include our recent guest checkout and universal cart product launches.  In addition, we expect marketing leverage to increase modestly from what we delivered in Q3.  **These factors, along with a continued momentum in North America Local including improved performance in units, give us confidence that we can drive sequential improvement in year-over-year gross profit trends and deliver approximately $270 million in adjusted EBITDA for full-year 2019**.

88.     Furthermore, after Goldman analyst Michael Ng noted that achieving the Guidance required an "implied EBITDA inflection in the fourth quarter" and inquired what would drive that inflection (and what effect Select would have), Defendant Thomas again affirmed the Guidance, adding that Select would have a "net neutral" impact on gross profits during the fourth quarter:

> [THOMAS]: . . .  And then on your question on Select and the headwinds that we saw in Q3 and what we expect to see in Q4, what I'd say there is we've been really pleased with the trajectory in terms of our ability to improve member accounts and what we're seeing on the customer side from a frequency standpoint as well as average order values improving.  I'm not going to give specific impacts on Q3, but just to give you a flavor for Q4 what we're expecting to see, we are expecting to continue to invest in acquiring members within the program.  But we expect overall the program to be net neutral impact on GP in Q4.

89.     Defendants' above-identified representations in the Q3 2019 Press Release, Q3

2019 Presentation and Q3 2019 Conference Call affirming the Guidance were materially misleading because, given the material adverse trends and conditions concerning Select and Goods set forth in Sections IV.B.5 and IV.C.1-2, *supra*, and then known to Defendants (as Defendants later admitted on February 18-19, 2020), the Guidance – in light of the collapse of both Goods and the cross-shopping business that Goods drove to Local, as well as Select's over-indexing to Goods and consequent unprofitability – was not achievable.

### 3. Williams' December 11, 2019 Statements

90.    On December 6, 2019, Groupon issued a press release titled "Groupon to Participate in the Barclays Global Technology, Media and Telecommunications Conference," announcing that Defendants Williams and Thomas would attend the conference, held on December 11-12, 2019 at San Francisco's Palace Hotel, where (1) they would participate in "one-on-one and small group meetings" with institutional investors; and (2) Williams would "participate in a fireside chat at 2:30pm PST."

91.    On December 11, 2019, as indicated by the Company's December 6, 2019 press release, Defendant Williams participated in the aforementioned "fireside chat," hosted by Barclays analyst Deepak Mathivanan (who covered Groupon and other companies in the mid-cap internet and online travel sectors), in which Defendant Williams presented on Groupon and answered questions from Mr. Mathivanan concerning Groupon's financial results, operations and strategy (the "Barclays Conference Presentation"). The Barclays Conference Presentation was webcast live on Groupon's investor relations website (and was available there in recorded form for the following 60 days) and was also transcribed and published by Bloomberg LP ("Bloomberg").

92.    When asked during his Barclays Conference Presentation on Groupon's declining customer count, Williams again asserted that the key strategic metric for Groupon and its return to profit growth was not the number of customers, but rather the *quality* of its customers and

41

specifically the purchase frequency they exhibited – and explained that the Company's efforts, including "the work that we're doing with loyalty programs" (*i.e.*, Groupon Select) was focused on purchase frequency:

> [MATHIVANAN]: Okay. So the flip side of it is **the customer base. I mean, you have seen declines over the past few quarters,** some of that is just driven by the marketing optimization efforts that you have been doing, when do you think we're going to reach a place where the marketing budgets are intact, and then the customer base gets to a stable levels and then the compounding effects or purchase frequency improvement starts to really drive gross profit growth?

> [WILLIAMS]: Yeah. It's a great question and I guess a lock-in on a couple of pieces of that. One is, **we are focused on quality of customer more than anything else. And the biggest linchpin to quality for us is frequency**. . .

> **So everything that we're doing is geared towards unlocking that extra unit of growth and the next unit after that and the unit after that. Whether that's booking, size of the catalog, the work that we're doing with loyalty programs and repeat purchasing products that keep us in the mix over the long term between a merchant and a consumer, all of that is geared to unlocking that piece.** When you unlock that piece, you also create more opportunity in the flywheel, right? So as gross profit per customer increases, so does our ability to go acquire more members into process and into the platform. But the core input to that, again, is **customer quality, which is really about purchase frequency and gross profit per customer. So that's everything that we're doing, it's geared to unlocking that.** . .

93.    During his Barclays Conference Presentation, Williams was again asked – as he and the other Individual Defendants had been asked in both the Q3 2019 Conference Call and the Q2 2019 Conference Call – about the "unit economics" of Groupon Select and its ability to be "accretive to gross profit." In response, Williams: (1) reiterated Select's 60% boost to purchase frequency; (2) affirmed that Select was profitable on a unit basis ("yes, our margins are such that we make money on the units"); and (3) represented that "the total economics of the program are really compelling" because Groupon was not only "making money on the units" but also "making money on the membership fees as well."

> [WILLIAMS]: **So, there is -- one of the things I'd say about Select, so two things. One, I'm most -- what I'm most excited about with Select is that, the**

**demonstration that we can move purchase frequency up into the right. And that's historically I think for many business has been one of the most difficult things, if not, the most difficult thing to do is to move buying behavior and intensify it. We're showing with Select with 60% improvement in purchase frequency within the first six months, we're showing we can move that needle. So that's the most exciting thing about that program** . . .

\*\*\*

**The other piece on that program is, yes, our margins are such that we make money on the units,** because there is not -- we as a part of our normal promotional process, we're offering discounts on a regular basis, which is part of why -- and you can see that when we share order discounts data. We're one of the few retail oriented sites who shows order discounts and so you can kind of calc what the average discount is. **So when you take that in consideration, plus our average margin, we're making money on the units as well as making money on the membership fees as well. So the total economics of the program are really compelling.** But again, that's almost secondary at this point, that's really how do you maximize education and knowledge base, so that we can extend everywhere possible.

94. Defendants' above-identified representations in the Barclays Conference Presentation concerning Select – including its purported boost to customer purchase frequency, and its purported incremental profitability to Groupon – were materially misleading because they omitted to disclose the material adverse facts and trends concerning Select, set forth in Section IV.C.1, *supra* and then known to Defendants (as Defendants later admitted on February 18-19, 2020), that Select, during the second half of 2019, was over-indexing to Goods (*i.e.*, Select was primarily being used to make Goods, rather than Local, purchases) at a time when Defendants later admitted that it had become "abundantly clear" to them that Groupon was not competing effectively in Goods, to the point where Defendants were planning to exit that business altogether, and consequently that Select had failed to (1) meaningfully boost *Local* purchase frequency, and (2) operate profitably or generate incremental gross profit (as Groupon's thinner profit margins on Goods were turned negative by the discounts and customer acquisition costs accompanying Select).

43

### 4. Additional Disclosure Duties Imposed By Item 303 Of Regulation S-K

95.      SEC Regulation S-K Item 303 ("Item 303") requires disclosure of operational and other information necessary to understand the Company's "financial condition, changes in financial condition and results of operations."  According to the SEC, this includes "unusual or infrequent events or transactions," "known trends or uncertainties that have had or [might] reasonably [be] expect[ed to] have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  These MD&A requirements are intended to provide a narrative explanation of a company's financial statements that enables investors to see the company through the eyes of management.

96.      During the Class Period, Defendants were aware of but failed to disclose the two particular, materially adverse trends described above, namely that: (1) Select was over-indexing to Goods; and (2) Goods was no longer able to compete and hard largely ceased providing added value for Groupon by driving meaningful business to Local.

97.      The material adverse trend relating to Select directly caused a material change in the relationship between costs and revenues.  Defendants had repeatedly represented Select as profitable on a per-unit basis:  *i.e.*, that even after factoring in the discounts and other costs associated with Select, Select transactions were still generating incremental profits.  However, because Select purchases were largely circumscribed to the low-margin Goods business rather than the high-margin Local business, the adverted relationship between costs and revenues did not in fact apply, and was in fact the very *opposite*.  For Goods, and thus for Select, costs (when Select-specific costs were added) rose higher than revenues, rather than remaining lower.

98.      The material adverse trend concerning Goods had *double*, material unfavorable impacts on Groupon's revenues (and consequently, income).  First, Goods revenues themselves suffered material declines, as Goods' inability to compete effectively led to increasing customer

abandonment.  Second, as Goods' ability to drive additional Local sales withered, Local revenues also suffered.  In fact, Defendants admitted at the end of the Class Period that (1) Goods' ability to generate Local benefits had long been in decline ("**Over time**, Goods has become a less meaningful driver of engagement. . ."), and (2)  it was "abundantly clear" to them no later than "[m]idway through the fourth quarter" that Groupon was unable to compete effectively in Goods and that the Company decided to exit the Goods segment entirely.

99.     Defendants should have disclosed the trend of over-indexing to the unprofitable Goods segment in the MD&A section of the Q2 2019 10-Q which they filed on July 30, 2019, as they later admitted that this trend, which ultimately led them to discontinue the highly-touted Groupon Select program, had started in the second half of 2019.  Likewise, Defendants should have also disclosed, in the same Q2 2019 10-Q, the trend of Goods' declining ability to drive engagement with the Company's Local offerings, a trend that Defendants admitted, after the Class Period and during the Q4 2019 Conference Call, they had witnessed developing "[o]ver time" as Groupon's "management team and board [had] been evaluating the role of Goods for some time."

100.    These trends, and their potential impact on the Company, had intensified by the time the Defendants filed the Q3 2019 10-Q on November 4, 2019.  By that time, Defendants accelerated this over-indexing trend by offering a 15% discount on Goods transactions beginning in August 2019, and midway through the fourth quarter of 2019, it had become "abundantly clear" to Defendants that the Goods segment, to which the highly-touted Select business was over-indexing, was not effectively competing to the point where Defendants were considering exiting that business altogether.

**B.**     **Defendants' February 18-19, 2020 Disclosures Correct Prior Misstatements and Cause the Company's Shares to Lose Nearly Half of Their Remaining Value**

    **1.**     **Groupon's Poor Fourth Quarter And Full Year 2019 Results**

101.     Following market close on February 18, 2020, Defendants announced Groupon's financial results of operations for the fourth quarter and full year of 2019, and issued, *inter alia*: (1) a press release titled "Groupon Announces Fourth Quarter and Fiscal Year 2019 Results" (the "Q4 2019 Press Release"); (2) a letter to shareholders from Williams (the "Q4 2019 Letter"); (3) a presentation titled "4Q19 Earnings" (the "Q4 2019 Presentation"); and (4) a Form 10-K for the year ended December 31, 2019 filed with the SEC.

102.     On the following morning of February 19, 2020, at 8:00 a.m. Eastern Standard Time and before the open of stock market trading, Defendants Williams and Thomas hosted a conference call with analysts and investors to further discuss the Company's financial results and operations (the "Q4 2019 Conference Call").

103.     Groupon's fourth quarter results, rather than displaying any amelioration of Groupon's longstanding customer/traffic declines (*e.g.*, as a result of Groupon Select and other strategic improvements), instead evidenced deepening customer, unit and gross profit declines, driven substantially, as discussed further below, by multiple matters centering on Groupon Goods of which Defendants had long been aware:

**Fourth Quarter 2019 Summary**

<u>**North America**</u>

• North America gross profit in the fourth quarter 2019 decreased 16% to $207.3 million **primarily due to fewer customers, lower traffic and increased competition in our Goods category**. The decrease was partially offset by higher gross profit per customer. In Local, gross profit decreased 6% to $169.7 million. **Goods gross profit decreased 45% to $30.6 million.** Gross profit in Travel decreased 41% to $6.9 million.

***

**Consolidated**

• Revenue was $612.3 million in the fourth quarter 2019, down 23% (23% FX-neutral).

• Gross profit was $310.0 million in the fourth quarter 2019, down 15% (15% FX-neutral).

***

• Adjusted EBITDA, a non-GAAP financial measure, was $83.8 million in the fourth quarter 2019, down from $104.6 million in the fourth quarter 2018.

• Global units sold were down 16% to 42.6 million in the fourth quarter 2019 largely driven by fewer customers and lower traffic. **North America units were down 11% in Local and down 32% in Goods. International units were up 4% in Local and down 22% in Goods**.

104. These poor fourth quarter operational and financial results had in turn led the Company to report adjusted EBITDA of $227.2 million for the full year of 2019 – significantly below Groupon's $270 million Guidance, which Defendants had affirmed and reiterated in their November 4-5, 2019 disclosures.

## 2. Defendants' Corrective Disclosures Concerning Goods And Select

105. As set forth immediately below, Defendants' February 18-19, 2020 disclosures corrected Defendants' prior Class Period statements concerning Goods and Select, in substantial part by revealing material adverse trends concerning Goods and Select that had existed, and were evident and known to Defendants, throughout the Class Period.

### a. Goods

106. Defendants' February 18-19, 2020 disclosures included the revelation of a "transformational" new strategy to exit Groupon's Goods segment, in light of especially poor performance in that segment and in order to focus solely on Local. The Q4 2019 Press Release summarized, in relevant part:

47

**Transformational Plan to Exit Goods and Focus on Our Local Experiences Marketplace**

Following a comprehensive review of opportunities and strategic alternatives, we determined that a plan to exit the Goods category and focus on our local experiences marketplace best positions us for long-term and sustained growth.  We believe this plan will allow us to devote the focused execution necessary to take share in the growing local experiences market.  This market, which we estimate to be north of $1 trillion, is highly fragmented, growing, and migrating quickly from offline to online.  Currently, we are a market leader, yet we have less than 1% market share.  In addition, **our 2019 Goods category performance, particularly in the fourth quarter, has made it increasingly clear that we are not well-positioned in a saturated retail market**.

107.    Defendants' Q4 2019 Letter provided a more fulsome explanation of the Company's decision to exit Goods, noting, *inter alia*, that: (1) although Goods was less profitable than Local, both overall and on a unit basis, it had "historically been a meaningful engagement tool for Local shoppers and its overall impact on the business extended beyond its direct contribution to gross profit" (*i.e.*, Groupon's Goods offerings had been serving, through "cross-shopping" and/or "customer activation," as a meaningful driver for Local traffic and sales); (2) this had changed no later than midway through the fourth quarter of 2019, as it had become "abundantly clear" to Defendants "[m]idway through the fourth quarter" that Groupon was unable to compete effectively in Goods, that customer engagement with Goods inventory had meaningfully declined, and that such decreased engagement with Goods was also translating into diminished customers, traffic and units for Groupon's core Local segment.

**Midway through the fourth quarter it became abundantly clear that we were not competing effectively in Goods.  We saw far fewer customers engage with Goods in the fourth quarter than we anticipated, which impacted overall traffic to our site.  The lower traffic ultimately impeded performance in all of our categories.**  This was particularly notable in November, including during the holiday peak period when Goods engagement has historically been a business driver.

***

**PLAN TO EXIT GOODS**

Our management team and board have been evaluating the role of Goods in our ecosystem for some time. **Goods' contribution to gross profit has been declining for four quarters, but it has historically been a meaningful engagement tool for Local shoppers and its overall impact on the business extended beyond its direct contribution to gross profit. Recently we've seen engagement with our Goods inventory shift meaningfully lower, driven in large part by our inability to compete in a fiercely competitive, and in some cases, economically irrational retail landscape.** In 2019, we were devoting about 40% of our site impressions to a category that was only delivering about 20% of our gross profit and **no longer generating the cross-shopping behavior or customer activation activity to continue to justify this investment. In short, Goods has outlived its role as a business driver and has become a significant drag on our business**.

Our fourth quarter performance, and the challenges Goods has posed over the past few years, has clarified our path forward. **What we've now realized is that too many of our efforts in the past, even good products like Select and Groupon+, didn't address the core of our product or business model**, nor did they overcome the limitations in the legacy Groupon business.

In order to deliver on our growth strategy to attack the large and growing market opportunity in local experiences, we have to be willing to walk away from any and all distractions. This is why we plan to exit Goods.

108.    Defendants Williams and Thomas, in their introductory remarks during the Q4 2019 Conference Call, reiterated the above-mentioned explanations concerning the extent, effects and timing of the dramatic deterioration of the Goods Segment:

[WILLIAMS]: . . . **Midway through the fourth quarter, it became clear, however, that we were seeing far fewer customers engaged with goods, and it impacted overall traffic to our site. The lower traffic ultimately impeded performance in all of our categories**. This was particularly notable in November and affected our holiday peak period, when goods engagement has historically been a business driver.

Adding to these challenges, certain conversion initiatives in Select did not deliver on expectations. Our traffic declines and these other factors, which Melissa will discuss in greater detail, combined to create a headwind that we could not overcome during the fourth quarter. Before I discuss our strategy, let's touch on Goods.

Our management team and board have been evaluating the role of Goods for some time. **Our fourth quarter performance and the challenges Goods has posed over the past few years have clarified our path forward**. Delivering on our growth strategy requires total focus on capturing the local experiences opportunity. **Over time, Goods has become a less meaningful driver of engagement and an increasingly inefficient use of our impressions.**

49

**It has effectively become a distraction, in which we can no longer compete and that we cannot afford, as it has taken roughly 40% of our impressions to deliver roughly 20% of our gross profit.** This is the crux of our plan to exit Goods.

\*\*\*

[THOMAS]: . . . To give you insight into the trajectory within the quarter, first note that our plan, which considers historical buying patterns on our site, calls for a meaningful shift of impressions and other assets to the Goods category throughout the quarter. **Midway through the quarter, however, it became clear that we were not competing well in Goods**, and November performance was particularly poor.

**The lack of engagement with our Goods offering impacted the overall traffic to our site, and ultimately performance in all of our categories**.

109.     In the Q4 2019 Presentation, Defendants described Goods as "a headwind to performance," explaining that "[c]ross-shopping between Local and Goods continues to decline" and that although Goods was "[h]istorically an important Local engagement tool" its current impact on Local was "now minimal."

110.     During the Q4 2019 Conference Call, Williams reiterated these points in response to questions from Wedbush analyst Ygal Arounian:

[WILLIAMS]:  Thanks, Ygal. I'll start on the traffic side, and how to think about overall the exit path and impression reallocation and just how balance of traffic plays into that. **So, yeah, Goods has been a significant part of our traffic. It's highly seasonal, in particular, just we didn't obviously see the kind of seasonality we expected in Q4. But it has been, historically, a significant driver of traffic, particularly that time of the year**.

I think the key piece, however, to think about it is how we manage our impression pool.  And as I mentioned, **historically, it's been around 40% of traffic going to Goods.  And at certain times of the year, in Q4, that could be as much as 60% or 70% during peak periods.  But what we've really seen change there over time is not just the volume of traffic or mix.  It's just that the overall utility or productivity of the impressions that we've been allocating to Goods has been declining**.

As a part of that, **we've also just seen more division and more clear division in the customer base.  And as you point out, historically, it has been more of a driver of Local activation.  And at times, I think in the past, we've shared as**

**one of our largest channels of Local activation. That's just no longer the case.** And we've seen that the customer base is becoming more specific in what their shopping behavior really drives.

And so, **those things combined, where you have a lack of utility of the impressions and a lack of cross-shopping behavior and more division or more calcification in the customer base,**[6] it makes it a lot easier to make these kinds of decisions. Still very hard call to make, given the overall size of the business, but it makes it a lot easier.

111.     Defendant Williams further specified that Groupon had been unable to compete –

*i.e.*, unable to meet customers' expectations (and competitors' provision) – with respect to

"comprehensive inventory" and fast shipping. *See* Q4 2019 Conference Call, FactSet transcript at

12-13.  Williams reiterated this explanation in later remarks made at UBS's March 5, 2020 Global

Consumer & Retail Conference (the "UBS Presentation"), noting that "the e-commerce landscape

fundamentally changed, in particular over the last couple of years," particularly with respect to the

importance of shipping speed, which Groupon's management "had considered a lot" as they saw

"that business shrinking" over "the last couple of years."

> [WILLIAMS]:. . . [T]he history of Groupon was really had started as a local services business and most people are familiar with that part of the business, where it's -- great deals on things in your neighborhood whether that's pizza or massages or concert tickets.  And over the course of the development of that business, we really by -- we experimented our way into selling physical goods and physical products and created a good business and that was during the time of where flash sales was a really big part of e-commerce growth.  And so it's in our brand in many ways in those days whereas about saving a lot of money and limited inventory as well, but -- and that goes back to that 2011-2012 timeframe.
>
> And that over the years, since then as we had become a pretty big business for us. North - - well at one point -- close to $2 billion of billings in that range, but **really**

---

[6] By "calcification in the customer base," Williams, as he clarified later in the Q4 2019 Conference Call, was referring to a substantial subset of Groupon's customer base that were, in effect, shopping only for Goods and not for Local. *See* Q4 2019 Conference Call, FactSet Transcript at 16 ("So, as I mentioned, we do have more of a calcified customer base there that's been more focused and specific to Goods only.").  As Thomas further noted during the Q4 2019 Conference Call, there were "8 million Goods-only customers" and 35 million further Local, Travel and cross-shopping customers.  *Id.*

**the e-commerce landscape fundamentally changed, in particular over the last couple of years and we saw that business really struggling to compete and that's starting at the crux of our big discussion and our bigger announcements over the last couple of weeks has been we made a decision to exit that physical products business and we had a really rough Q4 in that business, where consumers just – we're just engaging with it at a really high rate.**

**And when we talk to consumers about it, and it's like look we were a price leader, we had great prices on products that were popular, but when we're shipping in two days versus delivering in two days or a day or less consumers were less willing to trade-off price for that and it's something that we had considered a lot over the ensuing quarters as we've seen really the last couple of years that business shrinking** was really what's right for the business going forward, and I guess it boils down to a really simple paradigm of -- can we really let a business that we can't win in, keep us from winning in the business we must win in and that we have the right to win in. And that's -- those are hard decisions to make to make given the size of the business being north of $1 billion of billings, but **we didn't feel that we were in a place to compete effectively in the goods of the physical products business and the level of investment required to effectively compete didn't make sense for us** and that would frankly be a distraction from what is a leading business and local services and local experiences in particular.

**b.**     **Select**

112.     In their February 18-19, 2020 disclosures, Defendants also announced that Groupon Select had failed and would be discontinued. As Defendants revealed in these disclosures: (1) in the second half of 2019, Select, in Defendants' terminology, "over-indexed to Goods" (meaning that Select was being used "disproportionately [by] customers purchasing goods vs. those transacting on our local platform;" (2) Select had not generated meaningful change in customer behavior / purchase frequency with respect to Groupon's core Local business, and (3) Select was *unprofitable* for Groupon ("The Select program was expected to be net neutral to gross profit in the fourth quarter. But the program underperformed . . .").

113.     With respect to Select, the Q4 2019 Letter stated:

While we saw strong performance from guest checkout, other conversion initiatives did not deliver on expectations. **Groupon Select added to our challenges in the quarter as it over-indexed to Goods, pressured margins and drove higher than anticipated customer acquisition costs. This brings us to the future of Select.**

52

**The program's fourth quarter performance showed that it cannot provide the ROI needed for it to be a key priority for us at this time. Select's current features began appealing disproportionately to customers purchasing goods vs. those transacting on our local platform.** As a result, we will continue to provide Select benefits to current members, but we will not pursue new enrollees for the program.

***

What we've now realized is that too many of our efforts in the past, even good products like Select and Groupon+, didn't address the core of our product or business model, nor did they overcome the limitations in the legacy Groupon business. . .

114.    During the Q4 2019 Conference Call, Thomas provided additional disclosures and details concerning Select:

[THOMAS]: . . . **The Select program was expected to be net neutral to gross profit in the fourth quarter. But the program underperformed** due to higher than anticipated customer acquisition costs and a lower than expected number of enrollees converting to paid members. **The program also began over-indexing towards our Goods category in the second half of 2019.**

This, coupled with results in the fourth quarter, led to our decision to discontinue new enrollments in our Select program. . .

115.    Select's unprofitability was a direct result of the fact, evident to Defendants in the second half of 2019, that it "over-indexed to Goods." Groupon's profit margins on Goods (averaging approximately 10-20%, and often near-zero, nonexistent or even negative) were materially lower than its 80-90% margins for Local. The benefits and discounts included with Select, such as free shipping and a 15% discount for Goods purchases, had the effect of entirely erasing – and/or turning negative – the Company's profit margins on Goods.

### 3.    Groupon Shares Decline Materially Following The February 18-19, 2020 Corrective Disclosures

116.    Following Defendant's above-detailed February 18-19, 2020 corrective disclosures, Groupon shares, which had closed trading on February 18, 2020 at $3.05 per share – quite near to the Class Period high of $3.40 per share – fell sharply during February 19, 2020 to

53

close at $1.70 per share – a decline of $1.35 per share, representing more than 44% of Groupon's market capitalization. Trading volume on February 19, 2020 was extreme: approximately 155.34 million Groupon shares traded hands, more than 25 times Groupon's average daily trading volume of 6.18 million shares during the Class Period.

### C. Additional Allegations Regarding The Individual Defendants' Scienter

117. As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Groupon, their control over, and/or receipt and/or modification of Groupon's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Groupon, participated in the fraudulent scheme alleged herein.

### 1. The Collapse Of Goods, And Of The Cross-Shopping Benefits Good Historically Had Provided To Local, Was Long Monitored By Defendants And "Abundantly Clear" To Defendants "Midway Through The Fourth Quarter" Of 2019

118. As Defendants admitted in their February 18-19, 2020 disclosures, the collapse of Goods, and of the benefits that Goods provided to Local, had been (1) long ongoing, and (2) "abundantly clear" to Defendants no later than "[m]idway through the fourth quarter of 2019."

119. For example, in their February 18-19, 2020 disclosures, Defendants repeatedly explained that Goods' decline had been long evident to them: the "challenges Goods has posed **over the past few years**" and the fact that "Goods' contribution to gross profit ha[d] been

**declining for four quarters**" had caused Groupon's "management team and board [to] have been evaluating the role of Goods in our ecosystem **for some time**," to have seen "**over the course of the last year** in the Goods landscape specifically [that] it's a different world out there," and to have understood that "**[o]ver time**, Goods has become a less meaningful driver of engagement." *See e.g.* Q4 Letter at 2; Q4 2019 Conference Call, FactSet transcript at 4, 12-13.

120.     Additionally, Defendants admitted during the same disclosures that the material adverse trends and conditions affecting Goods had become "abundantly clear" to them no later than midway through the fourth quarter of 2019. *See e.g.* Q4 Letter at 2; Q4 2019 Conference Call, FactSet transcript at 3-4, 6-7.

### 2.     Select's Failures To Drive Local Business And Operate Profitably Were Evident To Defendants During The Second Half Of 2019 As Select Over-Indexed To Goods

121.     As set forth above, Defendants revealed on February 18-19, 2020, when announcing Select's discontinuation, that Select had "over-indexed to Goods" (*i.e.*, it had been used primarily to make Goods, rather than Local, purchases), and that, relatedly, Select was unprofitable (in light of the Company's thinner profit margins on Goods). *See* Section IV.C.1, *supra*.

122.     Simultaneously, Defendant Thomas then admitted that the underlying adverse trend – Select's over-indexing to Goods – had existed during the second half of 2019. *See* Sections IV.C.1 and V.B.2.b, *supra*.

123.     Given Select's importance for Groupon (*see* Section V.C.4, *infra*), Defendants' assertions that they monitored Select closely (*see* Section V.C.5, *infra*), and Defendants' demonstrated mastery of Select's technical and operating minutiae (*see* Section V.C.6, *infra*), Defendants were aware during the second half of 2019 that Select was over-indexing to Goods, failing to spur Local business, and consequently unprofitable.

### 3. Select's Over-Indexing To Goods During The Second Half of 2019, And Consequent Unprofitability, Were The Direct And Foreseeable Results Of Defendants' Own Actions

124. As set forth above, Defendants sought to accelerate the growth of Select following the second quarter of 2019, in part by adding a new benefit to Select membership: a 15% discount off all Goods purchases.

125. This 15% discount was a substantial driver of Select's over-indexing toward Goods, as it made the Goods value proposition, for Select members who already received free shipping on Goods purchases, all the more compelling. However, it simultaneously destroyed Select's profitability for Groupon, because, when added to Select's other costs (*e.g.*, free shipping, promotional expenses for 'customer acquisition,' etc.), this discount sufficed to erase and/or reverse the Company's already low profit margins on Goods.

126. Therefore, both Select's indexing towards Goods and its unprofitability were direct and foreseeable results of Defendants' own decision, following the second quarter of 2019, to add a 15% discount on Goods purchases to Select's membership benefits.

### 4. Goods And Select Were Core Operations For Groupon

127. Defendants' above-detailed misstatements concerned two matters – Goods and Select – both of which constituted core operations for Groupon. Consequently, knowledge of the fraud may be imputed to the Individual Defendants.

128. Goods was a substantially sizeable business for Groupon. As set forth in Table 1 above (*see* ¶24, *supra*), Goods provided Groupon with approximately 31% of its gross billings, 56% of total revenues, and 20% of gross profits.

129. Although Select, as a new product launched in late 2018, did not rise to the same sheer size, Select still constituted a core operation for Groupon in light of its central strategic importance. *See* Sections IV.B.3-4, *supra*. Defendants had identified increasing customer

purchase frequency as Groupon's foremost strategic concern and had represented Select as a primary means to address it. *Id*. Consequently, in Defendants' view and Defendants' own words, Select was "critical to transforming the business" and one of Groupon's "key strategic priorities." *See* Section IV.B.4, *supra*.

### 5. Defendants' Own Assertions That They Closely Monitored Select And Goods . . .

130. Defendants asserted, prior to their February 2020 corrective disclosures, and admitted as part of their February 2020 corrective disclosures, that they had long and closely monitored both Select and Goods.

131. As Select was intended and designed as a solution for what Defendants identified as Groupon's foremost strategic goal – increasing customers' purchase frequency, and thereby returning Groupon to gross profit growth – Defendants, by their own admission, thereafter monitored Select's operations and results closely. For example, during their May 1, 2019 conference call with analysts and investors in connection with Groupon's results of operations for the first quarter of 2019 (the "Q1 2019 Conference Call"), after B. Riley FBR, Inc. analyst Sameet Sinha asked for an early update on Select, Williams assured that "we're watching it really closely," and more specifically observed:

> [WILLIAMS]: …**As far as Groupon Select, it's not something that we've discussed broadly. And I think that's just because it's very much in an experimental stage. It's very early.** There's still a lot of folks who haven't been exposed to it, haven't seen it on the site or in our apps. We're very excited about that program. We think it has a lot of potential. But, again, it's a membership oriented program, so it's a little too early to start discussing what the potential of it is ultimately financially for the company and for customer accounts because as you know in membership it's really about continuity. And that's where it counts not just how many folks you can get in the program initially. So I'd say stay tuned on that one. **We're watching it really closely. We are excited about it and as an early stage initiative**, but we have a lot of wood to chop on that one.

132. During the Q3 2019 Conference Call, Thomas discussed the adoption of the Select

program at length and described how "we've been really pleased with the trajectory in terms of our ability to improve member accounts and what we're seeing on the customer side from a frequency standpoint as well as average order values improving."

133.    Similarly, during his Barclays Conference Presentation a month later, Williams detailed how he was pushing the team to develop more granular insights into how Select was performing. Specifically, he observed, "**So we're really challenging our team to decompose the value and not just the value in aggregate, but what's meaningful to every group**, what's meaningful to the first time buyer or the one-time buyer, versus the 12 time buyer. And can we use that to extend the program in different ways to evolve it in new ways."

134.    Likewise, with respect to Goods, Defendants clearly articulated prior to the Class Period what they viewed as Goods' fundamental purpose – to generate profits, even if at a lower margin than Local, while driving further traffic to Local and spurring Local "customer activation" and "cross-shopping" (*see* Section IV.B.2, *supra*). Throughout the Class Period, they closely monitored Goods' decline on both these metrics. As Williams explained in his February 18, 2020 Q4 Letter to shareholders:

> **Our management team and board have been evaluating the role of Goods in our ecosystem for some time. Goods' contribution to gross profit has been declining for four quarters**, but it has historically been a meaningful engagement tool for Local shoppers and its overall impact on the business extended beyond its direct contribution to gross profit. **Recently we've seen engagement with our Goods inventory shift meaningfully lower**, driven in large part by our inability to compete . . . In short, Goods has outlived its role as a business driver . . .

135.    Similarly, as Williams explained during the Q4 2019 Conference Call, Groupon's management and board had long been monitoring the deterioration of Goods and of Goods' ability to drive Local business:

> [WILLIAMS]: **Our management team and board have been evaluating the role of Goods for some time.** Our fourth quarter performance and **the challenges Goods has posed over the past few years** have clarified our path forward. . . **Over**

**time, Goods has become a less meaningful driver of engagement** and an increasingly inefficient use of our impressions.

> **6.      . . . Are Borne Out By The Mastery Of Details Displayed By Defendants In The Q2 2019 And Q3 2019 Conference Calls**

136.    Defendants, during both the Q2 2019 Conference Call and the Q3 2019 Conference Call, demonstrated extremely detailed knowledge with respect to Select that extended deep into the technical minutiae of Select's operations, and of the strategic and product development considerations and decisions responsible for them.

137.    For example, during the Q2 2019 Conference Call and in response to multiple questions from analysts concerning Select's operations and results, Defendant Williams discussed quite detailed considerations relating to Select's product development, how Select was being technically presented on Groupon's websites and mobile applications to optimize customer enrollment, and how Groupon had been and would be testing such technical features, and considering the resulting customer response data, in order to continue to optimize Select:

> [WILLIAMS]:  Yeah. I think that's right.  And just to speak a little bit about the philosophy and where we are on it now, you asked whether we're thinking about it as a way to subsidize growth and frequency.  That's not really how we're thinking about it.
>
> Ultimately, we're looking for a way to monetize what has historically been member-like behavior in our customer base.  So we've had that member-like behavior for years, but we haven't had a member-like monetization model to go along with it. We saw an opportunity to do that and to build that.
>
> And we – **really we set a philosophy for the program out of the gate to make it as incredibly compelling as we could, really to drive engagement and frequency and commitment to the platform and to Groupon over time more so than thinking about [ph] in a way as subsidiary of (21:57) growth**.  And I think hopefully now as you've heard Mike walk through the economics of the program, you see there's really – there's not a 'subsidy' there more so than it is just making the core Groupon value prop even more compelling.
>
> **And our goal pushing forward is to double down on what you mentioned now, which I think it is compelling today, but as we bring more features in, more partners in, and more unique experiences in, we think we have a program that**

starts to get into the no-brainer territory, the why wouldn't you territory, that ultimately over time can support higher membership fees.

But today, our focus is entirely gain traction in the program, gain trial in the program, get as many of our customers into the Select experience as we possibly can so that we can continue to add value, share the economics with them, and build those healthier relationships over time.

***

Yeah. And the only other thing that I'll add there, Deepak, is we're like everybody else in the online space, **we've spent years refining our checkout process. And as Mike mentioned earlier, any time you add something new, especially an extra step to the checkout process, the consumer reacts to that friction.**

**We're not going to be satisfied with that friction, this is an early program for us and it's early in our checkout funnel. We have a dedicated team that's working on conversion in our checkout funnel that is making Select a part of that conversion optimization effort.** So we're not going to just sit back and be satisfied with some conversion friction there.

**Over the next couple of quarters, a big part of our testing will be refining that checkout pipeline to make it as smooth and seamless for consumers as possible**, and hopefully we can mitigate some of that conversion headwind that makes the compounding effect of the membership fees even more powerful as we go forward. But we have real work to do there over the next few quarters, and we have a team whose sole focus is really pushing on those elements.

### 7. Defendants Attested To Their Data Driven Decision-Making Frameworks

138. Groupon likens itself to a "massive data-driven experiment," that "has tweaked and tested every corner of its e-commerce platform to find out precisely what makes customers click."[7] The Company's senior leadership, including the Individual Defendants, endorsed the development of data driven decision making processes. For example, during the Q2 2018 Conference Call held on August 3, 2018, Williams described how the Groupon used "**machine learning to use that data advantage that we have in this space, use that huge corpus of intent data that we have**

---

[7] *See* "Groupon is a massive data-driven experiment — this team helps run it," *available at*: https://people.groupon.com/2018/groupon-data-driven-experiment-chicago/ (last visited Sept. 21, 2020).

60

**to just better service the best possible offer instead of-- in many cases, the best possible discount**."

139.     Thus, when the Individual Defendants described how initiatives were being developed or deployed, they spoke based on their assessment of real time data analysis – and not mere anecdotal observation.  For example, during the Q3 2019 Conference Call held on November 5, 2019, Thomas described how Groupon sought to improve marketing efficiency by "deploying marketing strategies that allow us to leverage data to better segment our customer base and personalize the overall Groupon experience.  Our goal is to drive purchase frequency, particularly within the first 90 days post purchase."  During the same call, Williams described how "the more intelligent use of data" was directed towards "really harnessing all that we know about customers. So, you're starting to see some of those pieces really work their way through that local customer experience, and we're seeing the impacts of that."

**8.     Executive Terminations Shortly After the Class Period Further Support an Inference of Scienter**

140.     On March 25, 2020, Groupon abruptly announced that its Chief Executive Officer, Williams, and its Chief Operating Officer, Steve Krenzer, were "no longer serving" in their roles, but would "continue as employees of the Company."   The disclosure of the departures came approximately one month after the Company reported the failures of Goods and Select and the ensuing Guidance miss.

**D.     Additional Allegations Regarding Loss Causation**

141.     Defendants' wrongful conduct as alleged herein directly and proximately caused the economic loss suffered by Lead Plaintiff and the Class.

142.     During the Class Period, Lead Plaintiff and the Class purchased Groupon securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities

61

significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed or materialized, causing investors' losses.

143.    Artificial inflation in Groupon's stock price was removed when concealed risks materialized and/or the truth about the material misrepresentations and omissions was partially revealed to the public on February 18-19, 2020.  Defendants' disclosures on those days revealed, *inter alia*, the collapse of Goods, the unprofitability of Select, and the failure of both Goods and Select as drivers for Groupon's core Local business and overall gross profits.  As more particularly described above (*see* Section V.B.3, *supra*), these disclosures reduced the amount of inflation in the price of Groupon's publicly traded securities, causing economic injury to Lead Plaintiff and other members of the Class.

### E.    Presumption Of Reliance

#### 1.    General Allegations

144.    The market for Groupon's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Groupon's securities traded at artificially inflated prices during the Class Period.  On January 21, 2020, following the misstatements complained of herein and shortly prior to Defendants' corrective disclosures, the Company's share price closed at $3.14 per share, just below the Class Period high of $3.40 reached on the first day of the Class Period (July 30, 2019). Lead Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Groupon's securities and market information relating to Groupon, and have been damaged thereby.

145.    During the Class Period, the artificial inflation of Groupon's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the

damages sustained by Lead Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Groupon's business, operations and prospects. These material misstatements and/or omissions created an unrealistically positive assessment of Groupon and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Lead Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

146. At all relevant times, the market for Groupon's securities was an efficient market for the following reasons, among others:

(a) Groupon shares met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, Groupon filed periodic public reports with the SEC and/or the NASDAQ;

(c) Groupon regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d) Groupon was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

147.    As a result of the foregoing, the market for Groupon's securities promptly digested current information regarding Groupon from all publicly available sources and reflected such information in Groupon's share price. Under these circumstances, all purchasers of Groupon's securities during the Class Period suffered similar injury through their purchase of Groupon's securities at artificially inflated prices and a presumption of reliance applies.

148.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

### 2.    Class Period Analyst Reports Reflected And Transmitted Defendants' Misstatements

149.    Defendants' misstatements concerning Select and Goods were considered and relied upon by securities analysts and featured in their Class Period published reports on Groupon.

### a.    Analyst Reports Following Defendants' Q2 2019 Statements

150.    On July 31, 2019, UBS analyst Eric J. Sheridan published a report titled "Work in Progress; 2020 Is Key for Stock" (the "UBS Q2 Report") in which, after noting disappointing "headline [Q2 2019 numbers] on rev[enues] and bookings" that would "likely dominate the short-term narrative," he concluded that "management's strategy and focus is the correct approach," and

listed Select as the first "Q2 2019 Positive[]:"

**Work In Progress; 2020 Is Key For Stock**

**Transition Continues to Produce Volatility**

While headlines #s on revs and bookings will likely dominate the short-term narrative, we were encouraged that GRPN management remains laser focused on the same 2020 re-alignment that has been the investor narrative over past few quarters. In our view, management's strategy and focus is the correct approach for 2020 and beyond to stabilize customer trends, align marketing channels against customer value and drive higher margin/FCF trajectory. In the interim, we stay on the sidelines as we look for signs of the strategy producing a possible inflection in forward estimates and see the stock stuck in its recent trading range ($3-4) until further evidence emerges.

**Q2 2019 Positives & Negatives**

Positives: a) **Over 150k members joined 'Groupon Select' (new membership/subscription product) with initial indicators showing improved purchase frequency, higher AOV, and increased customer propensity to search for services/products**; . . .

UBS Q2 Report, at 1.

151.     On August 1, 2019, Credit Suisse analyst Stephen Ju published a report on Groupon

titled "Investing to Accelerate Subscription Adoption" (the "Credit Suisse Q2 Report"), in which

he focused on Select at length and described Select as "[t]he highlight this quarter:"

**Investing to Accelerate Subscription Adoption**

                                    ***

■ **Investment Case: The highlight this quarter was the strategic allocation of incremental marketing budgets and impressions towards driving membership of its recently-launched Groupon Select program** in North America – which offers ~25% discounts on Local deals, free shipping within the Goods category, and an extra ~10% off travel and event purchases. **Notably, in addition to a ~$5 monthly subscription fee, the company highlighted a significant increase in incremental repeat purchase rates and AOV resulting in higher annual gross profit per shopper.** As a result, management expects to pull forward marketing to accelerate adoption of its Select program from ~150,000 members this quarter. That said, Groupon continues to experience headwinds due to ongoing traffic issues within its SEO and email marketing channels, weaker consumer demand in the UK, and increased competition in seasonal categories (e.g., Home & Garden). As a

result we elect to maintain our wait-and-see Neutral stance as we anticipate the lapping of some of these headwinds as we exit FY19. As a reminder, management anticipates improving profitability in 2020 as it increases profitability per customer in its North American business and continues to rationalize OpEx.

Credit Suisse Q2 Report, at 1; *see also id.* at 3.

### b.  Analyst Reports Following Defendants' Q3 2019 Statements

152.  On November 5, 2019, UBS analyst Eric J. Sheridan published a report on Groupon titled "Is the Plan Coming Together for 2020?" (the "UBS Q3 Report"), taking note of Groupon's continuing customer declines as well as Groupon's "key" strategies to counter such declines, including Select, whose purported progress, as represented by Defendants (*i.e.*, that Select was growing fast and producing significant increases in purchase frequency and average order value), he deemed as the foremost "positive" among the Company's Q3 2019 results disclosures:

**Is The Plan Coming Together for 2020?**

**Is 2020 The Year GRPN's Plan Begins To Bear Fruit?**

**While some investors focused on declining active users (not a driver mgmt is focused on) and/or revenue volatility, GRPN mgmt is steadily building the strategy around a few key themes into 2020 -** effective marketing with defined pay back periods, broadening out available inventory (especially thru distribution partners), **driving higher levels of shopping velocity per user and driving better output in terms of gross profit per user growth. As we look into 2020, the key question is likely to remain how effectively GRPN mgmt can execute against these themes.** In addition, we believe the best course of action for GRPN mgmt is to be prudent with capital (balance sheet strength) and focus on organic execution with modest shareholder returns. While we remain with questions on execution vs. forward estimates, we reiterate our Neutral rating. We note that **GRPN is increasingly trading at the lower end of its 2019 trading range ($3-4) and positive signs could emerge for 2020 and beyond.**

**Q3 2019 Positives & Negatives**

**Positives: a) +260k members joined 'Groupon Select' (+100k QoQ) w/ initial indicators showing 60% increase in purchase frequency & 20% higher AOV;** b) Positive mgmt commentary on product enhancements intended to improve conversion and card- linked & booking initiatives (e.g., -65% of food & drink inventory is now bookable in Intl & rolled out bookings software in NA); & c) Repurchased 5m+ shares for -$15m (-$44m YTD). Negatives: a) Q3 revs miss

driven by softness in Europe & lower traffic in NA w/ expectations for current trends to remain in Q4; b) -900k net loss QoQ in NA active customers (vs. -(1000)k in Q2) due to continued traffic headwinds; & c) No change to FY19 Adj. EBITDA guide of -$270m despite 3 qtrs of beats.

UBS Q3 Report, at 1.

153.    On November 6, 2019, Credit Suisse analyst Stephen Ju published a report on Groupon titled "Turning to Order Frequency and Conversion to Offset Ongoing Traffic Headwinds" (the "Credit Suisse Q3 Report"), in which – as in his Credit Suisse Q2 Report – he focused on Select and described it as the quarter's "highlight:"

> **Investment Case**: **The highlight this quarter was continued traction in the NA rollout of Groupon Select – with subscribers growing by ~100k in 3Q19 to reach ~260k; with the company indicating that Select members are transacting at a +20%/+60% lift to AOV/order frequency resulting in higher annual gross profit per shopper**. That said, Groupon continues to experience headwinds due to ongoing traffic issues within its SEO and email marketing channels, with further weakening of consumer demand in the UK, and increased competition in its Goods business. These headwinds were offset by continued marketing optimization and the recent improvement in website traffic conversion within Groupon's domestic business following the rollout of a refreshed mobile website and the implementation of guest checkout functionality. As a result we elect to maintain our wait- and-see Neutral stance as we anticipate the lapping of some of these headwinds over the next few quarters. As a reminder, management anticipates improving profitability in 2020 as it increases profitability per customer in its North American business and continues to rationalize OpEx.

Credit Suisse Q3 Report, at 1; *see also id*. at 3.

### c.    The UBS Upgrade

154.    On January 17, 2020, following – and reflecting – Defendants' Class Period misstatements as set forth herein, UBS analyst Eric J. Sheridan upgraded Groupon to "Buy" (from his prior "Neutral" recommendation) and published a lengthy report on Groupon, tiled "Groupon on Sale" (the "UBS Upgrade Report") setting forth the basis for his upgrade. In essence, Sheridan credited Defendants' representations concerning the purported progress they had been making in "core initiatives," such as Select, intended to counter the Company's continued customer declines

and return it to profit/EBITDA growth, and cited as "evidence" that such initiatives were working Defendants' Class Period assertions concerning the effects of Select (*i.e.,* a purported 60% increase in purchase frequency and 20% increase in average order value):

**Groupon on Sale**

**2020 – GRPN's Mgmt Should Begin To Deliver On The Pla**n

While GRPN's stock remained volatile throughout 2019 on the back of user growth narratives, **we think that momentum has been building against mgmt long term objectives to focus on a) user growth wrapped around "quality" not "quantity";** b) framing and allocating mkting against payback ROI targets & c) positioning GRPN for success in a mobile first world. **In addition, initiatives aimed at broadening out available inventory (esp. thru distribution partners) & driving higher levels of shopping velocity per user and driving better output in terms of gross profit per user growth.** Looking forward, we see GRPN as compellingly cheap with an asymmetric risk/reward profile from current levels. As a result, we upgrade our rating to Buy and maintain our $3.50 PT but see a 2:1 skew in risk/reward between our upside & downside cases.

**What Are The Initiatives That Will Drive The Narrative Forward?**

**Throughout the course of 2019, Groupon has focused on a few key strategic initiatives to drive higher purchase frequency, conversion, and gross profit per customer growth.** Specifically, management has invested in: a) voucherless coupons (in the form of card-linked offers & bookability); b) an enhanced mobile experience; **& c) subscription-based program (Groupon Select).** Collectively, we see these initiatives reducing consumer shopping friction, reducing consumer churn & improving ROI as inventory and choice scales (especially thru distribution partner agreements). **We expect Groupon's strategic investments in Groupon Select, mobile experience, & voucherless transition to drive sustained YoY growth for TTM gross profit per active customer in 2020 and beyond.**

*** *** ***

**PIVOTAL QUESTIONS**

*** *** ***

**Q: Can Groupon maintain steady user growth to drive top line momentum?**

Yes. While we expect 2019 to result in customer net losses (due to traffic headwinds in NA & softened consumer environment in UK), we model ~400-900k in annual net adds in FY20 & beyond. As the company shifts to target high value users and forego low value customers, we see medium-to-long term momentum on the back of an improved user experience and growing international contribution.

68

**Q: Will core initiatives re-position Groupon for sustained adj. EBITDA growth?**

Yes. We expect GRPN to grow gross profit dollars at a ~3% CAGR ('19- '24E) for the next 5 years with potential upside from deepening personalization and further reducing customer friction. Against company guidance for the long-term, our estimates might prove to be conservative. We see increasing flow through to bottom line, driving ~8% ('19-'24E CAGR) adj. EBITDA growth runway.

**UBS VIEW**

**Groupon has formulated a focused turnaround strategy (centered on voucherless, local offerings, & driving GP dollar per customer) and executed steadily in the past few qtrs.** While there is still a long road ahead in strengthening the company's positioning in the local ad and/or local eCommerce mkt in the face of competitive threats from large internet companies, **we are constructive on GRPN shares at current levels as we see a + skew (2:1) in our upside/downside skew given better line of sight on GP & EBITDA growth (in terms of business momentum as an output of 2019 investments).**

**EVIDENCE**

**Anchored to its new focus on maximizing profit and de-emphasizing low ROI customer adds, GRPN was able to achieve GP per customer growth over the past 3 yrs w/ 2019 invtmts displaying + initial results (e.g., Select members have seen a ~60% increase in purchase frequency & ~20% higher AOV).**

**WHAT'S PRICED IN**

By applying a 11.0x EV/(FCF-SBC), the market is assuming ~28% FY19-FY21 FCF-SBC CAGR (vs. UBSe ~38.7%). **We view this as conservative given the potential for GRPN to scale Groupon Select & gross profit dollar growth on the back of 2019 investments**.

UBS Upgrade Report, at 1-2.

155.    Sheridan counted Select as one of three "key strategic initiatives" that Groupon had focused on through the court of 2019 "to drive higher purchase frequency, conversion, and gross profit per customer growth." UBS Upgrade Report, at 3 *et seq*. Sheridan believed that as Select was still "in early phases," the market was "not factoring in the opportunity this initiative presents in terms of enhancing the gross margin per customer profile." *Id*. at 3. Sheridan then depicted the opportunity presented by Select, principally by amalgamating and reflecting Defendants' above-

detailed Class Period representations concerning Select, including its purported 60% boost to

purchase frequency and its overall and per-unit profitability:

> **Groupon Select** – Earlier this year Groupon announced Groupon Select, a membership program that offers value for members for a monthly subscription fee of $4.99. Currently, the program is only offered in North America. **Initial indicators are positive with results pointing to ~60% increased purchase frequency, ~20% higher average order value, and an increased customer propensity to search on the site.** As of Q3 2019, Groupon Select had ~260,000 members in North America (up from ~150,000 in Q2 2019 and up from ~50,000 in Q1 2019). In order to support member acquisition, Groupon intends to leverage promotional offers for sign-up and encourage enrollment through the checkout path. To date, **Groupon has spent nearly ~$10m to support this initiative and have seen member acquisition costs pay back within 6 months driven both by the recurring revenue from membership fees and the incremental gross profit generated on membership-related transactions. As Groupon scales the program, management expects it to be a net neutral impact to gross profit in Q4. On the Q2 2019 earnings call, CFO Michael Randolfi stated that "a Select customer should earn at least $55 to $60 of gross profit on a per customer basis, if not more, which is almost double the average gross profit per customer that [they] generate today".** As can be seen in figure 4, at a $4.99 monthly subscription fee and ~2.2m Select members, **we would expect to see a ~520bps uplift to gross margins** – if Groupon were to raise the monthly fee to $9.99 and at ~2.2m Select members, we would expect to see ~1,050bps uplift to gross margins.

> **We expect Groupon's strategic investments in Groupon Select, mobile experience, & voucherless transition to drive ~2-3% YoY growth for TTM gross profit per active customer in 2020 and beyond.** For 2019, we forecast flat YoY growth as we believe the weak consumer environment in the UK, the traffic headwinds in North America, and initial investments (in Groupon Select, mobile experience, & transition to Voucherless) will offset any initial contributions from these 2019 strategic investments. With many of the partnerships launching in 2H19 (e.g., the 3 card-linked distribution offers), **we believe these investments will materialize as we enter 2020 and be a key driver in growing gross profit per customer.**

UBS Upgrade Report, at 5-6.

## VI.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE

156.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.   In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Groupon who knew that the statement was false when made.

## VII.    CLASS ACTION ALLEGATIONS

157.    Lead Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Groupon securities between July 30, 2019 and February 18, 2020, inclusive, and who were damaged thereby (the "Class").   Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

158.    The members of the Class are so numerous that joinder of all members is

impracticable. Throughout the Class Period, Groupon's common shares actively traded on the NASDAQ. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of shares of Groupon common stock were traded publicly during the Class Period on the NASDAQ. As of July 26, 2019, Groupon had 567,619,924 shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by Groupon or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

159. Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

160. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

161. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the Company's business, operations, and prospects;

(c) whether Defendants made false and/or misleading statements;

(d)     whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of circumstances under which they were made, not misleading; and

(e)     to what extent the members of the Class have sustained damages and the proper measure of damages.

162.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## VIII.   CLAIMS FOR RELIEF

**FIRST CLAIM**
**Violation of Section 10(b) of The Exchange Act and**
**Rule 10b-5 Promulgated Thereunder**
**Against All Defendants**

163.     Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

164.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; and ii) cause Lead Plaintiff and other members of the Class to purchase Groupon's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

165.     Defendants (i) employed devices, schemes, and artifices to defraud; ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements

not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Groupon's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

166. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Groupon's financial well-being and prospects, as specified herein.

167. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Groupon's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Groupon and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

168. Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the

creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

169.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.    Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Groupon's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.    As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

170.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Groupon's securities was artificially inflated during the Class Period.    In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the

market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiff and the other members of the Class acquired Groupon's securities during the Class Period at artificially high prices and were damaged thereby.

171.     At the time of said misrepresentations and/or omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Lead Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Groupon was experiencing, which were not disclosed by Defendants, Lead Plaintiff and other members of the Class would not have purchased or otherwise acquired their Groupon securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

172.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

173.     As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**
**Violation of Section 20(a) of The Exchange Act**
**Against the Individual Defendants**

174.     Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

175.     Individual Defendants acted as controlling persons of Groupon within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's

operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

176.    In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

177.    As set forth above, Groupon and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

(a)    determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of

Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     awarding Lead Plaintiff and the Class their reasonable costs and expenses

incurred in this action, including counsel fees and expert fees; and

(d)     such other and further relief as the Court may deem just and proper.

## X.     JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury.

Dated: September 22, 2020                   POMERANTZ LLP

By /s/ *Louis C. Ludwig*
Patrick V. Dahlstrom
Louis C. Ludwig
10 South LaSalle Street, Suite 3505
Chicago, IL 60603
Telephone: (312) 377-1181
Email: pdahlstrom@pomlaw.com
      lcludwig@pomlaw.com

*Liaison Counsel for Lead Plaintiff and the Proposed Class*

GLANCY PRONGAY & MURRAY LLP
Robert V. Prongay (admitted *pro hac vice*)
Christopher Fallon (*pro hac vice* pending)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Email: rprongay@glancylaw.com
      cfallon@glancylaw.com

KIRBY MCINERNEY LLP
Ira M. Press (admitted *pro hac vice*)
Thomas W. Elrod (admitted *pro hac vice*)
250 Park Avenue, Suite 820
New York, NY 10177
Telephone: (212) 371-6600
Email: ipress@kmllp.com
      telrod@kmllp.com

*Counsel for Lead Plaintiff and Lead Counsel for the Proposed Class*