**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| LAZAR MACOVSKI, Individually and On Behalf of All Others Similarly Situated, | |
| Plaintiff, | No. 1:20-cv-02581 |
| v. | Hon. Matthew F. Kennelly |
| GROUPON, INC., RICH WILLIAMS, and MELISSA THOMAS, | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
<u>MOTION TO DISMISS PLAINTIFF'S AMENDED CLASS ACTION COMPLAINT</u>**

Matthew R. Kipp
William E. Ridgway
Andrew J. Fuchs
Jennifer H. Berman
Laura Bernescu
SKADDEN, ARPS, SLATE,
 MEAGHER & FLOM LLP
155 North Wacker Drive
Chicago, Illinois  60606
(312) 407-0700
matthew.kipp@skadden.com
william.ridgway@skadden.com
andrew.fuchs@skadden.com
jennifer.berman@skadden.com
laura.bernescu@skadden.com

*Counsel for Defendants*

November 23, 2020

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ..........................................................................................................................1

STATEMENT OF FACTS ...........................................................................................................3

ARGUMENT ................................................................................................................................5

I.      Plaintiff Fails to State a Claim for Securities Fraud Against Any of the
        Defendants. ........................................................................................................................5

        A.      The Complaint Does Not Satisfy the PSLRA's Specificity Requirements. ............6

        B.      Plaintiff Fails to Plead That Defendants' Statements or Alleged Omissions
                Were Materially False or Misleading When Made...............................................7

                1.      Groupon's Q2 2019 Earnings Announcement ............................................7

                2.      Groupon's Q3 2019 Earnings Announcement ..........................................14

                        a.      Statements Concerning Select and Goods ....................................15

                        b.      Guidance Reaffirmation..................................................................19

                3.      December 11, 2019 Barclays Conference Presentation............................20

        C.      Plaintiff Fails to Plead a Violation of Item 303. ....................................................22

        D.      Plaintiff Fails to Plead Scienter.............................................................................24

                1.      Plaintiff Relies on Improper Group-Pleading. .........................................24

                2.      Plaintiff Fails to Raise A Strong Inference of Scienter............................25

                3.      Plaintiff Fails to Identify Any Motive for the Alleged Fraud...................26

        E.      Plaintiff Fails to Plead Loss Causation. ...............................................................27

                1.      Disclosures Concerning Select ................................................................29

                2.      Disclosures Concerning Goods................................................................30

II.     Plaintiff Fails to State a Claim for Controlling Person Liability. ......................................30

CONCLUSION.............................................................................................................................31

## TABLE OF AUTHORITIES

Page(s)

### CASES

*Alizadeh v. Tellabs, Inc.*,
No. 13 C 537, 2014 WL 2726676 (N.D. Ill. June 16, 2014) .............................................7

*Arazie v. Mullane*,
2 F.3d 1456 (7th Cir. 1993) ......................................................................................11

*Asher v. Baxter International Inc.*,
377 F.3d 727 (7th Cir. 2004) ...............................................................................11, 12

*Boca Raton Firefighters' & Police Pension Fund v. DeVry Inc.*,
No. 10 C 7031, 2012 WL 1030474 (N.D. Ill. Mar. 27, 2012) ..........................................30

*City of Livonia Employees' Retirement System & Local 295/Local 851, IBT v. Boeing Co.*,
711 F.3d 754 (7th Cir. 2013) ...........................................................................24, 25, 26

*Conlee v. WMS Industries*,
No. 11 C 3503, 2012 WL 3042498 (N.D. Ill. July 25, 2012) ............................................7

*Construction Workers Pension Fund-Lake County & Vicinity v. Navistar International Corp.*,
No. 13 C 2111, 2014 WL 3610877 (N.D. Ill. July 22, 2014) .............................................7

*Cornielsen v. Infinium Capital Management*,
916 F.3d 589 (7th Cir. 2019) ....................................................................................25

*Davis v. SPSS, Inc.*,
385 F. Supp. 2d 697 (N.D. Ill. 2005) ........................................................10, 18, 22, 27

*Desai v. General Growth Properties, Inc.*,
654 F. Supp. 2d 836 (N.D. Ill. 2009) .........................................................................12

*DiLeo v. Ernst & Young*,
901 F.2d 624 (7th Cir. 1990) ......................................................................................1

*Dura Pharmaceuticals, Inc. v. Broudo*,
544 U.S. 336 (2005)........................................................................................6, 27, 29

*Gallagher v. Abbott Laboratories*,
269 F.3d 806 (7th Cir. 2001) ..............................................................................9, 18, 22

*In re HealthCare Compare Corp. Securities Litigation*,
75 F.3d 276 (7th Cir. 1996) ...............................................................................12, 18

ii

*Higginbotham v. Baxter International Inc.*,
   495 F.3d 753 (7th Cir. 2007) ...................................................................................26

*Hughes v. Accretive Health, Inc.*,
   No. 13 CV 3688, 2014 WL 4784082 (N.D. Ill. Sept. 25, 2014)..........................................7

*Lauria v. Biosante Pharmaceuticals, Inc.*,
   968 F. Supp. 2d 951 (N.D. Ill. 2013) ......................................................................7

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011)..........................................................................................5

*Menzies v. Seyfarth Shaw LLP*,
   943 F.3d 328 (7th Cir. 2019) .................................................................................28

*Metzler Investment GMBH v. Corinthian Colleges, Inc.*,
   540 F.3d 1049 (9th Cir. 2008) ................................................................................28

*In re Midway Games, Inc. Securities Litigation*,
   332 F. Supp. 2d 1152 (N.D. Ill. 2004) ..........................................................10, 12, 18, 22

*In re Newell Rubbermaid Inc. Securities Litigation*,
   No. 99 C 6853, 2000 WL 1705279 (N.D. Ill. Nov. 14, 2000)...........................................11

*Pension Trust Fund for Operating Engineers v. Kohl's Corp.*,
   895 F.3d 933 (7th Cir. 2018) .................................................................................27

*Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*,
   679 F.3d 952 (7th Cir. 2012) .................................................................................27

*Pugh v. Tribune Co.*,
   521 F.3d 686 (7th Cir. 2008) .............................................................................25, 30

*Ray v. Citigroup Global Markets, Inc.*,
   482 F.3d 991 (7th Cir. 2007) .............................................................................27, 28

*Rochester Laborers Pension Fund v. Monsanto Co.*,
   883 F. Supp. 2d 835 (E.D. Mo. 2012)....................................................................14, 19

*Ross v. Career Education Corp.*,
   No. 12 C 276, 2012 WL 5363431 (N.D. Ill. Oct. 30, 2012) ...........................................26, 27

*Rossbach v. VASCO Data Security, International Inc.*,
   No. 15-CV-06605, 2018 WL 4699796 (N.D. Ill. Sept. 30, 2018) .......................................7

*Silverman v. Motorola, Inc.*,
   No. 07 C 4507, 2008 WL 4360648 (N.D. Ill. Sept. 23, 2008)........................................10, 22

*Stavros v. Exelon Corp.*,
266 F. Supp. 2d 833 (N.D. Ill. 2003) ...............................................................12

*Takara Trust v. Molex Inc.*,
429 F. Supp. 2d 960 (N.D. Ill. 2006) ...............................................................25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007).................................................................................4, 11, 24

*Tricontinental Industries v. PricewaterhouseCoopers, LLP*,
475 F. 3d 824 (7th Cir. 2007) ....................................................................28, 29

*Twin Master Fund, Ltd. v. Akorn, Inc.*,
No. 19 C 3648, 2020 WL 564222 (N.D. Ill. Feb. 5, 2020)...............................24

*Van Noppen v. Innerworkings, Inc.*,
136 F. Supp. 3d 922 (N.D. Ill. 2015) ...............................................................27

*West Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*,
No. 19-CV-01323, 2020 WL 6118605 (N.D. Ill. Oct. 15, 2020) ......................22

*In re Williams Securities Litigation—WCG Subclass*,
558 F.3d 1130 (10th Cir. 2009) .......................................................................29

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) ...........................................................................26

## STATUTES AND REGULATIONS

15 U.S.C. § 78u-4 ........................................................................................6, 27

15 U.S.C. § 78u-5 .............................................................................................12

17 C.F.R. § 229.303 ................................................................................22, 23, 24

**INTRODUCTION**

Plaintiff filed this suit in the wake of a large decline in Groupon's stock price following the Company's February 2020 earnings release. In that release, Groupon—an e-commerce company that connects customers to sellers of goods and services—announced that it had extremely poor sales during the crucial holiday shopping season. As Groupon's performance in prior years showed, holiday sales were a significant part of Groupon's overall financial performance; they could reverse its fortunes in any given year. In the fourth quarter of 2019, Groupon's poor sales—particularly in its Goods category—greatly depressed its quarterly and annual financial results. When Groupon announced those results, its stock dropped by 44%.

As the law in this Circuit has long recognized, the securities laws "do not protect investors against [business] reverses." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). Instead, to survive a motion to dismiss, a securities plaintiff must allege facts showing *fraud*. *Id*. Here, Plaintiff tethers almost his entire case to the notion that Groupon's statements earlier in 2019 about a new, subscale customer loyalty program artificially inflated Groupon's stock price between July 30, 2019 and February 18, 2020 (the "Class Period"). Groupon had announced this program, called Groupon Select ("Select"), on July 30, 2019. In its February 2020 earnings announcement, along with its disappointing financial results and new measures to transform its business, Groupon also disclosed that it would no longer invest in attracting new Select members. (¶¶68, 81.)

The very statements that Plaintiff cites in his complaint undermine his theory of fraud. Select had no bearing on Groupon's expected financial performance. Instead, as Groupon expressly disclosed, Select was an "early" testing "experiment" (¶¶73, 81) that included just *0.32%* of Groupon's customers at the start of the Class Period (¶¶27 n.3, 68). Given its size, any upside that Select offered in the near-term could not possibly have had a material impact on Groupon's prospects. What is more, Groupon disclosed at the start of the Class Period that marketing expenses

for Select and other initiatives announced that day might *adversely* affect Groupon's short-term financial results. (¶73.)

Plaintiff's "puzzle pleading" tactics cannot salvage his illogical fraud theory. His 78-page, 177-paragraph Complaint advances a media loop of block quotes and extraneous detail, but he never pleads with the required particularity which of the many facts contained in those quotes were false and why. Although dismissal is warranted for this reason alone, Plaintiff also fails to satisfy the PSLRA's requirements for pleading: (i) an actionable misstatement or omission, (ii) scienter, or (iii) loss causation.

*First*, the long statements identified in the Complaint are not actionable because they are either: (i) too vague to be material, (ii) "forward-looking," (iii) reasonable at the time made, or (iv) accompanied by meaningful cautionary language. Also, the "trends" that Defendants supposedly omitted did not exist until after Defendants made the affirmative statements identified in the Complaint.

*Second*, Plaintiff fails to plead scienter. In addition to improperly relying on group-pleading, the Complaint fails to plead facts demonstrating that Defendants made any forward-looking statements with actual knowledge that those statements were false, or that they acted knowingly or recklessly when making any other statement. Plaintiff also fails to identify any motive to commit securities fraud. And, Plaintiff's theory that Defendants concealed information that they knew would become public within months strains credulity and is a premise courts routinely reject.

Plaintiff's allegations regarding Ms. Thomas are particularly untenable. Ms. Thomas did not become Groupon's acting CFO until August 23, 2019 (three weeks into the Class Period (¶18)), and Plaintiff alleges she made no statements at all until November 5, 2019. Thus, Ms. Thomas

2

could not possibly have sought to mislead the market *throughout* the Class Period; she became acting CFO three weeks *after* it started and did not speak publicly until November 5, 2019.

*Third*, Plaintiff fails to plead loss causation. Plaintiff's allegation that Groupon's stock price was artificially inflated by the "promise" of Select (¶58)—an experiment that, at its height, involved just *0.57%* of Groupon's 45 million customers (¶27 n.3, 77)—and then fell because the experiment stalled after just three fiscal quarters, is implausible on its face.

For these reasons, the Court should dismiss the Complaint with prejudice.

## STATEMENT OF FACTS

Groupon is a global e-commerce marketplace that connects consumers with merchants offering local activities, goods and merchandise, and travel. (¶2.) Defendant Richard Williams was Groupon's CEO during the Class Period. (¶17.) Defendant Melissa Thomas was named Groupon's interim CFO on August 23, 2019, three weeks into the Class Period, and became the Company's permanent CFO on February 18, 2020, the final day of the Class Period. (¶18.)

As it repeatedly disclosed to the market, Groupon had for years been facing challenges caused, in part, by "severe 'traffic headwinds' in [] two of its principal marketing channels" and by "customer attrition." (¶¶3-4, 25-27.) Groupon continued to experience those challenges during the first half of 2019. (*Id.*) Groupon sought to develop long-term strategies for mitigating these issues and increasing competition (*e.g.*, ¶¶83, 151) by testing new experimental programs. (*See* ¶4 ("Select was the latest in a line of new big ideas").) Groupon announced one such initiative, a paid membership program called Groupon Select, that offered additional purchase discounts and other benefits, on the first day of the Class Period during its Q2 2019 earnings announcement. (¶68.)

Groupon disclosed that Select had 150,000 members, or 0.32% of Groupon's 46.2 million customers. (¶¶27, 68.) When asked if Groupon was "thinking about [Select] as a way to subsidize growth and frequency," Mr. Williams stated that while in the long term Groupon was "looking for

3

a way to monetize what has historically been member-like behavior in [its] customer base," in the near term its "focus [was] entirely on gain[ing] traction in the program . . . and build[ing] those healthier relationships over time." (¶71.) Groupon stated that its new initiatives, including Select, "may be important drivers for increasing customer purchase frequency and growing [its] business over time," but cautioned that "gross profit and operating income may be adversely impacted in the near term" as a result of the initiatives' up-front investments. (¶73.) Groupon made similar statements during its Q3 2019 earnings announcement (¶83), as did Mr. Williams at a December 11, 2019 investor conference, in each instance emphasizing Select's experimental nature (Ex. A (Barclays Tr.) at 6-7 ("[Select has] been a test bed for us"; "it's an early-stage program")).[1]

On February 18, 2020, Groupon announced "poor" Q4 and full-year 2019 financial results (¶¶101, 104), as "[its] fourth quarter results . . . evidenced deepening customer, unit and gross profit declines." (¶103.) "**Goods gross profit decreased 45%** (¶103 (emphasis in Complaint)), revenue and gross profit were down 23% and 15%, respectively (*id.*), and Groupon reported $227.2 million in adjusted EBITDA for 2019, below its $270 million guidance (¶104). Groupon explained that, unlike prior years, it had seen unexpectedly low customer traffic throughout Q4 2019, "ultimately imped[ing] performance in all of [its] categories," but especially so for the "highly seasonal" Goods segment, which was "historically, a significant driver of traffic" during the "holiday peak season." (¶¶106-11; *see* ¶103 (North America Goods units "down 32%").) "[M]idway through the fourth quarter," Groupon concluded that it was "not competing effectively in Goods." (¶107.) It thus announced a "transformational plan" for 2020 to re-focus its strategy on investing in Local and phasing out Goods "in light of [its] especially poor performance." (¶106.)

---

[1] The transcript from the Barclays conference is quoted in the Complaint (¶¶92-93) and incorporated therein by reference. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

Groupon also disclosed that Select had underperformed during Q4 2019 due to "higher than anticipated customer acquisition costs" and lower than expected numbers of enrollees converting to paid members. (¶114.) In addition, Groupon found that, "in the second half of 2019," Select "began over-indexing towards [the] Goods category"—meaning Select members were purchasing more Goods products than Local experiences. (*Id*.) Groupon stated that "[t]he program's fourth quarter performance showed that [Select] [could not] provide the ROI needed for it to be a key priority" for Groupon at the time. (¶113.) Groupon thus announced that it would continue Select, but would not invest in attracting new members. (*Id*.)

Notably, although Plaintiff bases his securities fraud theory almost entirely on Groupon's disclosures surrounding Select, nothing in Groupon's Q4 2019 earnings release, Form 10-K, or quarterly letter to stockholders attributed *any* of the reported adjusted EBITDA miss to Select's performance in Q4 2019. (*See, e.g.*, ¶¶101-116.) Nor does Plaintiff allege that Groupon's earnings miss resulted from Select's performance (nor could he given that only *0.57%* of Groupon's customers were Select members). (¶27 n.3, 77.)

On February 19, 2020, Groupon's stock price fell from the previous day's closing price of $3.05 to $1.70 per share. (¶116.)

## ARGUMENT

I.      **Plaintiff Fails to State a Claim for Securities Fraud Against Any of the Defendants.**

Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 make it unlawful to, "among other things, 'make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011) (quoting 17 C.F.R. § 240.10b-5(b)). To state a claim for securities fraud, a plaintiff must allege, among other elements, (1) a material misstatement or omission; (2) scienter, *i.e.*, "a wrongful state

5

of mind"; and (3) loss causation, *i.e.*, "a causal connection between the material misrepresentation and the loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).

### A. The Complaint Does Not Satisfy the PSLRA's Specificity Requirements.

The Court should dismiss the Complaint because it uses a pleading tactic known as "puzzle pleading"—a practice many courts in this district have rejected. Because the Complaint block quotes lengthy passages, without identifying the particular statements it contends are false, the Complaint runs afoul of the PSLRA, which requires a plaintiff to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1), (3) (court "shall . . . dismiss the complaint" if it does not meet this requirement).

Here, the Complaint simply cuts and pastes lengthy quotes from Groupon's Class Period public filings and investor communications—many of which Plaintiff alleges are mere "examples" of so-called "narratives" or "themes" that Defendants communicated to investors (*see, e.g.*, ¶¶68, 70, 77, 79, 87)—and then alleges, in boilerplate fashion, that the communications were "materially misleading because they omitted to disclose [] material adverse facts and trends set forth" earlier in the Complaint. (¶¶72, 74, 82, 84, 89, 94.) Almost every series of block quotes is followed by a near verbatim set of "reasons" that purportedly renders Defendants' statements misleading. Indeed, in some instances, the purported "facts and trends" that Plaintiff alleges rendered the preceding block quotes misleading did not even exist when the statements were made. It thus is impossible to use those purported "facts and trends" to establish that the statements were materially false or misleading when made. Moreover, Plaintiff fails to couple specific statements made by Defendants with *any* concrete contrary information known to them at the time they made each statement.

Numerous courts in this district have dismissed securities fraud complaints due to their use of such "puzzle pleading." *See, e.g.*, *Rossbach v. VASCO Data Sec., Int'l Inc.*, No. 15-CV-06605, 2018 WL 4699796, at *5-6 (N.D. Ill. Sept. 30, 2018) ("It is of the utmost importance for Plaintiff

to properly pinpoint what Defendants said that Plaintiff believes to have been unlawful, and the PSLRA requires a specific explanation as to why each specific statement was false or misleading. Plaintiff's approach of presenting long block quotes and general references to [unrelated] matters . . . [is] not sufficient."); *Alizadeh v. Tellabs, Inc.*, No. 13 C 537, 2014 WL 2726676, at *5 (N.D. Ill. June 16, 2014) ("[T]he PSLRA 'prevents a plaintiff from skirting dismissal by filing a complaint laden with vague allegations of deception unaccompanied by a particularized explanation stating why the defendant's alleged statements or omissions are deceitful.' By failing to identify exactly which facts controvert each specific false or misleading statement, Plaintiffs fall short of the PSLRA's pleading standard.") (citation omitted).[2] The same is warranted here.

## B.       Plaintiff Fails to Plead That Defendants' Statements or Alleged Omissions Were Materially False or Misleading When Made.

The Complaint fares no better under a statement-by-statement analysis. It discusses three investor communications during the Class Period: Groupon's Q2 2019 earnings announcement, its Q3 2019 earnings announcement, and a December 11, 2019 analyst conference. (¶¶66-94.) As demonstrated below, Plaintiff fails to identify any actionable misleading statements or omissions.

### 1.       Groupon's Q2 2019 Earnings Announcement

On July 30, 2019, Groupon announced its Q2 2019 earnings and financial results. (¶66.) Groupon issued a press release, a letter to shareholders from Mr. Williams, a presentation titled

---

[2]       *See also Hughes v. Accretive Health, Inc.*, No. 13 CV 3688, 2014 WL 4784082, at *5 (N.D. Ill. Sept. 25, 2014) (dismissing complaint containing lengthy block quotes from earnings statements followed by the same boilerplate allegations); *Lauria v. Biosante Pharms., Inc.*, 968 F. Supp. 2d 951, 957 (N.D. Ill. 2013) (dismissing complaint where "[i]t appears that the plaintiffs intend the court and the defendants to parse through their complaint in an attempt to: (1) locate reasons why the plaintiffs believe that the italicized/bolded statements are misleading; and (2) find specific facts corresponding to those statements that 'giv[e] rise to a strong inference that the defendant acted with the required state of mind.'. . . [But] the court cannot ascertain which allegations are meant to match up with the italicized/bolded portions of the complaint."); *accord Constr. Workers Pension Fund-Lake Cnty. & Vicinity v. Navistar Int'l Corp.*, No. 13 C 2111, 2014 WL 3610877, at *5 (N.D. Ill. July 22, 2014); *Conlee v. WMS Indus., Inc.*, No. 11 C 3503, 2012 WL 3042498, at *4 (N.D. Ill. July 25, 2012).

7

"2Q19 Earnings," and a Form 10-Q. (*Id.*) The following morning, Groupon hosted a conference call to discuss its financial results. (¶69.) Plaintiff alleges that, during its Q2 2019 earnings announcement, Defendants "omitted to disclose" certain "material adverse facts and trends concerning Select." (¶¶72, 74.)[3] But the facts that Plaintiff himself pleads show that the purportedly omitted information did not even exist when that earnings announcement took place. And none of the affirmative statements that Plaintiff quotes from the announcement can give rise to a securities fraud claim. Each is either too vague to be considered material, or is a forward-looking statement that had a reasonable basis when made and was accompanied by meaningful cautionary language. Any claim based on the Q2 2019 earnings announcement therefore must be dismissed.

Groupon opened the Q2 2019 earnings announcement by reporting "double-digit" declines in most financial metrics, which it attributed to having "fewer customers and lower traffic." (¶67.) Groupon stated that it was "sharpen[ing] [its] focus on engaging higher-value customers," and was "seeing encouraging progress" through initiatives that it "believ[ed] [would] lay the foundation for long-term, profitable growth." (¶68.)

Among other initiatives, Groupon announced that it was "testing" a "new program," Select, which it "believe[d]" could potentially be one of many "important drivers for increasing customer purchase frequency and growing business over time." (¶¶68, 71, 73.) The Company explained that Select was in its "early days," but that the "initial indicators" were showing "meaningful step-ups in purchase frequency, meaningful step-ups in the average order value, and a greater propensity to search." (*Id.*) Groupon stated that Select had at that time about 150,000 members (or 0.32% of Groupon's 46.2 million customers) and was "scaling quickly." (¶¶27 n.3, 68, 70.) Groupon

---

[3]      Although Plaintiff refers to the Q2 2019 earnings announcement as one in which "Defendants" participated (¶¶72, 74), Ms. Thomas was not interim CFO at the time (¶18), and Plaintiff does not allege that she made or participated in any of the Q2 2019 statements. Any allegations relating to the Q2 2019 earnings thus cannot be attributed to Ms. Thomas, and must be dismissed against her for that reason alone.

explained that its focus at the time was not on monetizing growth, but rather was "entirely [on] gain[ing] traction in the program . . . , [and] get[ting] as many of [its] customers into the Select experience as [it] possibly [could] so that [it could] continue to add value . . . over time." (¶71.)

Plaintiff does not, and cannot, allege that these statements or any others made during the Q2 2019 earnings announcement were actually false. Instead, he alleges that the Q2 2019 statements—*i.e.*, statements at the end of the *first half of 2019*—were "materially misleading because they omitted to disclose . . . that Select, *during the second half of 2019*, was over-indexing to Goods . . . and consequently failing to (1) meaningfully boost Local purchase frequency, and (2) operate profitably or generate incremental gross profit." (¶¶72-73 (emphasis added).) Plaintiff thus faults Groupon for "omitting to disclose" information that did not exist at the time it made these statements. This temporal flaw is fatal to Plaintiff's claims concerning the Q2 2019 earnings announcement. *See Gallagher v. Abbott Labs*., 269 F.3d 806, 810 (7th Cir. 2001) (dismissing claim based on failure to disclose March 17 regulatory letter, stating that "[u]nless Abbott had a time machine, it could not have described on March 9 a letter that had yet to be written").

Plaintiff cannot state a securities fraud claim based on the omission of information that did not exist at the time the alleged omission took place. Among the statements that Groupon did make, Plaintiff does not identify any that were materially false or misleading. For example, Plaintiff points to Groupon's statements regarding the "encouraging progress" that it was making toward its "key strategic priorities to build the daily habit in local commerce," which he alleges misleadingly told a "narrative of improvement and progress . . . *driven by* [] *Select*." (¶68 (emphasis added).) The allegation that Groupon suggested that Select—a trial program involving only 0.32% of Groupon's customers at the time—was driving meaningful progress on its key strategic goals is not only illogical, but finds no support in the statements that Groupon actually made. Although

9

it stated that Select's few enrollees were showing "significantly improved purchase frequency, higher average order value and increased customer propensity to search" for Groupon offers (*id.*), Groupon did not say that this tiny experiment was driving substantial business at the time.[4]

Moreover, statements like those regarding the "encouraging progress" that Groupon was seeing and its "excit[ement]" about Select's "very positive" initial indicators are too vague to give rise to a securities fraud claim, especially given that Plaintiff's claims rely on a fraud-on-the-market theory. Courts routinely hold that statements like these are immaterial as a matter of law. *See Silverman v. Motorola, Inc.*, No. 07 C 4507, 2008 WL 4360648, at *9 (N.D. Ill. Sept. 23, 2008) ("[s]tatements that [] new products are 'competitive' or 'compelling'" or that company is "well-positioned to continue creating value" are "immaterial as a matter of law"); *In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152, 1164 (N.D. Ill. 2004) ("Courts have held immaterial as a matter of law 'loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available.' . . . Scrutiny of [such] statements . . . is 'especially robust' in cases involving a fraud-on-the-market theory of liability." (citations omitted)).

Finally, many of the statements made in connection with the Q2 2019 earnings announcement are non-actionable "forward-looking statements." As Groupon sets forth in all of its SEC filings, including the Q2 2019 10-Q, words such as "believe," "should," "may," "will," "could," "expect," "continue," and other like expressions are intended to identify forward-looking statements that "involve risks and uncertainties that could cause [the Company's] actual results to

---

[4] Moreover, although Groupon decided to stop investing in attracting new Select members in February 2020, that does not mean that its purported "narrative of improvement and progress," including its statements about the "exciting" results it was seeing from Select, was false or misleading when delivered in July 2019. *See, e.g.*, *Davis v. SPSS, Inc.*, 385 F. Supp. 2d 697, 712 (N.D. Ill. 2005) (increase in contract's cost over its life did not render false statement about contract's cost when the statement was made).

10

differ materially from those expressed or implied in [its] forward-looking statements." (Ex. B (Q2 2019 10-Q, dated July 30, 2019) at 3.)[5] Many of the statements that Plaintiff identifies as false or misleading fall into this category. For example, in his quarterly letter to investors, Mr. Williams stated that Groupon was making progress on various initiatives, including Select, and that the Company "*believe[d]*" it could lay a foundation for future growth. (¶68 (emphasis added).) During the conference call, Mr. Williams said that, based on "indicators that [Groupon had] seen so far," a Select customer "*should* earn [Groupon] at least $55 to $60 of gross profit on a per customer basis," and that Groupon's "goal *pushing forward*" was to "gain traction in the program . . . so that [it could] *continue* to add value . . . and build those healthier relationships *over time*." (¶71 (emphases added).) And in the MD&A section of its 10-Q, Groupon stated that it "*believe[d]*" that the initiatives it was testing, including Select, "*may* be important drivers for increasing customer purchase frequency and growing our business *over time*." (¶73 (emphases added).)

Courts recognize that forward-looking statements like these, which contain "predictions of future performance[,] are inevitably inaccurate because things almost never go exactly as planned." *Arazie v. Mullane*, 2 F.3d 1456, 1468 (7th Cir. 1993); *see also Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 730 (7th Cir. 2004), as amended (Sept. 3, 2004) ("[A]n unexpected turn of events cannot demonstrate a securities problem at all, as there cannot be 'fraud by hindsight.'" (citation omitted)); *In re Newell Rubbermaid Inc. Sec. Litig.*, No. 99-cv-6853, 2000 WL 1705279, *10 (N.D. Ill. Nov. 14, 2000) (forward-looking statements that "turn out to be inaccurate are not fraudulent simply because later events show that a different projection would have been more reasonable"). It is well-settled that forward-looking statements need only have a "reasonable basis." *In re*

---

[5]    Groupon's Q2 10-Q and its other SEC filings are publicly available at www.sec.gov. Its Class Period SEC filings also are cited in the Complaint, though not attached as exhibits. The Court may take judicial notice of Groupon's SEC filings in ruling on this motion to dismiss. *See Tellabs*, 551 U.S. at 322.

11

*HealthCare Compare Corp. Sec. Litig*., 75 F.3d 276, 282 (7th Cir. 1996). Thus, to state a securities fraud claim based on forward-looking statements, a plaintiff must plead "sufficient facts" to call into question the reasonableness of the forward-looking statements *at the time they were made. Id*.

Plaintiff has not alleged facts to suggest that any of the allegedly misleading forward-looking statements made during the Q2 2019 earnings announcement lacked a reasonable basis at the time they were made. Indeed, the information that Plaintiff alleges undercut Groupon's Q2 2019 statements did not come into existence until *after* the statements were made. (¶¶72, 74.)

These forward-looking statements also are protected under the PSLRA's statutory safe harbor, which affirmatively shields speakers from liability for "forward-looking statements" that are "accompanied by meaningful cautionary statements."[6] 15 U.S.C. § 78u-5(c). Cautionary statements are meaningful if they "put[] an investor on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward." *Stavros v. Exelon Corp*., 266 F. Supp. 2d 833, 843 (N.D. Ill. 2003) (quotation marks omitted). "The PSLRA does not require the most helpful caution; it is enough to identify important factors that could cause actual results to differ materially from those in the forward looking statement." *Asher*, 377 F.3d at 734 (quotation marks omitted). Cautionary statements may accompany the forward-looking statement, or be incorporated by reference, to be "absorbed into the market." *Desai v. Gen. Growth Props., Inc.*, 654 F. Supp. 2d 836, 844 (N.D. Ill. 2009).

Here, the forward-looking statements made about Select during the Q2 2019 earnings announcement were accompanied by meaningful cautionary language that made clear that the actual future performance of both Select and Groupon as a whole could materially differ from the

---

[6]  The safe harbor also protects forward-looking statements that are immaterial, or were not made "with actual knowledge" of the falsity or misleading nature of the statement. 15 U.S.C. § 78u-5(c). But when a forward-looking statement is accompanied by meaningful cautionary statements, the state of mind of the individual making the statement is irrelevant. *See In re Midway Games*, 332 F. Supp. 2d at 1168.

aspirational and even expected results that the Company discussed. Groupon's 10-Q, which is incorporated by reference into all of its investor communications, explicitly stated that its "forward-looking statements involve risks and uncertainties that could cause our actual results to differ materially from those expressed or implied in our forward-looking statements. Such risks and uncertainties include, but are not limited to, . . . execution of our business and marketing strategies; retaining existing customers and adding new customers; . . . [and] competing successfully in our industry." (Ex. B at 3.) Groupon meaningfully cautioned investors of the risks that might negatively affect its business, including the risk that certain business strategies, including new experimental initiatives such as Select, might not pan out as hoped or expected. (*See id*. at 53 (incorporating by reference the risk factors disclosed in Groupon's 2018 10-K).)

Groupon also provided clear cautionary language specific to Select. Both during the Q2 2019 conference call and in the quarterly letter to investors, Groupon and Mr. Williams repeatedly warned that Select was a "new" initiative that was in its "early days" and was still being "tested," and that at that time Defendants had only "initial indicators" of its potential success. Indeed, each of the lengthy swaths of text that Plaintiff quotes includes multiple such reminders. (*See* ¶68 (announcing Select as "a new program"; stating that "[i]nitial indicators are very positive," but that "[i]t's still early days"); ¶71 ("[T]his was something that we started testing early last year, and . . . it's still early days"; noting that hopes for Select were "[b]ased on [] indicators that we've seen so far").).

Finally, as the Complaint itself notes, the MD&A section of Groupon's 10-Q included a risk factor stating that Groupon was "focusing [its] efforts on growing customer awareness" of various new programs, including Select, and "[a]s such, [its] gross profit and operating income may be adversely impacted in the near term." (¶73.) Defendants thereby warned investors that

13

even if Select was successful in the long run—which Defendants made clear was not guaranteed, given its "new" and "experimental" nature, not to mention its limited size—Groupon's financial results during the program's ramp-up period might not reflect that success, and in fact could be negatively affected by expenditures directed at growing customer awareness.

In light of Groupon's use of meaningful cautionary language regarding Select, its forward-looking statements about the program cannot give rise to a securities fraud claim. *See, e.g.*, *Rochester Laborers Pension Fund v. Monsanto Co.*, 883 F. Supp. 2d 835, 881 (E.D. Mo. 2012) (applying safe harbor where, "[i]n addition to the specific, detailed risks set out in the public filings, press releases, and the written materials accompanying investor conferences," defendants repeatedly warned of risks associated with new product launch, stating, among other things, that launch would come "with a cost" and might not "immediately translate into share shifts," and that the new product was still "in an early introductory year . . . so relative to the overall business it [was] still quite small," and would not contribute to the gross profit increase in the business).

### 2. Groupon's Q3 2019 Earnings Announcement

On November 4, 2019, Groupon announced its Q3 2019 earnings and financial results. (¶75.) It issued a press release, a letter from Mr. Williams, a presentation titled "3Q19 Earnings," and a Form 10-Q. (*Id.*) The next day, Groupon hosted a conference call to discuss its results. (¶78.) Plaintiff alleges that, during the Q3 2019 earnings announcement, Defendants "omitted" material information about both Select and Goods, and reaffirmed full-year earnings guidance that, according to Plaintiff, "was not achievable" in light of the omitted information. (¶89.)

This claim fails because Plaintiff does not plead facts showing that the purportedly omitted information existed at the time the Q3 2019 earnings announcement took place. And of the affirmative statements that Plaintiff quotes from this earnings announcement, none can give rise to a securities fraud claim, as they are all either too vague to be considered material, or are forward-

14

looking, had a reasonable basis when made, and were accompanied by meaningful cautionary language. Any claim based on the Q3 2019 earnings announcement therefore must be dismissed.

As it had in the prior quarter, Groupon announced that it had experienced "substantial" quarter-over-quarter and year-over-year declines in most financial metrics for Q3 2019. (¶76.) Mr. Williams gave an overview of Groupon's goals and the challenges it was facing in achieving them, noting that although the "product and engineering teams [were] delivering enhancements . . . with an ambitious future roadmap," Groupon was "not yet moving fast enough to offset [its] traffic challenge" of "over $100 million of annual . . . headwinds." (¶77.) That said, Mr. Williams stated that Groupon "believe[d] that the improvements [it was] making to the customer experience . . . [would] encourage [its] customers to return to Groupon again and again," and that it "believe[ed] [it] ha[d] the right strategy in place to deliver on the promise of [its] marketplace." (*Id.*)

### a.      Statements Concerning Select and Goods

With respect to Select, Groupon stated that it was "pleased" and "encourag[ed]" by Select's results to date, but reiterated that it was "still [in] very early" stages. (¶77.) Mr. Williams stated that of Groupon's 45.3 million customers, nearly 260,000 (0.57%) had joined Select, that these "first small cohorts [were] barely through their first year with the program," and that Groupon "still ha[d] work to do to fully build out the infrastructure necessary for Select to run at scale." (¶¶27 n.3, 45, 79.) He further stated that "early" results showed that "on average, in the first six-months post-enrollment, Select members increased purchase frequency by about 60% and average order values by about 20%." (*Id.*) Based on these early results, Groupon "expect[ed] overall the program to be net neutral impact on [gross profit] in Q4." (¶81.) Mr. Williams stated that by "mak[ing] progress" with Select, Groupon "believe[d] [it could] unlock the potential of [its] financial model and deliver long-term gross profit growth," but he reminded investors that "Select was an experiment, . . . a trial that [the Company] . . . continue[d] to develop over time." (*Id.*)

15

With respect to Goods, Groupon reported that the segment was facing "intense competition," which, along with lower customer counts and decreased customer traffic, contributed to the significant financial declines that the Company was experiencing. (¶83.)

Again, Plaintiff does not allege that any of these statements, or any others made in connection with the Q3 2019 earnings announcement concerning Select and Goods, were actually false. Instead, Plaintiff alleges that such statements about Select and Goods were "materially misleading because they omitted to disclose [] material adverse facts and trends" purportedly then known to Defendants. (¶¶82, 84.) Plaintiff alleges that Defendants "omitted to disclose" that:

> Goods was no longer able to compete effectively for customers and consequently was (1) being abandoned by its customer base, (2) failing to serve as a meaningful business driver for Local, and (3) discontinued by Groupon; and

> Select, during the second half of 2019, was over-indexing to Goods at a time when Defendants later admitted that it had become "abundantly clear" to them that Groupon was not competing effectively in Goods, to the point where Defendants were planning to exit that business altogether, and that consequently Select was failing to (1) meaningfully boost Local purchase frequency, and (2) operate profitably or generate incremental gross profit (as Groupon's thinner profit margins on Goods were turned negative by the discounts and customer acquisition costs accompanying Select). (¶¶82, 84.)

*First*, Plaintiff's allegation that Defendants failed to disclose the declines Groupon was seeing in Goods is belied by his own allegations concerning the content of Defendants' disclosures. Plaintiff concedes that Defendants affirmatively disclosed that Groupon had experienced financial declines due to "fewer customers," "lower customer traffic," and "intense competition in [] Goods." (¶83.) And Defendants could not, at the end of Q3 2019, have disclosed that Groupon was going to phase out Goods because, as Plaintiff himself alleges, Groupon did not make that decision until, at the earliest, "midway through the fourth quarter." (¶¶61, 107.)

*Second*, Plaintiff does not allege facts demonstrating that Select had begun over-indexing to Goods by the time of the Q3 2019 earnings announcement—he alleges only that this took place

16

at some point "*during the second half of 2019*." (¶¶82, 84 (emphasis added).) And even if it had, Defendants would not have had any reason at that time to believe that the over-indexing might hinder Select's performance such that Defendants would need to disclose that information to make their statements about Select not misleading. Groupon never suggested that Select's tendency to over-index to Goods was a negative indicator for Select or its business overall. The most that can be inferred from Groupon's disclosures is that it decided not to invest in attracting new Select enrollees because Select customers made more purchases in Goods, a segment that Groupon announced its intent to phase out because the unit was not competing effectively. But as Plaintiff concedes, Groupon's inability to compete effectively in Goods only became clear to Defendants "*midway through the fourth quarter*" of 2019, *after* the Q3 2019 earnings announcement.

Again, Plaintiff cannot state a securities fraud claim based on the omission of information that did not exist when the alleged omission took place. And among the Q3 2019 statements that Defendants actually made, Plaintiff does not identify any that were materially false or misleading. For example, Plaintiff fails to plead any facts that would suggest that any statements concerning the "encouraging" results that Groupon was seeing from Select were false or misleading at the time those statements were made. (¶77.) Indeed, although Plaintiff makes much of the fact that Defendants stated that they were seeing a "60% increase in purchase frequency," and "member acquisition costs pay[ing ]back within six months . . . driven by both the recurring revenue from membership fees as well as incremental gross profit generated on membership-related transactions," he notably does not allege that Defendants did not actually see such results from Select at the time. (¶¶79-80.) And even if Select's initial success had eventually declined or even completely reversed (as Groupon warned)—again, something Plaintiff does not allege—that

17

would not render Defendants' statements regarding its results as of the end of Q3 2019 false at the time they were made. *See Gallagher*, 269 F.3d at 810; *Davis*, 385 F. Supp. 2d at 712.

Defendants' statements about Select's "encouraging" early results and their "excit[ement]" about Select's potential (¶¶77, 79-81) are also too vague to be materially misleading and thus are not actionable as a matter of law. *See In re Midway Games*, 332 F. Supp. 2d at 1164.

Finally, as with the Q2 2019 earnings announcement, many of Defendants' statements in connection with the Q3 2019 earnings announcement are non-actionable because they were forward-looking statements that are not adequately alleged to have lacked a reasonable basis when made and were, in any event, accompanied by meaningful cautionary language. For example, Plaintiff highlights various statements regarding Groupon's general business trajectory, such as statements that Defendants "*believe[d]* Groupon ha[d] the right strategy in place to deliver on the promise of [its] marketplace," and "*continue[d] to believe* [Groupon] ha[d] significant opportunity to grow [its] active customer base over the long term." (¶77.) Specifically, as to Select, Plaintiff highlights statements from Groupon that it "*continue[d]* to scale" the program, "*expect[ed]* overall the program to be net neutral impact on [gross profit] in Q4," and believed that initiatives like Select "*may* be important drivers for increasing purchase frequency and growing [Groupon's] business over time." (¶¶79, 81, 83 (emphases added).) Plaintiff cannot allege that these statements lacked a reasonable basis when made, as the information he alleges rendered the statements misleading did not emerge until *after* the statements were made. Such forward-looking statements cannot give rise to a claim for securities fraud. *See In re HealthCare Compare*, 75 F.3d at 282.

The PSLRA's safe harbor again applies here. As with the Q2 2019 earnings announcement, the Q3 2019 earnings announcement included numerous meaningful cautionary statements that warned investors of the risks inherent in making investment decisions based on the Company's

forward-looking statements, including those regarding Select. The Q3 2019 10-Q disclosed various "risks and uncertainties that could cause [Groupon's] actual results to differ materially from those expressed or implied in [its] forward-looking statements," including, but not limited to, "execution of [its] business and marketing strategies; retaining existing customers and adding new customers; . . . [and] competing successfully in [its] industry." (Ex. C (Q3 2019 10-Q, dated Nov. 4, 2019) at 3.) The MD&A section of the 10-Q stated that Groupon was "focusing [its] efforts on growing customer awareness" of new initiatives, including Select, and that "[a]s such, [its] gross profit and operating income may be adversely impacted in the near term." (¶83.) And Defendants again highlighted that Select was still in its "very early" stages of development and that the Company "still ha[d] some investments to make . . . on this core infrastructure." (¶¶77, 81, 83.) Indeed, Defendants explicitly reminded investors that "Select was an experiment, [] a trial that [the Company had] iterated on and [was] continu[ing] to develop over time." (¶77.) This type of cautionary language brings Defendants' forward-looking statements during the Q3 2019 earnings announcement within the PSLRA's safe harbor. *See Monsanto Co.*, 883 F. Supp. 2d at 881.

### b. Guidance Reaffirmation

During the Q3 2019 earnings announcement, Groupon also reaffirmed the earnings guidance it had provided in February 2019, stating that it "continue[d] to expect" to achieve adjusted EBITDA of approximately $270 million for the 2019 fiscal year. (¶¶86-87.)

Plaintiff alleges that Groupon's reaffirmation of its full-year guidance was "materially misleading because . . . the Guidance—in light of the collapse of both Goods and the cross-shipping business that Goods drives to Local, as well as Select's over-indexing to Goods and consequent unprofitability—was not achievable." (¶89.) Plaintiff's own allegations refute this conclusory assertion. Most glaringly, Plaintiff alleges that Groupon's inability to effectively compete in Goods was not known until "[m]idway through the fourth quarter." (¶64.) He does *not*

allege that this information was known as of November 4, 2019 (nor could he). Similarly, Plaintiff alleges only that Select was over-indexing to Goods "during the second half of 2019" (¶82), and does not allege that Defendants knew of this information as of November 4, 2019.

Plaintiff also cannot connect his allegation concerning Select's tendency to over-index to Goods to a projected earnings impact that could possibly have warranted a revision to the full-year guidance. He cannot explain how an experimental program involving just 0.57% of Groupon's 45.3 million customers could have any material impact on full-year guidance, let alone warrant a revision thereto. Moreover, Plaintiff acknowledges that Groupon's business is "highly seasonal" and that, historically, Goods performed best late in Q4 during the holiday season. (¶110.) Thus, even if Select had begun over-indexing to Goods, and even if Goods' performance had declined in earlier quarters, that would not make the full-year guidance misleading when reaffirmed in Q3.

Finally, as with Groupon's other Q3 2019 forward-looking statements, its guidance affirmation is protected by the PSLRA safe harbor because it was accompanied by meaningful cautionary statements about the risks that could cause Groupon to miss its forecast.

### 3. December 11, 2019 Barclays Conference Presentation

On December 11, 2019, Mr. Williams participated in a conference hosted by Barclays. (¶91.) Plaintiff alleges that Defendants "omitted" material information about Select during this conference. (¶94.)[7] But again, Plaintiff fails to plead facts showing that the purportedly omitted information existed at the time of the Barclays conference. Nor does he plead facts demonstrating that the statements Mr. Williams did make were false.

When asked about Groupon's declining customer base, Mr. Williams stated that Groupon was "focused on quality of customer more than anything else" and that the "biggest linchpin to

---

[7]     Ms. Thomas did not participate in the Barclays conference; Plaintiff therefore cannot allege any securities fraud claims against her based on statements made during that conference. *See supra* n.4.

20

quality for [Groupon] is [purchase] frequency." (¶92.) Mr. Williams explained that Groupon's new initiatives, including Select, thus were geared toward "unlocking that extra unit of growth," *i.e.*, increasing customers' purchase frequency. (*Id.*) When asked about Select's "unit economics" and if it could be "accretive to gross profit," Mr. Williams explained that, in the first six months of the program, Groupon was seeing a "60% improvement in purchase frequency" and that Groupon's "margins [were] such that [it was making] money on the units . . . as well as making money on the membership fees as well." (¶93.) But Mr. Williams cautioned the audience on Select's prospects, stating that Groupon was taking a "pragmatic [approach] about [Select]" as it was still just a "test bed" and an "early-stage program" without even one "full year's data." (Ex. A at 6-7.)

Again, Plaintiff does not, and cannot, allege that any statements Mr. Williams made at this conference were false. Instead, he repeats the hollow refrain that Mr. Williams' statements, particularly those concerning Select, were "misleading because they omitted to disclose . . . that Select, during the second half of 2019, was over-indexing to Goods . . . at a time when Defendants later admitted that it had become 'abundantly clear' to them that Groupon was not competing effectively in Goods . . . and consequently that Select had failed to (1) meaningfully boost Local purchase frequency, and (2) operate profitably or generate incremental gross profit." (¶94.)

Plaintiff's allegations fail for many of the same reasons that his other claims falter. Although Plaintiff alleges that Select was over-indexing to Goods "during the second half of 2019," and that Groupon determined that it was not competing effectively in Goods "midway through the fourth quarter," he does not allege that either was evident as of December 11, 2019, much less that any such information was known or could be viewed as reliable at that time. As Mr. Williams stated during the subsequent quarterly earnings announcement, Goods was always "highly seasonal" and typically performed best during the holiday season. (¶110.) Accordingly,

21

any assessment of Select that was contingent on an analysis of Goods' performance would not have been meaningful on December 11, prior to the close of the holiday season.

Additionally, although Plaintiff highlights Mr. Williams' statements regarding the "60% improvement in purchase frequency" that Groupon was seeing from the few Select enrollees, and the fact that Groupon was "making money on the units as well as . . . on the membership fees," he again does not allege that these statements were false at the time of the Barclays conference and ignores the other context Mr. Williams provided about Select being an experimental program. Any later downturn in Select's performance does not render Mr. Williams' statements false or misleading at the time he made them. *See Gallagher*, 269 F.3d at 810; *Davis*, 385 F. Supp. 2d at 712. And regardless of the results that Select was showing at the time, Mr. Williams' statement that "the total economics of the program are really compelling" is too vague to be material. *Silverman*, 2008 WL 4360648, at *5; *In re Midway Games*, 332 F. Supp. 2d at 1164.

### C.      Plaintiff Fails to Plead a Violation of Item 303.

Along with identifying these investor communications, Plaintiff alleges that Defendants violated Item 303 of SEC Regulation S-K ("Item 303") by not disclosing operational trends and uncertainties during the Class Period. (*See* ¶¶95-100.) Item 303 requires certain SEC filings, including Form 10-Qs, to disclose, among other information, "any significant economic changes that materially affected the amount of reported income from continuing operations" for the reported period, and "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(i), (ii). Item 303 only requires disclosure of "those trends . . . or uncertainties that [the registrant] actually knows of *when it files* the relevant report." *West Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc., et al.*, No. 19-CV-01323, 2020 WL 6118605, at *14 (N.D. Ill. Oct. 15, 2020) (emphasis added).

Plaintiff alleges that Groupon had a duty under Item 303 to disclose in its Q2 and Q3 2019 10-Qs that "Select was over-indexing to Goods." (¶96.) But this allegation suffers from the same temporal flaws as his other allegations. Plaintiff alleges that this "trend" began sometime "in the second half of 2019" (¶99), but critically does not allege that it had begun when Groupon filed its quarterly reports in July and November 2019. Nor does Plaintiff allege any information that could have led Defendants to "reasonably expect" the over-indexing to occur before it actually did.

Plaintiff also does not allege that Select—a trial program that included a mere 0.57% of Groupon's customers—ever had a "material . . . impact on [Groupon's] net sales or revenues or income from continuing operations." It did not. Although Plaintiff attempts to allege that Select's tendency to over-index to Goods "directly caused a material change in the relationship between costs and revenues" (¶97)—presumably to satisfy language in Item 303 that requires disclosure of known "events that will cause a material change in the relationship between costs and revenues," 17 C.F.R. § 229.303(a)(3)(ii)—his allegations focus only on the relationship between costs of, and revenues from, Select itself. He does not, and cannot, draw a connection between Select's performance and Groupon's financial condition as a whole, as is required to trigger a disclosure duty under Item 303. *See* 17 C.F.R. § 229.303(a) (generally requiring disclosure of "information that the registrant believes to be necessary to an understanding of its financial condition").

Plaintiff further alleges that Defendants had a duty under Item 303 to disclose that "Goods was no longer able to compete and ha[d] largely ceased providing added value for Groupon by driving meaningful business to Local." (¶96.) But again, Plaintiff admits that Defendants did not reach this conclusion until "midway through the fourth quarter," *after* Groupon filed its quarterly reports. (¶100.) Groupon *did* disclose what information was available at the time: it reported financial metrics for each individual business segment, including both Goods and Local, and that

23

Groupon's overall business had seen significant declines in key financial metrics due to "fewer customers," "lower customer traffic," and, in Q3, "intense competition in [] Goods." (¶83; *see also* Ex. B at 31-33.) Groupon thereby provided investors all the information that was "necessary to an understanding of its financial condition." 17 C.F.R. § 229.303(a). Item 303 requires nothing more.[8]

### D. Plaintiff Fails to Plead Scienter.

The Court should dismiss the Complaint because it also fails to allege scienter. To plead scienter, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant[s]" harbored an "intention to deceive, manipulate, or defraud" when making the allegedly false or misleading statements. *Tellabs*, 551 U.S. at 314. That inference "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id*. To plead scienter for claims based on forward-looking statements, a plaintiff must allege "actual knowledge of falsity"; allegations of "mere[] reckless indifference to the danger that a statement is false" will not suffice. *City of Livonia Emps.' Ret. Sys. & Local 295/Local 851, IBT v. Boeing Co.*, 711 F.3d 754, 756 (7th Cir. 2013). And while "reckless indifference" remains sufficient for claims based on statements of current fact, even then this standard is limited to cases evidencing "an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id*. Plaintiff does not, and cannot, satisfy this high burden.

### 1. Plaintiff Relies on Improper Group-Pleading.

Plaintiff's scienter allegations are insufficient because they improperly rely on group-pleading—a presumption that "assumes that false or misleading group-published information

---

[8] Indeed, the Seventh Circuit has not decided whether Item 303 imposes a duty to disclose that can give rise to a securities fraud claim in any instance. Other circuits are divided on this issue. *See Twin Master Fund, Ltd. v. Akorn, Inc.*, No. 19 C 3648, 2020 WL 564222, at *7 (N.D. Ill. Feb. 5, 2020) (citing cases).

contained in SEC filings or press releases are the collective actions of the officers." *Takara Tr. v. Molex Inc.*, 429 F. Supp. 2d 960, 980 (N.D. Ill. 2006). The Seventh Circuit has rejected this practice in light of the PSLRA's heightened pleading requirements. *See Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008). To satisfy those requirements, a plaintiff "must create a strong inference of scienter with respect to each individual defendant." *Id.*; *accord Cornielsen v. Infinium Cap. Mgmt. LLC*, 916 F.3d 589, 609 (7th Cir. 2019).

Plaintiff fails to do so here. He alleges scienter against all Defendants collectively, without identifying what information was known by whom, or how that information rendered specific statements misleading. This "mak[es] it impossible to assess the statements any [] Defendant[] made . . . against the information he allegedly possessed at the time he made them," and plainly runs afoul of the PSLRA's scienter pleading requirements. *Cornielsen*, 916 F.3d at 602.

### 2. Plaintiff Fails to Raise A Strong Inference of Scienter.

Plaintiff's scienter allegations also suffer from the same temporal shortcomings that undermine his falsity allegations. Even if Defendants had made statements that turned out to be inaccurate in light of later events, it is well-settled that "there [is] no securities fraud by hindsight." *City of Livonia*, 711 F.3d at 758. Plaintiff identifies no information known or available to Defendants *at the time* that the allegedly misleading statements and omissions were made that would raise a strong inference of an intent to mislead or defraud. Again, based on Plaintiff's own allegations, the information that purportedly rendered Defendants' statements misleading— Select's over-indexing to Goods and the Company's inability to compete effectively in Goods— only became clear to Defendants *after* those statements were made.

In any event, even if this information had begun to develop by the time the alleged misleading statements or omissions were made (a conclusion that finds no plausible support in the Complaint), Plaintiff cannot raise a strong inference of scienter—an "intention to deceive,

25

manipulate, or defraud"—based on a purported failure to immediately disclose it. There is "no duty of total corporate transparency—no rule that every hitch or glitch, every pratfall, in a company's operations must be disclosed in 'real time,' forming a running commentary, a baring of the corporate innards, day and night." *City of Livonia*, 711 F.3d at 759. Corporate officers are encouraged to take the time necessary to develop and investigate results; they are not required to disclose developments the moment managers become aware of them. *See id.* at 761 ("Taking the time necessary to get things right is both proper and lawful."). "Prudent managers conduct inquiries rather than jump the gun with half-formed stories as soon as problems come to their attention." *Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753, 760-61 (7th Cir. 2007).

Nor does Mr. Williams' change in position in March 2020 (¶17)—more than a month after Groupon announced its full-year 2019 results—establish that he acted with an intent to defraud the market during the Class Period. Courts that have examined the issue have ruled that an inference of scienter arises only when a change in a corporate officer's position "is accompanied by additional evidence of the [officer's] 'wrongdoing.'" *Ross v. Career Educ. Corp.*, No. 12 C 276, 2012 WL 5363431, at *11 (N.D. Ill. Oct. 30, 2012) (citing cases); *see Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1002 (9th Cir. 2009) (finding no inference of scienter where complaint merely alleged CFO's resignation after alleged fraud). Here, Plaintiff has not alleged, and could not allege, any evidence of wrongdoing by Mr. Williams (or any other Defendant). Mr. Williams' change in position therefore cannot give rise to a strong inference of scienter on his part. And it says nothing about Ms. Thomas, whose position did not change at all after the Class Period.

### 3. Plaintiff Fails to Identify Any Motive for the Alleged Fraud.

Plaintiff also fails to allege any motive to defraud. "Without a motive to commit securities fraud, businessmen are unlikely to commit it." *City of Livonia*, 711 F.3d at 758. Although a plaintiff may not need to allege motive if "other allegations provide a strong basis to infer intent,"

26

*Career Educ.*, 2012 WL 5363431, at \*11, Plaintiff here fails to provide *any* basis for such an inference, let alone a strong one. His failure to plead motive thus is significant.

As courts have recognized, "a generalized motive common to all corporate executives"—such as "the desire to increase the value of a company and attain the benefits that result as successful"—is not enough to establish scienter. *Davis*, 385 F. Supp. 2d at 714; *Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*, 895 F.3d 933, 939-40 (7th Cir. 2018). Rather, a plaintiff must assert some concrete "personal[] benefit" to the defendants resulting from the fraud. *Davis*, 385 F. Supp. 2d at 714. Plaintiff makes no such assertion here. At most, his allegations suggest that Mr. Williams and Ms. Thomas had an incentive to delay the release of negative information to keep their jobs and compensation. But the Seventh Circuit has rejected the inference that such a generic corporate incentive could imply that a corporate officer committed fraud. *See Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*, 679 F.3d 952, 956 (7th Cir. 2012); *see also Van Noppen v. Innerworkings, Inc.*, 136 F. Supp. 3d 922, 944 (N.D. Ill. 2015) (allegations regarding managers' compensation packages are too generic to show scienter).

### E.    Plaintiff Fails to Plead Loss Causation.

The Court should dismiss the Complaint because it also fails to plead loss causation. To plead loss causation, a plaintiff must allege that the purported fraud "caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4); *see also Dura*, 544 U.S. at 342-43. The loss causation requirement is meant "to distinguish cases where the misrepresentation was responsible for the drop in the share's value from those in which market forces are to blame." *Ray v. Citigroup Glob. Mkts., Inc.*, 482 F.3d 991, 995 (7th Cir. 2007). Plaintiff must therefore plead facts that, if true, show that "but for the circumstances that the [alleged] fraud concealed, [his] investment . . . would not have lost its value." *Id.* The Seventh Circuit also recently observed that

27

a showing of loss causation requires a plaintiff to plead facts that "tether . . . directly" the alleged fraudulent conduct to the harm. *Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 335 (7th Cir. 2019).

Here, Plaintiff fails to allege facts from which the Court reasonably could infer that any of Defendants' statements about Select and Goods during the Class Period inflated Groupon's stock price, much less that the stock price fell as a result of any purported corrective disclosures. *See Ray*, 482 F.3d at 995 (plaintiff must show "both that the defendants' alleged misrepresentations artificially inflated the price of the stock and that the value of the stock declined once the market learned of the deception") (internal quotation marks omitted); *Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 843 (7th Cir. 2007) (plaintiff must allege that "material misrepresentation [] caused [the plaintiff] to suffer a loss when that material misrepresentation became generally known") (internal quotation marks omitted).

Plaintiff simply points to Groupon's stock price decline following the Q4 2019 earnings announcement, then assumes that fraud caused the decline. (¶143.) But Plaintiff does not explain how the earnings announcement corrected or otherwise revealed the falsity of any Class Period statements, nor does he allege that the market reacted negatively to any such corrective disclosures. Indeed, the most plausible inference is that investors reacted negatively to Groupon's "poor" Q4 and 2019 financial results, and missed guidance (¶104), not because of any purported fraud allegations concerning Select or Goods. *See Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1064-65 (9th Cir. 2008) (affirming dismissal for failure to plead loss causation, as the "far more plausible reason for the resulting drop in [the company's] stock price [was that] the company failed to hit prior earnings estimates"). Without any evidence, Plaintiff cannot plead loss causation. *See Citigroup*, 482 F.3d at 995 ("[I]t is not enough to show that shares were purchased

28

at a high price (whether inflated or not) and later sold at a much lower price [because] many different factors might account for the drop in value." (citing *Dura*, 544 U.S. at 342-43)).

### 1. Disclosures Concerning Select

Plaintiff alleges that Defendants' Class Period statements about Select were "corrected" when Groupon announced that Select: (i) appealed more to customers who purchased low margin Goods products rather than the more profitable Local offerings; (ii) had underperformed in Q4 2019 and would not be net neutral; and (iii) would continue, but would not be marketed to new members. (¶¶113-14.) However, Plaintiff does not allege any facts that support a reasonable inference that these purported "corrective disclosures" corrected any prior misleading statements about Select or caused Groupon's stock price to fall on February 19, 2020. In fact, Plaintiff fails to tie *any* of the alleged misleading statements or omissions about Select to *any* of the purported corrective disclosures. In other words, Plaintiff does not allege that the "corrective disclosures" actually "corrected" any prior statements concerning Select. Plaintiff cannot support a loss causation theory by identifying "other negative information about the company" that is not attributable to the specific misinformation challenged. *In re Williams Sec. Litig.—WCG Subclass*, 558 F.3d 1130, 1138-40 (10th Cir. 2009) (finding no loss causation when plaintiff failed to show that losses could be "reliably attributed to the revelation of fraud rather than other factors"); *see Tricontinental*, 475 F.3d at 843 (holding complaint failed to plead loss causation when stock price drop followed disclosures that did not correct alleged misrepresentation).

But even if those disclosures had "corrected" some prior hopeful statements about Select— which they did not—Plaintiff still failed to establish loss causation because he did not tether any of the alleged corrective disclosures to Groupon's stock price decline. As Plaintiff's allegations show, Select: (i) was one of many experimental initiatives, (ii) was not expected to be profitable in the near term, (iii) had only *0.32%* of Groupon's customers enrolled in Q2 2019, and (iv) had added

29

just *0.25%* more by Q3 2019. (¶¶27, 68, 77, 80-81.) Plaintiff provides no explanation as to how the failure of this tiny experiment could have caused any loss, much less the loss Plaintiff alleges here.

### 2. Disclosures Concerning Goods

Plaintiff also fails to plead loss causation with respect to any Class Period statements about Goods because he does not identify any statements that the Q4 2019 earnings announcement corrected. As Plaintiff's own allegations show, Groupon repeatedly highlighted, including in connection with its Q3 2019 earnings announcement, that it continued to face "intense competition in [its] Goods business" and was focusing its efforts on Local. (¶83.) Nonetheless, Plaintiff contends that a fraud was revealed when Groupon disclosed during its Q4 2019 earnings announcement that *midway through the fourth quarter 2019*, management had come to the conclusion that Groupon was no longer effectively competing in Goods, particularly because Goods' performance had been weaker than expected during the holiday peak, the period when Goods historically had performed very well. (¶¶106-07, 110.) But the information concerning Q4 2019 sales and Groupon's decision to phase out Goods was "new" information. (¶106.) It thus could not have "corrected" any prior statements made about Goods or Groupon's performance on the whole. Because Plaintiff cannot connect the purported corrective disclosures concerning Goods with any alleged fraud, he cannot plead loss causation. *See Boca Raton Firefighters' & Police Pension Fund v. DeVry Inc.*, No. 10 C 7031, 2012 WL 1030474, at *13 (N.D. Ill. Mar. 27, 2012) ("If [plaintiff] has not alleged a plausible link between the disclosures and the alleged fraud, then we must dismiss its complaint.").

## II. Plaintiff Fails to State a Claim for Controlling Person Liability.

Because Plaintiff fails to state a primary securities fraud claim against any of the Defendants, his Section 20(a) claim for control person liability must also be dismissed. *Pugh*, 521 F.3d at 698 ("[B]ecause the plaintiffs have not adequately alleged the direct liability of any defendant, their § 20(a) claim was also correctly dismissed.").

## CONCLUSION

For the reasons set forth herein and in Defendants' motion to dismiss, the Court should dismiss the Complaint with prejudice.

Dated: November 23, 2020                    Respectfully submitted,


                                            */s/ Matthew R. Kipp*
                                            Matthew R. Kipp
                                            William E. Ridgway
                                            Andrew J. Fuchs
                                            Jennifer H. Berman
                                            Laura Bernescu
                                            SKADDEN, ARPS, SLATE,
                                             MEAGHER & FLOM LLP
                                            155 North Wacker Drive
                                            Chicago, Illinois  60606
                                            (312) 407-0700
                                            matthew.kipp@skadden.com
                                            william.ridgway@skadden.com
                                            andrew.fuchs@skadden.com
                                            jennifer.berman@skadden.com
                                            laura.bernescu@skadden.com

                                            *Counsel for Defendants*

31

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiff's Amended Class Action Complaint was filed on November 23, 2020, with the Clerk of Court using the CM/ECF system, which will effect electronic service on all parties and attorneys registered to receive notifications via the CM/ECF system.

*/s/ Matthew R. Kipp*
Matthew R. Kipp
SKADDEN, ARPS, SLATE,
 MEAGHER & FLOM LLP
155 North Wacker Drive
Chicago, Illinois  60606
(312) 407-0700
matthew.kipp@skadden.com

*Counsel for Defendants*