**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| LAZAR MACOVSKI, Individually and On Behalf of All Others Similarly Situated, | Case No. 1:20-cv-02581 |
| Plaintiff, | LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT |
| v. | |
| GROUPON, INC., RICH WILLIAMS, and MELISSA THOMAS, | Honorable Matthew F. Kennelly |
| Defendants. | |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................................... iii

INTRODUCTION ........................................................................................................................ 1

STATEMENT OF FACTS ........................................................................................................... 3

    I.     Groupon's Business Segments: High-Margin "Local" And Low-Margin "Goods" .... 3

    II.    Groupon's Plan To Offset Customer Attrition Through "Select" ................................ 3

    III.   Unknown To Investors, In The Second Half Of 2019 Select Members Were
         Disproportionately Making Low-Margin Goods Purchases ......................................... 4

    IV.   Unknown To Investors, By Midway Through The Fourth Quarter Of 2019
         It Was "Abundantly Clear" To Defendants That Goods Was Failing ......................... 4

    V.    On February 18-19, 2020 Defendants Admitted The Failure Of Goods And
         Select, Causing Groupon Stock To Lose 44% Of Its Artificially Inflated Value ......... 5

ARGUMENT ................................................................................................................................ 5

    I.     Legal Standards Governing Motions To Dismiss And §10(b) Claims ........................ 5

    II.    The AC Does Not Engage In Puzzle Pleading ............................................................. 6

    III.   The AC Adequately Pleads The Falsity Of Defendants' Statements .......................... 6

        A.    Law Regarding Falsity ...................................................................................... 6

        B.    Defendant's Statements Were False When Made And Are Actionable ................ 7

             1.    The December 11, 2019 Barclays Call ...................................................... 8

             2.    Groupon's November 4, 2019 Q3 2019 Earnings Announcement ............ 8

             3.    July 30, 2019 Q2 2019 Earnings Announcement ................................... 11

        C.    The Challenged Statements And Omissions Were Material ................................ 11

             1.    Importance Of Select Relative To Groupon As A Whole ........................ 12

             2.    Purportedly "Vague" Statements ........................................................... 13

        D.    Defendants Cannot Avail Themselves Of Safe Harbor Protection ...................... 15

        E.    Plaintiff Has Alleged Actionable Item 303 Violations ...................................... 18

IV.    The AC Pleads A Strong Inference Of Scienter ........................................................ 21

    A.    Standards For Pleading Scienter .................................................................. 21

    B.    The AC Raises A Strong Inference Of Scienter ..................................................... 21

        1.    The AC Pleads The Individual Defendants' Scienter .............................. 21

        2.    The AC Pleads Groupon's Scienter .......................................................... 24

    C.    Defendants' Arguments Contesting Scienter Are Meritless................................ 25

V.    The AC Adequately Pleads Loss Causation ............................................................. 28

VI.    The AC Adequately Alleges Control Person Liability ................................................ 30

CONCLUSION.................................................................................................................... 30

ii

## TABLE OF AUTHORITIES

**CASES**

*In re Akorn, Inc. Sec. Litig.*,
    240 F. Supp. 3d 802 (N.D. Ill. 2017) ............................................................ 12

*In re Apple Sec. Litig.*,
    No. 19 Civ. 2033, 2020 WL 6482014 (N.D. Cal. Nov. 4, 2020).................................. 9, 11

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)............................................................................ 6

*Asher v. Baxter Intern., Inc.*,
    377 F.3d 727 (7th Cir. 2004) .................................................................. 17

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)............................................................................ 7

*Boca Raton Firefighters' & Police Pension Fund v. DeVry Inc.*,
    No. 10 Civ. 7031. 2012 WL 1030474 (N.D. Ill. Mar. 27, 2012) ...................................... 29

*Caremark, Inc. v. Coram Healthcare Corp.*,
    113 F.3d 645 (7th Cir. 1997) ............................................................ 5, 6, 30

*Carpenters Pension Trust Fund for N. Cal. v. Allstate Corp.*,
    16 Civ. 10510, 2018 WL 1071442 (N.D. Ill. Feb. 27, 2018) ........................................ 23

*Citiline Holdings, Inc. v. iStar Fin. Inc.*,
    701 F. Supp. 2d 506 (S.D.N.Y. 2010)............................................................ 22

*City of Lakeland Emps. Pension Plan v. Baxter Int'l*,
    No. 10 Civ. 6016, 2012 WL 607578 (N.D. Ill. Jan. 23, 2012) ...................................... 6, 7

*City of Livonia Employees' Retirement Sys. and Local 295/Local 851 v. Boeing Co.*,
    711 F.3d 754 (7th Cir. 2013) ................................................................ 27, 28

*City of Providence v. Bats Global Mkts.*,
    878 F.3d 36 (2d Cir. 2017)...................................................................... 8

*Constr. Workers Pension Fund–Lake Cty. & Vicinity v. Navistar Int'l Corp.*,
    114 F. Supp. 3d 633 (N.D. Ill. 2015) ............................................................ 7

*Cornielsen v. Infinium Capital Mgmt., LLC*,
    916 F.3d 589 (7th Cir. 2019) .................................................................. 26

*Dardick v. Zimmerman*,
    149 F. Supp. 2d 986 (N.D. Ill. 2001). ............................................................................ 25

*Desai v. Gen. Growth Properties, Inc.*,
    654 F. Supp. 2d 836 (N.D. Ill. 2009) ......................................................................... 24, 25

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005). ..................................................................................................... 28

*In re Equifax Inc. Sec. Litig.*,
    357 F. Supp. 3d 1189 (N.D. Ga. 2019) .......................................................................... 25

*Ganino v. Citizens Util. Co.*,
    228 F.3d 154 (2d Cir. 2000) ........................................................................................... 12

*Godinez v. Alere Inc.*,
    272 F. Supp. 3d 201 (D. Mass. 2017) ............................................................................ 13

*Holwill v. AbbVie Inc.*,
    No. 18 Civ. 6790, 2020 WL 5235005 (N.D. Ill. Sept. 1, 2020) ..................................... 30

*In re iDreamSky Tech. Ltd. Sec. Litig.*,
    236 F. Supp. 3d 824 (S.D.N.Y. 2017) ...................................................................... 21, 27

*In re Insys Therapeutics, Inc. Sec. Litig.*,
    No. 17 Civ. 1954, 2018 WL 2943746 (S.D.N.Y. June 12, 2018) ................................... 13

*Iowa Pub. Emps.' Ret. Sys. v. MF Global Ltd.*,
    620 F.3d 137 (2d Cir. 2010) ............................................................................................. 9

*Jones v. Corus Bankshares, Inc.*,
    701 F. Supp. 2d 1014 (N.D. Ill. 2010) ..................................................................... 22, 23

*Kleinman v. Elan Corp., Plc*,
    706 F.3d 145 (2d Cir. 2013) ............................................................................................. 7

*Litwin v. Blackstone Grp., L.P.*,
    634 F.3d 706 (2d Cir. 2011) ........................................................................................... 20

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
    437 F.3d 588 (7th Cir. 2006) .................................................................................... 15, 16

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
    513 F.3d 702 (7th Cir. 2008) ....................................................................... 15, 21, 25, 28

iv

*Marks v. CDW Computer Centers, Inc.*,
    122 F.3d 363 (7th Cir. 1997) ................................................................................. 11

*In re MBIA, Inc. Sec. Litig.*,
    700 F. Supp. 2d 566 (S.D.N.Y. 2010) .................................................................. 22

*Mild v. PPG Indus., Inc.*,
    No. 18 Civ. 4231, 2018 WL 6787351 (C.D. Cal. Dec. 21, 2018) ...................... 13

*In re Motorola Sec. Litig.*,
    No. 03 Civ. 287, 2004 WL 2032769 (N.D. Ill. Sept. 9, 2004)........................... 22

*In re Neopharm, Inc. Sec. Litig.*,
    705 F. Supp. 2d 946 (N.D. Ill. 2010) .................................................................. 27

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)................................................................................ 21

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015)............................................................................................. 6

*In re OSG Sec. Litig.*,
    12 F. Supp. 3d 622 (S.D.N.Y. 2014)................................................................... 24

*Pension Tr. Fund for Operating Engineers v. DeVry Educ. Grp., Inc.*,
    No. 16 Civ. 5198, 2018 WL 6714326 (N.D. Ill. Dec. 20, 2018) ...................... 26

*Pub. Employees' Ret. Sys. of Mississippi v. TreeHouse Foods, Inc.*,
    No. 16 Civ. 10632, 2018 WL 844420 (N.D. Ill. Feb. 12, 2018)................. 14, 16

*Ray v. Citigroup Glob. Markets, Inc.*,
    No. 03 Civ. 3157, 2003 WL 22757761 (N.D. Ill. Nov. 20, 2003)..................... 16

*Ray v. Citigroup, Glob. Markets, Inc.*,
    482 F.3d at 991 (7th Cir. 2007) .......................................................................... 29

*Rehm v. Eagle Fin. Corp.*,
    954 F. Supp. 1246 (N.D. Ill. 1997) ..................................................................... 24

*Roberti v. OSI Sys., Inc. Sys.*,
    No. 13 Civ. 9174, 2015 WL 1985562 (C.D. Cal. Feb. 27, 2015)...................... 22

*Rochester Laborers Pension Fund v. Monsanto Co.*,
    883 F. Supp. 2d 835 (E.D. Mo. 2012).................................................................. 17

*Ross v. Career Educ. Corp.*,
No. 12 Civ. 276, 2012 WL 5363431 (N.D. Ill. Oct. 30, 2012).................................*passim*

*Rossbach v. VASCO Data Sec., Int'l Inc.*,
No. 15 Civ. 6605, 2018 WL 4699796 (N.D. Ill. Sept. 30, 2018)………………………….…6

*Rubinstein v. Gonzalez*,
241 F. Supp. 3d 841 (N.D. Ill. 2017) .................................................................. 7

*S. Ferry LP No. 2 v. Killinger*,
687 F. Supp. 2d 1248 (W.D. Wash. 2009)........................................................ 23

*S. Ferry LP, No. 2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008) ............................................................................ 23

*Schleicher v. Wendt*,
529 F. Supp. 2d 959 (S.D. Ind. 2007). .............................................................. 28

*Schlifke v. Seafirst Corp.*,
866 F.2d 935 (7th Cir. 1989) ............................................................................ 27

*In re Sears Roebuck & Co. Sec. Litig.*,
291 F. Supp. 2d 722 (N.D. Ill. 2003) ................................................................ 23

*SEB Invest. Mgmt. AB v. Align Tech., Inc.*,
No. 18 Civ. 6720, 2020 WL 5408056 (N.D. Cal. Sept. 9, 2020)....................................... 23

*Selbst v. McDonald's Corp.*,
No. 04 Civ. 2422, 2005 WL 2319936 (N.D. Ill. Sept. 21, 2005)............................... 15, 17

*Shah v. Zimmer Biomet Holdings, Inc.*,
348 F. Supp. 3d 821 (N.D. Ind. 2018) ................................................................. 11, 16, 18

*Silverman v. Motorola, Inc.*,
No. 07 Civ. 4507, 2008 WL 4360648 (N.D. Ill. Sept. 23, 2008)....................................... 7

*Silverman v. Motorola, Inc.*,
798 F. Supp. 2d 954 (N.D. Ill. 2011)………………………………………………………….12

*In re Spiegel, Inc. Sec. Litig.*,
382 F. Supp. 2d 989 (N.D. Ill. 2004) ……………………………………………………....…6

*Stransky v. Cummins Engine Co., Inc.*,
51 F.3d 1329 (7th Cir. 1995) ............................................................................ 7

*Takara Trust v. Molex Inc.*,
429 F. Supp. 2d 960 (N.D. Ill. 2006)......................................................... 6, 13, 15, 30

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ................................................................................................. 21

*Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*,
   475 F.3d 824 (7th Cir. 2007) ................................................................................... 29

*Turner Ins. Agency, Inc. v. Farmland Partners Inc.*,
   No. 18 Civ. 2104, 2019 WL 2521834 (D. Colo. June 18, 2019) ..................................... 13

*Twin Master Fund, Ltd. v. Akorn, Inc.*,
   No. 19 Civ. 3648, 2020 WL 564222 (N.D. Ill. Feb. 5, 2020) ............................... 18, 28, 29

*Washtenaw Cty. Employees' Ret. Sys. v. Walgreen Co.*,
   No. 15 Civ. 3187, 2019 WL 4597518 (N.D. Ill. Sept. 23, 2019) .............................. 17, 30

*In re Williams Sec. Litig.-WCG Subclass*,
   558 F.3d 1130 (10th Cir. 2009) ............................................................................... 29

**STATUTES AND OTHER AUTHORITIES**

17 C.F.R. § 229.303 ....................................................................................................... 18

*Management's Discussion & Analysis of Fin. Condition & Results of Operations*,
   Release No. 6835, 1989 WL 270492 (May 18, 1989) ........................................... 18, 19, 20

*SEC Staff Accounting Bulletin No. 99*,
   1999 WL 1123073 (Aug. 12, 1999) ............................................................................. 13

Lead Plaintiff Fadi E. Rahal respectfully submits this memorandum of law in opposition to Defendants' motion to dismiss the amended class action complaint (ECF No. 43) (the "AC").[1]

**INTRODUCTION**

This is a straight-forward case of securities fraud. Prior to and during the Class Period (*i.e.*, July 30, 2019 through February 18, 2020, inclusive), Groupon Inc. ("Groupon" or the "Company") and its management made public statements that omitted known material adverse information concerning Groupon's Goods division and its Select program. As a result, Groupon's stock traded at artificially inflated levels, until the truth was belatedly revealed on February 18, 2020.

Groupon's Goods division generated more than 50% of Groupon's total revenue, but the division's margins were as low as 10%. However, Groupon regularly touted how Goods attracted new customers and drove engagement with Groupon's higher-margin Local division. Groupon also sought to combat its shrinking margins through a subscription-based program called Groupon Select. During the second half of 2019, Groupon consistently emphasized how Select was critical to boosting purchase frequency and generating incremental profits, and publicly touted the successes that the program was allegedly achieving. Yet, on February 18, 2020, Defendants announced that Groupon would exit Goods and scuttle Select.

The AC asserts a straight-forward theory of falsity and scienter rooted in Defendants' end-of-Class Period admissions. *See* Sections III (falsity) and IV (scienter), *infra*. Namely, a plain reading of Defendants' own words establishes that Defendants knowingly or recklessly made materially misleading statements regarding Goods, Select, and Groupon's overall financial

---

[1] Unless otherwise noted, all "¶__" citations and capitalized terms herein refer to the AC, citations to "Def Br." refer to Defendants' memorandum in support of their motion (ECF No. 49), and citations to "Ex." refer to the exhibits submitted in support of Defendants' motion (ECF Nos. 49-2–49-4). All internal citations are omitted and emphasis is added throughout, unless otherwise noted.

performance. For example, on December 11, 2019, Defendant Williams assured investors that Select was not only boosting purchase frequency ("60% improvement in purchase frequency within the first six months"), but doing so profitably both on a per-unit basis ("we're making money on the units") as well as overall ("the total economics of the program are really compelling"). Confronted with the juxtaposition of their present tense Class Period statements and frank end-of-Class Period admissions, Defendant argue that this information was not "evident as of December 11, 2019," when Williams spoke. Def. Br. at 21. Their own words betray them. Defendants admitted that they were aware *no later than midway through Q4 2019* – which was clearly prior to December 2019 – that they were unable to compete in Goods. ¶107. Defendants further admitted that Select was over-indexing to Goods "during the second half of 2019." ¶72. Given the precision with which Defendants' identified the emergence of these issues, it is reasonable to infer that this trend was evident during Q3 2019, otherwise Defendants would have said that Select's over-indexing was not apparent until Q4 2019.

Defendants also argue that Select was too small and new to be material. That fact intensive argument – beyond being improper at the pleading stage – also contradicts Defendants' own Class Period statements concerning Select's importance. *See* Section III.C.1, *infra*. And Defendants elide mention of the AC's allegations concerning how investment analysts endorsed Defendants' Class Period statements regarding the importance of the Select initiative. ¶¶149-54. For example, on January 20, 2020, a UBS research analyst upgraded Groupon stock from "Neutral" to "Buy" based, in substantial part, on his view that the Company's investment in the "core" Select initiative already was delivering meaningful results. ¶154.

Defendants' challenges to loss causation fare no better. *See* Section V, *infra.* Following Defendants' end-of-Class Period admissions, Groupon announced it was exiting Goods and

2

abandoning Select due to problems that had been known to Defendants throughout the Class Period, but had not previously been disclosed to investors. The price of Groupon shares declined by 44% on trading volume that was 25 times greater than the Class Period average (¶116)—this stunning reaction is the surest indicator that this information was new and material to investors. *See* note 7, *infra*.

The Court should deny the Defendants' motion to dismiss in its entirety.

## STATEMENT OF FACTS

**I.      Groupon's Business Segments: High-Margin "Local" And Low-Margin "Goods"**

Groupon connects consumers to merchants through mobile applications and websites. ¶2. Until recently, two of Groupon's primary product categories included: (1) Local, which sold nearby consumers experiences such as event tickets, dining, and beauty treatments; and (2) Goods, through which Groupon sold merchandise directly to consumers or facilitated third-party sales on its platform. *Id.* Local enjoyed gross profit margins of 80-90%, compared to just 10-20% for Goods. ¶3. In 2017 and 2018, Goods accounted for roughly 56% of Groupon's revenues, but only 20% of gross profits, whereas Local accounted for 40% of revenues and over 70% of profits. ¶24.

**II.     Groupon's Plan To Offset Customer Attrition Through "Select"**

Leading up to the Class Period, Groupon was losing customers at an accelerating pace. ¶27. At the ends of 2017, 2018, and the second quarter of 2019, Groupon reported 49.5 million, 48.2 million, and 46.2 million active customers, respectively. ¶27, n.3. Groupon attributed this decline to "traffic headwinds" (*e.g.*, Groupon promotions being buried at the bottom of web search result lists, or emails flagged as spam). ¶27. In order to offset its customer losses, Groupon sought to increase its profit margin per retained customer. ¶28.

On July 30, 2019, Groupon announced the widespread rollout of its previously-instituted Select membership program, in which customers paid $4.99 per month to receive discounts on

their Groupon purchases and various other perks. ¶¶39-40. Defendants touted Select as "critical to transforming the business," and claimed that Select would "almost double the average gross profit per customer that we generate today." ¶¶41-42.[2]

### III. Unknown To Investors, In The Second Half Of 2019 Select Members Were Disproportionately Making Low-Margin Goods Purchases

As Defendants later admitted, "[t]he [Select] program . . . began over-indexing towards our Goods category in the second half of 2019," meaning that Select was being used disproportionately for low-margin Goods purchases rather than high-margin Local purchases. ¶¶64, 114. Despite discussing Select's performance in detail and heralding Select as pivotal to Groupon's future (*see, e.g.*, ¶¶40-48), Defendants did not disclose Select's over-indexing trend until February 18, 2020. This omission was doubly misleading because as 2019 progressed, Defendants realized that Groupon could no longer effectively compete in the Goods market. ¶¶60-62.

### IV. Unknown To Investors, By Midway Through The Fourth Quarter Of 2019 It Was "Abundantly Clear" To Defendants That Goods Was Failing

In Defendants' own words, "[m]idway through the fourth quarter [of 2019] it became abundantly clear that [they] were not competing effectively in Goods." ¶107. Critically, Defendants did not disclose this fact to investors until February 18, 2020, when they announced that Groupon was exiting Goods. *Id.* This failure to compete not only reduced Groupon's Goods

---

[2] *See also* ¶45 (in November 4, 2019 shareholder letter, Williams states, "[W]e love how Select members continue to behave. Currently, we're seeing a 60 percent increase in purchase frequency and a 20 percent jump in average order value."); ¶46 (on November 4, 2019 call, Williams discusses 260,000 Select members and notes, "We're excited about our Select membership program and are already seeing encouraging results. . . . we're seeing member acquisition costs payback within six months; and payback has been driven by both the recurring revenue from membership fees as well as incremental gross profit generated on membership-related transactions.); ¶47 (Thomas discusses Select and adds, "And then the important part to remember is that we are also earning incremental [gross profit] on the transactions and we're seeing a purchase frequency lift at 60% higher in that 180-day post-enrollment in the program."); ¶48 (during December 11, 2019 conference, Williams assures investors that Select led to a "60% improvement in purchase frequency within the first six months," and that "we're making money on the units.").

revenue, it also "impacted overall traffic to [Groupon's] site" and "ultimately impeded performance in all of [Groupon's] categories." *Id*. While the failure of Goods became "*abundantly clear*" by midway through the fourth quarter of 2019—*i.e.*, by November 2019—this was a long-term trend that had been under review by Defendants for some time. ¶¶118-19.

As a result of these omissions, Defendants' Class Period statements regarding Goods and Select were remarkably misleading. ¶¶75-94. For example, on December 11, 2019 Defendant Williams informed analysts that Select was profitable and that the "total economics of the program [were] really compelling," despite Defendants already knowing that purchases by Select members were heavily skewed to the failing Goods business. ¶¶93-94.

## V.  On February 18-19, 2020 Defendants Admitted The Failure Of Goods And Select, Causing Groupon Stock To Lose 44% Of Its Artificially Inflated Value

After the stock market closed on February 18, 2020, Defendants revealed to investors for the first time that: (i) by midway through the fourth quarter of 2019 it was "abundantly clear" that Goods was failing, (ii) Select was "over-indexing" to Goods in the second half of 2019; (iii) Groupon's full year and fourth quarter EBITDA significantly missed guidance; and (iv) as a result, Groupon planned to discontinue both Goods and Select. ¶¶103-04, 107, 114. On these revelations Groupon's stock price plummeted by 44%—from $3.05 to $1.70—on trading volume more than 25 times Groupon's Class Period average daily volume. ¶116.[3]

## ARGUMENT

## I.  Legal Standards Governing Motions To Dismiss And §10(b) Claims

On a Rule 12(b)(6) motion to dismiss, the "the district court must take the allegations of the complaint as true and give the plaintiff the benefit of all inferences." *Caremark, Inc. v. Coram*

---

[3] On March 25, 2020, shortly following these admissions, Groupon announced that its CEO, Williams, and Groupon's COO, Steve Krezner, were "no longer serving" in their roles. ¶140.

*Healthcare Corp.*, 113 F.3d 645, 648 (7th Cir. 1997). To survive dismissal, a complaint need only "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To plead a §10(b) claim, a plaintiff must allege a (1) false statement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities (5) upon which the plaintiff justifiably relied and (6) that the false statement proximately caused the plaintiff's damages. *Caremark*, 113 F.3d at 648.

## II.     The AC Does Not Engage In Puzzle Pleading

Defendants are incorrect that the AC utilizes puzzle pleading. Def. Br. at 6. To the contrary, the AC is organized into clear sections and "identifies and quotes the statements allegedly misleading, including bolding and italicizing the precise statements." *City of Lakeland Emps. Pension Plan v. Baxter Int'l*, No. 10 Civ. 6016, 2012 WL 607578, at *5 (N.D. Ill. Jan. 23, 2012) (rejecting puzzle-pleading argument); *see, e.g.*, ¶¶92-93 (detailing December 11, 2019 misleading statements). The AC also specifies the who, what, when, and where concerning each false and misleading statement made during the Class Period. *See City of Lakeland*, 2012 WL 607578, at *5; *Takara Trust v. Molex Inc.*, 429 F. Supp. 2d 960, 971 (N.D. Ill. 2006).[4]

## III.    The AC Adequately Pleads The Falsity Of Defendants' Statements

### A.      Law Regarding Falsity

"[W]hether a statement is 'misleading' depends on the perspective of a reasonable investor: the inquiry . . . is objective." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186-87 (2015). Courts consider "the context in which the statement was

---

[4] Defendants' cases stand merely for the general proposition that "[t]here should not be any guesswork in identifying what statements are at issue in this case." *See* Def. Br. at 6-7 (citing, *inter alia*, *Rossbach v. VASCO Data Sec., Int'l Inc.*, No. 15 Civ. 6605, 2018 WL 4699796, at *6 (N.D. Ill. Sept. 30, 2018)). That concern does not exist here, as illustrated by Defendants undertaking a "statement-by-statement" analysis of the AC's allegations in contesting falsity, Def. Br. at 7, 8-22, thereby showing that the AC is not a "puzzle pleading." *In re Spiegel, Inc. Sec. Litig.*, 382 F. Supp. 2d 989, 1011-12 (N.D. Ill. 2004).

made" and "whether the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Rubinstein v. Gonzalez*, 241 F. Supp. 3d 841, 851-52 (N.D. Ill. 2017) (citing *Constr. Workers Pension Fund–Lake Cty. & Vicinity v. Navistar Int'l Corp.*, 114 F. Supp. 3d 633, 651 (N.D. Ill. 2015)).

An omission is actionable when there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). In this connection, once a corporate representative affirmatively chooses to speak on an issue, he or she is under a duty to provide whatever information is necessary to render his or her statements not misleading. *Stransky v. Cummins Engine Co., Inc.*, 51 F.3d 1329, 1331 (7th Cir. 1995). "Statements of literal truth can become, through their context and manner of presentation, devices which mislead investors." *Kleinman v. Elan Corp., Plc*, 706 F.3d 145, 153 (2d Cir. 2013); *Silverman v. Motorola, Inc.*, No. 07 Civ. 4507, 2008 WL 4360648, at *8 (N.D. Ill. Sept. 23, 2008).

Thus, when reviewing alleged false or misleading statements, "[i]t is not the function of [the] Court at the pleading stage to determine whether the statements were *in fact* false or misleading." *City of Lakeland*, 2012 WL 607578, at *2. Rather, "[t]he relevant question is 'whether the facts alleged are sufficient to support *a reasonable belief* as to the misleading nature of the statement or omissions.'" *Ross v. Career Educ. Corp.*, No. 12 Civ. 276, 2012 WL 5363431, at *3 (N.D. Ill. Oct. 30, 2012) (Kennelly, J.).

**B.** **Defendant's Statements Were False When Made And Are Actionable**

Defendants contest the falsity of their statements on numerous grounds, including that: (i) the omitted information purportedly did not exist at the time Defendants spoke; and (ii) the statements were immaterial, "puffery," forward-looking, or protected by the bespeaks caution doctrine. Def. Br. at 7-22. Defendants' arguments are meritless and should be rejected.

7

### 1. The December 11, 2019 Barclays Call

As explained in the AC, Williams' discussion of Select's performance and outlook was materially misleading because he omitted highly material information; namely, that (i) Select was over-indexing to Goods; (ii) Groupon was unable to effectively compete in Goods; and (iii) therefore, Select was not advancing Groupon's stated goals ¶¶90-94.

Defendant's primary argument is that the above information was not "evident as of December 11, 2019," when Williams spoke. Def. Br. at 21. This is nonsense. Defendants admitted that they were aware *no later than midway through Q4 2019* – which was clearly prior to December 2019 – that they were unable to compete in Goods. ¶107. Likewise, Defendants admitted that Select was over-indexing to Goods "during the second half of 2019." Given the precision with which Defendants' identified the emergence of these issues, it is reasonable to infer that this trend was evident during Q3 2019 (*i.e.*, the first part of the second half of 2019), otherwise Defendants would have said that Select's over-indexing was not apparent until Q4 2019.[5]

### 2. Groupon's November 4, 2019 Q3 2019 Earnings Announcement

Defendants first argue that they could not have disclosed "at the end of Q3 2019" that Groupon was no longer effectively competing in Goods, because the decision to exit Goods was made "midway through the fourth quarter." Def. Br. at 16. However, the middle month of Groupon's fourth quarter was *November*, and Defendants' Q3 2019 Earnings Announcement was *on November 4, 2019*. Moreover, Defendants themselves stated that they learned of Goods' untenability *in November 2019*. ¶108 (Williams' statement that "Midway through the fourth

---

[5] Defendants' argument that the "highly seasonal" nature of Goods means that its failure to compete in that marketplace was not evident as of December 11, 2019, *see* Def. Br. at 21, is not only irreconcilable with their own admission as to when the problem became "abundantly clear," but also misconstrues the scope of permissible arguments on a motion to dismiss. *See City of Providence v. Bats Global Mkts.*, 878 F.3d 36, 50 (2d Cir. 2017) ("But here there is a contested question of fact . . . . We must, at this stage, accept as true the factual allegations in the complaint and draw all reasonable inferences in favor of plaintiffs . . . .").

quarter, it became clear" that Goods was unsustainable, which "was *particularly notable in November.*"). As such, Defendants' admissions make clear that they were aware of the conditions that led Groupon to exit Goods as of their November 4, 2019 statements.

Even if Defendants were to quibble over the exact date in November 2019 that Goods' inability to effectively compete fully-crystallized, it is nonetheless reasonable to infer that this trend was known or knowable by November 4, 2019. To wit, even if one were to perfectly bisect the fourth quarter and peg November 15, 2019 as the midway point, the fact that Good's failure was "*abundantly* clear" (¶107) and "*particularly* notable" (*id.*) by that date, necessarily connotes that this trend was at least *reasonably* "clear" and "notable" when Defendants spoke *just a few days earlier* on November 4, 2019. *See Iowa Pub. Emps.' Ret. Sys. v. MF Global Ltd.*, 620 F.3d 137, 143 n.13 (2d Cir. 2010) ("Depending on [the nature] of the problem, its existence," at one point in time "may support an inference that it was present [many months] earlier.").

The recent decision in *In re Apple Sec. Litig.*, No. 19 Civ. 2033, 2020 WL 6482014 (N.D. Cal. Nov. 4, 2020) is particularly instructive. There, defendant Apple argued that its end-of-the-class-period admission that certain market conditions got "*particularly* bad in November" did not prove that those negative conditions existed as of Apple's November 1, 2018 investor conference call. *Id.* at *1, 6. The district court disagreed, because Apple's admission that conditions were "*particularly* bad" at some point in November, yielded the inference that they were at least "troubling" earlier in the quarter. *Id.* at *6. So too here, viewing the allegations in the light most favorable to Plaintiff, it is reasonable to infer that Defendants were aware of Goods' travails by November 4, 2019, but nonetheless concealed this critical information.

Defendants raise a similar temporal challenge to their omission of the fact that Select was over-indexing to Goods and not achieving Groupon's goal of unlocking repeat purchases in its

9

more profitable Local segment. *See* Def. Br. at 17. This argument strains the plain meaning of Defendants' words beyond their breaking point. If that trend was not occurring and known in Q3 2019, Defendants would not have said that it occurred during the "second half of 2019"; they would have said it occurred during Q4 2019. Moreover, the fact that Groupon enacted a 15% discount on all Select members' Goods purchases starting in August 2019, yields the reasonable inference that Defendants were not only aware that Select members had already gravitated towards Goods at that time, but that their policy would exacerbate that trend by favoring Goods. ¶¶43, 124-26. However, even if one were to accept that the trend was not ascertainable until Q4 2019, Defendants' November 4, 2019 statements were made *more than a month into the fourth quarter*.

Defendants also argue that, even if they were aware that Select was over-indexed to Goods as of November 4, 2019, they did not have "any reason" to disclose that information at that time because that trend purportedly only became relevant when Groupon decided to exit Goods later in the fourth quarter. *See* Def. Br. at 17. Defendants are flat wrong. The most reasonable interpretation of Defendants' statements is that they were aware of the conditions that led them to exit Goods as of November 4, 2019. But even assuming *arguendo* that Defendants had not decided to exit Goods as of that date, Defendants themselves admitted that Goods was performing poorly at that time. *See* Def. Br. at 16. Thus, Defendants' omission of the fact that Select was tethered to Groupon's floundering Goods line was extremely misleading, especially given their unbridled boosterism of Select at the time. *See* Def. Br. at 15 (recounting that Groupon disclosed that it was "pleased" and "encourage[ed]" by Select, that the program was "mak[ing] progress" and that Groupon "believe[d] [it could] unlock the potential of [its] financial model and deliver long-term gross profit growth") (internal quotation marks omitted, alterations supplied by Defendants).[6]

---

[6] Defendants also argue that they fully disclosed adverse information relating to Goods in their November 4, 2019 Earnings Announcement. Def. Br. at 16. Not so. Defendants came nowhere close to admitting

### 3. July 30, 2019 Q2 2019 Earnings Announcement

Defendants advance the same temporal argument with respect to their July 30, 2019 statements about Goods and Select. *See* Def. Br. at 9. Again Defendants ignore the clear import of their admission that Select's over-indexing trend became apparent in the "second half of 2019," which obviously includes the third quarter of 2019. The July 30, 2019 statements were made *one month into the third quarter*, by which time it is reasonable to infer the trend had emerged. *See Apple*, 2020 WL 6482014, at *6. Indeed, had the over-indexing trend become apparent only during the fourth quarter of 2019, Defendants would have said so, just like they did when describing their decision to exit Goods. In any event, Defendants' attempt to tie the emergence of the over-indexing trend to some point in the second half of 2019 *that was after July 30, 2019*, is an impermissible factual argument, and should be disregarded.

### C. The Challenged Statements And Omissions Were Material

"[D]etermining the materiality of a statement is quite fact intensive and as such the 'materiality determination is rarely appropriate at the summary judgment stage, let alone on a motion to dismiss.'" *Shah v. Zimmer Biomet Holdings, Inc.*, 348 F. Supp. 3d 821, 840 (N.D. Ind. 2018) (quoting *Marks v. CDW Computer Centers, Inc.*, 122 F.3d 363, 370 (7th Cir. 1997)).

Defendants do not dispute the materiality of their misstatements relating to Goods or their false earnings guidance. *See* Def. Br. at 7-22. And Defendants fall far short of carrying their heavy burden of showing that their omissions concerning Select "are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."

---

that it was already "abundantly clear" that Groupon was "not competing effectively in Goods" or that abandonment of Goods was even an option. *See* ¶107. In fact, Defendants consistently hedged any supposed partial disclosures by downplaying weak results as mere bumps on the road to long-term success, which were thus misleading. *E.g.*, ¶77B ("We are making consistent progress. I understand, however, that the improvements we are making are not always easy to see in our quarterly results and as such may not be as immediately meaningful to stockholders as they are to the teams driving them forward every day.").

11

*In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 815 (N.D. Ill. 2017) (quoting *Ganino v. Citizens Util. Co.*, 228 F.3d 154, 162 (2d Cir. 2000)).[7]

### 1. Importance Of Select Relative To Groupon As A Whole

Defendants argue that no reasonable investor could have been influenced by their misrepresentations because Select was an early-stage program that enrolled a comparatively small percentage of Groupon's customers. *See, e.g.*, Def. Br. at 9, 15, 21. This argument finds no support in law, and is contradicted by Defendants' own statements concerning Select's importance.

*First*, although Defendants downplay Select as "new" and "experimental" in their Motion, during the Class Period Williams told investors that Select had outgrown its experimental beginnings and was set to be the future of the Company: "[i]t's important to remember, Select *was* an experiment, *was* a trial . . . But we're excited about it in a way that we're feeling it needs to be part of Groupon. It can't just be the side . . . really needs to be – needs to permeate the Groupon customer experience, which we're starting to see." ¶81.

*Second*, while Defendants now downplay Select's membership as a small overall percentage of Groupon customers, not once during the Class Period did they describe Select's membership in those terms, and instead consistently emphasized Select's rapid customer growth and primary strategic importance.[8] Further, Defendants emphasized how Select's overall customer count was less important than its ability to increase purchase frequency. *See* ¶77B.

*Third*, due to Defendants' consistent emphasis on the importance of Select to Groupon's

---

[7] In addition to the clear qualitative importance of Defendants' misstatements and omissions, Groupon's stock price fell by *44%* upon revelation of the fraud, and so "[t]he market's negative reaction further tends to show that defendants' alleged misstatements were material." *Ross*, 2012 WL 5363431, at *6; *see also Silverman v. Motorola, Inc.*, 798 F. Supp. 2d 954, 983 (N.D. Ill. 2011).

[8] *See, e.g.*, ¶68B ("More than 150,000 members have joined the program so far, and it is scaling quickly"); ¶71 ("today, our focus is entirely gain traction in the program, . . . get as many of our customers into the Select experience"); ¶77B (touting "[m]embership gains" of "over 100,000 in the [third] quarter").

future growth prospects – particularly in response to questions posed by analysts – investors naturally saw Select as critical to Groupon's future. *See* ¶¶149-53 (analyst reports focusing on Select); ¶¶154-55 (UBS upgraded Groupon in part due to Select's purported progress).

*Fourth*, Defendants cite no authority holding that fraud relating to a comparatively small number of a company's customers is immaterial as a matter of law. This is because it is well established that "qualitative factors may cause misstatements of quantitatively small amounts to be material." *Molex*, 429 F. Supp. 2d at 979 (quoting SEC Staff Accounting Bulletin No. 99, 1999 WL 1123073 (Aug. 12, 1999) ("SAB 99")). Relevant qualitative factors include whether the misstatements or omissions: "mask a change in earnings or other trends," (when Select began "over-indexing" to Goods), or "arise from an item capable of precise measurement" (the extent to which Select users made Goods versus Local purchases, and the unprofitability of those Goods purchases). *Molex*, 429 F. Supp. 2d at 979. In addition, misstatements relating to "a relatively small segment that is represented by management to be important to the future profitability of the entity is more likely to be material to investors." SAB 99. When assessing materiality, "exclusive reliance on . . . any percentage or numerical threshold has no basis in the accounting literature or the law." *Id.*[9]

### 2. Purportedly "Vague" Statements

Defendants next claim that a small subset of their misleading statements regarding Select

---

[9] District courts routinely hold that a false or misleading statement is not immaterial as a matter of law merely because it falls below some arbitrary numerical threshold. *See, e.g.*, *In re Insys Therapeutics, Inc. Sec. Litig.*, No. 17 Civ. 1954, 2018 WL 2943746, at *4 (S.D.N.Y. June 12, 2018) ("Quantifying, in percentage terms, the magnitude of a misstatement . . . cannot appropriately be used as a substitute for a full analysis of all relevant considerations") (quoting SAB 99); *Godinez v. Alere Inc.*, 272 F. Supp. 3d 201, 218 (D. Mass. 2017) (recall of "showcase" products accounting for less than 2% of net revenue not immaterial as a matter of law); *Turner Ins. Agency, Inc. v. Farmland Partners Inc.*, No. 18 Civ. 2104, 2019 WL 2521834, at *5 (D. Colo. June 18, 2019) (materiality alleged despite "important" loan program representing 1% or less of company's operating revenue); *Mild v. PPG Indus., Inc.*, No. 18 Civ. 4231, 2018 WL 6787351, at *5 (C.D. Cal. Dec. 21, 2018) (earnings misstatements of less than 2% material).

13

were too vague to be material to investors. Def. Br. at 10, 18, 22.[10] Defendants' argument fails, however, because it impermissibly asks the Court to interpret isolated snippets of their statements stripped of all context. *Ross*, 2012 WL 5363431, at *7 (the Court "must take into account the context in which the statements were made to determine whether they amounted only to puffery"). For example, Defendants challenge their statement that Select's initial indicators were "very positive" as too vague, but fail to mention that this statement was embedded within a string of highly material factual information. ¶68B ("More than 150,000 members have joined the program so far, and it is scaling quickly with both new and existing customers. Initial indicators are very positive with significantly improved purchase frequency, higher average order value and increased customer propensity to search."). Likewise, Defendants recast their November 4, 2019 misstatements by focusing on the single word "encouraging," while glossing over the plainly material context in which the word was used. ¶77B ("We now have more than 260,000 paying Select members, up by over 100,000 in the quarter and nearly 200,000 since the beginning of the year. Membership gains are encouraging . . . . Currently, we're seeing a 60 percent increase in purchase frequency and a 20 percent jump in average order value.").

Defendants also object to the phrase the "total economics of the program are really compelling" in their December 11, 2019 statements, while omitting the crucial factual context from the immediately preceding sentence that "we're making money on the units as well as making money on the membership fees as well." ¶93; *see also Pub. Employees' Ret. Sys. of Mississippi v. TreeHouse Foods, Inc.*, No. 16 Civ. 10632, 2018 WL 844420, at *2 (N.D. Ill. Feb. 12, 2018) (rejecting materiality argument where challenged statements implicated defendant's ability "to

---

[10] The many misleading statements not challenged as vague by Defendants include, *inter alia*, the entirety of those detailed in ¶¶70, 73, 77A, 79A, 83, 87-88, and 92, as well as the vast majority of the statements detailed in ¶¶68, 71, 77B, 79B, 80-81, and 93.

14

maintain growth levels"). Moreover, the statement was made in direct response to an analyst's question (*see* Ex. A. at 6), and is therefore all the more material. *See Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 597 (7th Cir. 2006) ("*Tellabs I*") (when viewed in context of the CEO's "direct response to an analyst's inquiry", misleading statement about sales trends went "well beyond puffery").[11]

### D. Defendants Cannot Avail Themselves Of Safe Harbor Protection

Defendants argue that certain of their misleading statements are protected from liability as forward-looking statements accompanied by meaningful cautionary language. Def. Br. at 10-14, 18-19, 20-21.[12] As discussed below, Defendants' argument fails because their statements were not purely forward-looking, and any accompanying cautionary language was not meaningful.

"[A] mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present." *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008) ("*Tellabs III*"). Most of the statements for which Defendants claim safe harbor protection include numerous representations about *past and present* performance.[13] As a result, Defendants forfeited any protection otherwise available for forward-looking portions of these statements. *See McDonald's*, 2005 WL 2319936, at *9; *Ray v. Citigroup Glob. Markets,*

---

[11] Analysts routinely discussed in research notes the very statements Defendants now challenge as vague, further demonstrating the importance of this information to investors. *See* ¶¶149-55.

[12] Defendants do not argue that their material omissions (*see, e.g.* ¶¶56-59, 60-62), are protected forward-looking statements, nor could they. *See Molex*, 429 F. Supp. 2d at 974 ("it is axiomatic that the failure to make a statement cannot be forward-looking"); *Selbst v. McDonald's Corp.*, No. 04 Civ. 2422, 2005 WL 2319936, at *9 (N.D. Ill. Sept. 21, 2005) (similar).

[13] *E.g.*, ¶71 ("based on our indicators that we've seen so far . . . We're seeing meaningful step-ups in purchase frequency, meaningful step-ups in the average order value . . . if you look at Local, you look at our current take rate of 32%, 33%, the discount is 25%, so we're still earning money on the individual transaction"); ¶77B ("We now have more than 260,000 paying Select members, up by over 100,000 in the quarter and nearly 200,000 since the beginning of the year. . . we're seeing a 60 percent increase in purchase frequency and a 20 percent jump in average order value").

*Inc.*, No. 03 Civ. 3157, 2003 WL 22757761, at *3 (N.D. Ill. Nov. 20, 2003) (Kennelly, J.).

The safe harbor also requires accompanying cautionary language to be "substantive and tailored to the specific predictions made in the allegedly misleading statement." *Zimmer Biomet*, 348 F. Supp. 3d at 841. "A company . . . cannot simply include a generic list of factors that might affect future performance," which is precisely what Defendants have done here. *TreeHouse Foods*, 2018 WL 844420, at *3. For example, Defendants point to statements that they faced risks relating to "execution of our business and marketing strategies; retaining existing customers and adding new customers; . . . [and] competing successfully in our industry," *i.e.*, risks which apply equally to almost every company that has ever existed. Def. Br. at 13, 19.

Even the rare disclosures that were slightly more specific were still not sufficient to warn investors of the then-known risks facing Groupon. Defendants make much of their acknowledgment that the Select program was "new." Def. Br. at 13, 19, 21. This is less a "warn[ing]," than a mention of the obvious. Generic warnings of "risks associated with introducing new products" are "useless *caveat emptor* boilerplate." *Tellabs I*, 437 F.3d at 599. Defendants also seek protection in the statement that "Select *was* an experiment," Def. Br. at 19, but ignore that Williams was referring *to Select's past.* In the same breath, Williams explained that Select had outgrown its experimental roots and was now integral to the future: "[i]t's important to remember, Select *was* an experiment, *was* a trial . . . But we're excited about it in a way that we're feeling it needs to be part of Groupon. It can't just be the side . . . really needs to be – needs to permeate the Groupon customer experience, which we're starting to see." ¶81.

Defendants also claim safe harbor protection for their unachievable $270 million Adjusted EBITDA guidance, *see* Def. Br. at 20, however "[a] defendant . . . may be liable for issuing a future projection of earnings if the defendant ignored facts seriously undermining the accuracy of

16

the forecast." *McDonald's*, 2005 WL 2319936, at *9 (quotes and citations omitted); *see also Washtenaw Cty. Employees' Ret. Sys. v. Walgreen Co.*, No. 15 Civ. 3187, 2019 WL 4597518, at *4 (N.D. Ill. Sept. 23, 2019) (same). Putting aside that Defendants issued Groupon's guidance mid-way through the fourth quarter in the face of Goods' failure and Select's over-indexing to Goods, Defendants waived their safe-harbor argument because they do not cite *a single* cautionary statement sufficient to counteract Defendants' guidance-based misstatements. *See* Def. Br. at 20.

Defendants' cited authorities do not salvage their meritless arguments. For example, Defendants rely heavily on, *Rochester Laborers Pension Fund v. Monsanto Co.*, 883 F. Supp. 2d 835 (E.D. Mo. 2012). Def. Br. at 14. However, *Monsanto* is plainly distinguishable, as not only did the plaintiffs fail to allege falsity, the defendants' cautionary disclosures were highly detailed, on-point, and timely. *See, e.g.*, *Monsanto*, 883 F. Supp. 2d at 853 (early class period warning that Roundup weed killer product would soon "begin to decline in price and gross profit").[14]

Defendants' reliance on *Asher v. Baxter Intern., Inc.*, 377 F.3d 727 (7th Cir. 2004) is equally misplaced. In *Asher*, the Seventh Circuit declined to apply the safe harbor at the pleading stage, and stressed that "the cautionary language remained fixed even as the risks changed." *Id.* at 734. According to the Court, this raised the possibility that defendant "omitted important variables from the cautionary language and so made projections more certain than its internal estimates at the time warranted." *Id.* So too here. The generic second and third quarter 2019 disclosures on which Defendants pin their hopes, *see* Def. Br. at 13, 19, were repeated nearly verbatim from pre-Class Period filings such as Groupon's 2018 Form 10-K.[15] That Defendants'

---

[14] *See also, e.g.*, *id.* at 868 (tremendous Chinese production of generic Roundup flooded US market with four times prior year's inventory levels causing prices to drop dramatically); *id.* at 894 (competition from generic Roundup "put pressure on our ability to meet our projected gross profit expectation").

[15] *Compare* Def. Br. at 13, 19 & Ex. B *with* Plaintiff's Ex. 1 filed herewith (2018 Form 10-K excerpts); *see also* Ex. B (Q2 2019 10-Q excerpts) ("There have been no material changes from the risk factors previously

17

disclosures remained static as they learned of Select's over-indexing to Goods and of Goods' failure, shows that these disclosures were not "meaningful" as contemplated by the PSLRA's safe harbor.  *See Zimmer Biomet*, 348 F. Supp. 3d at 842.

**E.**      **Plaintiff Has Alleged Actionable Item 303 Violations**

Defendants' failure to disclose (i) Goods' inability to compete and to fulfill its role as a gateway to the more profitable Local business, and (ii) Select's over-indexing to Goods in the Q2 and Q3 2019 10-Qs, also violated Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(a) ("Item 303"), which concerns the disclosure of known material trends.  ¶¶95-100.[16]

The SEC's guidance for Item 303 creates a two-step process for determining whether a registrant must disclose a known trend or uncertainty.  *See Management's Discussion & Analysis of Fin. Condition & Results of Operations*, Release No. 6835, 1989 WL 270492, at *22430 (May 18, 1989) ("*S.E.C. Release No. 6835*").  First, management must determine whether "the known trend . . . [is] likely to come to fruition." *Id.*  Unless management determines that the event "is *not* reasonably likely to occur," management must proceed to the second step of the analysis. *Id.* Under the second step, management "must evaluate objectively the consequences of the known trend . . . *on the assumption that it will come to fruition.  Disclosure is then required unless* management determines that a material effect on the registrant's financial condition or results of operations *is not reasonably likely* to occur." *Id.* !

With respect to Goods, Defendants eventually admitted that: (1) Goods had been unable

---

disclosed in Part I, Item 1A, Risk Factors of our . . . Form 10-K for the year ended December 31, 2018").

[16] Item 303 requires disclosure of "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations," 17 C.F.R. §229.303(a)(3)(ii), and can give rise to §10(b) liability.  *Twin Master Fund, Ltd. v. Akorn, Inc.*, No. 19 Civ. 3648, 2020 WL 564222, at *6-8 (N.D. Ill. Feb. 5, 2020) (Kennelly, J.); *Zimmer Biomet*, 348 F. Supp. 3d at 837-8.

"to compete in a fiercely competitive . . . retail landscape" for the past couple of years (¶¶107, 111); and (2) Goods had been less meaningful as an "engagement tool" for Groupon to drive business to Local for some time (¶¶64, 107, 108, 119) which was Goods' historical primary benefit (*see, e.g.*, ¶¶32, 107). These trends had numerous, significant impacts on Groupon's financial condition including revenue and Groupon's net income. There should be no doubt as to their materiality when the end-result was the discontinuance of Groupon's second largest business segment. ¶¶24, 98, 107.

Defendants respond that they could not have disclosed these trends in the Q2 and Q3 2019 10-Qs because they did not reach these conclusions until midway through the fourth quarter. Def. Br. at 23. But that is when these trends became "abundantly clear," not when these trends became known to Defendants. Moreover, Defendants admitted that Groupon's "management team and board [had] been evaluating the role of Goods for some time." *E.g.*, ¶¶99, 134-35. This admission further underscores Defendants' Item 303 violations: whereas Defendants had been analyzing Goods' role within the Company "for some time," they did not provide investors with the same opportunity. Item 303's disclosure requirements are "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company" and "a historical and prospective analysis of the registrant's financial condition . . . with particular emphasis on the registrant's prospects for the future." *S.E.C. Release No. 6835*, 1989 WL 270492, at *22428, *22436.

Defendants also rely on Groupon's historical financial results and Goods' historical performance. But the disclosure of historical financial information has no bearing on Groupon's Item 303 compliance, which specifically requires disclosure of the impact that any such trend is expected to have on a company's *prospective* financial performance. *See Litwin v. Blackstone*

*Grp., L.P.*, 634 F.3d 706, 719 (2d Cir. 2011). Likewise, that Groupon on a global level saw declines due to fewer customers and lower traffic offers investors nothing in terms of understanding the true bleakness of Goods' future financial prospects, which included Groupon's wholesale cancellation of that busines segment.

With respect to Select, Thomas admitted that Select was over-indexing to Goods in the second half of 2019. ¶¶9, 57, 64, 114, 122. Defendants respond with their recycled "temporal flaws" argument, Def. Br. at 23, which fails for the reasons set forth in Sections III.B.2 & 3, *supra*. Moreover, Item 303's disclosure requirements are not limited to long-term trends, but also contemplates events or uncertainties. *See S.E.C. Release No. 6835*, 1989 WL 270492, at *22430. Select's over-indexing to Goods was admittedly a known event, and, at minimum, was anticipated, *i.e.*, a known uncertainty. Defendants counter that Plaintiff has not "allege[d] any information that could have led Defendants to 'reasonably expect' the over-indexing to occur before it actually did." Def. Br. at 23. This is nonsense. Defendants touted their close, active, and granular-level monitoring of Select[17] and of customer related data in general. *See* ¶¶138-39 (highlighting Defendants' use of real time customer data analysis). And just one week after issuing its Q2 2019 10-Q, Groupon announced a 15% discount for all Goods purchased by Select members, which made Goods *more attractive* to Select members and wholly undermines Defendants' argument that they could not have anticipated the over-indexing trend. ¶¶43, 124-26.

Finally, the materiality of Groupon's omissions concerning Select cannot be seriously disputed. In Groupon's Q4 2019 Letter, Defendants stated that "Groupon Select added to our

---

[17] *See, e.g.*, ¶68B ("[i]nitial indicators are very positive with significantly improved purchase frequency, higher average order value and increased customer propensity to search"); ¶¶70, 71 (similar); ¶77B ("we love how Select members continue to behave. Currently, we're seeing a 60 percent increase in purchase frequency and a 20 percent jump in average order value"); ¶¶79, 81, 88, 94 (similar); ¶131 ("We're watching it really closely").

20

challenges in the quarter as it over-indexed to Goods, pressured margins, and drove higher than anticipated customer acquisition costs" (¶113 (emphasis removed)), thus admitting that this over-indexing (i) had a materially unfavorable impact on Groupon's income, and (ii) caused a material change in the relationship between costs and revenues.

## IV. The AC Pleads A Strong Inference Of Scienter

### A. Standards For Pleading Scienter

To plead a §10(b) claim, a plaintiff must "state with particularity facts giving rise to a strong inference" of scienter, *i.e.*, that the defendant "either knew the statement was false or was reckless in disregarding a substantial risk that it was false." *Tellabs III*, 513 F.3d at 704.

In determining whether a plaintiff has pled scienter, a court is required to examine "whether *all* of the facts alleged, *taken collectively*, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007) ("*Tellabs II*") (first emphasis in original). "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs II*, 551 U.S. at 324. Rather, all that is required is that the plaintiffs' allegations collectively raise "an inference at least as likely as [any] competing inferences." *Id.* at 324 n.5. In applying the *Tellabs II* holistic analysis, "the court must accept as true all factual allegations in the complaint." *Ross*, 2012 WL 5363431, at *8.

### B. The AC Raises A Strong Inference Of Scienter

#### 1. The AC Pleads The Individual Defendants' Scienter

"Recklessness may be shown by allegations that the defendants 'knew facts or had access to information suggesting that their public statements were not accurate or failed to check information they had a duty to monitor.'" *In re iDreamSky Tech. Ltd. Sec. Litig.*, 236 F. Supp. 3d 824, 833 (S.D.N.Y. 2017) (quoting *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000)); *Ross*,

2012 WL 5363431, at *8 (recklessness established where defendants "either knew the particular statement was false or were reckless in disregarding a substantial risk that it was false."); *Jones v. Corus Bankshares, Inc.*, 701 F. Supp. 2d 1014, 1022 (N.D. Ill. 2010) (similar). Here, the AC provides several bases for inferring that Defendants were aware of undisclosed adverse information when they spoke, and therefore were reckless at a minimum.

*First*, not only did the Individual Defendants have access to the information they omitted concerning Select and Goods, but they also admitted that they *actively monitored* developments involving those business lines. ¶¶130-35. For example, in discussing Select, Williams noted that "[w]e're watching it *really closely*" (¶131), and that management was aware of the program's performance at a very granular level.[18] Similarly, with respect to Goods, Williams disclosed that Groupon's officers had long been closely scrutinizing it. ¶134 ("Our management team and board have been evaluating the role of Goods in our ecosystem for some time."). These allegations support a strong inference of scienter. *See In re Motorola Sec. Litig.*, No. 03 Civ. 287, 2004 WL 2032769, at *26 (N.D. Ill. Sept. 9, 2004) (scienter where defendants "knew facts or had access to information suggesting that their public statements were not accurate.").[19]

*Second*, it is well-established that "an inference of scienter can be established by the fact that the Defendants touched on the specific issue . . . in their public statements." *Roberti v. OSI Sys., Inc. Sys.*, No. 13 Civ. 9174, 2015 WL 1985562, at *12 (C.D. Cal. Feb. 27, 2015). Here, the Individual Defendants made repeated and specific statements concerning the performance of

---

[18] *See* ¶132 ("we've been really pleased with . . . what we're seeing on the customer side from a frequency standpoint as well as average order values improving"); ¶133 ("So we're really challenging our team to decompose the value and not just the value in aggregate, but what's meaningful to every group . . . .").

[19] *See also In re MBIA, Inc. Sec. Litig.*, 700 F. Supp. 2d 566, 591 (S.D.N.Y. 2010) (touting of management's review of relevant information supported inference that defendants were aware of contradictory information); *Citiline Holdings, Inc. v. iStar Fin. Inc.*, 701 F. Supp. 2d 506, 516 (S.D.N.Y. 2010) (scienter supported where defendants "told the investing public that they monitored the value of their portfolio").

Select and Goods, including in response to analysts' questions (¶¶46-47, 79-80, 81A, 92-93), which demonstrates their familiarity with the underlying data, as well as their personal interest in those topics, and gives rise to a strong inference of scienter. *See Ross*, 2012 WL 5363431, at *10 (court may infer from defendant's "public pronouncements" that he "made it his business to look into" the practices at issue, and was aware of the undisclosed adverse information).[20]

*Third*, "'officers of a company can be assumed to know of facts critical to a business's core operations or to an important transaction that would affect a company's performance.'" *Corus Bankshares*, 701 F. Supp. at 1028 (quoting *In re Sears Roebuck & Co. Sec. Litig.*, 291 F. Supp. 2d 722, 727 (N.D. Ill. 2003)).[21] That Groupon's Select program and Goods business segment were "core operations" is readily apparent from the AC's allegations.

Groupon launched Select to combat what it saw as "traffic headwinds" and "customer decline," by driving repeat customer engagement. ¶¶25-28. Defendants explained that repeat customer engagement was pivotal to Groupon's success,[22] and thus that Select was "critical to transforming [Groupon's] business" and one of Groupon's "key strategic priorities." ¶¶41, 46.

---

[20] *See also Carpenters Pension Trust Fund for N. Cal. v. Allstate Corp.*, 16 Civ. 10510, 2018 WL 1071442, at *5 (N.D. Ill. Feb. 27, 2018) (officers' statements during earnings call regarding subject matter of alleged fraud supported inference of scienter); *Sears*, 291 F. Supp. 2d, 727 (N.D. Ill. 2003) ("[L]ogically, defendants in their position would be expected to have knowledge of the facts regarding the [matter] at the time they were making statements about [it]."). Alternatively, if the Individual Defendants were not knowledgeable about Select and Goods and were unaware of the issues at hand when they spoke about those programs, then their actions were actionably reckless by definition. *See S. Ferry LP No. 2 v. Killinger*, 687 F. Supp. 2d 1248, 1260 (W.D. Wash. 2009) (noting that when a defendant chooses to speak on an issue but does not have "actual knowledge" about the subject matter, "it would be at least actionably reckless to reassure the public about these matters at all").

[21] *SEB Invest. Mgmt. AB v. Align Tech., Inc.*, No. 18 Civ. 6720, 2020 WL 5408056, at *12 (N.D. Cal. Sept. 9, 2020) ("The core operations doctrine – the theory that 'facts critical to a business's 'core operations' . . . are known to a company's key officers . . . can be one relevant part of a complaint that raises a strong inference of scienter.'") (quoting *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008)).

[22] *E.g.*, ¶36 (Williams stated that "increasing purchase frequency and total unit volume are more important to us at this point than our customer counts, as they unlock leverage in our model"); ¶40 (Williams stated that Select was driving "significantly improved purchase frequency").

Similarly, Goods' importance to Groupon's business during the Class Period cannot be reasonably disputed.  Goods provided approximately 31% of Groupon's gross billings, 56% of its revenue and 20% of its gross profits.  ¶24.  But Goods' value was far greater than its numeric contributions, insofar as Goods was a gateway to customer engagement with Groupon's more profitable Local business segment.  ¶¶32, 33 ("Goods has been a good, solid engagement driver for us over the years" that helps "us bridge to this vision of a broader Local focus marketplace.").

*Fourth*, "[t]he magnitude of defendants' alleged fraud lends weight to plaintiff's allegations of scienter."  *Ross*, 2012 WL 5363431, at \*9 (citing *Rehm v. Eagle Fin. Corp.*, 954 F. Supp. 1246, 1256 (N.D. Ill. 1997)).  Here, the fraud ended with the scrapping of the floundering Goods line—*i.e.*, 56% of Groupon's total revenue.  Under such circumstances, it is inconceivable that when Williams touted Select in mid-December 2019, he was unaware that Select had over-indexed to Goods and that Groupon was determined to exit Goods entirely.  This is especially so considering that he admitted that the trends revealing the abject failure of Goods and Select were known well-before December 2019.  *See* Secs. III.B & E, *supra*; *Desai v. Gen. Growth Properties, Inc.*, 654 F. Supp. 2d 836, 860 (N.D. Ill. 2009) (strong inference of scienter may be found where "it is almost inconceivable" that an individual defendant would be unaware of the matters at issue).

*Finally*, the suspicious timing of Williams' termination on the heels of Groupon's revelations concerning Select and Goods, further supports a strong inference of scienter.  *See Ross*, 2012 WL 5363431, at \*10 (timing of officer's resignation "lends weight to a finding of scienter"); *In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 632-33 (S.D.N.Y. 2014) (similar).

### 2. The AC Pleads Groupon's Scienter

Although the AC pleads Groupon's scienter through Williams and Thomas as agents of Groupon, it also pleads corporate scienter by raising a strong inference that at least one Groupon official who participated in the misleading statements knew or recklessly disregarded the truth.

*See Tellabs III*, 513 F.3d at 708. The Seventh Circuit has determined that a plaintiff can raise an inference that a such corporate official exists, even "without being able to name" him at the pleading stage, because corporate "knowledge is inferable from [the] gravity" of the omitted facts. *Id.* at 704, 710. Courts routinely find that corporate scienter is sufficiently alleged where the misstatements concern serious problems with a key product line, or the complaint alleges widespread knowledge of the truth within the company. *Id.* at 709; *Desai*, 654 F. Supp. 2d at 860; *Dardick v. Zimmerman*, 149 F. Supp. 2d 986, 988 (N.D. Ill. 2001).

Here, as in *Tellabs III*, the AC's allegations support an overwhelming inference that "*some* corporate officials at [Groupon], who would have had a role in crafting many of the statements made by the company, knew of" the serious undisclosed problems with Select and Goods. *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1247 (N.D. Ga. 2019); (*see also* ¶¶131, 133, 134 (Defendants' admissions that management closely monitored Goods and Select)). In sum, either Defendants sought input about the performance of Select and Goods in the second-half of 2019 from other senior Groupon officials, whose scienter can be imputed to Groupon as "furnishers of information;" or those senior officials were never consulted, in which case the misstatements were made recklessly. *See, e.g.*, *Desai*, 654 F. Supp. 2d at 860; *Dardick*, 149 F. Supp. 2d at 988.

C.     **Defendants' Arguments Contesting Scienter Are Meritless**

Defendants argue that Plaintiffs' scienter allegations constitute impermissible "group pleading": a practice that assumes that uncredited statements in a company's SEC filings or press releases can be attributable to all corporate officers. *See* Def. Br. at 24-25. This argument, however, fails to make contact with the AC's actual allegations. Indeed, the AC: (i) focuses almost exclusively on statements that the Individual Defendants *personally made* during earnings calls, or that were *directly attributable to them* in press releases or letters to investors (¶¶68, 71, 77, 79-81, 87-88, 92-93); and (ii) establishes, through the Individual Defendants' admissions, their

25

frequent and detailed statements regarding Goods and Select, and their close monitoring of those aspects of Groupon's business, that they possessed undisclosed adverse information concerning the existing the problems with Select and Goods.

Defendants' reliance on *Cornielsen v. Infinium Capital Mgmt., LLC*, 916 F.3d 589 (7th Cir. 2019) is misplaced. *See* Def. Br. at 25. There, the individual defendants' culpable knowledge was premised on a *single allegation*, which: (i) asserted that *one of the plaintiffs* purportedly saw a non-public document revealing that the individual defendants possessed adverse undisclosed information; *but* (ii) did not link knowledge of that information to "any particular individual defendant." *Id.* at 602. As such, the instant case could not be more different.

Defendants next argue that Plaintiff has not established that the information Defendants omitted actually existed at the time they spoke. But this argument – which simply rehashes the same temporal challenge Defendants raised to falsity – is plainly counterfactual and fails for the same reasons set forth above. *See* Secs. III.B.1-3, *supra*; *see also Pension Tr. Fund for Operating Engineers v. DeVry Educ. Grp., Inc.*, No. 16 Civ. 5198, 2018 WL 6714326, at *4 (N.D. Ill. Dec. 20, 2018) ("The Court recognizes that it is unclear from the allegations at what point, if at all, the information available to defendants became 'bad enough to render Defendants' statements knowingly [or recklessly] false,' but the Court does not need to 'identify the precise moment at which the culpable inference overtook the innocent one,' at this early stage.").

Defendants alternatively contend that even if they were in possession of the information at issue at the time of their misleading statements, there was no foul because prudence dictated that they delay providing such information to the investing public, lest they "'jump the gun with half-formed stories[.]'" *See* Def. Br. at 25-26. This argument is nonsense both factually and legally.

*First*, Defendants clearly admitted that the concealed information did not suddenly emerge

26

moments before they spoke. With respect to Select, it is clear that: (i) the Individual Defendants closely monitored that program since its inception several quarters *prior to* the Class Period; and (ii) during the second half of 2019, the Individual Defendants were aware that Select was over-indexed to Goods and not accomplishing its stated goals. ¶¶40, 131-33. Yet, Defendants touted Select well into December 2019. ¶¶92-93. With respect to Goods, Defendants admitted that by midway through Q4 2019 (*i.e.*, November 2019) it was not just clear, but "*abundantly clear*," that Groupon could not effectively compete in that marketplace; but nonetheless omitted that information when they spoke in November and December 2019. *See* Secs. III.B.1 & 2, *supra*; *see also iDreamSky*, 236 F. Supp. 3d at 833 ("The failure to acknowledge the then-known" problems "is precisely the type of omission, that, even if included in the context of an opinion, would be misleading to a reasonable investor.").

*Second*, while corporate management is encouraged to take the time to get things right, *see* Def. Br. at 26, that aspiration does not trump the legal obligation to speak truthfully and completely when one *affirmatively* chooses to speak on a given topic. *See Schlifke v. Seafirst Corp.*, 866 F.2d 935, 944 (7th Cir. 1989) (Rule 10b-5 "proscribes omissions that render affirmative statements misleading; thus, incomplete disclosures, or 'half-truths,' implicate a duty to disclose whatever additional information is necessary to rectify the misleading statements.").[23] Here, once Defendants volunteered to discuss the performance of Goods and Select, they were duty-bound to disclose material, adverse information.[24]

---

[23] *See also In re Neopharm, Inc. Sec. Litig.*, 705 F. Supp. 2d 946, 967 (N.D. Ill. 2010) (concluding that "touting of favorable news and data" about a drug, while failing to disclose development setbacks that significantly delayed its time to market, was a materially misleading omission).

[24] Defendants' cited cases do not counsel otherwise. *See* Def. Br. at 25-26. For example, in *City of Livonia Employees' Retirement Sys. and Local 295/Local 851 v. Boeing Co.*, 711 F.3d 754 (7th Cir. 2013), the plaintiffs alleged that the defendants should have disclosed certain tests revealing structural flaws in its new aircraft, which could potentially delay the aircraft's scheduled maiden flight. It did *not* turn, as Defendants erroneously suggest, *see* Def. Br. at 25, on the temporal proximity between the tests at issue and the

Lastly, Defendants' arguments regarding motive merit little if any attention. *See* Def. Br. at 26-27. As Defendants concede, motive allegations are not required to plead a strong inference of scienter. *See id.*; *see also Ross*, 2012 WL 5363431, at *11; *Schleicher v. Wendt*, 529 F. Supp. 2d 959, 971 (S.D. Ind. 2007). Further, in *Tellabs III*, the Seventh Circuit rejected an argument similar to the one Defendants advance, explaining that even in the absence of an apparent motive, defendants might still commit securities fraud because prompt disclosure of the truth would cause an immediate drop in the company's stock price, whereas delay might allow the situation to correct itself or allow other events to overtake the bad news: "The fact that a gamble—concealing bad news in the hope that it will be overtaken by good news—fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble." *Tellabs III*, 513 F.3d at 710.

## V.      The AC Adequately Pleads Loss Causation

Pleading loss causation does "not . . . impose a great burden upon a plaintiff," and requires only that a plaintiff "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). A plaintiff may plead loss causation "by alleging that a defendant's misrepresentations artificially inflated its stock price and that once the market learned of the deception, the stock value declined." *Akorn*, 2020 WL 564222, at *13. Plaintiff has done so here.

As detailed above, Defendants misleadingly omitted that it was "abundantly clear" that Goods was failing by midway through the fourth quarter of 2019, and that Select users were disproportionately making unprofitable Goods purchases in the second half of 2019. ¶¶72, 82, 94. Defendants also falsely issued guidance for $270 million in 2019 Adjusted EBITDA when it was

---

defendants' pronouncements, *see* 711 F.3d at 759-61. Rather, the Seventh Circuit found that the plaintiffs failed to show that the test results were communicated to the individual defendants prior to their public statements (*see id.* at 761), which Plaintiff has sufficiently demonstrated here. *See* Sec. IV.B.1, *supra*.

28

already clear that this was unachievable based on the failure of Goods.  ¶89.  Defendants'

misleading statements caused Groupon stock to trade at artificially inflated prices during the Class

Period.  ¶¶144-45.  On February 18-19, 2020 Defendants issued corrective disclosures directly tied

to each of these earlier misrepresentations and omissions (*see* ¶¶104, 108, 114), and Groupon's

stock price immediately plunged by 44%.  ¶¶116, 143.  This "close connection between the market

revelations . . . and the drops in stock price are sufficient, at this stage, to properly allege loss

causation."  *Akorn*, 2020 WL 564222, at *13.

Defendants primarily quibble that the AC fails to connect Defendants' misrepresentations

and omissions to any price inflation or corrective disclosures.  But this is not a case, such as those

cited by Defendants, where alleged misrepresentations had no connection to later disclosures.[25]

Rather, Defendants' corrective disclosures belatedly revealed the exact information that had been

fraudulently concealed from investors.  *See* ¶108 (failure of Goods); ¶114 (Select "over-indexing"

to Goods);[26] ¶104 (earnings guidance vastly exceeded achievable result).

Defendants next dispute Plaintiff's factual allegations, *see* Def. Br. at 28 ("[w]ithout any

*evidence*, Plaintiff cannot *plead* loss causation"), and impermissibly rely on cases *decided at

summary judgment*, *see id.* at 27-29 (citing *Ray v. Citigroup, Glob. Markets, Inc.*, 482 F.3d at 991,

995 (7th Cir. 2007) (weighing expert testimony); *In re Williams Sec. Litig.-WCG Subclass*, 558

F.3d 1130, 1137 (10th Cir. 2009) (same)).  But, "[a]s the Seventh Circuit instructs, the requirement

of loss causation 'ought not place unrealistic burdens on the plaintiff *at the initial pleading stage*.'"

---

[25] *See, e.g.*, *Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 844 (7th Cir. 2007) (revision of 1998 financials did not disclose alleged 1997 accounting fraud); *Boca Raton Firefighters' & Police Pension Fund v. DeVry Inc.*, No. 10 Civ. 7031. 2012 WL 1030474, at *14 (N.D. Ill. Mar. 27, 2012) (report criticizing defendant's industry did not reveal any information about defendant).

[26] Defendants' repackaged temporal argument, Def. Br. at 30, fails for the same reasons set forth in Sections III.B.1-3, *supra*.  Similarly, Defendants' erroneous contention that they fully disclosed the truth about Goods in the Q3 2019 earnings announcements, Def. Br. at 30, fails for the reasons set forth in n. 6, *supra*.

*Walgreen*, 2019 WL 4597518, at *7 (quoting *Caremark*, 113 F.3d at 649).

Defendants also suggest that Groupon's February 19, 2020 stock price decline was wholly unrelated to their misstatements and instead merely reflected "poor Q4 and 2019 financial results, and missed guidance." Def. Br. at 28. However, the law is clear that dismissal as a matter of law is not warranted by defendants' proffer of alternative causes for a stock price decline. *See, e.g.*, *Caremark*, 113 F.3d at 649 (fact that stock price decline can have multiple causes does not negate pleading of loss causation); *see also Holwill v. AbbVie Inc.*, No. 18 Civ. 6790, 2020 WL 5235005, at *6 (N.D. Ill. Sept. 1, 2020) (determination of factors contributing to stock price decline "is a proper subject for discovery and a motion for summary judgment or trial, not a motion to dismiss").

Lastly, after repeatedly hyping Select throughout the Class Period, Defendants now attempt to downplay it as too small to have mattered to investors or affected Groupon's stock price. Def. Br. at 29-30. But again, Defendants improperly ask this Court to reach factual conclusions and draw inferences in Defendants' favor. Moreover, Defendants simply rehash their materiality arguments about Select, which fail for the reasons discussed above. *See* Sec. III.C.1, *supra*.

## VI.     The AC Adequately Alleges Control Person Liability

Plaintiff has adequately pled a primary violation under §10(b). Thus, Plaintiff has rebutted Defendants' only challenge to control person liability. *Molex*, 429 F. Supp. 2d at 983.

### CONCLUSION

For the foregoing reasons, the motion to dismiss should be denied. Should the Court grant the motion in whole or in part, Plaintiff respectfully requests leave to replead.

30

Dated: December 23, 2020

Respectfully submitted,

**POMERANTZ LLP**

By:  _s/ Louis C. Ludwig_
Patrick V. Dahlstrom
Louis C. Ludwig
10 South LaSalle Street, Suite 3505
Chicago, IL 60603
Telephone: (312) 377-1181
Email: pdahlstrom@pomlaw.com
        lcludwig@pomlaw.com

_Liaison Counsel for Lead Plaintiff and the
Proposed Class_

**GLANCY PRONGAY & MURRAY LLP**
Robert V. Prongay (admitted _pro hac vice_)
Christopher Fallon (admitted _pro hac vice_)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Email: rprongay@glancylaw.com
        cfallon@glancylaw.com

**KIRBY MCINERNEY LLP**
Ira M. Press (admitted _pro hac vice_)
Andrew M. McNeela (admitted _pro hac vice_)
Thomas W. Elrod (admitted _pro hac vice_)
250 Park Avenue, Suite 820
New York, NY 10177
Telephone: (212) 371-6600
Email: ipress@kmllp.com
        amcneela@kmllp.com
        telrod@kmllp.com

_Counsel for Lead Plaintiff and Lead Counsel for the
Proposed Class_

31

## PROOF OF SERVICE

I, the undersigned say:

I am not a party to the above case and am over eighteen years old. On December 23, 2020, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Northern District of Illinois, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on December 23, 2020, at Chicago, Illinois.

_s/ Louis C. Ludwig_
Louis C. Ludwig