# EXHIBIT A

2021 WL 736839
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Dennis BORN, Marilynn Born, and VALERIE
BLOOM, individually and on behalf of
all others similarly situated, Plaintiffs,
v.
QUAD/GRAPHICS, INC., J. Joel
Quadracci, and David J. Jonan, Defendants.

19-CV-10376 (VEC)
|
Signed 02/25/2021

**Attorneys and Law Firms**

Gregory Bradley Linkh, Glancy Prongay & Murray LLP, New York, NY, Lesley Frank Portnoy, Glancy Prongay & Murray LLP, Los Angeles, CA, David Stein, Gibbs Law Group, Oakland, CA, Eric H. Gibbs, Girard, Gibbs & De Bartolomeo, San Francisco, CA, Javier Bleichmar, Ross Mitchell Shikowitz, Bleichmar Fonti & Auld LLP, New York, NY, for Plaintiffs.

Joseph S. Allerhand, Stacy Nettleton, Nicole Elizabeth Prunetti, Tania Matsuoka, Weil Gotshal & Manges LLP, Robert Allen Scher, Foley & Lardner, LLP, New York, NY, Bryan B. House, Foley & Lardner, Milwaukee, WI, for Defendants.

OPINION AND ORDER

VALERIE CAPRONI, United States District Judge

 *1  Plaintiffs in this putative securities fraud class action are on a fruitless endeavor to manufacture a fraud case out of a stock drop that followed a company (in a struggling if not dying industry) announcing that it would not meet its 2019 financial projections and was reducing its dividend. Plaintiffs have sued Quad/Graphics, Inc. ("Quad") and two of its senior executives, J. Joel Quadracci, Quad's Chairman, President, and Chief Executive Officer, and David J. Honan, Quad's Executive Vice President and Chief Financial Officer, on behalf of themselves and all others who purchased or otherwise acquired Quad's publicly traded class A common stock between February 21, 2018, and October 29, 2019 (the "Class Period"), alleging claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), and related regulations. Plaintiffs' claims concern alleged misrepresentations and omissions touching on: Quad's corporate transformation plan; Quad's attempted acquisition of a competitor, LSC Communications, Inc.; and the nearly contemporaneous sale of a subsidiary and settlement of SEC charges for Foreign Corrupt Practice Act ("FCPA") violations. On May 15, 2020, after having been appointed lead plaintiff, *see* Dkt. 53, Alaska Electrical Pension Fund filed an Amended Complaint ("AC" or "Complaint"). *See* Dkt. 67. On July 14, 2020, Defendants moved to dismiss the Complaint. *See* Notice of Mot., Dkt. 70. For the following reasons, Defendants' motion is GRANTED.

BACKGROUND[1]

[1] At the motion to dismiss stage, the Court accepts all factual allegations in the pleadings as true and draws all reasonable inferences in the light most favorable to Plaintiffs. *See Gibbons v. Malone*, 703 F.3d 595, 599 (2d Cir. 2013). The Court may also "consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff upon which it relied in bringing the suit." *Tongue v. Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016) (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). Similarly, the Court may "take judicial notice of the *fact* that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents." *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008).

Quad has long had a large footprint in the printing business, with a significant presence in the magazine, catalog, and book printing markets. *See* AC ¶¶ 2, 23. Starting around 2017, Quad, which until this time had been focused on building scale and breadth in its printing business, recognized that it was in a declining business sector; to respond to broad and accelerating declines in the industry, Quad launched a transformation plan to position itself as a "multi-

channel," "marketing services provider." *Id.* ¶¶ 2–3, 36–37, 42–43. Quad represented to investors that this transformation strategy, called Quad 3.0, would allow it to compete more effectively amid a shifting industry landscape and would provide additional opportunities for its foundational print business. *See id.* ¶¶ 2–3, 42–43. By expanding into other forms of media while continuing to leverage its strong print business, Quad sought to provide clients an "integrated stack of marketing services" in a dynamic industry with an "ever-expanding choice of media channels." *Id.* ¶¶ 2–3, 42. In support of its transition, throughout the Class Period, Quad acquired or increased its stake in several marketing firms. *Id.* ¶¶ 5, 44–48.

**\*2** Despite its transition to a marketing services firm, during the Class Period, Quad's printing business remained its primary source of revenue and a critically important part of its business. *See, e.g., id.* ¶¶ 3, 38, 42. In addition to difficulties caused by broad declines in the printing business, Quad was engaged in intense competition with LSC Communications, Inc. ("LSC"), the other significant player in the magazine, catalog, and book printing sectors, with executives at both companies describing the competition as particularly intense and resulting in a "price war." *See id.* ¶¶ 6, 40, 53–55, 67. On or around October 31, 2018, Quad announced that it had agreed to acquire LSC in an all-stock transaction valued at $1.4 billion, positioning the combined company to be one of the, if not the, largest printing companies in the nation. *Id.* ¶¶ 7, 56–58, 65. Quad disclosed that it expected to achieve "net synergies" from the acquisition worth approximately $135 million within two years, with the majority of the benefits coming from "capacity rationalization" and "administrative efficiencies." *Id.* ¶¶ 57, 63.

In February 2019, Quad announced its 2019 financial guidance, anticipating net sales of $4.05 to $4.25 billion, adjusted EBITDA of $360 to $400 million, and free cash flow of $145 million to $185 million, while touting Quad's quarterly dividend of $0.30 per share. *Id.* ¶ 8. Quad made explicit that its 2019 financial guidance did not reflect the pending LSC acquisition. *Id.* Even as it announced disappointing results for the first and second quarters of 2019, Quad reaffirmed its original 2019 guidance and noted that it expected to achieve superior financial results in the second half of the year. *Id.*

Shortly after Quad announced the planned acquisition of LSC, the Department of Justice ("DOJ") began reviewing the transaction. Defendants provided periodic public updates on DOJ's review, indicating that it was going "as expected" and that they anticipated that the deal would be approved. *See id.* ¶¶ 182, 194. On June 20, 2019, however, DOJ announced that it had sued to block Quad's acquisition of LSC. *See id.* ¶¶ 67–71. Defendants immediately announced that they were "fully committed to defending the DOJ's lawsuit in court" and intended to "vigorously defend" the acquisition. *Id.* ¶ 72. Quad and LSC jointly asked the federal district court hearing DOJ's suit to expedite the trial schedule to permit a decision to be made in advance of the acquisition's "drop-dead date." *See* Dkt. 71-23; Dkt. 71-22. The district court declined to do so. *See* Dkt. 71-22. Shortly thereafter, on July 23, 2019, Quad announced that it was abandoning the LSC acquisition due to the added costs and uncertainty from the delay, explaining that the delay caused by the litigation "would have likely eroded a considerable amount of the expected benefits of the merger." AC ¶¶ 72–73. In the wake of the aborted acquisition, LSC cut its financial guidance and warned of anticipated poor financial performance; Quad, on the other hand, reaffirmed its original 2019 financial guidance and stated that it was on track to meet its projections. *Id.* ¶ 73.

Separately, on September 4, 2019, Quad announced that it was selling its heavy-duty industrial wood crating business, Transpak Corporation ("Transpak"), for approximately $10 million. *Id.* ¶ 75. Quad attributed the sale to the 3.0 transition plan and stated that the net proceeds from the sale would be "used to reduce debt." *Id.* Three weeks later, on September 26, 2019, Quad announced that it had agreed to pay approximately $10 million to settle SEC charges that it had violated the FCPA when its Peru and China-based subsidiaries engaged in bribery schemes. *Id.* ¶ 76.

On October 29, 2019, Quad announced that it had missed its 2019 third-quarter ("3Q19") projections, was reducing its 2019 financial guidance, and was cutting its quarterly dividend by 50% to $0.15 per share.[2] *See id.* ¶¶ 13, 132. Quad further announced that it had decided to divest its book business and to engage in additional cost-reduction actions to accelerate Quad 3.0. *Id.* The following day, October 30, 2019, Quad's stock price dropped $6.42 per share and closed at an all-time low of $4.85 per share, despite steady results across the rest of the market. *Id.* ¶ 133. Market analysts expressed surprise at Quad's announcement, especially given Quad's affirmance of its guidance a quarter earlier. *See id.* ¶ 134.

---

2   Specifically, for 3Q19, Quad reported earnings per share from continuing operations of -$0.94, revenue of $944 million, and EBITDA margins

of -7.4%, all of which fell short of analyst expectations and represented a drop-off from Quad's year-over-year or past quarter performance. *See id.* ¶ 132. With respect to its 2019 financial guidance, Quad reduced its expected sales to $3.9 billion from the previous target of $4.05 billion to $4.25 billion and reduced its free cash flow estimate to $80 to $100 million from a previous range of $145 to $185 million. *Id.*

# DISCUSSION

## I. Standard of Review and Elements of a Section 10(b) Claim

**\*3** To survive a motion to dismiss under Rule 12(b)(6), "a complaint must allege sufficient facts, taken as true, to state a plausible claim for relief." *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 275 (2d Cir. 2013) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)). In general, "a complaint does not need to contain detailed or elaborate factual allegations, but only allegations sufficient to raise an entitlement to relief above the speculative level." *Keiler v. Harlequin Enters. Ltd.*, 751 F.3d 64, 70 (2d Cir. 2014) (citation omitted). The Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the light most favorable to the plaintiff. *See Gibbons v. Malone*, 703 F.3d 595, 599 (2d Cir. 2013). The Court is not, however, "bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555)).

Section 10(b) of the Securities Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). The SEC's implementing rule, Rule 10b–5, makes it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5. To state a claim under these provisions, a plaintiff must plead six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Pac. Inv. Mgmt. Co. v. Mayer Brown LLP*, 603 F.3d 144, 151 (2d Cir. 2010) (quoting *Stoneridge Inv. Partners v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).

Notably, in addition to the general pleading requirements set forth in *Twombly* and its progeny, a "complaint alleging securities fraud must satisfy the heightened pleading requirements" of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA") of 1995 "by stating with particularity the circumstances constituting fraud." *ECA & Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) (citing *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319–20 (2007)). To satisfy Rule 9(b), a securities fraud complaint based on alleged misstatements or omissions must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012) (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)). Further expanding the pleading requirements of Rule 9(b), the PSLRA requires that "securities fraud complaints specify each misleading statement; that they set forth the facts on which a belief that a statement is misleading was formed; and that they state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* (cleaned up).

## II. The Amended Complaint Fails to Plead Fraud with Particularity

As this Court and others have held, "failing to meet Rule 9(b) and the PSLRA's pleading requirements alone is reason to dismiss a complaint." *Plumbers & Steamfitters Loc. 773 Pension Fund v. Danske Bank*, No. 19-CV-235, 2020 WL 4937461, at \*3 (S.D.N.Y. Aug. 24, 2020); *see also Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 37–38 (2d Cir. 2012). Plaintiffs in this circuit have long been on notice that a complaint predominantly "marked by lengthy block quotes followed by pro forma reasons why the statements quoted are allegedly false ... fails to state a claim because it is insufficiently particular under the PSLRA." *Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*, 433 F. Supp. 3d 515, 530 (S.D.N.Y. 2020) (citing *Bahash*, 506 F. App'x at 37–38); *see*

*also* *Tabor v. Bodisen Biotech, Inc.*, 579 F. Supp. 2d 438, 453 (S.D.N.Y. 2008) ("Plaintiffs['] use of large block quotes from SEC filings and press releases, followed by generalized explanations of how the statements were false or misleading[, is] not sufficient to satisfy the heightened pleading requirements."); *In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513, 534 (S.D.N.Y. 2005) ("Plaintiffs list various statements—often setting forth lengthy quotations from various releases by Defendants' officers and securities analysts—then follow each with a similar (in most cases identical) laundry list of 'specific' reasons why the statements are allegedly false.... This method is deficient under the pleading standards."). To survive a motion to dismiss, a securities fraud complaint "must do more than simply assert that a statement is false—'[it] must demonstrate with specificity why that is so.' " *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014) (quoting *Rombach*, 355 F.3d at 174), *aff'd*, 604 F. App'x 62 (2d Cir. 2015).

**\*4** Here, Plaintiffs employ a 100-page, 268-paragraph Complaint, of which 69 paragraphs spanning over 30 pages are dedicated to reciting Defendants' statements during the Class Period. *See* AC ¶¶ 138–206. Broken down by fiscal quarter, Plaintiffs excerpt statements from nearly every public disclosure document and related investor call Quad conducted during the Class Period, relying primarily on bolded text in half-page block quotations to identify the allegedly misleading statements. *See, e.g.*, *id.* ¶ 177. After each subsection of the Complaint pertaining to a particular fiscal quarter, Plaintiffs include a substantially similar paragraph containing some variation of the same five or so generalized, conclusory statements. The conclusory statements boil down to: All of the statements within the previous five to twenty paragraphs were false and misleading because they failed to disclose that the pace of the Quad 3.0 transition needed to be "significantly and rapidly accelerated to offset secular declines in the Company's print business," that the true purpose of Quad's acquisition of LSC was the elimination of a competitor, without which Quad would be unable to meet its financial projections, and (where relevant) that Quad's true reason for selling Transpak was to generate cash to pay the FCPA-related SEC settlement. *See id.* ¶¶ 147, 152, 158, 164, 184, 195, 206. Plaintiffs also include some formulation of an allegation decrying Defendants' statements regarding Quad's book and packaging businesses, claiming that Defendants failed to disclose that they were "non-core assets" subject to divestment to support Quad 3.0 even though those businesses had actual and future growth prospects. *See id.* ¶¶ 147, 158, 184. While in a couple of these paragraphs Plaintiffs point to a specific type of statement — such as those discussing Quad's quarterly dividend — the explanation for *why* the statement is allegedly false or misleading can be reduced to the same conclusory assertions articulated above. *See, e.g.*, *id.* ¶ 164.

This type of pleading is insufficient to support Plaintiffs' allegations that over 18 months' worth of statements, only marginally winnowed down for purposes of the Complaint, are all false or misleading. Plaintiffs' "selective" bolding does little to assist the Court in identifying the falsity of Defendants' statements because, in many instances, Plaintiffs bold almost the entirety of a multi-paragraph block quotation. *See, e.g.*, *id.* ¶¶ 161, 176, 204. While Plaintiffs' Complaint may not be the most egregious instance of "puzzle pleading" this Court has seen, the Court is nonetheless unable to meaningfully distinguish Plaintiffs' Complaint from others filed in this circuit that have been dismissed for failure to plead fraud with the requisite particularity. Plaintiffs' Complaint does little to "describe[ ] what portion of each quotation constitutes a false representation," instead "placing the burden on the Court to sort out the alleged misrepresentations and then match them with the corresponding adverse facts." *CBS Corp.*, 433 F. Supp. 3d at 530 (cleaned up).

As discussed extensively below, Plaintiffs' failure to plead fraud with the requisite particularity is a fatal flaw that marks their entire Complaint and inhibits Plaintiffs from successfully alleging either falsity or scienter. Plaintiffs' Complaint is marked by an utter lack of particularized factual allegations, as is evident in the seven generalized paragraphs Plaintiffs rely on to demonstrate why all of Defendants' Class Period statements were false or misleading. Plaintiffs' reference to these assertions as "facts" does nothing to transform generalized statements into particularized allegations. Ultimately, Plaintiffs repeatedly fall back on their same conclusory statements without alleging specific facts and without adequately explaining with the required specificity how 30 pages worth of statements, spanning an 18-month Class Period, support Plaintiffs' theory of fraud. *See* 15 U.S.C. § 78u-4(b)(1) ("[T]he complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity *all facts on which that belief is formed*." (emphasis added)). The Complaint is, therefore, dismissed for failing to meet the heightened pleading standards of Rule 9(b) and the PSLRA.

### III. Plaintiffs Have Not Pled a Material Misstatement or Omission

Even if Plaintiffs' Complaint were properly categorized as something other than "puzzle pleading" such that it met the heightened requirements of Rule 9(b) and the PSLRA, Plaintiffs have failed to allege that any of Defendants' material statements were false or misleading. For a plaintiff to properly plead a claim of securities fraud, the alleged statement or omission must be both material, such that it "would have been viewed by the reasonable investor as having significantly altered the total mix of information available," *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988) (cleaned up), and false or misleading, "evaluated not only by literal truth, but by context and manner of presentation," *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019) (cleaned up).

**\*5** "To base a claim on an omission — such as failing to disclose a material business risk — a plaintiff must also plead that the defendant had a duty to disclose the omitted fact." *CBS Corp.*, 433 F. Supp. 3d at 531 (citing *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015)). While Section 10(b) and Rule 10b-5 "do not create an affirmative duty to disclose any and all material information," *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011), speakers have a duty to disclose when a statement would otherwise be "inaccurate, incomplete, or misleading" without the omitted material, *Stratte-McClure*, 776 F.3d at 101 (quotation omitted). *See also Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014) ("Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth.").

Although Plaintiffs contend that Defendants' statements "ma[k]e up 'a network of interrelated lies, each one slightly distinct from the other, but all collectively aimed at perpetuating a broader, material lie,' " they concede that the statements about which they are complaining can be bucketed into three general categories: (1) statements concerning Quad's 3.0 plan and the pace at which the 3.0 transition had to occur in order to offset general declines in the printing business and to meet its 2019 financial projections; (2) statements concerning Quad's attempted acquisition of LSC; and (3) statements concerning Quad's sale of Transpak.

*See* Pl. Resp. at 8 (quoting *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 250 (2d Cir. 2016)). For each category, there is a dearth of particularized facts to support Plaintiffs' assertions that Defendants' statements were false or misleading; instead, Plaintiffs rely almost entirely on conclusory statements concerning what Defendants were obligated to disclose to prevent their statements from being "half-truths." *In re Vivendi, S.A.*, 838 F.3d at 240. Because Plaintiffs have failed to plead particularized, factual material that would permit the Court to infer that Defendants' statements were false or misleading when made, Plaintiffs have failed to allege adequately that any of Defendants' statements were false or misleading.

#### 1. Statements Concerning the Quad 3.0 Transition Plan

While Plaintiffs challenge a vast swath of Defendants' statements concerning the Quad 3.0 transition, Defendants accurately identify the gist of Plaintiffs' gripe as: "Quad 'failed to disclose that the pace of Quad's 3.0 transition needed to be significantly and rapidly accelerated to offset secular declines in the Company's print business.' " Defs. Mem. at 13 (citing AC ¶¶ 147, 152, 158, 164, 184, 195, 206). Plaintiffs take issue with Defendants' statements concerning Quad's success in "executing, aggressively implementing, and 'accelerating' its Quad 3.0 transition." Pl. Resp. at 9; *see also, e.g.*, AC ¶¶ 138, 139, 151, 156, 162, 165, 166, 167, 176, 189. Plaintiffs also contend that Defendants made misleading statements concerning the potential for Quad 3.0 to offset organic declines in Quad's print business. *See* Pl. Resp. at 9; *see also, e.g.*, AC ¶¶ 139, 142, 144, 167, 176–77, 189. Relatedly, Plaintiffs argue that Defendants misled investors by giving the impression that Quad's acquisitions and investments would sufficiently accelerate Quad 3.0 so that Quad could offset organic print revenue declines and meet its 2019 financial projections. *See* Pl. Resp. at 9; *see also, e.g.*, AC ¶¶ 138–39, 140, 143, 148, 151, 154, 162, 165–66, 171, 176, 180, 200. Plaintiffs' theory is that, combined with allegedly false statements concerning Defendants' intent to prioritize and maintain its "affordable and sustainable dividend," *see, e.g.*, AC ¶¶ 139, 150, 155, 156, 161, 163, 168, 188, 191, 199, 201, 204, and their allegedly misleading statements promoting the strength of Quad's book business, *see, e.g.*, *id.* ¶¶ 145–46, 157, 172, 175, 192, Defendants' statements regarding the Quad 3.0 transition "created a misleading picture of Quad's business" by failing to disclose that Quad 3.0 was not proceeding quickly enough to allow

Quad to meet its 2019 projections or to offset declines in the print business. Pl. Resp. at 9.

**\*6** Plaintiffs do not, however, plead any facts from which the Court could infer that Defendants knew or should have known that they needed to expedite the pace of Quad 3.0 in order to meet their 2019 projections or that the transition plan was not proceeding as publicly disclosed during the Class Period. Plaintiffs similarly fail to identify any information in Defendants' possession that they should have disclosed to avoid making misleading disclosures concerning Quad 3.0 or Quad's internal state of affairs. Instead, Plaintiffs simply invoke their repeated mantra that "Defendants failed to disclose that the pace of the 3.0 transition needed to be significantly and rapidly accelerated at all times." *Id.* Yet, in citing to the Complaint to support their contention that they have adequately alleged particularized facts, Plaintiffs cite only to paragraphs containing that exact same assertion, engaging the Court in a veritable hyperloop of conclusory allegations. *See* AC ¶¶ 51, 147, 152, 158, 164, 184, 195, 206.[3]

3      Plaintiffs rely on two cases to argue that they have adequately alleged falsity by demonstrating that "Defendants' Class Period statements painted a far different picture than their end-of-Class Period disclosure." Pl. Resp. at 10. But those cases are not analogous. In each case Plaintiffs cite, the complaint contained *particularized facts* to show that the impression the defendant created of a particular state of affairs differed materially from what actually existed. *See In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 453 (S.D.N.Y. 2005) (highlighting specific information concerning defendant's role in financing certain purchases that rendered their statements misleading); *Yellowdog Partners LP v. CURO Grp. Holdings*, 426 F. Supp. 3d 864, 871 (D. Kan. 2019) (stressing that the plaintiffs' complaint was "detailed and contain[ed] specific allegations" and that plaintiffs "alleged *specific facts* that should have been disclosed" (emphasis added)). Here, Plaintiffs allege no "specific facts" that needed to be disclosed to give an accurate depiction of Quad's 3.0 transition plan.

The nearest Plaintiffs come to supporting their allegations of falsity are a handful of allegations concerning the nature of the competition between Quad and LSC. See AC ¶¶ 53–55, 67. Accepting these allegations as true, as the Court must at this stage, and even construing them as broadly as possible, allegations concerning the "cutthroat" competition between Quad and its chief rival do little, if anything, to support Plaintiffs' argument that dozens of Defendants' statements discussing Quad 3.0 were false or misleading. Without more, the fact that Quad and LSC were engaged in a "price war" is patently insufficient to demonstrate that Defendants were required to disclose that Quad 3.0 was proceeding too slowly to meet Quad's 2019 financial projections or to offset general declines in the printing business. This is especially true in light of Defendants' frequent disclosures during the Class Period that ongoing changes to the print industry were inhibiting Quad's performance and that Quad continued to experience organic declines in its print business. *See* Defs. Mem. at 5–6; *see also* AC ¶¶ 148, 153, 160, 167, 177, 178, 185, 197 (quoting Defendants' public disclosures that Quad's organic sales continued to decline despite boosts from acquisitions and investments).

Without any particularized facts upon which to base their argument, Plaintiffs instead rely entirely on Quad's disclosure at the conclusion of the Class Period and the market's reaction to it.[4] As discussed below in the context of loss causation, Defendants' 3Q19 disclosures did not contain any admission that Defendants knew Quad 3.0 had not been proceeding apace or any statement correcting Defendants' past disclosures concerning the Quad 3.0 transition. Plaintiffs quote Defendants as stating only that Quad was taking "decisive actions" to "further accelerate" Quad 3.0. AC ¶ 210. But that is not a corrective disclosure, and it is ineffective to cast doubt on the truth of Defendants' prior statements regarding Quad 3.0. *See Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 n.4 (2d Cir. 2005) (finding that for a statement to constitute a corrective disclosure, it must "reveal to the market the falsity of the prior" statements). Further, Plaintiffs' cited cases do not support the proposition that market reaction alone is sufficient to satisfy Plaintiffs' burden to plead falsity. *See In re Ply Gem Holdings, Inc. Sec Litig.*, No. 14-CV-3577, 2016 WL 5339541, at \*4 (S.D.N.Y. Sept. 23, 2016) ("Though market reaction alone is 'too blunt an instrument to be depended on' to determine whether a single omission is material, especially 'where a disclosure contains many revelations,' Plaintiff excerpts two analyst reports that point directly to the alleged omissions as justification for reduced stock-price expectations." (quotation omitted)); *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 236 (S.D.N.Y. 2010) (relying on the market's reaction to

corrective disclosures only as additional support after finding that plaintiffs adequately alleged that certain undisclosed information was material to investors' valuation). In short, Plaintiffs have failed to allege that Defendants' statements concerning the Quad 3.0 transition were false or misleading.[5]

[4] Plaintiffs object that Defendants inappropriately seek to impose a heightened pleading standard pursuant to which Plaintiffs' Complaint must include confidential witness statements, contemporaneous internal documents, or the like.

*See* Pl. Resp. at 10–11 (citing *Ok. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 38 (S.D.N.Y. 2019)). While Plaintiffs are correct that they need not point to a confidential informant or specific internal document that conclusively reveals Defendants' alleged fraud, Plaintiffs must fulfill their obligation to plead facts with particularity demonstrating that Defendants' statements or omissions were false or misleading – not simply that things turned out different. Here, Plaintiffs fail to allege any facts, whether derived from confidential witness statements, contemporaneous insider documents, or elsewhere, that reveal Defendants' statements concerning Quad 3.0 and the speed at which it was proceeding were false or misleading.

[5] Plaintiffs' assertion that Defendants' statements promoting Quad's book business were misleading is also completely unsupported by any particularized factual allegations in the Complaint, supported solely by the fact that Quad decided in third quarter 2019 to divest its book business as part of its move to accelerate the Quad 3.0 transition. *See, e.g.*, AC ¶¶ 158, 162, 184. But, again, there are no facts alleged that would permit the Court to infer that positive statements about the book business were false or misleading when made. The same analysis applies to Defendants' statements that they anticipated that the company would continue to pay a $0.30 per share quarterly dividend. *See, e.g.*, *id.* ¶¶ 139, 150, 155, 188, 199.

### 2. Statements Concerning the LSC Acquisition

**\*7** Plaintiffs' arguments concerning Defendants' LSC-related statements are less easily distilled into a single mantra, as Plaintiffs challenge statements pertaining to each stage of the failed acquisition. Plaintiffs' general theory, however, appears to be that by failing to disclose facts regarding the uber-competitive battle between Quad and LSC, Defendants' statements — including those regarding "general 'pricing pressures' in the market and 'net synergies' to be gained from acquiring LSC" — were misleading because investors were unable to properly "evaluate risks to Quad's business, the need to rapidly accelerate Quad 3.0, and how the failed LSC acquisition would reignite the war between LSC and Quad." Pl. Resp. at 14 (quoting AC ¶¶ 139, 174).[6]

[6] Plaintiffs also seem to allege that Defendants should have disclosed that the LSC acquisition "stood to significantly bolster Quad's books business." *See* Pl. Resp. at 13 n.9 (citing AC ¶ 59). This appears to have been readily apparent to the market, however, as seen in multiple contemporaneous analyst reports released in the wake of the acquisition announcement. *See* Dkt. 71-15 at 2 ("[T]he acquisition will substantially increase QUAD's presence in book publishing ... [which] represents about 28% of [LSC's] annual revenue ...."). Even if it were not, Plaintiffs never make clear how Defendants' failure to disclose another potential benefit of the merger makes the statements Defendants did make false or misleading.

Plaintiffs again fail to allege facts from which the Court can plausibly infer that any of Defendants' Class Period statements regarding the ultimately-failed LSC acquisition were false. Instead, Plaintiffs attempt to stretch a handful of particularized allegations far beyond their capacity to support Plaintiffs' claim that Defendants' statements were false or misleading. While Plaintiffs may have adequately alleged that there was intense competition between Quad and LSC, Plaintiffs have failed to allege adequately that the existence of such competition rendered any of Defendants' public statements regarding the LSC acquisition false or misleading.

As an initial matter, Plaintiffs vastly overstate the import of their allegations describing the nature of the competition between Quad and LSC. Plaintiffs contend that their Complaint "lays bare the hypercompetitive environment between Quad and LSC." Pl. Resp. at 13. Borrowing from the DOJ's antitrust complaint seeking to block the LSC acquisition, Plaintiffs quote insiders at Quad and LSC who described the competition as a "price war" and a "blood bath," and alleged that the company's respective CEOs "want[ed] to

beat each other into oblivion." AC ¶¶ 53, 55, 67. Plaintiffs also cite internal Quad documents for the proposition that the companies held a combined 69% share of the catalog printing market and to show that Quad and LSC were the only companies in the book printing sector that could "offer the largest [p]ublishers a complete solution." *Id.* ¶¶ 54–55, 67. Plaintiffs further allege, without attribution, that Quad and LSC "controlled more than half of all publication printing for magazines." *Id.* ¶ 53. Finally, Plaintiffs allege that both Quad and LSC feared losing existing accounts and prospective clients to the other, which colored each company's business activity and allowed customers to play one off the other. *Id.* ¶¶ 53–55. [7]

[7] The Court notes that some of the information Plaintiffs have copied from DOJ's antitrust complaint appears to have been derived from internal LSC documents, not internal Quad documents. *See, e.g., id.* ¶ 53 ("The ferocity of Quad and LSC's competition prompted LSC's magazine head to avoid any negative changes to customer accounts out of fear of the customer going back into the market and LSC 'get[ting] into a blood bath with Quad.' "); *id.* ¶ 55 (quoting internal LSC executives). The Court is unwilling to infer that Defendants' statements were false or misleading based on inside information from LSC.

\*8 In the Court's view, Plaintiffs do little more than describe a particularly competitive dynamic between the two major players in a markedly consolidated industry. Plaintiffs argue, however, that, in addition to showing that "Quad was engaged in a brutal and undisclosed 'price war' with its largest competitor," Plaintiffs' LSC-related allegations reveal that this price war "was negatively impacting Quad's financial results and the success of the 3.0 transition." Pl. Resp. at 13. Plaintiffs similarly argue that Defendants' continued affirmance of its 2019 financial guidance — and perhaps the guidance itself — both before and after the LSC acquisition fell apart was misleading because Defendants failed to disclose that Quad would be unable to meet its financial projections without eliminating the price war with LSC. *See id.* at 14–15, 16 n.11. Thus, Plaintiffs contend, Defendants should have disclosed that the "true reason" for acquiring LSC was to eliminate its primary competitor and end the price war. *See, e.g.*, AC ¶¶ 131, 164.

Plaintiffs, however, plead no facts, let alone particularized facts, to support their contention that Quad knew it would be unable to meet its 2019 financial projections or that Quad 3.0 could not succeed absent elimination of LSC as a competitor. Instead, Plaintiffs are left to support conclusory assertions in their brief with conclusory allegations from their Complaint. *See* Pl. Resp. at 13–15 (citing AC ¶¶ 6, 66, for statements such as, "[w]ithout eliminating LSC and ending the ongoing blood bath for customers between the two companies, Quad would simply be unable to implement its Quad 3.0 transition at the speed necessary to offset the secular declines in the print industry and achieve its 2019 guidance"). Plaintiffs fail to allege a single fact tying the impact of the competition between Quad and LSC to the pace at which the Quad 3.0 transition needed to proceed in order for Quad to meet its 2019 financial projections or offset general printing business declines. Further, the Court cannot infer from Plaintiffs' allegations describing the competition between LSC and Quad that Defendants knew or should have known, either at the time they established Quad's 2019 financial projections or after abandoning the LSC acquisition or anytime between, that Quad would be unable to achieve its guidance without eliminating LSC as a competitor. [8] Plaintiffs' allegations are simply insufficient to allow the Court to infer that Quad knew it would be unable to achieve its financial projections and could not carry out its Quad 3.0 plan unless it acquired LSC and ended the alleged price war. [9]

[8] There is some dispute between the parties whether LSC's decision to reduce its own 2019 guidance after the acquisition fell through can support Plaintiffs' argument that Defendants' statements reaffirming Quad's 2019 guidance were misleading. *See* AC ¶¶ 10, 73; Defs. Mem. at 19 n.35; Pl. Resp. at 14 n.10. The Court agrees with Defendants that the fact that LSC cut its projections following the failure of the acquisition has little, if any, bearing on whether Defendants' statements were false or misleading. LSC was an entirely distinct business, and Plaintiffs have failed to demonstrate that the two companies were so similar that it could not have been reasonable for Defendants to expect Quad to meet its guidance while LSC simultaneously concluded that it would fall far short of meeting its projections. Plaintiffs' argument that Defendants' cases are distinguishable is also unavailing. That the factual setting — a failed merger — differs from those in the cited cases does not diminish the overarching principle that the circumstances

facing one company tend to shed little light on those facing a competitor. *See Ret. Bd. of Policemen's Annuity & Benefit Fund of Chi. v. FXCM Inc.*, 333 F. Supp. 3d 338, 352 (S.D.N.Y. 2018) ("[I]nformation about [Defendants'] competitors provides no information about Defendants' conduct or knowledge." (cleaned up)); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 356 (S.D.N.Y. 2011) ("[T]hat Wachovia's practices were distinguishable from those of their competitors in some ways and not in others is not fraud, especially when Defendants made no attempt to represent otherwise.").

plaintiffs had adequately alleged particularized facts showing that defendants were engaged in patently anticompetitive behavior while publicly stating that they were engaged in competition. *See, e.g., In re Mylan N.V. Sec. Litig.*, No. 16-CV-7926, 2018 WL 1595985, at *7 (S.D.N.Y. Mar. 28, 2018); *In re Sotheby's Holdings, Inc.*, No. 00-CV-1041, 2000 WL 1234601, at *4 (S.D.N.Y. Aug. 31, 2000). Plaintiffs, therefore, have not adequately alleged that Defendants' repeated reaffirmance of Quad's 2019 guidance was misleading because they failed to disclose additional information regarding its competitive stance vis-à-vis LSC.

**\*9** Absent particularized allegations supporting their theory, Plaintiffs are left with nothing more than Quad's end-of-Class-Period disclosure of poor 3Q19 financial results, a reduction in Quad's 2019 fiscal guidance, and a business decision to accelerate Quad 3.0 to show that Defendants' earlier statements about being "on track" to meet its financial targets, maintain its dividend, and successfully implement Quad 3.0 were false or misleading when made. While the October 2019 disclosures may support the suspicion that Quad's management team had been overly optimistic when it set the company's financial guidance for 2019, they do not support an inference that Defendants' prior statements concerning the LSC acquisition were false or misleading. *See Ok. Firefighters Pension & Ret. Sys. v. Student Loan Corp.*, 951 F. Supp. 2d 479, 498 (S.D.N.Y. 2013) ("[A]t best, plaintiffs' theory is one of underestimation in hindsight[,] ... reli[ant] on conclusory allegations to mask the legally insufficient contention at its core, which is that defendants could not have possibly believed their own estimates, since plaintiffs interpret those estimates to have proven inadequate.").

Plaintiffs also fail to allege adequately that Defendants' public statements describing the motivations behind the proposed LSC acquisition were misleading because they failed to include additional detail on the nature of Quad and LSC's competition. As Plaintiffs seemingly concede, Defendants had no independent duty to disclose the nature of Quad's competition with LSC; Plaintiffs, therefore, must show that Defendants' statements about the LSC acquisition were misleading absent additional disclosure concerning the hypercompetitive battle between the two companies. *See Caiola v. Citibank, N.A., N.Y.*, 295 F.3d 312, 331 (2d Cir.

---

9   Plaintiffs cite to *In re Henry Schein, Inc. Sec. Litig.*, No. 18-CV-1428, 2019 WL 8638851, at *10–11 (E.D.N.Y. Sept. 27, 2019), to argue that while Quad's ability to achieve its 2019 guidance may not have been dependent on revenues from the LSC acquisition, its ability to achieve its financial projections was dependent on ending the Quad-LSC price war. *See* Pl. Resp. at 15. In *Henry Schein*, the court found defendants' statements touting the competitiveness of the industry were misleading in light of plaintiff's allegations demonstrating that defendants were simultaneously engaged in undisclosed anticompetitive behavior, namely "collud[ing] with its competitors to block new buyers from entering the market." *Id.* at *10. Here, Plaintiffs allege nothing of the sort, as Quad was openly seeking to acquire the company known to be its primary competitor. Plaintiffs' primary argument is merely that Quad did not disclose details illuminating the precise nature of that competition. As discussed, Plaintiffs do not adequately allege that ending this price war was critical to Quad's performance. Furthermore, the fact that DOJ determined such a merger would be bad for competition does not mean that Quad was engaged in undisclosed anticompetitive behavior in seeking to acquire a competitor. *Cf. Tanaskovic v. Realogy Holdings Corp.*, No. 19-CV-15053, 2021 WL 211049, at *14 (D.N.J. Jan. 21, 2021) (finding that the existence of a DOJ investigation into alleged anticompetitive practices is insufficient to demonstrate that defendants acted in an anticompetitive way, absent particularized allegations). In all cases like *Henry Schein* of which this Court is aware, the

2002) ("[U]pon choosing to speak, one must speak truthfully about material issues."). Unless Defendants' "silence would make other statements misleading or false," they had no duty to disclose any additional detail about the Quad-LSC competition. *Glazer v. Formica Corp.*, 964 F.2d 149, 157 (2d Cir. 1992) (quotation omitted).

Defendants' statements announcing the LSC acquisition and the benefits to be gained from the acquisition largely disclosed much of what Plaintiffs assert was missing, although in more circumscribed and less jarring terms. Throughout the Class Period, Defendants openly disclosed the existence of extreme pricing pressures in the print industry due to excess capacity and increased consolidation. *See, e.g.*, AC ¶ 173. In announcing the LSC acquisition, Defendants disclosed that they expected the acquisition to result in the "elimination of duplicative functions, capacity rationalization, greater operational efficiencies and greater efficiencies in supply chain management." *Id.* ¶¶ 161, 174. Defendants also acknowledged that the LSC acquisition fit within Quad's strategy of pursuing "value-driven industry consolidating acquisitions." *Id.* ¶ 171.

The touchstone of whether a statement is misleading under federal securities laws is whether a *reasonable* investor would find it to be so. *See Basic*, 485 U.S. at 234. The Court is unable to find that a reasonable investor could have been misled about the motivations or implications of Quad's planned acquisition of LSC based on Defendants' public statements.[10] The Court's inability to infer that the statements were misleading is bolstered by contemporaneous statements by market analysts: They readily understood that Quad was acquiring its primary competitor, which would have an impact on pricing in the print industry. *See* Dkt. 71-15 at 1 (stating that "QUAD announced the acquisition of its #1 competitor" and, "[a]ssuming a smooth integration, by 2020 we estimate QUAD's ... share of the U.S. commercial print industry will almost double to 11%"); Dkt. 71-16 at 1 (noting that "[t]he proposed deal would combine the industry's two leaders in long-run print" and that "we have to assume the deal would, over[ ]time, have positive ramifications on industry pricing trends which generally averaged an annual decline of 1%-2%"); Dkt. 71-18 at 1–2 (referring to LSC as Quad's "largest commercial printing peer," projecting "immediate cost and revenue synergies" because "QUAD and [LSC] have a significant overlap in magazine and catalog customers," and predicting "wide-scale improvement in printing unit economics").[11] Because Plaintiffs have failed to allege facts showing that Quad's "true reason" for acquiring LSC was to end a price war and eliminate competition, and because Defendants adequately disclosed the expected benefits from the LSC acquisition and were under no obligation to describe pejoratively their reasoning for acquiring LSC, Plaintiffs have not adequately alleged that statements regarding the LSC acquisition were false or misleading.

10  The Court also agrees with Defendants that they had "no obligation to negatively mischaracterize its reason for the acquisition." Defs. Mem. at 17; *see also In re MGT Cap. Invs., Inc. Sec. Litig.*, No. 16-CV-7415, 2018 WL 1224945, at *11 (S.D.N.Y. Feb. 27, 2018) ("Companies need not draw negative inferences or characterize their behavior in a pejorative way in order to comply with the securities laws." (citing *Singh v. Schikan*, 106 F. Supp. 3d 439, 448 (S.D.N.Y. 2015)).

11  Plaintiffs argue that Defendants' "improperly appended" exhibits — including the analyst reports cited here — cannot be considered on a motion to dismiss without converting the motion to one for summary judgment. Pl. Resp. at 8 n.5. The Second Circuit, however, has held that district courts can take judicial notice of analyst reports for the fact that they contain certain information without considering the truth of the matters asserted and can do so without converting a motion to dismiss to a motion for summary judgment. *See Colbert v. Rio Tinto PLC*, 824 F. App'x 5, 10 n.5 (2d Cir. 2020) ("[W]e can take notice of the fact that there was such coverage and reports by investment analysts in April 2012, several months before the November SEC filing in question.");

*Staehr*, 547 F.3d at 425; *see also In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 284 n.23 (S.D.N.Y. 2008). Nevertheless, while it is appropriate for the Court to consider the content of analyst reports following the announcement of Quad's acquisition of LSC for what investment analysts said of the proposed transaction at that time, even without considering the reports, the Court would still find that Plaintiffs have failed to allege facts from which the Court can infer that Defendants' statements about the proposed merger were false or misleading.

**\*10** Plaintiffs next contend that Defendants' description of DOJ's antitrust review as "going as planned" or "as expected" was misleading because, again, they omitted material facts describing the hypercompetitive price war raging between Quad and LSC. *See* Pl. Resp. at 15–16 (quoting AC ¶¶ 182, 194). Plaintiffs argue that Defendants had an obligation to disclose facts about the nature of the competition between Quad and LSC "that could impact the review process" in order to present a "complete," albeit "less favorable," assessment of the ongoing DOJ review. *Id.* Plaintiffs' argument is a non sequitur: the level of competitiveness in the market is neither here nor there in terms of whether an antitrust review is proceeding as expected.

Putting aside the illogic of Plaintiffs' argument, Plaintiffs have failed to allege the particularized *facts* that Defendants were obligated to disclose when publicly commenting on the DOJ review process. Instead, Plaintiffs speak in generalities about what would have made Defendants' statements not misleading, arguing that Defendants had to "reveal the unusual and profit-sapping price war between the two companies." *Id.* at 16 n.11. The Court does not agree that Defendants were required to disclose corporate executives' hyperbolic characterizations of the corporate rivalry to keep their statements about the progress of the DOJ antitrust review from being misleading.

More important, however, Plaintiffs' Complaint is bereft of (1) any particularized allegations regarding the nature of the competition between Quad and LSC that rendered DOJ antitrust approval particularly unlikely [12] or (2) information at Defendants' disposal that cast doubt on the likelihood of receiving DOJ approval. Plaintiffs' description of the Quad-LSC relationship as exceptionally competitive and their inclusion of a handful of insider statements from Quad and LSC executives to support that description, in conjunction with allegations describing the companies' combined prowess in certain subsectors of the printing industry, do not come close to raising an inference that statements describing the review as proceeding "as expected" are false or misleading. Plaintiffs must allege facts from which the Court can plausibly infer that Defendants knew or should have known that the "cutthroat competition" between Quad and LSC or their collective market share in specific subsectors would render DOJ approval unlikely in order for Defendants' statements about the DOJ review process to be misleading. [13] *See In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 160 (S.D.N.Y. 2008) ("The requirement to be complete and accurate, however, does not mean that by revealing one fact ... one must reveal all others that, too, would be interesting ... but means only such others, if any, that are needed so that what was revealed would not be so incomplete as to mislead." (cleaned up)). Plaintiffs have failed to make that showing, and Plaintiffs may not rely on the fact that DOJ ultimately sued to block the acquisition to fill their pleading gap.

12   It was public knowledge that Quad and LSC were significant competitors in the magazine, catalog, and book printing businesses. *See* AC ¶ 53–55; *see also, e.g.*, Dkt. 71-16 at 1 ("The proposed deal would combine the industry's two leaders in long-run print."). That public knowledge would put reasonable investors on alert that approval of the transaction from DOJ's Antitrust Division was not assured. That some market analysts expected DOJ to assess the merger in terms of the combined company's market share in the overall commercial printing business rather than in particular subsectors does not mean that a reasonable investor would have understood Defendants' disclosures to signal that DOJ's approval was assured. *See* Dkt. 71-20 at 1–2 (describing Quad and LSC as "the two largest commercial printers in the U.S." but expressing surprise at DOJ's request for additional information on the acquisition because the combined entity would "control no more than 11% ... of the U.S. commercial printing industry").

13   At the time of the proposed merger, industry analysts predicted that the combined company would control approximately 11% of the "U.S. commercial printing industry." *See, e.g.*, Dkt. 71-20 at 2. While the Court does not credit this statement for its truth, it supports the Court's conclusion that absent allegations demonstrating that Defendants knew or should have known that DOJ would likely oppose the merger because of the combined company's market share in submarkets within the overall printing industry, Plaintiffs have failed adequately to allege that Defendants' statements regarding the progress of DOJ's review were misleading.

**\*11** This case is plainly distinguishable from those on which Plaintiffs rely. First, Plaintiffs fail to allege that Defendants received any indication from DOJ that the review was not proceeding "as expected" or that the transaction was unlikely

to be approved. *See In re Sprint Corp. Sec. Litig.*, 232 F. Supp. 2d 1193, 1219–20 (D. Kan. 2002) (citing particularized facts that defendants failed to disclose including that DOJ had suggested to defendants that merger approval was unlikely and that other negative events had occurred during the review process). Plaintiffs similarly fail to plead facts showing that Defendants were aware that the level of competition between Quad and LSC was likely to lead DOJ to challenge the merger. *See Tomaszewski v. Trevena, Inc.*, No. 18-CV-4378, 2020 WL 5095865, at *7–8 (E.D. Pa. Aug. 28, 2020) (finding misleading defendant's statement that he was hopeful for patent approval because of defendant's reliance on information already rejected by regulators). Notwithstanding the fact that the DOJ review process did not turn out as Defendants expected, Plaintiffs have failed adequately to allege that Defendants' expression of optimism during the review process was misleading.

Finally, Plaintiffs argue that Defendants' decision to abandon the acquisition "at the slightest sign of delay and less than one month after committing to 'vigorously defend' the acquisition" is sufficient to plead falsity. *See* Pl. Resp. at 16–17; AC ¶¶ 72–73. While the proximity between Defendants' forceful proclamations of their intention to defend DOJ's attempt to block the acquisition and their subsequent abandonment of that position may arouse suspicion, given the surrounding context and Plaintiffs' failure to plead any particularized allegations showing that Defendants did not intend to defend the acquisition at the time they made those statements, the Court finds that Plaintiffs have not adequately alleged that Defendants' statements were misleading.

In arguing their point, Plaintiffs rely on *Martinek v. AmTrust Fin. Servs.*, No. 19-CIV-8030, 2020 WL 4735189 (S.D.N.Y. Aug. 14, 2020). There is a critical factor, however, that distinguishes this case from *Martinek*. In *Martinek*, the defendants repeatedly stated that the company's stock would continue to be listed on a public exchange after a planned merger, but less than two months after the merger closed, the defendants delisted the company's stock. *Id.* at *12. The *Martinek* court held that "the very fact that Defendants decided to delist the preferred shares barely two months after the Merger closed — *on bases that were known to Defendants at the time they represented that they 'will' maintain the listings* — strongly suggests that Defendants knew this statement to be false when made." *Id.* (emphasis added).

Here, however, Plaintiffs have not pointed to any information known to Defendants at the time they announced their intention to defend the acquisition that ultimately motivated them to abandon it. Instead, Plaintiffs omit a critical, subsequent development that appears to explain Defendants' about-face: the district court's decision not to set an expedited trial schedule. *See* Dkt. 71-23; Dkt. 71-22.[14] Absent any factual allegation that Defendants did not intend to defend the acquisition in court at the time they announced they would — i.e., facts tending to show "contemporaneous falsity" — especially in consideration of the significant intervening event, Plaintiffs' allegations are insufficient to give rise to an inference that Defendants' stated intention to defend the LSC acquisition was false or misleading when made. *See In re China Mobile Games & Ent. Grp., Ltd. Sec. Litig.*, No. 14-CV-4471, 2016 WL 922711, at *4 (S.D.N.Y. Mar. 7, 2016) ("Plaintiffs fail to allege any actionable misstatements or omissions, because they do not allege contemporaneous falsity." (citing *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000)).

[14] As with the analyst reports, the Court may take judicial notice of publicly filed documents in prior litigation, although not for the truth of the matters asserted. *See Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998). The Court, therefore, takes judicial notice of the fact that Quad and LSC jointly requested an expedited trial schedule, with a bench trial to begin around October 1, 2019 (well before the October 30, 2019, expiration date contained in the Quad-LSC merger agreement), and that the district court thereafter set the case for trial beginning on November 14, 2019 (after the expiration date). *See* Dkt. 71-23; Dkt. 71-22; *see also* Dkt. 71-19. The Court also notes that, even were it unable to consider these prior litigation documents, Plaintiffs incorporate by reference into the Complaint Quad's July 23, 2019, press release discussing Quad's decision to abandon the acquisition in light of the district court's decision, providing another basis on which the Court may consider this information. *See* AC ¶ 73.

**\*12** In short, Plaintiffs have failed adequately to allege falsity with respect to any of Defendants' statements concerning the LSC acquisition.

### 3. Statements Concerning Quad's Sale of Transpak [15]

[15] Plaintiffs dedicate over 50 paragraphs and nearly 15 pages of their Complaint to detailing Quad's FCPA violations that have no connection whatsoever to Plaintiffs' purely speculative theory of fraud regarding Quad's sale of Transpak. *See* AC ¶¶ 77–130. The Court gives zero credence to Plaintiffs' transparent attempt to draw attention to Defendants' unrelated misdeeds in order to bolster Plaintiffs' case.

Finally, Plaintiffs argue that Defendants' statement that Quad would use the $10 million in proceeds from the sale of Transpak to pay down debt was false or misleading in light of Quad's announcement less than one month later of a settlement with the SEC in which it agreed to pay nearly the same amount to settle FCPA charges.[16] *See* Pl. Resp. at 17; *see also* AC ¶ 76. This is pure speculation and is plainly insufficient to survive a motion to dismiss.[17] *See* ⚑ *Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level."). The cases Plaintiffs cite in support stand only for the proposition that allegations demonstrating that a defendant continually represented that it would act in a certain way and shortly thereafter acted in a completely contrary way can raise an inference that the statements were false when made. *See* ⚑ *Martinek*, 2020 WL 4735189, at *12; *see also* ⚑ *Fecht v. Price Co.*, 70 F.3d 1078, 1083–84 (9th Cir. 1995) (finding "shortness of time" between optimistic statements and decision to terminate a program to be "circumstantial evidence that the optimistic statements were false when made"). Without any particularized allegation that Defendants did not, in fact, use the proceeds to pay down debt and did not intend do so at the time of the sale, Plaintiffs may have alleged coincidence, but they have come up woefully short of alleging any false or misleading statements.[18]

[16] While Plaintiffs repeatedly state that Quad paid the SEC nearly $10 million in settlement of the FCPA violations, in their Complaint, Plaintiffs also allege that, in October 2019, Quad paid "a total of more than $13 million to resolve the scandal." AC ¶ 235. It is unclear whether this covers the $10 million paid to the SEC in combination with $3.2 million Quad agreed to pay the Peruvian antitrust authority INDECOPI beginning in January 2020 or represents some other settlement payment. *See* AC ¶ 212. In any event, this allegation further weakens Plaintiffs' speculative theory, eliminating the similarity in dollar amounts and leaving only the proximity in time.

[17] To the extent Plaintiffs challenge any of Defendants' other statements concerning the prospects for the growth of Quad's packaging business, that argument similarly fails for failure to plead adequately particularized facts demonstrating the falsity of Defendants' statements. *See* Pl. Resp. at 17 (citing AC ¶ 146).

[18] In addition to arguing that Plaintiffs failed adequately to allege falsity, Defendants also argue that Plaintiffs have failed to allege materiality for certain statements and that a number of Defendants' complained-of statements are protected under the PSLRA safe harbor for forward-looking statements. *See* Defs. Mem. at 14–17, 18–19; *see also* Defs. Reply at 4–7. Although the Court is inclined to agree with Defendants, at least with respect to certain challenged statements, because the Court finds that Plaintiffs have failed to allege adequately falsity with respect to *any* of Defendants' Class Period statements — preventing Plaintiffs from adequately alleging any material misstatements or omissions — the Court need not parse through 30 pages of complained-of statements to ascertain which are inactionable or immaterial as a matter of law.

The Court notes, however, that its decision not to examine further the issues of materiality and the PSLRA safe harbor is not driven by Plaintiffs' assertion that Defendants' arguments on these issues are insufficiently developed for the Court to consider. *See* Pl. Resp. at 19, 21. While Defendants did not identify each allegedly immaterial or safe-harbor-protected statement in Plaintiffs' Complaint, that is as much a product of the volume of statements Plaintiffs allege were misleading as anything else. Nevertheless, Defendants adequately identify certain categories of statements covered by their arguments and cite examples from the Complaint. *See* Defs. Mem. at 14–16 (citing AC ¶¶ 138, 146, 151, 156, 159, 165, 167, 170, 171, 176, 188, 190); Defs. Reply at 4–7 (same). The heightened pleading requirements under Rule 9(b) and the PSLRA apply only to

Plaintiffs' Complaint, not Defendants' motion. Were it necessary, Defendants' papers provide a sufficiently developed basis upon which the Court could determine whether certain of the challenged statements are immaterial or protected as forward-looking statements warranting dismissal of Plaintiffs' Complaint.

## IV. Plaintiffs Have Not Pled Facts Giving Rise to a Strong Inference of Scienter

**\*13** Just as Plaintiffs' pleading deficiencies inhibit their ability to plead falsity adequately, so too do they prevent Plaintiffs from adequately pleading scienter. The PSLRA requires that a securities fraud complaint "state with particularity facts giving rise to a strong inference" that the defendant acted with "a mental state embracing intent to deceive, manipulate, or defraud." 15 U.S.C. § 78u–4(b)(2)(A); *Tellabs*, 551 U.S. at 319 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)). To plead scienter, a plaintiff must allege "facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (citing *Ganino v. Citizen Utils. Co.*, 228 F.3d 154, 168–69 (2d Cir. 2000)). In considering whether a plaintiff has pleaded facts giving rise to a strong inference of scienter, "the court must take into account plausible opposing inferences." *Id.* (quoting *Tellabs*, 551 U.S. at 323). A plaintiff has alleged a strong inference of scienter "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.

To adequately plead motive, "plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud"; motives "generally possessed by most corporate directors and officers do not suffice." *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001). The Second Circuit has therefore held that motive "entail[s] concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Novak*, 216 F.3d at 307 (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994)).

Plaintiffs' proffered theory of motive is that Defendants sought to inflate artificially the price of Quad stock to acquire LSC in an all-stock deal for fewer shares than would otherwise have been required absent the fraudulently-inflated stock price. [19] *See* Pl. Resp. at 27; AC ¶¶ 131. Unaccompanied by the desire to achieve some articulable goal, a general allegation that defendants sought to inflate the price of a company's stock falls far short of the PSLRA's pleading requirements. *See, e.g., In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 532 (S.D.N.Y. 2009) ("The alleged motivation of a corporation to raise money to prevent the negative ramifications of a resultant drop of a credit rating or a stock price—even if such a drop would allegedly threaten the 'survival' of a company—is far too generalized (and generalizable) to allege the proper 'concrete and personal' benefit required by the Second Circuit." (citing *Kalnit*, 264 F.3d at 142)). Plaintiffs' theory of motive is more particularized than the general desire to increase Quad's stock price, although only marginally so.

---

[19] Whether or not included in a "Background" section of Plaintiffs' Complaint, as Defendants contend, *see* Defs. Reply at 8 & n.16, Plaintiffs plainly alleged this theory of motive in their Complaint. *See* AC ¶ 131. The Court, therefore, may properly consider it on Defendants' motion to dismiss. Whether it is supported by particularized facts is another matter entirely.

---

As Plaintiffs point out, the Second Circuit has held that, "in some circumstances, the artificial inflation of stock price in the acquisition context may be sufficient for securities fraud scienter." *Rothman v. Gregor*, 220 F.3d 81, 93 (2d Cir. 2000); *see also In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 328 (S.D.N.Y. 2001) ("[A]rtificial inflation of a stock price in order to achieve some more specific goal may satisfy the pleading requirement."). Nevertheless, Plaintiffs overstate the point in arguing that such an allegation is alone "a sufficient motive for pleading scienter." Pl. Resp. at 27. The Second Circuit explicitly cautioned that "[w]hether sufficient motive could be shown solely by an allegation of a high stock price artificially maintained in the context [of] one impending acquisition might well depend on the particular circumstances of the case." *Rothman*, 220 F.3d at 94; *see also In re Complete Mgmt.*, 153 F. Supp. 2d at 328 (describing as "highly fact-intensive" and "extremely contextual" the analysis of whether "the desire to maintain an

inflated stock price" to achieve a specific goal is "sufficiently specific support for an allegation of scienter").

**\*14** Here, Plaintiffs assert in a completely conclusory fashion that Defendants sought to artificially inflate Quad's stock price to complete the LSC acquisition. *See* AC ¶ 131. Plaintiffs do not plead any particularized facts to support their motive allegation, such as facts demonstrating that the inflation of Quad's stock price was necessary to consummate the LSC acquisition. *See [In re Vivendi Univ., S.A. Sec. Litig.](...)*, 381 F. Supp. 2d 158, 185 (S.D.N.Y. 2003) ("Scienter may be imputed ... to defendants when defendants[ ] were motivated to inflate company stock prices as a means to effectuate a specific acquisition *that would not otherwise be possible without fraudulently inflating stock prices*." (emphasis added)), *aff'd sub nom. [In re Vivendi, S.A.](...)*, 838 F.3d 223. Plaintiffs' allegation, seemingly pled in passing, that Quad's "artificially inflated stock price enabled Quad's attempt to acquire LSC in an all-stock transaction worth $1.4 billion," AC ¶ 131, does not suffice to plead motive, especially in light of the tendency to interpret "narrowly" the Second Circuit's guidance that "artificial inflation of stock price in the acquisition context may be sufficient for securities fraud scienter." *In re Agnico-Eagle Mines Ltd. Sec. Litig.*, No. 11-CIV-7968, 2013 WL 144041, at \*12 (S.D.N.Y. Jan. 14, 2013) (quoting *[Rothman](...)*, 220 F.3d at 93). A narrow interpretation is further warranted where, as here, any effort by Defendants to achieve an all-stock acquisition of LSC using the fewest shares possible would have redounded to Quad's shareholders' benefit. *See [Kalnit](...)*, 264 F.3d at 141 ("[A]ny intent to defraud Comcast cannot be conflated with an intent to defraud the shareholders ... [as] achieving a superior merger [would] benefit[ ] all shareholders, including the defendants.").

Plaintiffs also fail to explain how their motive allegation can support their sweeping theory of fraud covering the entirety of Defendants' alleged material misstatements and omissions throughout the 18-month Class Period. Even were the Court to credit Plaintiffs' theory of motive with respect to Defendants' actions and statements leading up to the announcement of the LSC acquisition, it does not explain Defendants' motive with respect to their statements *after* Quad announced the LSC acquisition — or, at the very least, after deciding to abandon the LSC acquisition. Plaintiffs' theory entirely fails to allege scienter with respect to Defendants' alleged fraud connecting the Transpak sale to the SEC settlement. "[T]he link between the [LSC] acquisition and the alleged misconduct simply is not close enough to strengthen the inference of an intent to defraud" across the entirety of the Class Period. *[ECA & Loc. 134](...)*, 553 F.3d at 201.

Perhaps acknowledging the infirmity of their motive allegation, Plaintiffs assert that they are primarily relying on allegations that purportedly demonstrate that Defendants acted recklessly or with knowledge that their statements were false or misleading. *See* Pl. Resp. at 23–26. Because Plaintiffs have failed adequately to allege motive, "the strength of the circumstantial allegations must be correspondingly greater." *[Kalnit](...)*, 264 F.3d at 142 (quotation omitted).

Plaintiffs fail to plead facts raising a strong inference that Defendants' statements were made recklessly or with conscious disregard of the truth. Despite their assertions to the contrary, Plaintiffs do not plead with particularity that Defendants had access to facts or information suggesting the falsity of their public disclosures. *See [Novak](...)*, 216 F.3d at 308 ("[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements."). What Plaintiffs characterize as "facts" of which Defendants allegedly had knowledge and that contradicted their public statements are nothing more than conclusory assertions lacking any basis in fact, at least as plead in Plaintiffs' Complaint. *See* Pl. Resp. at 24–25 (describing as "facts" the need for Quad to accelerate the pace of Quad 3.0 and to address the price war with LSC, among other conclusory statements). As extensively discussed above, Plaintiffs' allegations regarding the nature of the Quad-LSC competition, without more, fail to demonstrate that Defendants had access to information that would cast doubt on the truthfulness of their public statements. Although Quad's poor 3Q19 performance and subsequent decision to accelerate Quad 3.0 may provide hindsight support for Plaintiffs' assertions that Quad needed to act much earlier to accelerate 3.0 in order to meet its financial projections, Plaintiffs do not provide evidence that Defendants had access to any information demonstrating as much at the time Defendants made their allegedly misleading statements. *[In re PXRE Grp.](...)*, 600 F. Supp. 2d at 536 ("Second Circuit cases uniformly rely on allegations that [1] *specific* contradictory information was available to the defendants [2] *at the same time* they made their misleading statements." (quoting *[In](...)*

re Marsh &Mclennan Cos., Inc. Sec. Litig., 501 F. Supp. 2d 452, 484 (S.D.N.Y. 2006)).

**\*15** Plaintiffs also point to their scienter-specific allegations and argue that they are adequate to give rise to the inference that Defendants acted recklessly or with conscious disregard of the truth. See AC ¶¶ 24–30 (detailing individual Defendants' control over Quad and access to insider information); ¶¶ 217–236 (discussing individual Defendants' senior positions and Sarbanes-Oxley certifications, Quadracci's extensive control over Quad, the importance of ending the LSC price war and rapidly accelerating Quad 3.0, and Quad's "historically weak internal controls"). [20] But absent particularized allegations of specific information Defendants had at their disposal that rendered their statements false or misleading, allegations of circumstantial evidence — such as the individual Defendants' senior positions, control over Quad, regulatory certifications, and the relative importance of Quad 3.0 — are not sufficient to plead scienter, even considered in their totality. See Jackson v. Abernathy, 960 F.3d 94, 99 (2d Cir. 2020) (finding an argument that a product or sector was "of such core importance to the Corporate Defendants that their senior officers must have known the challenged statements were false" is, without more, "a naked assertion ... plainly insufficient to raise a strong inference of ... scienter"); Strougo v. Barclays PLC, 105 F. Supp. 3d 330, 350 (S.D.N.Y. 2015) (holding that, where the complaint fails to identify any specific information demonstrating the falsity of the allegedly actionable statements, "[c]ourts in this Circuit have long held that accusations founded on nothing more than a defendant's corporate position are entitled to no weight" (quoting Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of Com., 694 F. Supp. 2d 287, 300 (S.D.N.Y. 2010)); In re Take-Two Interactive Sec. Litig., 551 F. Supp. 2d 247, 304–05 (S.D.N.Y. 2008) ("[A] Sarbanes-Oxley certification is probative of scienter only if the complaint alleges specific contrary information ... of which the certifying defendant had reason to know." (cleaned up)). In the absence of any specific information demonstrating the falsity of Defendants' statements, Plaintiffs may not rely on conclusory assertions that, based on this circumstantial evidence, it is "virtually inconceivable" or "absurd to suggest" that Defendants were not aware of "facts," to wit: Quad's ability to meet its financial projections was dependent on expediting the pace of Quad 3.0 or acquiring LSC. See Harris v. AmTrust Fin. Servs., Inc., 135 F. Supp. 3d 155, 176 (finding that "broad allegations that Defendants 'knew' " of the falsity of their statements "lack[ ] the specificity required to plead a securities fraud claim"). [21]

[20] Much like the rest of Plaintiffs' allegations concerning Quad's FCPA violations, see supra note 15, Plaintiffs' allegations regarding Quad's "historically weak internal controls" are not helpful in their quest to plead scienter when Defendants' alleged false statements are not logically connected to any weaknesses in Quad's internal controls.

[21] To the extent Plaintiffs seek to raise an inference of scienter with respect to the alleged Transpak-related fraud, the Court is unable to find it in Plaintiffs' papers. Even had Plaintiffs adequately alleged facts giving rise to a strong inference of scienter with respect to Defendants' Quad 3.0 and LSC-related statements, the Court would conclude that Plaintiffs failed to allege such facts in connection with the alleged Transpak-related false statements.

In short, Plaintiffs have failed to allege facts giving rise to an inference of scienter more compelling than other non-fraudulent inferences. See Tellabs, 551 U.S. at 324. Of the more cogent explanations for Defendants' statements is this: Defendants, upon realizing that they had miscalculated the speed at which Quad needed to implement its 3.0 transition amid worse-than-expected performance, decided to take significant steps to expedite its corporate transition plan to compete more effectively after failing to consummate the LSC acquisition.

**V. Plaintiffs Have Not Pled Loss Causation**

As a final, independent reason to dismiss the Complaint, Plaintiffs fail to allege adequately loss causation. Loss causation is "the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc., 343 F.3d 189, 197 (2d Cir. 2003). To allege loss causation, "[a]mong other things, the misconduct must be a 'substantial factor in the sequence of responsible causation.' " Gould v. Winstar Commc'ns, Inc., 692 F.3d 148, 161 (2d Cir. 2012) (quoting AUSA Life Ins. Co. v. Ernst & Young, 206 F.3d 202, 215 (2d Cir. 2000)).

Plaintiffs contend that their burden to demonstrate loss causation is not overly significant and requires only that they allege facts raising a reasonable inference that some part of the decline in Quad's share price was substantially caused by a disclosure of fraud. *See* Pl. Resp. at 29 (citing *Gould*, 692 F.3d at 162). Plaintiffs have not, however, alleged the existence of any corrective disclosures. Defendants' October 30, 2019, announcement contained no information that even remotely suggests that Defendants' prior statements regarding Quad 3.0, the LSC acquisition, or the Transpak sale were false or misleading. *See Lentell*, 396 F.3d at 175 n.4. The closest Defendants' statements come to a "corrective disclosure" is the announcement of a decision to take "decisive actions" to "further accelerate" Quad 3.0. AC ¶ 210. But those statements, which may have announced a "corrective path" for the company going forward, are not "corrective" disclosures for purposes of alleging loss causation. Plaintiffs fail to point to any disclosure by Defendants that even remotely suggests that they knew when making their earlier statements about the prospect of meeting their financial projections that the Quad 3.0 plan was proceeding too slowly or that they would be unable to meet their financial targets unless they accelerated Quad 3.0.

**\*16** Because Plaintiffs fail to allege facts from which the Court can infer that Defendants' end-of-Class-Period disclosures revealed fraud to the market, Plaintiffs are reduced to relying solely on Defendants' revelation of poor financial results and concomitant market dissatisfaction to allege loss causation. That is simply not enough. *See In re AOL Time Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666, 678–79 (S.D.N.Y. 2007) ("[I]t is not enough to argue that [the] audit opinions concealed the risk that [the company] would be unable to meet future revenue projections, because the mere failure to meet earnings forecasts is insufficient to establish loss causation."); *In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 261, 266–67 (S.D.N.Y. 2005) ("If downturns in stock prices based on such mundane events as failures to meet forecasts and downward revisions of forecasts were legally sufficient to constitute disclosures of securities fraud, then any investor who loses money in the stock market could sue to recover for those losses without alleging that a fraudulent scheme was ever disclosed and that the disclosure caused their losses."). [22]

[22] As with Plaintiffs' arguments concerning scienter, the Court is entirely unable to divine a theory of loss causation with respect to the alleged false statement regarding the proceeds from the Transpak sale.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED. Because Plaintiffs had an opportunity to amend their pleadings in response to Defendants' motion to dismiss, and because the arguments made in response to the motion to dismiss give no indication that the Complaint's defects are curable, Plaintiffs are denied leave to amend. *See* Fed. R. Civ. P. 15(a)(2); *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505–06 (2d Cir. 2014). The Amended Complaint is therefore DISMISSED with prejudice.

The Clerk of Court is respectfully directed to close all open motions and close this case.

**SO ORDERED.**

**All Citations**

Slip Copy, 2021 WL 736839