# EXHIBIT A

**2021 WL 1608342**
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

ASHLEY PIERRELOUIS, individually and on behalf of all others similarly situated, Plaintiff,
v.
Judge Jorge L. Alonso GOGO, INC., MICHAEL J. SMALL, NORMAN SMAGLEY, BARRY ROWAN, and JOHN WADE, Defendants.

No. 18 C 4473
|
Filed: 04/26/2021

## MEMORANDUM OPINION AND ORDER

HON. JORGE L. ALONSO United States District Judge

**\*1** Lead plaintiff Daniel Rogers [1] has filed a Third Amended Class Action Complaint for Violation of the Federal Securities Laws ("Third Amended Complaint"), asserting violations of sections 10(b) and 20(a) of the Securities Exchange Act and Rule 10b-5 of the Securities Exchange Commission ("SEC"). Defendants, Gogo, Inc. ("Gogo"), Michael J. Small, Norman Smagley, Barry Rowan, and John Wade, move to dismiss the complaint pursuant to 🚩 Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim under Rule 8, Rule 9(b), and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). For the following reasons, the motion is denied.

## BACKGROUND

The Court assumes familiarity with its previous decision in this case, in which it granted defendants' motion to dismiss plaintiff's amended complaint for failure to state a claim. *Pierrelouis v. Gogo, Inc.*, 414 F. Supp. 3d 1164, 1176-77 (N.D. Ill. 2019). Since then, plaintiff has twice repleaded, but the core of the complaint has not changed. As before, plaintiff alleges that, during the class period between February 27, 2017 and May 4, 2018, defendants —Gogo and several of its executives—made certain false and misleading public statements about the reliability of Gogo's in-flight internet connectivity services and its impact

on Gogo's financial picture. According to plaintiff, Gogo installed its new "2Ku" antenna-and-satellite-based in-flight wifi systems on numerous partner airplanes before and during the class period, although defendants knew that the 2Ku systems sometimes did not work after the airplanes had been sprayed with de-icing fluid. As a result, plaintiff alleges, defendants knew that Gogo would be unable to hit its service availability targets during periods of winter weather unless it made costly modifications to its 2Ku systems, which would hurt the company's financial performance. Nevertheless, according to plaintiff, defendants concealed the de-icing issue from investors for months, and then, even after disclosing it in February 2018, still concealed its true seriousness, until Gogo's new CEO finally disclosed the extent of the problem in May 2018. The May 2018 disclosure caused Gogo's allegedly artificially inflated stock price to plummet, to the detriment of plaintiff and other investors.

The Court described these allegations in more detail in its prior opinion, *see id.* at 1168-70, and, apart from the above brief summary, it will not repeat that description here. In the present Third Amended Complaint, plaintiff's core allegations are the same, but he includes new allegations about the 2Ku system's importance to Gogo's business prospects and about Gogo employees' attempts to assess and correct the de-icing problem.

**\*2** According to plaintiff, Gogo's financial future was heavily dependent on the success of the 2Ku system. Investors perceived Gogo as a company that needed to make capital expenditures in the short term in order to achieve profitability in the long term. That meant that Gogo needed to spend heavily to install its systems on more and more aircraft so that it could reach more customers. Additionally, the improved bandwidth of the new 2Ku satellite system, as compared with the old air-to-ground system, was meant to attract more passengers per flight and increase average revenue per aircraft, a key accounting metric. Analysts perceived Gogo's ability to (a) contract with airline partners to install its systems on new planes and then (b) successfully and efficiently install its systems on the resulting "backlog" of planes as crucial to its fortunes. Gogo had incurred significant debt to finance 2Ku installations and buy satellite capacity, and it continued to borrow throughout the class period for the same purpose, expecting that it its investment would pay off with revenue growth as soon as the 2Ku installations were complete. In light of the expectations of analysts and investors and the increased debt, plaintiff alleges, any disruption to the rollout of the 2Ku product or to the installation of 2Ku systems

on Gogo's backlog of partner airplanes would have had a significant impact on Gogo's financial position.

According to plaintiff, several former employees have confirmed that Gogo discovered the de-icing problem in the winter of 2016-2017, recognized its seriousness, and began to make an extensive, concerted effort to correct it by the start of the class period in February 2017. The first of these former employees, identified only as "FE-1," served as Director of Aircraft Engineering. FE-1 recalls that multiple planes began to have connectivity problems in December 2016 and January 2017. An airline partner grounded one plane so that engineers from ThinKom, the company that designed the 2Ku system, could inspect it. The ThinKom engineers determined that the problem was caused by de-icing fluid leaking into the "radome," the compartment that housed the 2Ku system's antennas. FE-1 recalled that the problem affected a dozen planes that winter, and the outages appeared on an outage list that was circulated to everyone in management.

Based on these developments, FE-1 recalled, Gogo engineers began working on a solution to the problem in February 2017. Gogo obtained an old airplane fuselage, affixed a 2Ku system to it, installed a camera in the radome, and sprayed it with de-icing fluid to determine how and where the fluid penetrated the radome. This testing revealed that the fluid leaked in under the rubber seal between the radome and the fuselage. Gogo continued to install the 2Ku systems on new airplanes while it sought a remedy for this problem. By October 2017, when FE-1 left the company, Gogo had managed to engineer a couple of repair procedures, but the repairs took about three days to implement, which was difficult to arrange with the airlines.

FE-2 served as a Project Engineer who oversaw installations of 2Ku systems, and he recalled that Gogo discovered the de-icing problem when cold weather arrived in the latter part of 2016. However, Gogo continued to install 2Ku systems on new airplanes, not wanting to disrupt its aggressive installation schedule. FE-2 was involved in the installations of supplemental equipment to address the de-icing problem, following an effort by a "fully coordinated, integrated product team comprised of people with subject matter expertise" to develop a fix to the problem. (3d Am. Compl. ¶ 77, ECF No. 101.) Gogo began to roll out its remedy for the de-icing problem in the spring or summer of 2017, after months of testing. FE-2 recalled that the de-icing fluid was a big concern that had reached the attention of many executives, given the importance of the 2Ku product for the company and the

sophistication of the equipment. As FE-2 explained, "when you're putting stuff on an airplane, even if you're drilling one hole, there are about three dozen people at the company that know about that one hole." (*Id.* ¶ 79.)

FE-3 joined Gogo in February 2017 as "Director – Airline Technical Operations." (*Id.* ¶ 42.) At that time, Gogo was working on finding a solution to the de-icing problem. During FE-3's first few months at the company, fixing the de-icing problem before winter set in again was a priority for Gogo, and everyone was aware of what was going on, including defendant John Wade, Gogo's chief operating officer during the class period. FE-3 recalled attending weekly meetings at which the de-icing problem was discussed. Wade also attended these meetings.

**\*3** FE-4 worked at Gogo from 2013 to May 2017, advancing to the role of "Senior VP, Airline Technical Operations." (*Id.* ¶ 43.) He recalls learning of the 2Ku problems in the winter of 2016-2017, and that Gogo was still working on assessing and fixing the problem when he left the company.

FE-5 worked at Gogo from 2014 to May 2017, advancing to the role of "Director, Aircraft Certification and Compliance." (*Id.* ¶ 44.) He recalls that the 2Ku system was having problems in the winter of 2016-2017. He learned of them because his team served as liaison between Gogo and the FAA for obtaining "Supplemental Type Certificates" or "STCs." Any modification to the outside of an airplane must receive an STC, which the FAA defines as "a type certificate ... issued when an applicant has received FAA approval to modify an aeronautical product from its original design." (3d Am. Compl. ¶ 92.) Gogo was required to obtain an STC for each type of aircraft on which it installed 2Ku systems, and indeed even for different configurations of the same aircraft type. This was a time-consuming, multi-step process that could take months or even years. In the case of the 2Ku system, according to FE-5, the STC application required testing the equipment under different environmental conditions and against different contaminants that the equipment might encounter once it was in use. Gogo's airline partners would have to supply specific parts for testing. Before FE-5 left the company in May 2017, his team had been involved in internal discussions at Gogo about whether the company's attempts to address the de-icing issue would require a new STC. FE-5 told members of the department tracking the functionality of the 2Ku system that he could not say whether a fix would require a new STC until after he saw the design of the proposed fix. He did not recall seeing a

revised design before he left in May 2017, but he knew that Wade was aware of what was going on.

Plaintiff claims that defendants' false statements deceived and defrauded investors in violation of the Securities Exchange Act and Rule 10b-5 of the SEC. Additionally, plaintiff claims that the individual defendants are liable as "controlling persons" of Gogo under § 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t. Defendants have moved to dismiss for failure to state a claim under Federal Rule of Procedure 12(b)(6).

## ANALYSIS

Section 10(b) of the Securities Exchange Act prohibits the use "in connection with the purchase or sale of any security ... [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe." 15 U.S.C. § 78j. Under SEC Rule 10b-5, it is unlawful for any person:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. Thus, under § 10(b) and Rule 10b-5, "a plaintiff can obtain damages if she can prove (1) the defendant made a false statement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities (5) upon which the plaintiff justifiably relied and (6) that the false statement proximately caused the plaintiff damages." *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 595 (7th Cir. 2006) ("*Tellabs I*"), *vacated and remanded on other grounds by Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007). The required scienter is "an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756 (7th Cir. 2007).

**\*4** "A motion [to dismiss] under Rule 12(b)(6) tests whether the complaint states a claim on which relief may be granted." *Richards v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012). Under Rule 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The short and plain statement under Rule 8(a)(2) must " 'give the defendant fair notice of what the claim is and the grounds upon which it rests.' " *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (ellipsis omitted)).

Under federal notice-pleading standards, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Stated differently, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "In reviewing the sufficiency of a complaint under the plausibility standard, [courts must] accept the well-pleaded facts in the complaint as true, but [they] 'need[ ] not accept as true legal conclusions, or threadbare recitals of the elements of a cause of action, supported by mere conclusory statements.' " *Alam v. Miller Brewing Co.*, 709 F.3d 662, 665-66 (7th Cir. 2013) (quoting *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009)).

Additionally, any claims of or including acts of fraud must comply with Federal Rule of Civil Procedure 9(b), which requires the pleading party to "state with particularity the circumstances constituting fraud." *U.S. ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 775 (7th Cir. 2016). Although fraudulent or deceptive intent "may be alleged generally," Rule 9(b) requires a plaintiff to describe the "circumstances" of the alleged fraudulent activity with "particularity" by including such information as "the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated." *Windy*

*City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 668 (7th Cir. 2008).

The Private Securities Litigation Reform Act ("PSLRA") imposes heightened pleading requirements on private, class action claims of securities fraud under § 10(b) and Rule 10b-5:

**(b) Requirements for securities fraud actions**

**(1) Misleading statements and omissions**

In any private action arising under this chapter in which the plaintiff alleges that the defendant—

**(A)** made an untrue statement of a material fact; or

**(B)** omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;

*the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.*

**(2) Required state of mind**

**(A) In general**

Except as provided in subparagraph (B), in any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, *state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.*

**\*5** 15 U.S.C. § 78u-4 (italicized emphasis added). Thus, under the PSLRA, private securities fraud plaintiffs not only must plead with particularity the factual circumstances constituting fraud, including by specifying the alleged misrepresentations and the basis for any allegations made on information and belief, but they must also plead with particularity sufficient facts to give rise to a "strong inference" that the defendant acted with scienter. *See Tellabs I*, 437 F.3d at 594 ("[T]he PSLRA essentially returns the class of cases it covers [*i.e.*, private securities fraud class actions] to a

very specific version of fact pleading—one that exceeds even the particularity requirement of ... Rule ... 9(b).").

A "strong inference" is one that is "strong in light of other explanations." *Tellabs*, 551 U.S. at 323. That is, it is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 314. Determining whether allegations give rise to such an inference requires courts to "take into account plausible opposing inferences" because "[t]he strength of an inference cannot be decided in a vacuum," and "[t]he inquiry is inherently comparative." *Id.* at 323 (internal quotation marks omitted); *see Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 711 (7th Cir. 2008) ("*Tellabs II*") ("The plausibility of an explanation depends on the plausibility of the alternative explanations.").

The required state of mind under the PLSRA is "an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Higginbotham*, 495 F.3d at 756. Defendants acted with the required scienter if they spoke in disregard of a risk of falsity that was " 'so obvious that [they] must have been aware of it.' " *See Tellabs II*, 513 F.3d at 702, 704 (quoting *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001)). "When the facts known to a person place him on notice of a risk, he cannot ignore the facts and plead ignorance of the risk." *Tellabs II*, 513 F.3d at 704.

In support of their motion to dismiss, defendants argue—as before—that plaintiff does not meet his burden to plead falsity and plaintiff's complaint fails to raise a strong inference of scienter. Additionally, they argue that certain of the statements that plaintiff challenges were forward-looking statements protected by the PSLRA safe harbor, *see* 15 U.S.C. § 78u-5, and that defendants cannot be liable as control persons under § 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a), because plaintiff does not state a claim for an underlying violation of § 10(b).

**I. Material Falsity**

Under the PSLRA, a complaint containing a Rule 10b-5 claim must "specify each statement that is allegedly misleading, the reasons why it is so, and, if based on information and belief, what specific facts support that information and belief." *Tellabs I*, 437 F.3d at 595 (citing 15 U.S.C. § 78u–4(b)

(1)). That does not mean that a complaint "automatically survives" if it states all the known facts that might support an inference of falsity, nor that it fails if it "leaves out a redundant detail." *Tellabs I*, 437 F.3d at 595. "[T]he relevant question is 'whether the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission.' " *Id.* (quoting *Novak v. Kasaks*, 216 F.3d 300, 314 n.1 (2d Cir. 2000)). "A litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements were false, does not meet" the standard set by the PSLRA. *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008).

 **\*6** Plaintiffs list all of the materially misleading statements and omissions defendants are alleged to have made in a thirty-one page, eighty-four-paragraph section of the Third Amended Complaint. (3d Am. Compl. ¶¶ 140-224.) The Court previously held that plaintiff had not alleged sufficiently "specific facts to demonstrate when the 2Ku problems showed themselves to be of [such] ... magnitude" that they made the challenged statements false, at the time defendants made them, for failing to disclose the 2Ku problems or their severity. *Pierrelouis*, 414 F. Supp. 3d at 1174 (internal quotation marks and citations omitted). Plaintiff had alleged that Gogo tracked service outages, the individual defendants had access to the outage reports, and the outage reports showed that service availability had dropped; but without allegations bearing on "*when* the data revealed that the de-icing problem had caused a precipitous drop in availability, or when it became clear that costly remediation efforts were necessary," the Court reasoned, plaintiff had not made sufficiently specific allegations to permit a plausible inference that defendants' statements were false when made. *Id.*

Defendant argues that the Third Amended Complaint suffers from the same defects, but the Court disagrees. The new former-employee allegations, combined with the allegations establishing the importance for Gogo's financial health of keeping to the 2Ku installation schedule, correct this deficiency. The former-employee allegations, particularly the allegations of FE-1, show that the de-icing fluid issue had begun to manifest itself prior to the beginning of the class period on February 27, 2017. According to FE-1, a dozen planes—12% of Gogo's 2Ku fleet, at that time—were experiencing problems. Such a high failure rate among 2Ku systems in the field would have been an extremely ominous sign, given the critical importance of the 2Ku product to

Gogo's fortunes. Gogo was forced to make extensive efforts, beginning before the class period, to correct the problem, and the former-employee allegations show that Gogo's efforts involved not only extensive engineering and technical work, including the acquisition and testing of an old airplane fuselage, but also preparations to clear potential regulatory hurdles by obtaining new STCs, if necessary.

True, these allegations still lack certain specifics that might make plaintiff's claim more convincing, but the claim need not be airtight to survive a motion to dismiss. At this stage, the Court must ensure that "the grounds for the plaintiff's suspicions ... make the allegations plausible," while "remain[ing] sensitive to information asymmetries that may prevent [plaintiff] from offering more detail" before he has had the benefit of discovery. *See Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 443 (7th Cir. 2011); *see Pension Tr. Fund for Operating Engineers v. DeVry Educ. Grp., Inc.*, No. 16 C 5198, 2017 WL 6039926, at \*8-9 (N.D. Ill. Dec. 6, 2017). Given the extent of the company's efforts to address the de-icing problem and the importance of the 2Ku product, and given the limited information available to plaintiff concerning Gogo's internal deliberations and operations, plaintiff has alleged enough factual matter to make it at least plausible that the de-icing problem had shown itself to be of a "sufficient magnitude" to make defendants' statements misleading at the time they were made. *Cf. Pierrelouis*, 414 F. Supp. 3d at 1174-75 (citing *DeVry*, 2017 WL 6039926, at \*8-9, and *Jones v. Corus Bankshares, Inc.*, 701 F. Supp. 2d 1014, 1020-21 (N.D. Ill. 2010)).

## II. Scienter

As stated above, the PSLRA requires plaintiffs to make not general but *particularized* allegations of "facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4. A "strong inference" of scienter is one that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314; *see id.* at 323-24. The Court previously held that plaintiff did not make sufficiently particularized allegations of facts giving rise to a strong inference of scienter because he did not allege when defendants knew or should have known of the magnitude of the de-icing problem. Defendants argue that plaintiff has not corrected this deficiency. As above, the Court disagrees.

**\*7** Plaintiff has added particularized allegations based on accounts of former employees demonstrating that, by the beginning of the class period, an ominously large percentage of the 2Ku systems in operation had experienced problems, and Gogo was engaged in an extensive internal effort to assess and correct the de-icing fluid problem in late 2016 and early 2017. Further, plaintiff has explained in more detail that not only was the 2Ku product central to Gogo's success, but also the timing of its rollout was critical, and any disruption to Gogo's installation plans risked endangering Gogo's financial position.

Adding these new allegations to the old ones changes the relative strength of the competing inferences. Previously, the Court concluded that, "because the complaint contains so little factual detail about what defendants knew and when, there might be any of a number of different plausible explanations for why defendants did not disclose more facts about the 2Ku de-icing problems to investors at an earlier date." *Pierrelouis*, 414 F. Supp. 3d at 1176.

> For example, defendants could have reasonably believed subordinates who told them erroneously that the problem was not serious or widespread and could be easily repaired or avoided, and it may have taken time to realize that they were wrong.... They may have thought outages were caused by other factors apart from the de-icing fluid that were easier to fix ... ; they may not have known how expensive and difficult the necessary repairs would be at first; the weather may have been different from what they expected, preventing the problem from revealing itself right away or worsening it once it did, and so on and so forth.

*Id.* The Court relied on *Tellabs II*, which explained that a fraudulent inference is not "cogent" if it is only one of many possible explanations:

> Suppose a person woke up one morning with a sharp pain in his abdomen. He thought it was due to a recent operation to remove his gall bladder, but realized it could equally well have been due to any number of other things. The inference that it was due to the operation could not be thought cogent.

513 F.3d at 710-11; *see Pierrelouis*, 414 F. Supp. 3d at 1176-77.

In light of the new allegations in the Third Amended Complaint, the fraudulent inference is no longer essentially speculative. This case is now less like the above-quoted hypothetical in the *Tellabs II* decision and more like the *Tellabs* case itself. In *Tellabs*, the defendant company allegedly "paint[ed] the prospects" for its "key products" in misleadingly "rosy hues," *Tellabs II*, 513 F.3d at 710, by failing to acknowledge in public statements that there had been a reduction in orders for its "flagship" product and that orders for the flagship product's "heralded successor" had not materialized, *id.* at 709, due to "the bursting of the fiber-optics bubble," *id.* at 706. The Seventh Circuit explained that it was "exceedingly unlikely" that the defendants' misleading statements were "the result of merely careless mistakes at the management level ... rather than of an intent to deceive or a reckless indifference to whether the statements were misleading," because the challenged statements concerned the company's "most important products." *Id.* at 709. It was "very hard to credit" that "no member of the company's senior management who was involved in authorizing or making public statements about the demand" for these products "knew that they were false," at least in the absence of any "plausible story" to the contrary. *Id.*

Similarly, in this case, it seems unlikely, given the importance of the 2Ku product to Gogo's fortunes and the scale of the internal effort to fix the de-icing problem, that Gogo and members of "senior management" such as the individual defendants were unaware of the magnitude of the problem. Indeed, the former employees specifically allege

that defendant Wade, the company's COO, did know of these problems at the start of the class period. Further, plaintiff alleges that defendants Small and Wade made private statements to an investor in February 2018 that showed that at least by that time, still several months before the full truth came out, they were aware of the problem to a greater extent than they had revealed in public comments. (3d Am. Compl. ¶ 228.)

**\*8** Defendants argue that the Court must "discount," *Higginbotham, 495 F.3d at 757*, the value of allegations based on information from anonymous sources such as the numbered—but not named—former employees mentioned in the Third Amended Complaint. The argument has some force, but this Court has previously recognized that the value of allegations from anonymous sources "need not be discounted to zero," if the accounts of the anonymous sources are "set forth in 'convincing detail' and the witnesses provide enough information about their jobs to demonstrate that they 'were in a position to know at first hand the facts to which they are prepared to testify.' " *Pension Tr. Fund for Operating Engineers v. DeVry Educ. Grp., Inc.*, No. 16 C 5198, 2018 WL 6714326, at \*3 n.2 (N.D. Ill. Dec. 20, 2018) (quoting *Tellabs II*, 513 F.3d at 711-12). As in *DeVry*, here the former employees' accounts are "rendered in sufficient detail to afford them a high degree of reliability." 2018 WL 6714326, at \*3 n.2.

Defendants argue that plaintiff has not established a motive for them to lie to Gogo's investors. In fact, defendants argue, Small purchased $100,000 shares of Gogo stock in November 2017, and, according to defendants, this all but proves that he was totally unaware that Gogo's stock value was artificially inflated. The Court does not find this line of argument convincing. Plaintiff does not need to allege any motive, *see* *Tellabs, 551 U.S. at 325*, and plaintiff succeeds in making allegations that permit a strong inference of scienter even without allegations that directly establish a clear motive or demonstrate that the fraud was directly or purely in the individual defendants' own rational economic self-interest. The point is illustrated by *Tellabs II*, in which the Seventh Circuit rejected the argument that the plaintiffs failed to state a claim in the absence of any allegation that the defendant company's executives stood to profit from the alleged fraud. The court explained that the argument "confuses expected with realized benefits, " as the executives "may have thought that there was a chance that the [problem] would right itself,"

in which case "the benefits of concealment might exceed the costs":

> Investors do not like to think they're riding a roller coaster. Prompt disclosure of the truth would have caused Tellabs's stock price to plummet, as it did when the truth came out a couple of months later. Suppose the situation had corrected itself. Still, investors would have discovered that the stock was more volatile than they thought, and risk-averse investors (who predominate) do not like volatility and so, unless it can be diversified away, demand compensation in the form of a lower price; consequently the stock might not recover to its previous level. The fact that a gamble—concealing bad news in the hope that it will be overtaken by good news—fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble. It is like embezzling in the hope that winning at the track will enable the embezzled funds to be replaced before they are discovered to be missing.

*Tellabs II*, 513 F.3d at 710 (internal citation omitted). Similarly here, the Court sees no reason why it is particularly unlikely that Small's stock purchase was a "gamble" he took in the hope that he could "conceal[ ] bad news" long enough for it to be "overtaken by good news," such as the discovery of a miracle fix for the de-icing problem. The fact that the gamble failed is not inconsistent with its having been a "considered," if "reckless," gamble. *Id*; *see* *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 728 (7th Cir. 2004) ("[T]he truth was bound to come out quickly, but the securities laws forbid foolish frauds along with clever ones."). Further, the stock purchase was not massive in comparison with Small's other stock holdings, plaintiff contends, and Small may have concluded that his need to demonstrate his commitment to Gogo in order to maintain his position by making the stock purchase outweighed any short-term harm that may come

if the stock value subsequently dropped. Additionally, as plaintiff argues, the stock purchase could have been based on Small's judgment that the fraud "had been successful": by that time, Gogo had installed the 2Ku system on numerous partner airplanes and raised $100 million to pay expenses, and Small may have thought that the 2Ku had become too big to fail. (Lead Pl.'s Opp'n Br. at 27, ECF No. 111.) Given these plausible possibilities, the absence of a clear motive in the Third Amended Complaint does not doom plaintiff's claim.

**\*9** As in *Tellabs*, while it is perhaps "conceivable" that defendants were unaware of the problem during much of the class period, that nonfraudulent inference is certainly no more compelling than the fraudulent inference that plaintiff urges, in light of the allegations of the complaint as a whole. *See*

*In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 821 (N.D. Ill. 2017) ("Ultimately, it would not be unreasonable to infer that [defendants] acted with mere carelessness. But that inference is not *more* plausible or compelling than the inference that they acted recklessly or intentionally."). Additionally, the fact that it is not certain precisely when the "information available to defendants became 'bad enough to render Defendants' statements knowingly [or recklessly] false' " does not defeat plaintiff's claim because the Court need not " 'identify the precise moment at which the culpable inference overtook the innocent one' at this early stage." *DeVry*, 2018 WL 6714326, at \*4 (quoting *In re ITT Educ. Servs., Sec. Litig.*, 34 F. Supp. 3d 298, 310 (S.D.N.Y. 2014)). " 'When the precise moment at which liability attached becomes clear, the Court can limit the class period accordingly,' if necessary." *DeVry*, 2018 WL 6714236, at \*4 (quoting *ITT Educ. Servs.*, 34 F. Supp. 3d at 310). Because the fraudulent inference is cogent and at least as compelling as competing nonfraudulent inferences, it meets the PSLRA standard for pleading scienter.

### III. Safe Harbor for Forward-Looking Statements

Defendants argue that certain of their statements[2] are protected by the PSLRA's statutory safe harbor. The relevant provision states as follows:

> Except as provided in subsection (b), in any private action arising under this chapter that is based on an untrue statement of a material fact or omission of a material fact necessary to make the statement not misleading, a person referred to in subsection (a) shall not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that--

> **(A)** the forward-looking statement is--

>> **(i)** identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or

>> **(ii)** immaterial; or

> **(B)** the plaintiff fails to prove that the forward-looking statement--

>> **(i)** if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or

>> **(ii)** if made by a business entity;[1] was--

>> **(I)** made by or with the approval of an executive officer of that entity; and

>> **(II)** made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

15 U.S.C. § 78u-5(c)(1). Under this provision, a material "forward-looking" statement "cannot give rise to liability if it was (1) 'identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement,' or (2) it was not made with 'actual knowledge' that it was 'false or misleading.' " *W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, No. 19-CV-01323, 2020 WL 6118605, at \*21 (N.D. Ill. Oct. 15, 2020) (quoting 15 U.S.C. § 78u-5(c)(1)). The PSLRA defines "forward-looking statements" to include the following:

> **(A)** a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

> **(B)** a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

> **(C)** a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results

of operations included pursuant to the rules and regulations of the Commission;

**(D)** any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C)

15 U.S.C. §§ 78u-5(i)(1).

**\*10** Defendants argue that certain of the statements that plaintiff challenges were forward-looking statements accompanied by meaningful cautionary language, and alternatively, that plaintiff has not plausibly alleged that any such forward-looking statements were made with actual knowledge that they were false or misleading, rather than merely recklessly or carelessly.

Plaintiff emphasizes in response, and defendants appear to concede, that this argument does not apply to all of the misleading statements plaintiffs cite in their complaint. Thus, even if the Court were to agree with defendants on this issue, it would not permit the Court to dismiss any claim in its entirety. That being the case, it might be argued that defendants' argument is out of place at this stage. The Seventh Circuit has explained that "[a] motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of *parts* of claims; the question at this stage is simply whether the complaint includes factual allegations that state a plausible claim for relief." *BBL, Inc. v. City of Angola*, 809 F.3d 317, 324-25 (7th Cir. 2015). In this regard, Rule 12 is unlike Rule 56, which expressly permits courts to award "[p]artial [s]ummary [j]udgment" to litigants who "identif[y] each claim or defense —or the part of each claim or defense" on which there is no genuine dispute of material fact. *See BBL*, 809 F.3d at 325 (internal quotation marks omitted). If plaintiff states a claim based on some statements, then he states a claim that survives defendants' motion to dismiss, and the Court need not determine whether the forward-looking statements could support a claim on their own. *See Cothron v. White Castle Sys., Inc.*, 467 F. Supp. 3d 604, 618 (N.D. Ill. 2020); *Kenall Mfg. Co. v. Cooper Lighting, LLC*, 354 F. Supp. 3d 877, 898 (N.D. Ill. 2018); *In re Testosterone Replacement Therapy Prod. Liab. Litig. Coordinated Pretrial Proc.*, 159 F. Supp. 3d 898, 923-24 (N.D. Ill. 2016). But plaintiff does not make the argument, and it makes no difference because the Court concludes that, at least at this early stage, there is no basis for dismissal of even a claim based only on the forward-looking statements.

### A. Meaningful Cautionary Language

With respect to whether defendants made forward-looking statements that were accompanied by meaningful cautionary statements, the parties' arguments center on whether defendants adequately disclosed the risk that the 2Ku system might not work properly. Defendants do not dispute that they made some statements of their expectations for Gogo's financial future, but, defendants argue, they were identified as forward-looking and accompanied by public warnings of certain risks to Gogo's business. As examples of meaningful cautionary statements, defendants cite the press releases that Gogo made to announce financial results during the class period, which routinely warned of the risk of Gogo's

> inability to timely and efficiently deploy [the] 2Ku service ... [,] the effects of service interruptions or delays, technology failures and equipment failures or malfunctions arising from defects or errors in [Gogo's] software or defects in or damage to [Gogo's] equipment[, and] increases in [Gogo's] projected capital expenditures due to, among other things, unexpected costs incurred in connection with the roll-out of [its] technology roadmap.

(Defs.' Mem. in Supp. of Mot. to Dismiss 3d Am. Compl. at 27 (citing Fortinsky Decl. Exs. N-Q, ECF Nos. 108-14– 108-17).) Additionally, after the partial disclosure of the de-icing problem in February 2018, Gogo updated its 10-K form to disclose that Gogo had "encountered delays and quality problems" in "deploy[ing] 2Ku," and it "may continue to do so given the aggressive installation schedule" it had set. (3d Am. Compl. ¶ 223.) In response, plaintiff points out not only that the forward-looking statements are only a portion of the allegedly misleading statements he cites in the Third Amended Complaint, but also, even leaving that aside, defendants' supposedly cautionary statements are inadequate because they do not disclose the impact of the de-icing issue specifically and lack sufficient detail to "meaningful[ly]" inform investors.

**\*11** The Seventh Circuit has explained that, to be meaningful, a firm's warnings must amount to something more than "caveat emptor." *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 733 (7th Cir. 2004). This means that it does not suffice to warn that " 'all businesses are risky' or 'the future lies ahead,' " nor does it suffice simply to "highlight[ ] some parts of the business that might cause problems." *Id.* If it were otherwise, "then any issuer could list its lines of business, say 'we could have problems in any of these,' and avoid liability for statements implying that no such problems were on the horizon even if a precipice was in sight." *Id.*; *see In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 318 (S.D.N.Y. 2013) ("By superficially warning of possible risks while failing to disclose critical facts, MF Global was akin to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.") (internal quotation marks omitted); *see also Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004)[3] ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired.").

Defendants warned of the risk that that Gogo might not be able to "timely and efficiently deploy [the] 2Ku service" due to the "effects of ... technology failures and equipment failures or malfunctions arising from ... defects in or damage to [Gogo's] equipment[, and] increases in [Gogo's] projected capital expenditures" to remediate the defects. (*See* Defs.' Mem. in Supp. of Mot. to Dismiss 3d Am. Compl. at 27.) They argue that, by providing these warnings concerning the risk that defective or malfunctioning equipment might affect Gogo's ability to deploy the 2Ku system, they warned of the exact risk that plaintiff accuses them of failing to disclose. The Court disagrees. On the critical points, Gogo's caution is "vague" in comparison with what plaintiff alleges to have been happening behind the scenes with respect to the 2Ku system, and if plaintiff's allegations are true, then Gogo did not precisely disclose "the exact risk that materialized." *See Slayton v. Am. Exp. Co.*, 604 F.3d 758, 772 (2d Cir. 2010) (defendants' general warning of "potential deterioration in the high-yield sector" did not meaningfully warn of specific risk that "rising defaults on the bonds underlying [the defendant company's] own investment-grade CDOs would cause deterioration in [the defendant company's] own portfolio"). Obviously there is always the possibility that a new and untried technology may not work as well as intended, and defendants disclosed little more than

that possibility. *See id.* If plaintiff's allegations are proved true, this might well be a case in which defendants merely "highlighted some parts of the business that might cause problems," without disclosing problems that were "on the horizon" although the "precipice was in sight." *Asher*, 377 F.3d at 733. Thus, at least at this stage of the case, plaintiff has the better of the argument on this issue.

### *B. Actual Knowledge*

For the same reasons the Court described in Part II of this Opinion, the Court concludes that it is at least plausible that defendants had actual knowledge that their statements were false at the time they were made. The Seventh Circuit explained in *Tellabs II* that it was "very hard to credit" that "no member of the company's senior management who was involved in authorizing or making public statements about the demand" for the defendant company's key products "knew that they were false." 513 F.3d at 709. This case is similar. If plaintiff's allegations are true, it is hard to imagine that Gogo's C-level executives did not know that there was a serious question about the 2Ku system's reliability, given the importance of the 2Ku product to Gogo's fortunes and the scale of the internal effort to fix the de-icing problem. Similarly, it is hard to imagine that they did not know that the de-icing issue was serious enough to require a reassessment of their expectations for the company's financial performance on some level. Thus, at least at this early stage, the PSLRA safe harbor does not bar plaintiff's claim.

### IV. Control Person Liability

**\*12** Finally, defendants argue that plaintiff has not properly pleaded control person liability under § 20(a) of the Securities Exchange Act, which would make the individual defendants liable to the extent they exercised general control over Gogo's operations and " 'possessed the power or ability to control the specific transaction or activity upon which the primary violation [of the securities laws] was predicated, whether or not that power was exercised.' " *See Ross v. Career Education Corp.*, No. 12 C 276, 2012 WL 5363431, at \*13-14 (N.D. Ill. Oct. 30, 2012) (quoting *Harrison v. Dean Witter Reynolds*, 974 F.2d 873, 881 (7th Cir. 1992)); 15 U.S.C. § 78t.

This argument is unavailing. First, whether an individual is a controlling person for purposes of § 20(a) is a fact-intensive issue that generally is not properly resolved at the

pleading stage. *Ross*, 2012 WL 5363431, at \*14. Second, defendants argue only that there can be no control-person liability without an underlying violation of the securities laws; but, as the Court has explained above, plaintiff *has* pleaded a violation of section 10(b) of the Securities Exchange Act and SEC Rule 10b-5. Third, defendants argue that the Court must at least dismiss plaintiff's claim as to defendant Norman Smagley, who was Gogo's chief financial officer for only a portion of the class period, but they do not explain, and the Court does not see, why this entitles him to dismissal. As the Court has explained, "[a] motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of *parts* of claims." *See* *BBL*, 809 F.3d at 324-25.

## CONCLUSION

For the reasons set forth above, the Court denies defendants' motion to dismiss [106]. A status hearing is set for May 26, 2021 at 9:30 a.m.

**SO ORDERED.**

**All Citations**

Slip Copy, 2021 WL 1608342

## Footnotes

1    This class action was initially brought by the above-captioned plaintiff, but class members Maria Zingas and Daniel Rogers, among others, moved for appointment as lead plaintiffs. After the other movants withdrew, the Court granted Zingas and Rogers's motions and appointed them as co-lead plaintiffs. (Oct. 10, 2018 Order, ECF No. 41.) Zingas became unable to continue serving as a lead plaintiff (*see* Lead Pl.'s Mem. In Supp. Of Mot. For Leave to Amend at 1 n.1, ECF No. 98), leaving Rogers as the sole lead plaintiff.

2    (*See* Defs.' Mem. in Supp. of Mot. to Dismiss 3d Am. Compl. at 32-33, ECF No. 107.)

3    Defendants argue in their reply brief that plaintiff's reliance on *Rombach* is "misplaced" (Reply Br. at 15 n.12, ECF No. 112) because *Rombach* interpreted the "bespeaks caution" doctrine rather than the PSLRA, but the Court is not convinced that the distinction makes *Rombach* any less persuasive. The two contexts are similar. As one court has put it, Congress "borrow[ed] from the "bespeaks caution" doctrine in creating the "analogous" PSLRA safe harbor. *Stavros v. Exelon Corp.*, 266 F. Supp. 2d 833, 842 (N.D. Ill. 2003).

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.