**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| LAZAR MACOVSKI, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>GROUPON, INC., RICH WILLIAMS, and MELISSA THOMAS,<br><br>Defendants. | Case No. 20 C 2581 |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

On behalf of himself and others, Lazar Macovski brought this securities fraud case after shares he purchased in Groupon, Inc. lost significant value. Under the Private Securities Litigation Reform Act, Fadi E. Rahal was appointed to serve as Lead Plaintiff. *See* 15 U.S.C. § 78u-4(a)(3)(B)(i). The Court will refer to the plaintiff as "Rahal" even though he was not the party who initially filed the complaint.

At the heart of this suit are two alleged omissions of material adverse information: (1) the performance of Groupon's Select program; (2) the Company's performance in a subcategory of its sales called "Goods." Rahal blames his shares' loss in value on the alleged omissions. He accuses Groupon, its former chief executive officer, Richard Williams, and its then interim chief financial officer, Melissa Thomas, of misleading investors by knowingly omitting the adverse information.

Rahal brings two claims, both under the Securities Exchange Act: fraud under

section 10(b) and vicarious liability for fraud under section 20(a).  The defendants (Thomas, Williams, and Groupon) assert that Rahal's amended complaint fails to state a claim and therefore move to dismiss.  For the reasons stated below, the Court grants that motion.

**Background**

The following facts are drawn from Rahal's amended complaint.  Because the Court is considering a motion to dismiss, the Court accepts as true the well-pleaded factual allegations in Rahal's complaint and views those allegations in the light most favorable to Rahal.  *See Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 332 (7th Cir. 2019).

**A.     Groupon's business model and recent "headwinds"**

Groupon is an e-commerce marketplace that connects consumers to merchants.  At the time the relevant events occurred, Groupon competed in three markets:  (1) "Local" (e.g., local services, events, and activities sold by Groupon but provide by a third-party merchant); (2) "Goods" (i.e., merchandise sold directly to customers), and (3) "Travel" (i.e., hotels, airfare, and package travel deals).  Of the three, Local deals were the Company's primary profit driver.  Though Local only made up 40 percent of Groupon's consolidated revenues, it generated 73 percent of the Company's consolidated gross profits.  Conversely, though Goods sales made up 55 percent of Groupon's total revenue, it represented only 20 percent of  gross profits.

Despite its low margins, Goods had value beyond its profits because it drew customers to other parts of Groupon's platform where they could view and purchase the Company's higher-margin offerings, especially Local deals.  In other words, even

2

though Local was Groupon's main profit driver and that market was the one with the greatest opportunity for growth, the Company believed Goods—even with its smaller profit margins—was necessary as an "engagement driver" for its other products. *See* Amd. Compl. ¶¶ 29, 33. As Williams explained during Groupon's Q4 2018 conference call with analysts and investors in February 2019: "Goods has been a good, solid engagement driver for us over the years . . . . And our focus with Goods has just been making it more and more efficient and driving more gross profit . . . . But we're just trying to build a good quality business there that continues to engage customers and help us bridge to this vision of a broader Local focus marketplace." *Id.* ¶ 34 (emphasis omitted).

These customer cross-shopping opportunities were especially important for Groupon, as the Company was—and had for years been—"experiencing severe 'traffic headwinds,'" i.e., decreases in "its principal marketing channels (email and search engine marketing)." *Id.* ¶ 3; *see id.* ¶¶ 4, 26. Also distressing was the fact that the Company had for years been facing a stubborn decline in its active customer count.

**B.     Groupon's focus on increasing customers' purchase frequency**

In response to these "headwinds," Groupon settled on a strategy of increasing existing customers' purchase frequency. As Williams explained in a letter to shareholders in 2019, at that point, "increasing purchase frequency and total unit volume [were] more important . . . than . . . customer counts," because increased purchase frequency and total unit volume would "unlock the leverage in [Groupon's] model and an ability to profitably invest in growth." *Id.* ¶ 36 (emphasis omitted).

One way Groupon tried to increase purchase frequency was through Groupon

Select, a paid membership program. The way the Select program worked was that, in exchange for a monthly membership fee, Groupon customers who joined the program received discounts on products in addition to other benefits. Groupon hoped that Select, along with other "product enhancements" and "initiatives," would be "important drivers for increasing customer purchase frequency and growing . . . business over time." *Id.* ¶ 73 (emphasis omitted). The Company cautioned, however, that "gross profit and operating income may be adversely impacted in the near term" as a result of its focus on "driving" these strategic initiatives. *Id.*

Throughout the class period, the defendants shared positive reports about Select's rollout and performance. In a July 30, 2019 letter to shareholders, Williams said that Select's early "indicators [were] very positive with significantly improved purchase frequency, higher average order value and increased customer propensity to search for things to eat, see, do and buy." *Id.* ¶ 40 (emphasis omitted). In the subsequent Q2 2019 conference call with analysts and investors, Groupon asserted that Select was profitable and that it would "almost double the average gross profit per customer" that Groupon generated at that point. *Id.* ¶ 42 (emphasis omitted).

In a November 4, 2019 letter to shareholders, Williams indicated that Groupon was "pleased" with Select's "results to date," noting that the program had attracted more than 260,000 members. *Id.* ¶ 45 (emphasis omitted). Williams said that he and others were encouraged by how Select's members behaved, and he told shareholders that the Company's metrics showed a "60 percent increase in purchase frequency and a 20 percent jump in average order value" among the program's members. *See id.* (emphasis omitted). Still, Williams observed that these results were "early" and that the

4

Company was "still analyzing" them as the first Select members had only barely completed their first year in the program.  *Id.*  He further noted that Groupon had "work to do to fully build out the infrastructure necessary for Select to run at scale."  *Id.*

In the subsequent Q3 2019 conference call with analysts and investors, Groupon's executives repeated many of the positive points about Select and reasserted its profitability.  For example, Thomas said "It's still early days, but we're seeing member acquisition costs payback within six months; and payback has been driven by both the recurring revenue from membership fees as well as incremental gross profit generated on membership-related transactions."  *Id.* ¶ 46 (emphasis omitted).  Similarly, Williams, in a December 11, 2019 Barclays conference presentation, shared that Select's margins were "such that [Groupon made money] on the units . . . [and] on the membership fees as well.  So, the total economics of the program are really compelling."  *Id.* ¶ 48 (emphasis omitted).

**C.     Groupon's financial guidance for 2019**

Before and throughout the class period, Groupon made statements "specifying certain financial results expected for upcoming periods," i.e., the Company's financial guidance or outlook.  *Id.* ¶ 49.  These statements were made in the Company's quarterly press releases, results presentations, and conference calls.  Groupon's outlook was principally expressed through a figure known as its adjusted projected EBITDA—earnings before interest, taxes, depreciation, and amortization.  In 2019, Groupon's adjusted projected EBITDA—first provided in February of that year—was $270 million.  The 270-million-dollar figure was reiterated and reaffirmed when the Company announced its first, second, and third quarter results for 2019.

5

**D.      Groupon shutters Select and exits the Goods marketplace**

In February 2020, Groupon announced two decisions.  The first was that the Company would exit the Goods category and instead focus on Local experiences.  The Company explained in its Q4 2019 letter to shareholders that "[m]idway through the fourth quarter it became abundantly clear" that Groupon was not able to compete "effectively in Goods."  *Id.* ¶ 107 (emphasis omitted).  Data showed "far fewer customers engag[ing] with Goods in the fourth quarter than . . . anticipated, which impacted overall traffic to [the] site."  *See id.* (emphasis omitted).  Lower traffic to the site caused lower performance in all of Groupon's categories.

Of course, Goods had been a troubled area for some time ("for four quarters").  *See id.* (emphasis omitted).  As indicated earlier, the Company justified its continued competition in the market because Goods had been an engagement driver for other categories, primarily Local.  *Id.* (emphasis omitted).  However, by this time Groupon had "seen engagement with . . . Goods inventory shift meaningfully lower, driven in large part by [the Company's] inability to compete in [this] fiercely competitive . . . retail landscape."  *Id.* (emphasis omitted).  In short, because Goods was "no longer generating the cross-shopping behavior or customer activation activity" to justify further investment, Groupon's executives determined that "Goods ha[d] outlived its role as a business driver" and instead had "become a significant drag."  *Id.*  (emphasis omitted).  Williams gave similar explanations for the decision during the Q4 2019 conference call with analysts and investors.

The second decision announced in February 2020 was that Groupon would "discontinue new enrollments" in the Select program.  *Id.* ¶ 114.  As with the Goods

decision, the Company explained the move to shutter Select in its Q4 2019 letter to shareholders and on the Q4 2019 conference call with analysts and investors. The Q4 2019 letter stated that Select "added to [the Company's] challenges in [Q4 2019]" because Select's benefits began "appealing disproportionately to customers purchasing goods" rather than those "transacting on [the Company's] local platform." *Id.* ¶ 113 (emphasis omitted). As a result, Select "pressured margins and drove higher than anticipated customer acquisition costs." *Id.* (emphasis omitted). After it became aware of these facts, Groupon determined that Select could not provide the return on investment "needed for it so be a key priority", as the program did not "address the core of [Groupon's] product or business model, nor [did it] overcome the limitations in the legacy Groupon business." *See id.* (emphasis omitted).

On the Q4 2019 conference call, Thomas added that Select "was expected to be net neutral to gross profit in the fourth quarter, but the program underperformed because—in addition to the problems discussed in the letter to shareholders—there was "a lower than expected number of enrollees converting to paid members." *Id.* ¶ 114 (emphasis omitted).

**E.     Groupon's shares decline**

Following the disclosures of these decisions, Groupon's shares—which had closed on February 18, 2020 at $3.05 per share—fell $1.35 (nearly 44 percent of Group's market capitalization) and closed the next day at $1.70 per share. On February 19, over 155 million Groupon shares traded hands, more than 25 times Groupon's average daily trading volume during the Class Period.

7

## Discussion

Defendants move to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. "A motion under Rule 12(b)(6) tests whether the complaint states a claim on which relief may be granted." *Richards v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012). To survive such a motion, the complaint "must (1) describe the claim in sufficient detail to give the defendant fair notice of the claim and [the] grounds on which it rests and (2) contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Cornielsen v. Infinium Cap. Mgmt.*, LLC, 916 F.3d 589, 598 (7th Cir. 2019) (citation omitted) (internal quotation marks omitted). A complaint's factual allegations "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

In addition to the standard under Rule 12(b)(6), the Court must also consider the heightened pleading requirements imposed by Federal Rule of Civil Procedure 9(b). *See Cornielsen*, 916 F.3d at 598 ("Heightened pleading requirements apply to complaints alleging fraud."). Under Rule 9(b), a party alleging fraud or mistake "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9. The Seventh Circuit has said that Rule 9(b) requires a plaintiff to provide "precision and some measure of substantiation to each fraud allegation." *Menzies*, 943 F.3d at 338 (internal quotation marks omitted). The court has stated that a plaintiff satisfies Rule 9(b) when he pleads "the who, what, when, where, and how of the alleged fraud." *Id.* (internal quotation marks omitted).

There is one further standard to consider. In securities fraud cases, the Private

8

Securities Litigation Reform Act (PSLRA) imposes further pleading requirements. *See Cornielsen*, 916 F.3d at 599. Specifically, claims under the Securities Exchange Act must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). Additionally, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A).

### A. Section 10(b) claim

The bulk of the parties' briefs is devoted to discussing Rahal's claim under Section 10(b) of the Securities Exchange Act, which prohibits the unlawful "use or employ[ment], in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). SEC Rule 10b-5 "implements" Section 10(b) of the Exchange Act. *See West Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, No. 19 C 1323, 2020 WL 6118605, at *4 (N.D. Ill. Oct. 15, 2020). Rule 10b-5 prohibits any "untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).

To state a claim under Section 10(b) and Rule 10b–5, the plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a

9

security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *See Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) (internal quotation marks omitted).

### 1. Failure to plead with particularity

The Court's consideration of the defendants' motion begins with the PSLRA's pleading requirements. The defendants argue that Rahal's complaint is a so-called "puzzle pleading" and therefore does not satisfy the PSLRA's particularity requirements. In his response, Rahal contends that he has met the particularity requirements because his complaint is organized into sections and he clearly identifies the allegedly misleading statements.

Though the Seventh Circuit has never used the term "puzzle pleading," *Hughes v. Accretive Health, Inc.*, No. 13 C 3688, 2014 WL 4784082, at *5 (N.D. Ill. Sept. 25, 2014), many of this circuit's district courts have used that term to describe a complaint that would "require[ ] the Court and the defendant to piece together exactly which statements the [p]laintiffs are challenging and which allegations contradict those statements," rather than the complaint itself doing so. *See Constr. Workers Pension Fund-Lake Cty. & Vicinity v. Navistar Int'l Corp.*, No. 13 C 2111, 2014 WL 3610877, at *5 (N.D. Ill. July 22, 2014).

Courts have found so-called "puzzle pleadings" where the complaint "quotes the defendant at length and then uses a stock assertion that the statement is false or misleading for reasons stated in an earlier paragraph." *See Alizadeh v. Tellabs, Inc.*, No. 13 C 537, 2014 WL 2726676, at *4 (N.D. Ill. June 16, 2014). Courts have also dismissed complaints whose "net effect" is to "leave the reader . . . jumping from page

to page in an attempt to link the alleged statements to the background that supposedly makes them false or misleading," especially where it is "difficult to discern where the supposedly challenged statements end and [ ] context or characterization begins." *Conlee v. WMS Indus., Inc.*, No. 11 C 3503, 2012 WL 3042498, at *4 (N.D. Ill. July 25, 2012).

These deficient complaints do not satisfy the PSLRA's pleading standards for a few reasons. The most obvious, in the context of securities fraud and the PSLRA, is that it "improperly places the burden on the Court to sort out the alleged misrepresentations and then match them with the corresponding adverse facts." *Constr. Workers Pension Fund*, 2014 WL 3610877, at *5 (alterations accepted) (internal quotation marks omitted). But the "greater cost" of these inadequate pleadings is that they may "lead to more expansive (and expensive) document production and unnecessarily lengthy depositions covering needless factual ground." *Conlee*, 2012 WL 3042498, at *5 (N.D. Ill. July 25, 2012).

Here, Rahal has presented the Court with a 78-page, 177-paragraph complaint, of which about 34 paragraphs spanning over 23 pages are devoted to reciting the defendants' alleged misstatements and omissions in violation of the Exchange Act. *See generally* Amd. Compl. ¶¶ 66–100. Organized chronologically, Rahal excerpts statements made by Groupon, Williams, and Thomas in quarterly reports, conference calls, and SEC filings. *See id.* ¶¶ 66–94. These excerpts often take the form of long block quotes with portions of the quotes bolded for emphasis. Rahal says he has met the PSLRA's requirements and pinpointed the allegedly misleading statements because he has bolded the precise statements at issue and because the complaint is organized

into clear sections. That's all well and good, but the mere fact that a complaint is somewhat well-organized does not mean it satisfies the PSLRA's pleading requirements.

The PSLRA requires a plaintiff to "specify each statement alleged to have been misleading." § 78u–4(b)(1). In the complaint, Rahal has inserted excerpts from investor communications that he says contain allegedly misleading statements. Portions of these excerpts are in bold typeface, but many of bolded excerpts in the complaint include statements that Rahal cannot possibly be alleging are misleading representations (such as obviously benign statements and statements made by analysts rather than Groupon or its representatives). *See id.* ¶¶ 66-72, 75–82, 83–84, 85–89, 90–94. In short, Rahal's liberal use of bold to emphasize statements is not very helpful in identifying, precisely, the materially misleading statements he is alleging were made. *See Alizadeh*, 2014 WL 2726676, at *4.

Even in the paragraphs where Rahal is purportedly giving his reasons for why the "above representations" were misleading, he does not identify—*specifically*—which of the representations are the misleading statements. As it stands then, he has left it to the defendants and to the Court to sort out the alleged misrepresentations and match them with the purportedly contrary facts. *See Constr. Workers Pension Fund*, 2014 WL 3610877, at *5. The amended complaint is deficient for this reason.

In sum, Rahal has not met the burden required by the PSLRA. "It is of the utmost importance for Plaintiff to properly pinpoint what Defendants said that Plaintiff believes to have been unlawful." *Rossbach v. VASCO Data Sec., Int'l Inc.*, No. 15-CV-06605, 2018 WL 4699796, at *6 (N.D. Ill. Sept. 30, 2018). The section 10(b) claim is

therefore dismissed because it is not adequately pleaded.[1]

**B.      Section 20(a) claim**

Because Rahal has failed to state a claim for his section 10(b) claim, he cannot sustain his section 20(a) claim, as the viability of the latter is reliant on the former. *See Pugh v. Trib. Co.*, 521 F.3d 686, 693 (7th Cir. 2008) ("Thus, to state a claim under § 20(a), a plaintiff must first adequately plead a primary violation of securities laws—here, a violation of § 10(b) and Rule 10b–5."). The Court therefore dismisses Rahal's section 20(a) claim.

## Conclusion

For the reasons stated above, the Court grants defendants' motion to dismiss [docket no. 48] and dismisses the amended complaint. Rahal has until May 19, 2021 to file a motion for leave to amend that includes a proposed second amended complaint that meets the PSLRA's pleading requirements. The Court will then handle any further necessary briefing in the context of the motion for leave to amend. The case is set for a telephone status hearing on May 26, 2021 at 9:30 a.m. to set any necessary schedules for further proceedings, using call-in number 888-684-8852, access code 746-1053. Counsel should wait for the case to be called before announcing themselves.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  April 28, 2021

---

[1] Given this disposition, the Court need not address the parties' arguments about falsity, Item 303, scienter, or loss causation.

13