**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| LAZAR MACOVSKI, Individually and On Behalf of All Others Similarly Situated, | |
| Plaintiff, | No. 1:20-cv-02581 |
| v. | Hon. Matthew F. Kennelly |
| GROUPON, INC., RICH WILLIAMS, and MELISSA THOMAS, | |
| Defendants. | |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
LEAD PLAINTIFF'S MOTION FOR LEAVE TO AMEND**

Matthew R. Kipp
William E. Ridgway
Andrew J. Fuchs
Jennifer H. Berman
Laura Bernescu
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
155 North Wacker Drive
Chicago, Illinois 60606
(312) 407-0700
matthew.kipp@skadden.com
william.ridgway@skadden.com
andrew.fuchs@skadden.com
jennifer.berman@skadden.com
laura.bernescu@skadden.com

*Counsel for Defendants*

June 23, 2021

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ..................................................................................................................1

LEGAL STANDARD............................................................................................................2

ARGUMENT .......................................................................................................................2

I.     The PSAC Still Fails to Plead Falsity. ........................................................................2

     A.     Statements and Alleged Omissions Regarding Goods...........................................2

     B.     Statements and Alleged Omissions Regarding Select ...........................................3

          1.     July 30-31, 2019 – Q2 2019 Earnings Announcement ..............................4

          2.     November 4-5, 2019 – Q3 2019 Earnings Announcement.........................6

          3.     December 11, 2019 – Barclays Conference.................................................9

     C.     Guidance Reaffirmation........................................................................................10

     D.     Alleged Violations of Item 303.............................................................................11

II.     The PSAC Still Fails to Plead Scienter..........................................................................12

III.     The PSAC Still Fails to Plead Loss Causation. ............................................................13

CONCLUSION....................................................................................................................16

i

## TABLE OF AUTHORITIES

Page(s)

### CASES

*Alizadeh v. Tellabs, Inc.*,
No. 13 C 537, 2015 WL 557249 (N.D. Ill. Feb. 9, 2015).....................................................2

*Anderson v. Abbott Laboratories*,
140 F. Supp. 2d 894 (N.D. Ill. 2001) ...............................................................................4

*In re Baxter International Inc. Securities Litigation*,
No. 19 C 7786, 2021 WL 100457 (N.D. Ill. Jan. 12, 2021) .............................................12

*Born v. Quad/Graphics, Inc.*,
No. 19-CV-10376 (VEC), 2021 WL 736839 (S.D.N.Y. Feb. 25, 2021) ...........................15

*City of Livonia Employees' Retirement System & Local 295/Local 851 v. Boeing Co.*,
711 F.3d 754 (7th Cir. 2013) ........................................................................................12

*Conlee v. WMS Industries, Inc.*,
No. 11 C 3503, 2013 WL 1767648 (N.D. Ill. Apr. 24, 2013)............................................2

*Delaware Motel Associates, Inc. v. Capital Crossing Servicing Co.*,
17 C 1715, 2018 WL 4829598 (N.D. Ill. Oct. 4, 2018)....................................................2

*DiLeo v. Ernst & Young*,
901 F.2d 624 (7th Cir. 1990) .........................................................................................9

*Gallagher v. Abbott Laboratories*,
269 F.3d 806 (7th Cir. 2001) .........................................................................................3

*Garden City Employees' Retirement System v. Anixter International, Inc.*,
No. 09-CV-5641, 2012 WL 1068761 (N.D. Ill. Mar. 29, 2012)......................................11

*In re Guidant Corp. Securities Litigation*,
536 F. Supp. 2d 913 (S.D. Ind. 2008) .............................................................................13

*Higginbotham v. Baxter International, Inc.*,
495 F.3d 753 (7th Cir. 2007) ........................................................................................12

*Menzies v. Seyfarth Shaw LLP*,
943 F.3d 328 (7th Cir. 2019) .....................................................................................3, 15

*Oyoque v. DePaul University*,
No. 20 C 3431, 2021 WL 1837399 (N.D. Ill. May 7, 2021) .............................................2

ii

*Pugh v. Tribune Co.*,
    521 F.3d 686 (7th Cir. 2008) ........................................................................................13

*Ray v. Citigroup Global Markets, Inc.*,
    482 F.3d 991 (7th Cir. 2007) ........................................................................................13

*Rochester Laborers Pension Fund v. Monsanto Co.*,
    883 F. Supp. 2d 835 (E.D. Mo. 2012)...........................................................................11

## STATUTES AND REGULATIONS

17 C.F.R. § 240.10b-5(b) ...............................................................................................4

## INTRODUCTION

This Court should deny Plaintiff's motion for leave to amend (the "Motion") as futile because Plaintiff still fails to state a securities fraud claim. Notwithstanding the Court's directive to identify more clearly the precise representations on which his claims rest and to "match them with [] purportedly contrary facts" (Dkt. No. 64 (Mem. Op.) at 12), Plaintiff's Proposed Second Amended Complaint ("PSAC") features only small and superficial changes that further expose the flaws in his theory. Although the PSAC no longer includes as many swaths of block quotes as did the Amended Complaint ("AC"), nothing of substance has changed.

The PSAC, like the AC, alleges a Class Period beginning on July 30, 2019—the date that Groupon first announced the Select membership program. As the PSAC acknowledges, on that date, Groupon disclosed that Select was an early-stage program that had 150,000 members, or 0.32% of Groupon's customer base. The PSAC further acknowledges that Groupon stated that Select and other initiatives were part of a ***long-term*** strategy to increase its customer engagement, but that the initiatives' marketing costs might ***adversely*** affect 2019 full-year results.

The PSAC, again like the AC, improperly blames Select for Groupon's $43 million earnings miss for full-year 2019. But based on the facts alleged in the PSAC, Groupon's earnings miss could not possibly have been caused by the performance of Select. Rather than try to cure his failure to plead the elements of a securities fraud claim to support this theory (or offer a new one), Plaintiff simply refers this Court to his opposition to Defendants' Motion to Dismiss. (Motion at 3.) For the reasons discussed previously and below, Plaintiff *still* fails to allege any "purportedly contrary facts" that rendered Defendants' statements false or misleading at the time they were made. He *still* fails to plead facts giving rise to a strong inference of scienter, including motive. And his theory of loss causation *still* is illogical.

The Motion should be denied and the case dismissed, this time with prejudice.

## LEGAL STANDARD

A motion for leave to amend is not, as Plaintiff implies, a mere formality. A court "should deny a motion for leave to amend if the proposed amendment is futile, as when, for example, the amended pleading would not survive a motion to dismiss." *Delaware Motel Assocs., Inc. v. Capital Crossing Servicing Co.*, No. 17 C 1715, 2018 WL 4829598, at *3 (N.D. Ill. Oct. 4, 2018) (internal quotations omitted). When, like here, a plaintiff's original complaint suffers from substantive defects that warrant dismissal, and a proposed amended complaint "is hobbled by the same defects," leave to amend should be denied. *Oyoque v. DePaul Univ.*, No. 20 C 3431, 2021 WL 1837399, at *1 (N.D. Ill. May 7, 2021). Addressing technical defects, without remediating factual and legal shortcomings, does not suffice. *See, e.g.*, *Alizadeh v. Tellabs, Inc.*, No. 13 C 537, 2015 WL 557249, at *7, *16 (N.D. Ill. Feb. 9, 2015) (dismissing case with prejudice when plaintiff failed to cure substantive defects in a complaint initially dismissed for puzzle pleading); *Conlee v. WMS Indus.*, No. 11 C 3503, 2013 WL 1767648, at *1 (N.D. Ill. Apr. 24, 2013) (same).

## ARGUMENT

### I. The PSAC Still Fails to Plead Falsity.

As previously demonstrated and as explained below, Plaintiff still fails to identify an actionable statement or omission (or Item 303 claim).

#### A. Statements and Alleged Omissions Regarding Goods

The PSAC's "Material Misrepresentations and Omissions" section (¶¶68-99) does not identify a single affirmative statement about Goods' performance that purportedly was false or misleading.[1] Plaintiff in fact deletes references to Class Period statements concerning Goods that

---

[1]     Citations to ¶___ refer to the numbered paragraphs in the PSAC, or, if noted, to the AC; citations to "Br." refer to Defendants' brief in support of dismissal, Dkt. No. 49; and citations to "Reply" refer to Defendants' reply brief in support of dismissal, Dkt. No. 56.

he included in the AC—statements that repeatedly disclosed the challenges Groupon was facing in Goods. (AC ¶83 (Q3 10-Q); *see also* Br. Ex. B (Q2 10-Q).) And as Plaintiff acknowledges, when Groupon announced its decision to exit Goods, it stated that its "*fourth quarter performance*, and the challenges Goods ha[d] posed over the past few years, ha[d] clarified [its] path forward." (¶105 (emphasis added); *accord* Mem. Op. at 6.) Plaintiff alleges no facts showing that Groupon decided in 2019 to exit Goods and to pursue a transformation strategy, much less at the start of the Class Period or at the time Groupon made its Q3 earnings announcement on November 4, 2019. Thus, any duty to disclose the decision to exit Goods could not have arisen before the Q4 earnings announcement. *See Gallagher v. Abbott Labs.*, 269 F.3d 806, 808 (7th Cir. 2001) (explaining that SEC has implemented a periodic, rather than continuous, disclosure system, and stating that "firms are entitled to keep silent . . . unless positive law creates a duty to disclose").

### B.    Statements and Alleged Omissions Regarding Select

The PSAC continues to theorize that Select was over-indexing to Goods during the entire Class Period, and that omission of this information rendered a handful of statements about Select misleading. Plaintiff does not plead any facts to support this theory—that Select members were purchasing more Goods offerings than Local throughout the Class Period. Rather, Plaintiff alleges only that Select members began over-indexing to Goods sometime during "the second half of 2019," and then speculates that Defendants knew this on July 30, 2019, because it was one month into the second half of 2019. (¶¶71, 73.) Plaintiff applies that same speculative logic to each of the investor communications identified in the PSAC. (¶¶79, 82, 84-85, 87-88, 93, 97, 99.) To state a claim for fraud, however, Federal Rule of Civil Procedure 9(b) requires more than conclusory speculation. A plaintiff must state each fraud allegation with "particularity," "precision[,] and some measure of substantiation," including with respect to the "when . . . of the alleged fraud." (Mem. Op. at 8 (quoting *Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 338 (7th Cir. 2019).)

Moreover, even if Select had begun over-indexing to Goods as of July 30, 2019, Groupon had no duty to disclose that information unless it was necessary to make other statements, "in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). "Merely mentioning a topic . . . does not require the company to disclose every tangentially related fact . . . . [O]mitting smaller details, even if investors might care about them, is not necessarily misleading." *Anderson v. Abbott Labs.*, 140 F. Supp. 2d 894, 903 (N.D. Ill. 2001).

Here, the omission of information about Select's "over-indexing" could not have rendered misleading any of the few statements Plaintiff now has identified, particularly when read in context. As the PSAC acknowledges, Defendants repeatedly disclosed that Select was a "new" and "experimental" program that was still in its early "testing" phase. (¶¶70, 72, 86, 119; AC ¶¶68, 71, 73, 131.) Groupon never stated that Select would drive substantial business or boost earnings in 2019 (which would have been illogical given its size). To the contrary, Groupon disclosed that its financial results "may be adversely impacted in the near term" due to marketing costs. (¶72.)

Moreover, the handful of affirmative statements about Select on which Plaintiff bases his claims are either factually accurate according to the PSAC itself, too vague to be considered material, or forward-looking statements accompanied by meaningful cautionary language that Plaintiff does not allege lacked a reasonable basis when made. Those affirmative statements, too, are not actionable.

### 1.      July 30-31, 2019 – Q2 2019 Earnings Announcement[2]

The PSAC identifies three statements made during Groupon's Q2 earnings announcement that Plaintiff asserts were misleading. The first two are statements that Mr. Williams made in the

---

[2]      As noted in Defendants' Motion to Dismiss, Ms. Thomas was not interim CFO at the time of the Q2 2019 earnings announcement (Br. at 8 n.3), and Plaintiff still does not allege that she made or participated in any of the statements related thereto. Any claims relating to the Q2 2019 earnings announcement cannot be attributed to Ms. Thomas, and therefore must be dismissed for that reason alone.

4

Q2 shareholder letter: (1) that Groupon was "making progress on initiatives" that Groupon "believe[d] la[id] the foundation for long-term, profitable growth," and (2) that "[i]nitial indicators" for Select showed that it was driving "significantly improved purchase frequency [and] higher average order value." (¶¶70-71.) The third is in the MD&A section of the Q2 10-Q, in which Groupon stated that it "believe[d]" that Select and other initiatives still in their testing phase "may be important drivers for increasing customer purchase frequency and growing [Groupon's] business over time." (¶72.) Plaintiff does not allege that these statements were false, but rather avers that they were misleading because Select was over-indexing to Goods, an "underachieving business segment," and speculates that Select was thus "failing to meaningfully boost purchase frequency in the important Local category." (¶71; *see also* ¶73.) Plaintiff surmises that these statements "misled investors to believe that Select was more successful than it in fact was." (¶71.)

These statements do not support a securities fraud claim. According to the "corrective disclosure" on which Plaintiff relies, "[Select's] *fourth quarter performance* showed that it [could not] provide the ROI needed for it to be a key priority." (¶110 (emphasis added); *accord* Mem. Op. at 6-7.) This Q4 information, which led to the decision to cease new Select enrollments, was not available during Q2, and thus could not have rendered Q2 statements misleading when made.

Temporal flaws aside, the claims based on these statements still fail. The first statement in the shareholder letter does not even refer to Select, but rather to Groupon's strategic "initiatives" more broadly. The statement is also not actionable because it is too vague to be material, and because it is forward-looking and was accompanied by meaningful cautionary language. (*See* Br. at 10-14.) Indeed, Groupon made clear that while its initiatives were developed to achieve "long-term, profitable growth" (¶70), "gross profit and operating income may be adversely impacted in the near term" by their investment costs (¶72).

5

As to the second statement in the shareholder letter, the allegation that Select members' purchases over-indexed to Goods at some point does not render misleading the statement that Select was improving purchase frequency or average order value as of July 30, 2019. During the Q2 earnings announcement, neither Groupon nor Mr. Williams discussed how Select purchases were trending, whether to Goods, Local, or Travel. There is nothing in the statements identified by Plaintiff that asserts or implies the distribution of these purchases among Groupon's three categories. Even if Select had begun over-indexing to Goods as of the close of Q2 (which it was not), that would mean only that Select had a greater impact on purchase frequency in Goods than other segments. It would not mean that Select was failing to increase purchase frequency in Local, meaningfully or otherwise.

Moreover, regardless of Select's impact on member purchase frequency in any of Groupon's business segments by the close of Q2, Mr. Williams made clear that the program was still in its "early days"—with only 150,000 members, or 0.32% of Groupon's customer base—and that he was only reporting "[i]nitial indicators" of the program's performance. (¶¶25, 70.)

Plaintiff's claim based on the statement in the MD&A (that Groupon "believe[d]" new initiatives like Select "may be important drivers" for its business "over time"), fails for all these same reasons. Read in full, this statement shows that (1) Groupon was referring to a number of new initiatives, not just Select, (2) the timeline for these initiatives extended past 2019, and (3) the expense of these initiatives could adversely affect Groupon's financial results for the year. (¶72.) And as a forward-looking statement and one of opinion rather than fact, this statement is inactionable in any event. (*See* Br. at 10-14.)

### 2. November 4-5, 2019 – Q3 2019 Earnings Announcement

Plaintiff identifies several affirmative statements about Select from the Q3 earnings announcement, including statements that:

- among the 260,000 paying Select members at the time, Groupon was "seeing a 60 percent increase in purchase frequency and a 20 percent jump in average order volume," which Mr. Williams characterized as "pretty significant" (¶¶78-79, 81-84);

- Groupon was "making consistent progress" and "improvements" on its strategic initiatives (¶¶78-79);

- through its strategic initiatives, Groupon's long-term strategy was "start[ing] to play its way through the local consumer" (¶¶81-82);

- Groupon was "earning incremental [gross profit]" on Select transactions (¶¶83-84);

- Groupon was "starting to see" Select membership benefits "permeate the Groupon customer experience" (¶¶83-84); and

- Groupon was focused on "increasing gross profit per customer" through various initiatives that it was then "currently developing and testing," and Groupon "believe[d]" that these initiatives "may be important drivers for increasing customer purchase frequency and growing [its] business over time" (¶¶86-87).

The PSAC again does not allege that any of these statements was actually false, nor could it, as they are all either verifiably true, too vague to be considered material, or forward-looking and accompanied by meaningful cautionary language. (*See* Br. at 16-19.) Nonetheless, Plaintiff alleges that these statements were misleading because Defendants did not simultaneously disclose that (1) Select was over-indexing to Goods and "therefore was failing to meaningfully boost purchase frequency" in Local, (2) Groupon "could no longer compete in, and would therefore have to exit" Goods, and (3) Groupon allegedly was "exacerbating Select's over-indexing problem by enacting a 15% discount on all Select members' Goods purchases starting in August 2019." (¶¶79, 82, 84; *see also* ¶87.) Plaintiff alleges that these omissions "misled investors by portraying Select's performance and prospects as more positive than they in fact were." (¶¶79, 82, 84.)

Again, Plaintiff's allegations neither establish that Select was, in fact, "failing to meaningfully boost purchase frequency," nor that its "performance and prospects" at the time were not as "positive" as Defendants portrayed. As Defendants stated at the end of the proposed Class

7

Period, Groupon ultimately decided to discontinue new enrollments in Select at the same time Groupon decided to exit Goods. As the PSAC alleges, Groupon made the decision to discontinue Select enrollments based on Select's "fourth quarter performance," which had "higher than anticipated customer acquisition costs and a lower than expected number of enrollees converting to paid members," and thus failed "to provide the ROI needed for it to be a key priority . . . at [that] time." (¶¶110-11; *accord* Mem. Op. at 6-7.) As noted above and as Plaintiff himself alleges, this data was not available as of the Q3 earnings announcement. (¶¶110-11.) And it says nothing about Select's profitability, either at the end of Q4, or as of the Q3 earnings announcement when these statements were made.

Moreover, regardless of Select's impact on purchase frequency in any of Groupon's business segments, as described above and in greater detail in Defendants' Motion to Dismiss, these statements could not have been misleading in the context of the myriad other statements Groupon made about the small role and early stage of Select. (*See* ¶¶25, 78 (Select was still in its "very early days" and had only 260,000 members, comprising only 0.57% of Groupon's customer base by Q3's end); ¶83 (Select was still in its "early stage of development," Groupon "still ha[d] some investments to make" in terms of "integrating it into the core of the Groupon experience," and Groupon was "continu[ing] to develop [Select] over time").)

The fact that Groupon enacted an additional discount on Goods purchases in August 2019, which then remained in place throughout the Class Period, actually undercuts Plaintiff's allegations that Defendants knew that Select was over-indexing to Goods as early as the Q2 2019 earnings announcement in July 2019. Plaintiff provides no reason why Groupon would try to motivate purchases in a business segment to which Select members supposedly were gravitating already, thereby "exacerbating" behavior that Groupon perceived to be a "problem." Nor does

Plaintiff plead facts showing why Groupon would then keep that incentive in place despite knowing that it was hurting Groupon's financial performance. As the Seventh Circuit has stated, "indulging ready inferences of irrationality would too easily allow the inference that ordinary business reverses are fraud." *DiLeo v. Ernst & Young*, 901 F.2d 624, 629 (7th Cir. 1990).

The PSAC also challenges statements Ms. Thomas made, in particular that Groupon expected Select "to be net neutral" to gross profit "in the fourth quarter." (¶¶83, 85.) Plaintiff alleges that these statements "misleadingly implied that [Select's] subscription fees and [the] operating profits Select generated would offset" its investment costs, "and that Select was indeed profitable on a unit-basis." (¶85; *see also* ¶93.) But Plaintiff does not allege that Select was ever losing money on a per-unit basis. The mere fact that Select's customer acquisition costs were higher than expected in the subsequent quarter, and that conversions to paying subscriptions were lower than expected in that quarter, does not render Ms. Thomas' forward-looking statements regarding profit expectations misleading at the time they were made.

### 3. December 11, 2019 – Barclays Conference

Plaintiff next challenges several statements about Select that Mr. Williams made during the Barclays conference on December 11, 2019:

- Groupon's initiatives, including Select, were "focused on quality of customer" and increasing "purchase frequency and gross profit per customer" (¶¶96-97);

- Groupon was "showing with Select [a] 60% improvement in purchase frequency within the first six months" (¶¶98-99); and

- Groupon was "making money on the units [purchased by Select members] as well as . . . on the membership fees," which, according to Mr. Williams, made "the total economics of the program [] really compelling" (¶¶98-99).[3]

---

[3]     Ms. Thomas did not participate in the Barclays conference. Plaintiff therefore cannot allege any securities fraud claims against her based on statements made during that conference. *See supra* n.2.

Plaintiff alleges that these statements were "misleading" for the same reasons as the other statements, *i.e.*, Select's over-indexing. (¶¶97, 99.) These allegations fail on multiple grounds. To start, Plaintiff does not allege facts to establish that any of these "reasons" was actually true at the time of the Barclays conference. Even if Groupon had, by December 11, 2019, concluded that it could no longer effectively compete in Goods, Plaintiff cannot allege that Groupon had decided to exit Goods by that time. As the PSAC acknowledges, Groupon explained on February 18 and 19, 2020, that it was Goods' fourth quarter performance—which was still in progress as of December 11, 2019—that "clarified [Groupon's] path forward" with respect to Goods. (¶105 ("We saw far fewer customers engage with Goods in the fourth quarter than we anticipated, which impacted overall traffic to our site."); Mem. Op. at 6 (same).)

Furthermore, the statements that Plaintiff challenges all were either true statements of verifiable fact (*e.g.*, that the goal of Groupon's strategic initiatives was to increase "purchase frequency and gross profit per customer"), or were statements of opinion that are too vague to be material (*e.g.*, that "the total economics of [Select were] really compelling"). Plaintiff therefore cannot state a securities fraud claim based on these statements.

### C. Guidance Reaffirmation

Plaintiff alleges that Groupon materially misled the market by reaffirming its full-year adjusted EBIDTA guidance of approximately $270 million on November 4, 2019, because at that time Groupon was "not competing effectively in Goods," "'Goods ha[d] become a less meaningful driver of engagement' with Groupon's more profitable Local segment," and "as a result . . . , the Guidance was not achievable." (¶¶90-91.) This allegation, too, fails for several reasons.

*First*, Plaintiff alleges that Groupon's inability to effectively compete in Goods was not known until "midway through the fourth quarter." (¶63.) He does not plausibly allege, with particularity, that this information was known as of November 4, 2019. *Second*, Defendants *did*

10

repeatedly disclose the challenges that Groupon was facing in Goods, including during the Q3 earnings announcement. (¶77.) *Third*, Plaintiff's conclusory allegation that the guidance was "not achievable" in light of Goods' declines—which were fully and accurately disclosed—is speculative. *See Garden City Emps.' Ret. Sys. v. Anixter Int'l, Inc.*, No. 09-CV-5641, 2012 WL 1068761, at *4 (N.D. Ill. Mar. 29, 2012) ("Claiming that a particular statement was untrue is not enough—Plaintiffs must explain, with particularity, the factual basis for their assertion that the statement was untrue."). Indeed, as Plaintiff previously pled, Groupon's business is "highly seasonal" and, historically, Goods performed best late in Q4 during the holiday season. (AC ¶110 (Q4 earnings call).) Thus, even if Goods' performance had declined in earlier quarters, that would not make the full-year guidance misleading when reaffirmed at the close of Q3 2019.

Finally, Groupon's guidance reaffirmation is protected by the PSLRA safe harbor because it was accompanied by meaningful cautionary statements about the risks that could cause Groupon to miss its forecast, including, but not limited to, "execution of [its] business and marketing strategies; retaining existing customers and adding new customers; . . . [and] competing successfully in [its] industry." (Br. Ex. C (Q3 2019 10-Q, dated Nov. 4, 2019) at 3.) *See Rochester Laborers Pension Fund v. Monsanto Co.*, 883 F. Supp. 2d 835, 881 (E.D. Mo. 2012). Plaintiff thus cannot state a securities fraud claim based on Groupon's guidance reaffirmation.

### D.     Alleged Violations of Item 303

Plaintiff alleges that the MD&A sections of the Q2 and Q3 2019 10-Qs were "materially misleading" because Groupon was required to, but did not, disclose under Item 303 of SEC Regulation S-K that (1) Select was over-indexing to Goods, which was "reasonably likely to cause a material change in the relationship between costs and revenues," or "a material unfavorable impact on net sales or income," (¶¶74-75, 88) and (2) Goods "had largely ceased providing added value for Groupon by driving meaningful business to Local." (¶¶74-75, 89.) As to the latter, again,

11

Groupon did disclose the challenges it was facing in Goods at the time the Q2 and Q3 10-Qs were issued. (AC ¶83 (Q3 10-Q); Br. Ex. B (Q2 10-Q).) And as to the former, as already explained, Plaintiff does not, and cannot, draw a connection between Select's performance and Groupon's financial condition as a whole, as is required to trigger a disclosure duty under Item 303. (*See* Br. at 23.) Any claims under Item 303 thus would be futile.

## II. The PSAC Still Fails to Plead Scienter.

The PSAC still fails to plead a strong inference of scienter. Plaintiff has done virtually nothing to bolster his scienter allegations. The deficiencies Defendants identified in their initial Motion to Dismiss are all still present, if not highlighted. (*See* Br. at 24-27.)

Like the AC, the PSAC faults Defendants for not providing a "running commentary on Groupon's ups and downs." (Reply at 12 (citing *City of Livonia Emps.' Ret. Sys. & Local 295/Local 851 v. Boeing Co.*, 711 F.3d 754, 759 (7th Cir. 2013)).) The only notable change now, besides conclusory allegations of Groupon's corporate scienter (¶¶130-31), is a paragraph noting that Defendants stated on the Q4 2019 earnings call that Goods struggled "midway through the quarter" and "November performance was particularly poor" (¶123). But this merely reinforces the more plausible inference: that Defendants preferred not to disclose "half-formed stories" before the earnings call. *Higginbotham v. Baxter Int'l, Inc.,* 495 F.3d 753, 760-61 (7th Cir. 2007).

And more than a year and three complaints later, Plaintiff still has not identified any motive to commit fraud. There are no allegations of stock sales, bonuses, or any other concrete benefits that would have inured to Defendants from engaging in short-term conduct that they knew would be revealed within months. *See City of Livonia*, 711 F.3d at 758 ("Without a motive to commit securities fraud, businessmen are unlikely to commit it."). This "weighs against a finding of scienter because 'the fact that [Defendants] are not alleged to have sold the[ir] stock at [] inflated prices mean[s] that they stood to lose a lot of money if the value of [Groupon's] stock fell.'" *In re*

*Baxter Int'l Inc. Sec. Litig.*, No. 19 C 7786, 2021 WL 100457, at *16 (N.D. Ill. Jan. 12, 2021) (quoting *Pugh v. Tribune Co.*, 521 F.3d 686, 695 (7th Cir. 2008)).[4]

### III.       The PSAC Still Fails to Plead Loss Causation.

Plaintiff makes no attempt to cure his failure to plead loss causation. Further amendment therefore would be futile for the reasons Defendants already demonstrated: the facts pled do not support an inference that (1) Groupon's stock price was artificially inflated at the start of the Class Period by any alleged statements or omissions about Goods or Select; (2) Groupon's announcement at the end of the Class Period "corrected" any misleading statements; or (3) Groupon's stock price fell by 44% as a result. (*See* Reply at 14-15); *Ray v. Citigroup Glob. Mkts., Inc.*, 482 F.3d 991, 995 (7th Cir. 2007) (plaintiff must show "that the defendants' alleged misrepresentations artificially inflated the price of the stock and that the value of the stock declined once the market learned of the deception").

*First*, Plaintiff still fails to identify misleading information about Select or Goods that artificially inflated Groupon's stock price as of the start of the Class Period on July 30, 2019. The PSAC identifies the following July 30, 2019 statements:

- "[W]e are making progress on the initiatives that we believe lay the foundation for long-term, profitable growth." (¶70.)

- "We believe that those initiatives may be important drivers for increasing customer purchase frequency and growing our business over time." (¶72.)

- Select is showing "significantly improved purchase frequency, [and] higher average order value." (¶70.)

---

[4]       Further undermining scienter is the lack of confidential witnesses after over a year's opportunity to investigate. *See, e.g.*, *In re Guidant Corp. Sec. Litig.*, 536 F. Supp. 2d 913, 931 (S.D. Ind. 2008) ("Plaintiffs have not cited any internal documents, confidential witnesses, or other sources to support their allegations that Defendants deliberately concealed [] information."), *aff'd*, 583 F.3d 995 (7th Cir. 2009).

13

None of these statements relates to Goods. The first two statements refer to Groupon's announcement of several development-stage product-enhancement initiatives, one of which was Select. (¶¶70, 72.) Groupon made clear that these initiatives could have a negative financial impact:

> We are currently developing and testing a number of product enhancements intended to make our offerings easier to use for both customers and merchants and to improve purchase frequency, including cash back offers linked to customer credit cards, booking capabilities and a paid membership program in North America, Groupon Select. . . . We believe that those initiatives may be important drivers for increasing customer frequency and growing our business over time. . . . As such our gross profits and operating income may be adversely impacted in the near term as we focus more on driving our strategic initiatives. (¶72.)

The only statement on July 30, 2019 that is specific to Select—that "[i]nitial indicators" showed "significantly improved purchase frequency, [and] higher average order value" (¶70)—referred to a program that had enrolled only 150,000 members (0.32% of Groupon's customers). (*Id.*; ¶25.) Any allegedly omitted information about Select members' product choices (Goods, Local, or Travel) as of July 30, 2019, could not possibly have artificially inflated Groupon's stock.

*Second*, Plaintiff fails to plead facts showing that Groupon's stock price fell because the market learned on February 18 and 19, 2020, of a purported deception about the Company's decision to exit Goods or to continue Select but refrain from marketing the program any further. Plaintiff does not identify disclosures that corrected (or revealed as deceptive) anything Defendants said about Select or Goods at the beginning of the Class Period or thereafter. Indeed, while Groupon announced on July 30, 2019 several enhancement initiatives designed to combat traffic headwinds over the long-term, including Select, Groupon disclosed in Q3 2019 that these initiatives were "not yet moving fast enough to offset our traffic challenge." (AC ¶77 (Q3 shareholder letter).) Groupon further disclosed on February 19, 2020, that it was discontinuing new enrollments in Select because the program underperformed in the fourth quarter due to "higher

14

than anticipated customer acquisition costs," "lower than expected numbers of enrollees converting to paid members," and "over-indexing" toward Goods. (¶¶110-11.)

Nor does Plaintiff identify any corrective disclosures with respect to Goods. Groupon's disclosure that it discovered midway through the fourth quarter of 2019 that it was not effectively competing in Goods or its announcement of a transformation strategy that included exiting Goods (¶106) could not have "corrected" prior statements about Goods, particularly because Plaintiff does not identify any misleading statements about Goods at the start of the Class Period. *See Born v. Quad/Graphics, Inc.*, No. 19-CV-10376 (VEC), 2021 WL 736839, at *1, *15 (S.D.N.Y. Feb. 25, 2021) (Dkt. No. 62-1) (explaining that "statements, which may have announced a 'corrective path' for the company going forward, are not 'corrective' disclosures for purposes of alleging loss causation," and dismissing claims as a "fruitless endeavor to manufacture a fraud case out of a stock drop that followed a company . . . announcing that it would not meet its [] financial projections").

*Third*, Plaintiff tries to connect the purported fraud (alleged omissions about the purchase preferences of Select enrollees) to the harm (a 44% stock price decline) by conflating Select's performance with Groupon's $43 million earnings miss. But Select's small size and Groupon's repeated warnings that the costs of Select and other initiatives may negatively affect 2019 results render these inferences illogical. *See id.* at *1, *16 ("[R]elying solely on Defendants' revelation of poor financial results and concomitant market dissatisfaction to alleged loss causation . . . is simply not enough."). Because Plaintiff still fails to identify facts that "tether . . . directly" the alleged fraudulent conduct to the harm, leave to amend should be denied. *See Menzies*, 943 F.3d at 335.

15

## CONCLUSION

For the reasons set forth herein and in Defendants' Motion to Dismiss the AC, this Court should deny Plaintiff's Motion for Leave to Amend and dismiss this case with prejudice.

Dated: June 23, 2021

Respectfully submitted,

/s/ Matthew R. Kipp
Matthew R. Kipp
William E. Ridgway
Andrew J. Fuchs
Jennifer H. Berman
Laura Bernescu
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
155 North Wacker Drive
Chicago, Illinois 60606
(312) 407-0700
matthew.kipp@skadden.com
william.ridgway@skadden.com
andrew.fuchs@skadden.com
jennifer.berman@skadden.com
laura.bernescu@skadden.com

*Counsel for Defendants*

16