**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **LAZAR MACOVSKI, individually and on behalf of all others similarly situated,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 20 C 2581** |
| | ) | |
| **GROUPON, INC., RICH WILLIAMS, and MELISSA THOMAS,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

On April 28, 2021, the Court dismissed the plaintiffs' amended complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *See Macovski v. Groupon, Inc.*, No. 20 C 2581, 2021 WL 1676275, at *1 (N.D. Ill. Apr. 28, 2021). The plaintiffs now seek leave to file a second amended complaint. The defendants assert that the proposed second amendment complaint also fails to state a claim, and they urge the Court to deny leave to amend. For the reasons discussed below, the Court grants the plaintiffs' motion.

## Background

On behalf of himself and others, Lazar Macovski brought this securities fraud case after shares he purchased in Groupon, Inc. lost significant value. Under the Private Securities Litigation Reform Act, Fadi E. Rahal was appointed to serve as Lead Plaintiff. *See* 15 U.S.C. § 78u-4(a)(3)(B)(i). The Court will refer to the plaintiff as

"Rahal" even though he was not the party who initially filed the complaint.

At the heart of this suit are two alleged omissions of material adverse information: (1) the performance of Groupon's Select program; and (2) the company's performance in a subcategory of its sales called "Goods." Rahal blames his shares' loss in value on the alleged omissions. He accuses Groupon, its former chief executive officer, Richard Williams, and its then interim chief financial officer, Melissa Thomas, of misleading investors by knowingly omitting the adverse information. Rahal brings two claims, both under the Securities Exchange Act: fraud under section 10(b) and vicarious liability for fraud under section 20(a).

The defendants argue that the Court should deny leave to amend because the proposed amendment would not survive a motion to dismiss and is therefore futile. Thus, in considering the plaintiffs' motion, the Court must accept as true the well-pleaded factual allegations in Rahal's proposed second amended complaint and must view those allegations in the light most favorable to Rahal. *See Runnion ex rel. v. Girl Scouts of Greater Chicago & Nw. Indiana*, 786 F.3d 510, 524 (7th Cir. 2015) ("But when the basis for denial is futility, we apply the legal sufficiency standard of Rule 12(b)(6) to determine whether the proposed amended complaint fails to state a claim."); *Appert v. Morgan Stanley Dean Witter, Inc.*, 673 F.3d 609, 622 (7th Cir. 2012) (recounting the standards for considering dismissals under Rule 12(b)(6)).

The following facts are drawn from Rahal's proposed second amended complaint.

## A. Groupon's business model and recent "headwinds"

Groupon is an e-commerce marketplace that connects consumers to merchants.

At the time the relevant events occurred, Groupon competed in three markets: (1) "Local" (e.g., local services, events, and activities sold by Groupon but provided by a third-party merchant); (2) "Goods" (i.e., merchandise sold directly to customers); and (3) "Travel" (i.e., hotels, airfare, and package travel deals). Of the three, Local deals were the company's primary profit driver. Though Local only made up 40 percent of Groupon's consolidated revenues, it generated 73 percent of the company's consolidated gross profits. Conversely, though Goods sales made up 55 percent of Groupon's total revenue, it represented only 20 percent of gross profits.

Despite its low margins, Goods had value beyond its profits because it drew customers to other parts of Groupon's platform where they could view and purchase the company's higher-margin offerings, especially Local deals. In other words, even though Local was Groupon's main profit driver and that market was the one with the greatest opportunity for growth, the company believed Goods—even with its smaller profit margins—was necessary as an "engagement driver" for its other products. *See* 2d Amd. Compl. ¶ 30 (internal quotation marks omitted).

These customer cross-shopping opportunities were especially important for Groupon, as the company was—and had for years been—"experiencing severe 'traffic headwinds,'" i.e., decreases in "its principal marketing channels (email and search engine marketing)." *Id.* ¶¶ 3-4; *see also id.* ¶¶ 26-27. Also distressing was the fact that the company had for years been facing a stubborn decline in its active customer count.

**B.    Groupon's focus on increasing customers' purchase frequency**

In response to these "headwinds," Groupon settled on a strategy of increasing existing customers' purchase frequency. *Id.* ¶ 31. As Williams explained in a letter to

shareholders in 2019, at that point, "increasing purchase frequency and total unit volume [were] more important . . . than . . . customer counts," because increased purchase frequency and total unit volume would "unlock the leverage in [Groupon's] model and an ability to profitably invest in growth." *Id.* ¶ 31.

One way Groupon tried to increase purchase frequency was through Groupon Select, a paid membership program. The way the Select program worked was that, in exchange for a monthly membership fee, Groupon customers who joined the program received discounts on products in addition to other benefits. Groupon hoped that Select, along with other "product enhancements" and "initiatives," would be "important drivers for increasing customer purchase frequency and growing . . . business over time." *Id.* ¶ 72 (emphasis omitted). The company cautioned, however, that "gross profit and operating income may be adversely impacted in the near term" as a result of its focus on "driving" these strategic initiatives. *Id.*

Throughout the class period, the defendants shared positive reports about Select's rollout and performance. In a July 30, 2019 letter to shareholders, Williams said that Select's early "indicators [were] very positive with significantly improved purchase frequency, higher average order value and increased customer propensity to search for things to eat, see, do and buy." *Id.* ¶¶ 35, 70 (emphasis omitted). In the subsequent Q2 2019 conference call with analysts and investors, Groupon asserted that Select was profitable and that it would "almost double the average gross profit per customer" that Groupon generated at that point. *Id.* ¶ 37 (internal quotation marks omitted).

In a November 4, 2019 letter to shareholders, Williams indicated that Groupon

4

was "pleased" with Select's "results to date," noting that the program had attracted more than 260,000 members.  *Id.* ¶¶ 40, 78.  Williams said that he and others were encouraged by how Select's members behaved, and he told shareholders that the company's metrics showed a "60 percent increase in purchase frequency and a 20 percent jump in average order value" among the program's members.  *Id*. ¶¶ 40, 78 (emphasis omitted).  Still, Williams observed that these results were "early" and that the company was "still analyzing" them, as the first Select members had only barely completed their first year in the program.  *Id.* ¶ 40.  He further noted that Groupon had "work to do to fully build out the infrastructure necessary for Select to run at scale."  *Id.*

In the subsequent Q3 2019 conference call with analysts and investors, Groupon's executives repeated many of the positive points about Select and reasserted its profitability.  For example, Thomas described being "really excited" by the "encouraging results" that Select had produced to date.  *Id.* ¶ 41.  During the same call, Williams indicated that Groupon's strategy around Select was starting "to play its way through the local customer" and pointed to a 60 percent increase in purchase frequency as evidence of this fact.  *Id.* ¶ 81 (emphasis omitted).  Moreover, Williams, in a December 11, 2019 Barclays conference presentation, shared that Select's margins were "such that [Groupon made money] on the units . . . [and] on the membership fees as well.  So, the total economics of the program are really compelling."  *Id.* ¶ 98 (emphasis omitted); *see also id.* ¶ 43.

## C.    Groupon's financial guidance for 2019

Before and throughout the class period, Groupon's financial outlook was principally expressed through a figure known as its adjusted projected EBITDA—

earnings before interest, taxes, depreciation, and amortization. In 2019, Groupon's adjusted projected EBITDA—first provided in February of that year—was $270 million. The 270-million-dollar figure was reiterated and reaffirmed when the company announced its first, second, and third quarter results for 2019.

**D.    Groupon shutters Select and exits the Goods marketplace**

In February 2020, Groupon announced two decisions. The first was that the company would exit the Goods category and instead focus on Local experiences. The company explained in its Q4 2019 letter to shareholders that "[m]idway through the fourth quarter it became abundantly clear" that Groupon was not able to compete "effectively in Goods." *Id.* ¶¶ 60,105. Data showed "far fewer customers engag[ing] with Goods in the fourth quarter than . . . anticipated, which impacted overall traffic to [the] site." *Id.* Lower traffic to the site caused lower performance in all of Groupon's categories.

Goods had been a troubled area for some time ("for four quarters"). *See id* ¶¶ 65, 105, 122. As indicated earlier, the company justified its continued competition in the market because Goods had been an engagement driver for other categories, primarily Local. By this time, however, Groupon had "seen engagement with . . . Goods inventory shift meaningfully lower, driven in large part by [the company's] inability to compete in [this] fiercely competitive . . . retail landscape." *Id.* ¶¶ 65; 105. In short, because Goods was "no longer generating the cross-shopping behavior or customer activation activity" to justify further investment, Groupon's executives determined that "Goods ha[d] outlived its role as a business driver" and instead had "become a significant drag." *Id.* ¶¶ 65, 105. Williams gave similar explanations for the decision

6

during the Q4 2019 conference call with analysts and investors.

The second decision announced in February 2020 was that Groupon would "discontinue new enrollments" in the Select program. *Id.* ¶¶ 53, 111. As with the Goods decision, the company explained the move to shutter Select in its Q4 2019 letter to shareholders and on the Q4 2019 conference call with analysts and investors. The Q4 2019 letter stated that Select "added to [the company's] challenges in [Q4 2019]" because Select's benefits began "appealing disproportionately to customers purchasing goods" rather than those "transacting on [the company's] local platform." *Id.* ¶ 110. As a result, Select "pressured margins and drove higher than anticipated customer acquisition costs." *Id.* After it became aware of these facts, Groupon determined that Select could not provide the return on investment "needed for it to be a key priority", as the program did not "address the core of [Groupon's] product or business model, nor [did it] overcome the limitations in the legacy Groupon business." *See id.*.

On the Q4 2019 conference call, Thomas added that Select "was expected to be net neutral to gross profit in the fourth quarter," but the program underperformed because—in addition to the problems discussed in the letter to shareholders—there was "a lower than expected number of enrollees converting to paid members." *Id.* ¶ 111.

### E. Groupon's shares decline

Following the disclosure of these decisions, Groupon's shares—which had closed on February 18, 2020 at $3.05 per share—fell $1.35 (nearly 44 percent) and closed the next day at $1.70 per share. *Id.* ¶ 113. On February 19, over 155 million Groupon shares changed hands, more than 25 times Groupon's average daily trading volume during the Class Period. *Id.*

7

**Discussion**

In his proposed second amended complaint, Rahal asserts that the defendants violated the Exchange Act when they made materially misleading statements about Select and Goods.  Specifically, Rahal alleges that though the defendants knew that Select was "over-indexing" to Goods and knew that Groupon could no longer effectively compete in Goods, they failed to disclose this information to investors.  The defendants urge the Court to deny leave to amend because they believe that proposed second amendment complaint—like the since dismissed amended complaint—fails to state a claim.

"Although Federal Rule of Civil Procedure 15(a)(2) directs courts to freely give leave to amend when justice so requires, courts may deny a proposed amended pleading if the amendment would be futile."  *Always Towing & Recovery, Inc. v. City of Milwaukee*, 2 F.4th 695, 707 (7th Cir. 2021) (alterations accepted) (internal quotation marks omitted).  An amendment is futile "only if it appears to a certainty that [the] plaintiff cannot state a claim."  *Barry Aviation Inc. v. Land O'Lakes Mun. Airport Comm'n*, 377 F.3d 682, 687 (7th Cir. 2004); *see also Garcia v. City of Chicago*, 24 F.3d 966, 970 (7th Cir. 1994) ("[F]utile repleadings include restating the same facts using different language, reasserting claims previously determined, failing to state a valid theory of liability, and the inability to survive a motion to dismiss." (citations omitted)).

To survive a motion to dismiss for failure to state a claim, a complaint "must (1) describe the claim in sufficient detail to give the defendant fair notice of the claim and [the] grounds on which it rests and (2) contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Cornielsen v. Infinium Cap.*

*Mgmt., LLC*, 916 F.3d 589, 598 (7th Cir. 2019) (citation omitted) (internal quotation marks omitted).  A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Bissessur v. Indiana Univ. Bd. of Trustees*, 581 F.3d 599, 602 (7th Cir. 2009) (internal quotation marks omitted).

A complaint's factual allegations "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In addition to the standard under Rule 12(b)(6), the Court must also consider the heightened pleading requirements imposed by Federal Rule of Civil Procedure 9(b). *See Cornielsen*, 916 F.3d at 598 ("Heightened pleading requirements apply to complaints alleging fraud.").  Under Rule 9(b), a party alleging fraud or mistake "must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9.  The Seventh Circuit has said that Rule 9(b) requires a plaintiff to provide "precision and some measure of substantiation to each fraud allegation." *Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 338 (7th Cir. 2019) (internal quotation marks omitted).  The court has also said that a plaintiff satisfies Rule 9(b) when he pleads "the who, what, when, where, and how of the alleged fraud." *Id.* (internal quotation marks omitted).

There is one further standard to consider.  In securities fraud cases like this one, the Private Securities Litigation Reform Act (PSLRA) imposes further pleading requirements. *See Cornielsen*, 916 F.3d at 599.  Specifically, claims under the Securities Exchange Act must "specify each statement alleged to have been

misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u–4(b)(1)(B).  Additionally, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u–4(b)(2)(A).

## A.      Section 10(b) claim

Section 10(b) of the Securities Exchange Act prohibits the unlawful "use or employ[ment], in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe."  15 U.S.C. § 78j(b).  SEC Rule 10b–5 "implements" Section 10(b) of the Exchange Act.  *See W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, No. 19 C 1323, 2020 WL 6118605, at *4 (N.D. Ill. Oct. 15, 2020).  Rule 10b–5 prohibits any "untrue statement of a material fact or . . . omit[ting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b–5(b).

To state a claim under section 10(b) and Rule 10b–5, the plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *See Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) (internal quotation marks omitted).

10

### 1.    Material misrepresentations or omissions

To determine whether a statement was misleading, a court must "consider the context in which the statement was made" and "determine whether the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Constr. Workers Pension Fund-Lake Cty. & Vicinity v. Navistar Int'l Corp.*, 114 F. Supp. 3d 633, 651 (N.D. Ill. 2015) (internal quotation marks omitted). "Even statements that are literally true can still be actionable under § 10(b) as misleading if they are susceptible to another interpretation by a reasonable investor." *Id.*

Rahal argues that the defendants made various material misstatements and omissions during the class period. The allegedly misleading statements were shared in Groupon's Q2 2019 and Q3 2019 earnings announcements and at a conference held in December 2019.[1] For each statement he has proffered, Rahal asserts it was materially misleading because the defendants were "in possession of, but concealed and failed to disclose, material adverse information." *Id.* ¶¶ 71, 79, 82, 84; *see also id.* ¶¶ 73, 85, 87, 91, 93, 97, 99. Specifically, Rahal alleges that when the statements were communicated, the defendants were already aware that "Select was over-indexing to Goods . . . and therefore that Select was failing to meaningfully boost purchase

---

[1] The defendants contend that because Thomas was not interim CFO at the time of Groupon's Q2 2019 earnings announcement and did not participate in the Barclay's conference, Rahal cannot "allege any securities fraud claims against her based on statements" made at those times. *See* Def.'s Resp. Br. at 2 n.1, 9 n.2. But there are only two claims in this case—a single claim of fraud under section 10(b) and a single claim of vicarious liability for fraud under section 20(a)—not a series of parsed claims premised on individual statements. In short, the proposition that Thomas did not make misleading statements during Q2 2019 or at the Barclay's conference does not affect the outcome. If, as Rahal alleges, Thomas made materially misleading statements during the Q3 2019 earnings announcement, and the other requirements for liability are met, she can be held liable.

frequency in the important Local category." *Id.* ¶¶ 71, 73, 79, 82, 84; *see also id.* ¶¶ 85, 87, 93, 97, 99. Rahal also argues that the defendants knew that Goods had long been underperforming. *See id.* ¶¶ 71, 73, 79, 82, 84, 85, 87, 91, 93, 97, 99. At bottom, Rahal contends that by "omitting that Select was over-indexing to an admittedly underachieving business segment" the defendants "misled investors to believe that Select was more successful that it in fact was." *Id.* ¶¶ 71; *see also id.* ¶¶ 73, 79, 82, 84, 85, 87, 93, 97, 99.

The defendants assert that the proposed second amended complaint does not include any actionable false or misleading statements regarding either Goods or Select. First, the defendants argue that Rahal has failed to plead any facts showing that Select members were purchasing more Goods offerings than Local products throughout the Class Period or that the defendants knew this when Rahal alleges they did. The defendants then argue that Rahal's allegations fault them for failing to disclose information that did not even exist at the time the allegedly misleading statements were made. Third, even if the defendants omitted information, they argue that the omissions do not make any of the identified statements misleading, especially when read in context. Finally, the defendants assert that several of the statements proffered are affirmative statements that are either factually correct according to the proposed amended complaint, too vague to be considered material, or "forward-looking statements accompanied by meaningful cautionary language" that Rahal "does not allege lacked a reasonable basis." Def.'s Resp. Br. at 3.

The Court addresses each of the defendants' arguments against the proffered statements below.

12

### a. So-called "temporal flaws"

The defendants argue that there is a "temporal flaw" in some of Rahal's allegations. *See* Def.'s Resp. Br. at 5. According to the defendants, Williams's Q2 2019 statements regarding Select's performance were not misleading because the information that led Groupon to end the Select program did not exist until the fourth quarter. *See id.* Additionally, the defendants assert that the decision to exit the Goods market was based on fourth quarter performance and thus any duty to disclose the decision to exit the Goods market could not have arisen before the Q4 2019 earnings announcement. *See id.* at 3.

The defendants misunderstand Rahal's allegations. In the proposed second amended complaint, Rahal alleges the defendants "knew that Select was over-indexing to Goods" by the time of the July 30, 2019 letter, i.e. long before the fourth quarter and the decision to shutter Select. 2d Amd. Compl. ¶ 71. To support this allegation, Rahal notes that defendants admitted that Select's over-indexing trend became apparent in the "second half of 2019." *Id.* ¶ 111. Thus it is plausible that, as Rahal alleges, the defendants knew of the Select's troubles in July 2019 when the Q2 earnings statements were made. *See id.* ¶¶ 68–72.

Regarding Goods, Rahal does not allege that the defendants' statements were misleading because they failed to disclose that Groupon decided to exit Goods. Instead, the proposed complaint repeatedly alleges that the defendants knew Select was over-indexing to Goods—an already underachieving business segment—instead of Local, and failed to disclose this fact. *See id.* ¶¶ 71, 73, 75, 79, 82, 84–85, 87–89, 91, 93, 97, 99. Rahal asserts that by omitting this information, the defendants misled

investors about Select's performance and its relationship to Goods. *See id.* ¶¶ 71, 73, 75, 79, 82, 84–85, 87–89, 91, 93, 97, 99.

To the extent the defendants argue that it is unreasonable to infer that they knew of Select's troubling trend only one month into the second half of 2019, that argument lacks merit. Depending on the problem alleged, its existence at a later date "may support an inference that it was present . . . months earlier." *Iowa Pub. Employees' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 143 n.13 (2d Cir. 2010); *see also In re Apple Inc. Sec. Litig.*, No. 19-CV-02033-YGR, 2020 WL 6482014, at *9 (N.D. Cal. Nov. 4, 2020) (holding defendant's statement that "he saw signs that were 'particularly bad'" in November 2019, yielded the inference that troubling signs existed in preceding months). Moreover, making such an inference is "sufficient to raise the plaintiffs' right to relief above the speculative level." *Iowa Pub. Employees' Ret. Sys.*, 620 F.3d at 143 n.13 (alterations accepted) (internal quotation marks omitted). Defendants' contention on this point is unavailing.

### b. Materiality

The defendants argue that many of the proffered statements are not actionable because they are not material. Determining the materiality of a statement is a fact-intensive process. *Shah v. Zimmer Biomet Holdings, Inc.*, 348 F. Supp. 3d 821, 840 (N.D. Ind. 2018). Materiality is judged by determining "the significance the reasonable investor would place on the withheld or misrepresented information." *W. Palm Beach Firefighters' Pension Fund*, 495 F. Supp. 3d at 650 (internal quotation marks omitted). "The crux of materiality is whether, in context, an investor would reasonably rely on the defendant's statement as one reflecting a consequential fact about the company." *Id.* at

14

651 (internal quotation marks omitted).

Because determination of the materiality of a statement is fact intensive, materiality determinations are "rarely appropriate at the summary judgment stage, let alone on a motion to dismiss." *Shah*, 348 F. Supp. 3d at 840 (internal quotation marks omitted); *see also Marks v. CDW Computer Centers, Inc.*, 122 F.3d 363, 370 (alterations accepted) (internal quotation marks omitted) (7th Cir. 1997) ("[T]he determination of materiality requires delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact."); *In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 815 (N.D. Ill. 2017) (explaining that at the motion to dismiss stage, materiality arguments are not appropriate unless the allegedly misleading statements are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance").

The defendants do not argue outright that the allegedly misleading statements are so obviously unimportant that reasonable minds could not question their materiality. *See In re Akorn, Inc. Sec. Litig.,* 240 F. Supp. 3d at 815. Instead, they argue that many of the statements were too vague to be material. That argument may turn out to have merit once the evidence is presented, but at this point in the proceedings, the Court cannot appropriately conclude, on the face of the complaint, that any of the statements challenged by the defendants would have been obviously unimportant to a reasonable investor such that reasonable minds could not disagree. *See id.* Each of the challenged statements supports Rahal's theory that the defendants communicated a narrative of improvement rather than disclosing the adverse trends affecting Select and

Goods.  *See* 2d Amd. Compl. ¶¶ 70, 71, 78–79, 81–84, 86–87, 98–99.  Without more, it is not *obvious* that a reasonable investor would not view these statements as important, especially when considering the importance of Goods to Groupon's overall business, *see* 2d Amd. Compl. ¶¶ 3, 4, 65, and that Select was implemented to increase "customer purchase frequency" and Groupon's "business over time," *see id.* ¶ 72. Further, whether these particular statements are too vague to be material seems exactly the kind of inquiry that would lead reasonable minds to different conclusions.

For these reasons, the Court concludes that the defendants' materiality arguments are inappropriate at this stage of the proceedings.

### c.    Truth

Related to their materiality argument, the defendants assert that many of the challenged statements were true when made.  But, as noted earlier, truthful statements are still actionable under section 10(b) if they are misleading.  *Constr. Workers Pension Fund*, 114 F. Supp. 3d at 651; *Plumbers & Pipefitters Loc. Union No. 630 Pension-Annuity Tr. Fund v. Allscripts-Misys Healthcare Sols., Inc.*, 778 F. Supp. 2d 858, 878 (N.D. Ill. 2011).

To allege that a statement was misleading, a plaintiff must identify "a specific statement that is made misleading by an omission, and offer specific, contradictory information known to Defendants sufficient to establish that Defendants made any misleading statements."  *Constr. Workers Pension Fund*, 114 F. Supp. 3d at 651 (alterations accepted) (internal quotation marks omitted); *see also Plumbers & Pipefitters Loc. Union No. 630*, 778 F. Supp. 2d at 878 ("In determining whether a statement is false or misleading, the relevant question a court must answer is 'whether

16

the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission.'").

Rahal has met this burden for each of the statements the defendants argue were not misleading. First up, Williams's Q2 2019 statements. Rahal asserts that Williams' Q2 2019 statements that Groupon was "making progress on initiatives" it believed would "lay the foundation for long-term, profitable growth," and the statement that Select was driving "significantly improved customer purchase frequency" and "higher average order value," communicated a "narrative of improvement" despite having material adverse information indicating otherwise. *See* 2d Amd. Compl. ¶¶ 69-71. Rahal alleges that the statements were misleading because Williams, at the time the statements were made, must have been aware "that Select was over-indexing to Goods" instead of Local and was therefore aware that "Select was failing to meaningfully boost purchase frequency in the important Local category." *Id.* ¶ 71. At this stage, Rahal's allegations regarding the Q2 2019 statements are sufficient. He has identified the allegedly misleading statements and explained what contrary information he believes Williams knew at the time he made the statements. *See Constr. Workers Pension Fund*, 114 F. Supp. 3d at 651. If Williams knew of this adverse trend, his statements, even if true, would be misleading. *Id.*

Second to consider are a series of statements made within Groupon's Q3 earnings announcements. 2nd Amd. Compl. ¶¶ 76–93. The defendants argue that the allegations in the proposed second amended complaint do not establish that Select was "failing to meaningfully boost purchase frequency" and do not refute that Select's

"performance and prospects" were as positive as portrayed.[2]  Def.'s Resp. Br. at 7.

Again, Rahal does not and does not need to allege that the defendants' statements

were false.  Instead, he alleges that the statements were misleading because the

defendants were in possession of material adverse information—that Select was over-

indexing to Goods—and failed to disclose that information.  Rahal concludes that the

defendants' failure to disclose "that Select was over-indexing to a foundering business

line that Groupon was on the verge of exiting . . . [misled] investors by portraying

Select's performance and prospects as more positive than they in fact were."  *See id.* ¶¶

79, 82; *see also id.* ¶¶ 84, 85, 87, 93, 97, 99.  Thus, here too, the Court concludes that

Rahal alleged facts sufficient to support a reasonable belief that the proffered

statements were misleading.   He has identified allegedly misleading statements,

explained what information he believes the defendants knew at the time the statements

were made, and provided a basis for his belief.  *See Constr. Workers Pension Fund*,

114 F. Supp. 3d at 651.

In sum, Rahal has adequately and properly pled that the defendants' various

statements were misleading when made.

### d.    PSLRA safe harbor provision

The defendants argue that many of their statements are not actionable because

they are forward-looking statements accompanied by meaningful cautionary language.

The PSLRA's safe harbor provision protects forward-looking statements.  A statement is

forward-looking if it "discuss[es] 'the plans and objectives of management for future

---

[2] For the reasons already discussed, the Court is not persuaded by the defendants' arguments regarding the immateriality of these statements or any purported temporal flaw.

operations, including plans and objectives relating to the products or services of the issuer' and 'the assumptions underlying or relating' to those statements." *Constr. Workers Pension Fund*, 114 F. Supp. 3d at 646 (quoting 15 U.S.C. §§ 78u–5(i)(1)(B), (D)).  To be eligible for safe harbor protection, the statement must be "identified as forward-looking and accompanied by meaningful cautionary language identifying factors that could cause actual results to materially differ from those in the forward–looking statement." *Constr. Workers Pension Fund*, 114 F. Supp. 3d at 646. (internal quotation marks omitted).  A statement may also be eligible for safe harbor protection "if the plaintiff fails to demonstrate that the statement was made with actual knowledge that it was false or misleading." *Id.*

The Court addresses each of the challenged statements individually.

### i. Q2 2019 letter to shareholders

In Groupon's Q2 2019 letter, Williams wrote:

In the second quarter, Groupon continued our relentless focus on becoming the daily habit in local commerce.  We are transforming our brand, product and business, and *we are making progress on the initiatives that we believe lay the foundation for long-term, profitable growth* and a new Groupon for consumers, merchants and stockholders alike.

\* \* \*

Select is simply the best way to experience Groupon today, leveraging all of the work we're putting into voucherless while accelerating the savings for which we're best known.  And it's only getting better . . . .

*More than 150,000 members have joined the program so far, and it is scaling quickly with both new and existing customers.  Initial indicators are very positive with significantly improved purchase frequency, higher average order value and increased customer propensity to search for things to eat, see, do and buy.*  It's still early days, but given its promise and pace, we expect to invest more aggressively in Select over the coming quarters.

2d Amd. Compl. ¶ 70.

Williams's statements were forward-looking (e.g., "we are making progress on the initiatives that *we believe lay the foundation for long-term*, profitable growth" and "*we expect* to invest more aggressively in Select *over the coming quarters*.").[3]  *See* 2d Amd. Compl. ¶ 70 (emphasis from original omitted) (emphasis added).  But even if the first element of the test is satisfied, the second element is not because the statements were not accompanied by meaningful cautionary language sufficient to trigger safe harbor protection.  *See Constr. Workers Pension Fund*, 114 F. Supp. 3d at 646.  "Cautionary language is meaningful if it puts an investor on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward."  *Desai v. Gen. Growth Properties, Inc.*, 654 F. Supp. 2d 836, 844 (N.D. Ill. 2009) (internal quotation marks omitted).  Boilerplate warnings will not do; instead, cautionary language must be "substantive and tailored to the specific predictions made in the allegedly misleading statement."  *Id.* at 845 (internal quotation marks omitted).  To say that the cautionary language must be substantive and tailored to the specific predictions made does not mean that the language must "expressly refer to the risk that ultimately caused the projection to differ from the results" or that companies are expected to provide the "*most* helpful caution."  *See id.* at 845.  It is enough that the company identify that "the principal contingencies," *related to the particular projections*, "that could cause actual results to differ."  *Id.*

There are no tailored cautions in Williams's statements, and no such cautions were incorporated by reference.  *See id.* at 844. ("[C]ourts consider cautionary

---

[3] In its Q2 2019 10–Q, Groupon notes that the words like "may," "will," "should," "could," "expect," "anticipate," "believe," "estimate," "intend," "continue" are intended to identify forward-looking statements.  Dkt. no. 49-3 at ECF p. 3 of 10.

statements that either accompanied the forward-looking statement or were incorporated by reference.")  It is true that Williams was clear that he was only communicating "initial indicators" in the program's "early days", *see* 2d Amd. Compl. ¶ 70 (emphasis omitted), but those obvious facts do not amount to *substantive and tailored* language meant to put an investor on notice of the danger in investing.  *See Desai*, 654 F. Supp. 2d at 845. In fact, read in context, these statements give no reason to conclude that Williams even intended to mention any principal or important risks for investing.  *See Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 734 (7th Cir. 2004), *as amended* (Sept. 3, 2004) (concluding that there was no reason on the record to conclude that the defendant mentioned the allegedly cautionary statements to share principal or important risks for investing).

Additionally, the defendants suggest that language from Groupon's Q2 2019 Form 10–Q was meant to temper Williams's statements in the letter.  Ordinarily, courts are only permitted to "consider cautionary statements that either accompanied the forward-looking statement or were incorporated by reference."  *Desai*, 654 F. Supp. 2d at 844.  However, the defendants assert that the plaintiffs have invoked the fraud-on the-market theory, that is, they allege that third parties (e.g., professional traders, mutual fund managers, securities analysts) analyzed the allegedly false or misleading statements and "made trades or recommendations that influenced the price."  *See Asher*, 377 F.3d at 731.[4]  Rahal does not contest this characterization of his suit.

Plaintiffs who invoke a fraud-on-the-market theory "must acknowledge that all public information is reflected in the price."  *Id.*  Thus, in fraud-on-the-market cases,

---

[4] In a traditional securities suit, the suit is brought by an investor who claims "to have read or heard the statement and, not having access to the truth, relied to his detriment on the falsehood."  *Asher*, 377 F.3d at 731.

courts may consider "cautionary statements contained in SEC filings, so long as they were available when the purportedly misleading statements cited by Plaintiffs were made [and] were absorbed into the market." *Desai*, 654 F. Supp. 2d at 844; *see also Asher*, 377 F.3d at 732 ("[I]f the truth or the nature of a business risk is widely known, an incorrect statement can have no deleterious effect, and if a cautionary statement has been widely disseminated, that news too affects the price just as if that statement had been handed to each investor.").

In its Q2 2019 10–Q filing, Groupon noted that it was "currently developing and testing a number of product enhancements" including Select, which it described as one of the "important drivers for increasing customer purchase frequency and growing . . . business over time." 2d Amd. Compl. ¶ 72 (emphasis omitted). The company advised, however, that given its current focus on efforts to grow customer awareness of the new product enhancements and "scaling the related merchant base," its "gross profit and operating income [could] be adversely impacted in the near term as [it focused] more on driving [these] strategic initiatives." *Id.*

The above statement from Groupon's 10–Q is not cautionary language that would temper Williams's Q2 2019 statements. Again, cautionary language must be "substantive and tailored to the *specific predictions* made in the allegedly misleading statement." *Desai*, 654 F. Supp. 2d at 845 (emphasis added). The warnings in Groupon's Q2 2019 10–Q do not even address the predictions made in Williams's statements. Rahal asserts that Williams's misleading statements from Q2 2019 were that Groupon was "making progress on initiatives," believed the initiatives (including Select) would "lay the foundation for long-term, profitable growth," and that Select was

driving "significantly improved customer purchase frequency" and "higher average order value."  2d Amd. Compl. ¶ 71.  Rather than identifying the principal or important variances from the projections Williams made regarding Select, the statement from the Q2 2019 10–Q merely explains that Groupon's decision to invest in its growth might adversely and temporarily impact the corporate bottom line.  That is not enough.  *Cf. Asher*, 377 F.3d at 734; *Pub. Employees' Ret. Sys. of Mississippi v. TreeHouse Foods, Inc.*, No. 16 C 10632, 2018 WL 844420, at *3 (N.D. Ill. Feb. 12, 2018) ("A company providing projections cannot simply include a generic list of factors that might affect future performance, but instead, must list the principal or important sources of variances from projections.").  Moreover Groupon's disclaimer does not address Select's performance or its role in Groupon's long term, profitable growth.

Because the identified cautionary statements are not meaningful, Williams's Q2 2019 statements are not—at this point—within the protection provided by the PSLRA's safe harbor.  This is not to say that Groupon cannot avail itself of the PSLRA's safe harbor provision in this case.  Today, the Court has concluded only that the safe harbor provision is not a basis for insulating this statement on a motion to dismiss for failure to state a claim.  *See Shah*, 348 F. Supp. 3d at 842 (holding that a defendant could not, "at the motion to dismiss stage, avail itself of the safe harbor provision").  The Court does not "exclude the possibility that if after discovery [the defendants] establish[ ] that the cautions did reveal what were, *ex ante*, the major risks, the safe harbor may yet carry the day."  *See Asher*, 377 F.3d at 734; *see also Shah*, 348 F. Supp. 3d at 842 (citing *Asher* and reaching the same conclusion).

23

### ii.    Q2 2019 Form 10–Q

Second, as mentioned above, the company indicated in a section titled

"Management's Discussion and Analysis of Financial Condition and Results of

Operations" that it was:

> . . . currently developing and testing a number of product enhancements intended to make our offerings easier to use for both customers and merchants and to improve purchase frequency, including cash back offers linked to customer credit cards, booking capabilities and a paid membership program in North America, Groupon Select, which offers greater discounts on our offerings and other benefits. ***We believe that those initiatives may be important drivers for increasing customer purchase frequency and growing our business over time.*** We are currently focusing our efforts on growing customer awareness of those products and scaling the related merchant base. As such, our gross profit and operating income may be adversely impacted in the near term as we focus more on driving our strategic initiatives.

2d Amd. Compl. ¶ 72.

Rahal argues that Groupon's statement that Select could be an important driver

to "increasing customer purchase frequency and growing business over time" was

misleading because the defendants knew that Select was over-indexing to Goods

instead of Local and was therefore failing to meaningfully boost purchase frequency in

Local. *Id.* ¶ 73 (emphasis omitted).

The statement from the 2019 10–Q was forward looking (e.g., "we *believe* that

those initiatives *may* be important drivers. . . *over time*."). *See* 2d Amd. Compl. ¶ 72

(emphasis from original omitted) (emphasis added). The problem, again, is that the

statement was not accompanied by meaningful cautionary language sufficient to trigger

safe harbor protection. *See Constr. Workers Pension Fund*, 114 F. Supp. 3d at 646.

The allegedly misleading projection was the role Select would play in increasing

customer purchase frequency and business over time. *See* 2d Amd. Compl. 72. The

warnings here do not touch on that particular projection. Instead, the statement from the Q2 2019 10–Q merely explains that Groupon's decision to invest in Select and other initiatives might adversely and temporarily impact the corporate bottom line. That is not enough to confer safe harbor protection at this point. *See Shah*, 348 F. Supp. 3d at 842.

### iii. November 4-5, 2019 statements

Last, the defendants claim the PSLRA's safe harbor protects a statement Thomas made in November 2019. During a conference call announcing Q3 results, Thomas said the following about Select:

> [THOMAS]: And then on the Select side there, just to give you a little bit of color on why essentially ***Select is – we expect it to be net neutral in the fourth quarter.*** There is [sic] a few elements I laid out in my prepared remarks that you need to take into consideration when we think about Select. So, we are making investments in Select and those do show up in terms of [gross profit], whether it be opportunity, costs, et cetera. However, those are offset by subscription fees that we are collecting. ***And then the important part to remember is that we are also earning incremental [gross profit] on the transactions and we're seeing a purchase frequency lift at 60% higher in that 180-day post-enrollment in the program.***

2d Amd. Compl. ¶ 83.

In part, Rahal asserts that Thomas's statement that Select would have a "net neutral" impact in the fourth quarter was misleading because Thomas knew Select was not operating profitably, it was over-indexing to Goods, and the company's 15 percent discount for Select members' purchases "cannibalized any profit margins." *Id.* ¶ 85. Thomas's statement is forward looking ("we expect"), but the statement did not include meaningful cautionary language that was "substantive and tailored to the *specific predictions* made in the allegedly misleading statement." *See Desai*, 654 F. Supp. 2d at

845 (emphasis added); 2d Amd. Compl. ¶ 83 (emphasis omitted). Rather, the remainder of Thomas's statement only provides support for her forward-looking statement. Without more, her statement is not insulated by the PSLRA's safe harbor. *See Shah*, 348 F. Supp. 3d at 842.

e. **Forward-looking statements and reasonableness**

In addition to arguing that some of their statements are eligible for protection under the PSLRA, the defendants argue that those same statements are not actionable because Rahal has not pleaded sufficient facts to call into question the statements' reasonableness. *See In re HealthCare Compare Corp. Sec. Litig.*, 75 F.3d 276, 282 (7th Cir. 1996). In other words, the defendants argue that unless Rahal can demonstrate that the defendant's forward-looking statements were not reasonable at the time they were made, the statements must be protected.

This argument is unpersuasive, for two reasons. First, it is true that the Seventh Circuit has held that forward-looking statements were not actionable unless plaintiffs allege "specific facts which illustrate that the company's predictions lacked a reasonable basis." *Id.* (alterations accepted) (internal quotation marks omitted). But one of the Seventh Circuit cases enunciating this requirement came before the PSLRA's enactment in 1995, *see Arazie v. Mullane*, 2 F.3d 1456, 1466 (7th Cir. 1993), and the other came shortly after the PSLRA's enactment, *see In re Healthcare Compare Corp.*, 75 F.3d at 282. Thus, it is not clear what viability this requirement has after the PSRLA's alteration of the pleading standards applicable in federal securities fraud litigation. *See City of Livonia Employees' Ret. Sys. & Loc. 295/Loc. 851 v. Boeing Co.*, 711 F.3d 754, 756–57 (7th Cir. 2013) (recognizing that the PSLRA "altered the

26

landscape of federal securities fraud litigation" and identifying four of the ways it did so).

Second, even assuming that a plaintiff is still required to allege specific facts illustrating that the forward-looking statements lacked a reasonable basis, Rahal has cleared that bar. Rahal's theory of this case is that the defendants knew and failed to disclose that Select was over-indexing to Goods and that Select was not meaningfully boosting purchases in Local. *See* 2d Amd. Compl. ¶¶ 71, 73, 75, 79, 82, 84–85, 87–89, 91, 93, 97, 99. And he contends that the defendants' statements misled investors about Select's performance. *See id.* ¶¶ 71, 73, 75, 79, 82, 84–85, 87–89, 91, 93, 97, 99. If both assertions are true, there can be no question that the defendants would not have had a reasonable basis for sharing an incomplete (or even contrary) narrative.

In short, even assuming that a plaintiff must proffer specific facts illustrating why predictions lacked a reasonable basis, Rahal has met that standard, and the defendants' statements are actionable.

### 2. Guidance reaffirmation

Rahal alleges in his proposed second amended complaint that the defendants' reaffirmation of Groupon's adjusted EBITDA was materially misleading. During the Q3 2019 conference call, Thomas told listeners:

> [THOMAS]: As we move into the fourth quarter, a very important time for us, we expect positive contribution from our conversion initiatives, which include our recent guest checkout and universal cart product launches. In addition, we expect marketing leverage to increase modestly from what we delivered in Q3. These factors, along with a continued momentum in North America Local including improved performance in units, give us confidence that **we can drive sequential improvement in year-over-year gross profit trends and deliver approximately $270 million in adjusted EBITDA for full-year 2019.**

*Id.* ¶ 90. Moreover, in the company's Q3 2019 press release, Groupon declared that it

continued to "expect Adjusted EBITDA of approximately $270 million." *Id.* (emphasis omitted). And in its Q3 2019 presentation, the company repeatedly affirmed its confidence that it would meet its expected adjusted EBITDA. *Id.*

The defendants argue that their guidance reaffirmation is not actionable, but the Court is not persuaded. First, as discussed earlier, Rahal has plausibly alleged that the defendants knew of the material adverse trends at the heart of this case as early as the end of July 2019. There is no "temporal flaw." *See supra* at 13–14.

Second, the defendants contend that in the Q3 earnings call—as in other earning calls—they disclosed the challenges Groupon faced in the Goods category. But that contention ignores the heart of Rahal's allegation here. He asserts that the guidance reaffirmation was misleading because the defendants' "knew, but concealed and failed to disclose, that: (i) by November 2019 it became 'abundantly clear' that Groupon was not competing effectively in Goods, (ii) by November 2019 Goods has become a less meaningful driver of engagement with Groupon's more profitable Local segment, and (iii) as a result of the foregoing, the Guidance was not achievable." 2d Amd. Compl. ¶ 91 (internal quotation marks omitted).

So even if it is true that the defendants were open about Groupon's troubles in Goods, Rahal's allegation is that the defendants did not disclose the severity of Goods' troubles and did not adjust their forecast even though they had knowledge that seriously undermined the accuracy of that guidance. *See Selbst v. McDonald's Corp.*, No. 04 C 2422, 2005 WL 2319936, at *9 (N.D. Ill. Sept. 21, 2005) ("A defendant thus may be liable for issuing a future projection of earnings if the defendant 'ignored facts seriously undermining the accuracy of the forecast.'"). If, as Rahal alleges, Groupon failed to

"speak the whole truth" and omitted a known fact that would make the guidance misleading, the defendants are liable.  *See id.*

The defendants' third argument is that Rahal's allegation that the guidance affirmation was not achievable is speculative.  The defendants assert that Rahal has not explained, with particularity, the factual basis for his allegation.  Yet, as previously noted, Rahal has explained the basis for his allegation.  He claims that the defendants knew that Groupon could not effectively compete in Goods and knew that Goods was a less potent tool for driving customers to Local, the more profitable category of Groupon's sales.  *See* 2d Amd. Compl. ¶ 91.  Considering those two facts, Rahal concludes that the 2019 guidance could not have been achievable, and defendants' reaffirmation of the guidance was therefore misleading.  *Id*.  As alleged, Rahal has provided sufficient detail to support a reasonable belief the guidance reaffirmation was misleading.  *See Constr. Workers Pension Fund*, 114 F. Supp. 3d at 651; *Plumbers & Pipefitters Loc. Union No. 630*, 778 F. Supp. 2d at 878.

Finally, the defendants argue that the guidance reaffirmation was protected by the PSLRA's safe harbor provision.  To support their argument, they point to statements made in their Q3 2019 10–Q.  In that document, Groupon explains that among the "risks" and "uncertainties" that could affect forward-looking statements are the "execution of [its] business and marketing strategies," its ability to "retain[ ] existing customers and add[ ] new customers," and its ability to "compet[e] successfully in [its] industry."  Dkt. no. 49–4 at ECF p. 3 of 3.

Groupon's guidance was inherently forward looking, as it was a communication of the company's projected earnings.  Nevertheless, at this stage, the PSLRA's safe

29

harbor cannot insulate the guidance from liability. The disclosures of risks and uncertainties in Groupon's Q3 2019 10–Q were boilerplate, not substantive cautionary language tailored to the specific predictions made. *See Desai*, 654 F. Supp. 2d at 844. The warnings from the Q3 2019 10–Q do not address the company's adjusted EBITDA; instead they address generally "any statements regarding [its] future results of operations and financial position, business strategy and plans and [its] objectives for future operations." Dkt. no. 49–4 at ECF p. 3 of 3. In addition to the risks mentioned above, the Q3 2019 10–Q lists more than a dozen other "risk" and "uncertainties" each with general bearing on the companies' earnings. Of course, the success of any firm doing business in a competitive market will depend on the execution of its business, its ability to sell goods or services, and its ability to compete. The PSLRA requires more. *See Pub. Employees' Ret. Sys.*, 2018 WL 844420, at *3 ("A company providing projections cannot simply include a generic list of factors that might affect future performance, but instead, must list the principal or important sources of variances from projections."). Because the defendants did not identify risks, uncertainties, or "principal contingencies" related to the particular projections "that could cause actual results to differ," the guidance is not eligible for safe harbor protection. *See Desai*, 654 F. Supp. 2d at 844. However, it is worth repeating that the Court does not exclude the possibility that post discovery "the safe harbor may yet carry the day." *See Asher*, 377 F.3d at 734.

In sum, the defendant's guidance reaffirmation is actionable under section 10(b).

**3.    Item 303**

In addition to the investor communications discussed above, Rahal claims that

Groupon should have disclosed in certain SEC filings Select's trend of over-indexing to Goods and the trend of Goods' declining ability to drive meaningful business to Groupon's Local offerings.  2d Amd. Compl. ¶¶ 75, 88, 89.  He alleges that these trends were "reasonably likely to have a material unfavorable impact on net sales or income from continuing operations or cause a material change in the relationship between costs and revenues."  *See* 2d Amd. Compl. ¶ 88; *see also* ¶¶ 74, 75, 89.  In Rahal's view, the failure to disclose these adverse trends were violations of Item 303 of SEC Regulation S-K, "which provides that registration statements and annual 10–K reports must reveal any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  *See Gallagher v. Abbott Labs.*, 269 F.3d 806, 810 (7th Cir. 2001).

The Seventh Circuit has not decided whether Item 303 imposes a duty to disclose that, when violated, can give rise to fraud under the Exchange Act and other circuits are divided on the issue.  *Twin Master Fund, Ltd. v. Akorn, Inc.*, No. 19 C 3648, 2020 WL 564222, at *7 (N.D. Ill. Feb. 5, 2020) (Kennelly, J.); *compare Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2nd Cir. 2015) ("Item 303's affirmative duty to disclose in Form 10–Qs can serve as the basis for a securities fraud claim under Section 10(b)."), *with Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1331 (11th Cir. 2019) ("Item 303 imposes a more sweeping disclosure obligation than Rule 10b-5, such that a violation of the former does not *ipso facto* indicate a violation of the latter."), *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1056 (9th Cir. 2014) ("Item 303 does not create a duty to disclose for purposes of Section 10(b) and Rule 10b–5."), *and Oran v.*

*Stafford*, 226 F.3d 275 (3rd Cir. 2000) (Alito, J.) (concluding that a violation of Item 303 "does not automatically give rise to a material omission under Rule 10b–5.").

Regardless, the Court will assume for purposes of this motion that there's a duty to disclose under Item 303 and that it can give rise to a claim under the Exchange Act. When using Item 303 to state a claim for securities fraud under Section 10(b), "a plaintiff must first allege that the defendant failed to comply with Item 303 in a 10–Q or other filing." *Stratte-McClure*, 776 at 103.  Second, he must allege "that the omitted information was material under *Basic*'s probability/magnitude test, because 10b–5 only makes unlawful an omission of material information that is necessary to make statements made . . . not misleading." *Id.* (alterations accepted) (internal quotation marks omitted). [5]  Lastly, the plaintiff must plead scienter, reliance, and loss causation, as with any Section 10(b) claim.  *Id.*

Groupon claims that Rahal has failed to sufficiently plead a violation of Item 303 for two reasons.  First, Groupon contends it adequately disclosed the challenges it faced in Goods in its Q2 2019 and Q3 2019 10–Q filings.  Second, Groupon argues that Rahal has not drawn "a connection between Select's performance and Groupon's financial conditions as a whole, as is required to trigger a disclosure duty under Item

---

[5] Under *Basic Inc. v. Levinson,* 485 U.S. 224 (1988), the materiality requirement is satisfied when a plaintiff alleges that there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* at 232.  "[I]t is not necessary to assert that the investor would have acted differently if an accurate disclosure was made." *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 717 (2d Cir. 2011).  Moreover, as with a Rule 10b–5 claim, a district court may not dismiss a complaint premised on Item 303 "on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Id.*

303." Def.'s Resp. Br. at 12. Groupon notes that Rahal does not allege that Select had an adverse effect on Groupon's bottom line but instead only that the program did not do well relative to its own costs and revenues.

Regarding the adverse trend related to Goods, Rahal has stated a claim for an Item 303 violation. He asserts that Groupon's revenues "suffered material declines" due to Goods' inability to compete in the competitive market and that Local revenues also suffered because Goods could no longer meaningfully drive customers to Local. 2d Amd. Compl. ¶ 89. Groupon says it disclosed this information in its Q2 and Q3 10–Qs for 2019 and therefore met its burden under Item 303. That's not entirely true. Groupon disclosed its historical financial metrics for each individual business segment, including Goods. Groupon also reported that financial metrics declined due to "fewer customers," "lower customer traffic," *see* dkt. no. 49–3 at ECF p. 4 of 10, and "intense competition in [ ]Goods," Amd. Compl. ¶ 89. But Rahal contends that Item 303 required Groupon to also disclose that Goods "had largely ceased providing added value for Groupon" because it was no longer "driving meaningful business to Local" *and* explain how that trend was likely to have a materially unfavorable impact on Groupon's future revenues. 2d Amd. Compl. ¶ 85; *see also Litwin*, 634 F.3d at 718–19 ("In this case, the key information that plaintiffs assert should have been disclosed is whether, and to what extent, the particular known trend, event, or uncertainty might have been reasonably expected to materially affect" the plaintiff's investments."). The historical information on the 10–Qs provides an answer to the wrong question. Accepting Rahal's well-pleaded allegations as true, the Court concludes that he has sufficiently alleged an Item 303 violation regarding Goods.

Regarding the adverse trend related to Select, Groupon argues that Select was not material to Groupon's financial condition as a whole. Def.'s Resp. Br. at 12 ("Plaintiff does not, and cannot, draw a connection between Select's performance and Groupon's financial condition as a whole, as is required to trigger a disclosure duty under Item 303."). But Groupon overlooks that Item 303 also says that if a "registrant" like Groupon "knows of events that are reasonably likely to cause a material change in the relationship between costs and revenues (such as known or reasonably likely future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship must be disclosed." 17 C.F.R. § 229.303(b)(2)(ii).

In his proposed second amended complaint, Rahal alleges that Select's over-indexing to Goods was "reasonably likely to cause a material change in the relationship between costs and revenues" because the defendants "had repeatedly represented Select [w]as profitable on a per-unit basis: i.e., that even after factoring in the discounts and other costs associated with Select, transactions were still generating incremental profits." 2d Amd. Compl. ¶ 75; *see also id.* ¶ 88. Put another way, Rahal asserts that because Select over-indexed to Goods rather than Local, it must also be true that Select's costs "rose higher than revenues, rather than remaining lower." *Id.* ¶¶ 75, 88. That is enough to give rise to a viable Item 303 claim regarding Select.

### 3. Scienter

"The PSLRA requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention 'to deceive, manipulate, or defraud.'" *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007). A complaint fails to satisfy the PSLRA's particularity

requirements when it includes only "conclusory allegations of scienter derived from a defendant's mere access to information." *Cornielsen*, 916 F.3d at 602; *see also Pugh v. Trib. Co.*, 521 F.3d 686, 694 (7th Cir. 2008) ("[T]here is a big difference between knowing about the reports from [a subsidiary] and knowing that the reports are false.").

In considering allegations regarding scienter, courts must determine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 323. A strong inference of scienter is one that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 314. To determine whether allegations give rise to a strong inference of scienter, courts must "take into account plausible opposing inferences because the strength of an inference cannot be decided in a vacuum, and the inquiry is inherently comparative." *Pierrelouis v. Gogo, Inc.*, No. 18 C 4473, 2021 WL 1608342, at *5 (N.D. Ill. Apr. 26, 2021) (alterations accepted) (internal quotation marks omitted).

The defendants first argue that Rahal does not plead a strong inference of scienter. The Court disagrees and concludes Rahal has met his burden. As Rahal notes in his reply brief, the proposed second amended complaint improves upon the prior complaint by including individualized allegations against each defendant and describing what information each defendant is alleged to have known when their respective statement was communicated. *See* 2d Amd. Compl. ¶¶ 71, 79, 82, 83, 84, 97, 99 (regarding Williams); ¶¶ 83, 84, 85, 91, 93 (regarding Thomas); ¶¶ 73, 75, 87, 88, 89, 91 (regarding Groupon). These allegations, along with the additional scienter allegations, *see id.* ¶¶ 114–129, and the allegations regarding corporate scienter, *see*

*id.* ¶¶ 130–31, go beyond merely alleging that Groupon owed investors a running commentary on its ups and down, *see* Def.'s Resp. Br. at 12, and provide a strong inference of scienter.[6]

Next, the defendants contend that there is another inference more plausible than an inference they had the requisite scienter:  that they "preferred not to disclose 'half-formed stories'" before their earning calls.[7]  *See id.* (quoting *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 761 (7th Cir. 2007)).  The Court is not convinced.  Rahal's allegations regarding scienter are "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *See Tellabs*, 551 U.S. at 323.  It bears repeating once more that Rahal alleges that, at the time their statements were made, the defendants knew and failed to disclose the various adverse trends regarding Select and Goods.  He further asserts that rather than disclosing the information they had, the defendants affirmatively misled investors.  If Rahal's allegations are true, there can be

---

[6] In drive-by fashion, the defendants assert that because Rahal has not provided any confidential witnesses after having the opportunity to investigate, his case for scienter is undermined.  Def.'s Resp. Br. at 13 (citing *In re Guidant Corp. Sec. Litig.*, 536 F. Supp. 2d 913, 931 (S.D. Ind. 2008).  But the court in *In re Guidant Corp.* did not hold that confidential witnesses were required in considering scienter.  *See id.*  Instead, it simply noted what evidence the plaintiffs had not provided to support their allegations that the defendants had deliberately concealed adverse information.  *Id.*  Thus, Court is not persuaded by this argument.

[7] It is not clear, but to the extent the defendants are arguing that the Court should rule in their favor because Rahal has not alleged precisely when they knew the adverse information, that argument is not appropriate at this stage.  "[T]he fact that it is not certain precisely when the information available to defendants became bad enough to render [the defendants'] statements knowingly or recklessly false does not defeat plaintiff's claim because the Court need not identify the precise moment at which the culpable inference overtook the innocent one at this early stage." *Pierrelouis*, 2021 WL 1608342, at *9 (alterations accepted) (internal quotation marks omitted).

no question that the defendants had the required state of mind to commit securities fraud. Based on the allegations discussed above, this story is at least as plausible as the story proffered by the defendants.

Finally, the defendants assert that Rahal has not meet his burden here because he has not identified a motive to commit fraud. Though a "motive can be a relevant consideration . . . the absence of a motive allegation is not fatal." *Id.* at 325. "[A]llegations must be considered collectively; the significance that can be ascribed to an allegation of motive, or lack thereof, depends on the entirety of the complaint." *Id.* Though motive allegations "might meaningfully enhance the strength of the inference of scienter, a strong inference of scienter does not necessarily depend on such an enhancement." *Shah*, 348 F. Supp. 3d at 846 (internal quotation marks omitted). Considering the allegations in their totality, Rahal has proffered a cogent and compelling inference that the defendants elected not to disclose adverse events. Because the absence of an allegation of motive is not dispositive, the Court concludes that the lack of such an allegation does not meaningfully undermine Rahal's contentions regarding scienter.

In sum, Rahal's inference of fraudulent intent is cogent and as compelling as the contrary inference offered by the defendants. Rahal has met the PSLRA's standard for pleading scienter.

### 4.  Loss Causation

"Loss causation is a fact-based inquiry that need not be proven until later stages of litigation." *In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d at 821 (internal quotation marks omitted). "Because pleading loss causation is 'not meant to impose a great

burden upon a plaintiff,' loss causation allegations need only 'provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind.'" *Id.* (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)); *Washtenaw Cty. Employees' Ret. Sys. v. Walgreen Co.*, No. 15-CV-3187, 2019 WL 4597518, at *7 (N.D. Ill. Sept. 23, 2019) ("As the Seventh Circuit instructs, the requirement of loss causation 'ought not place unrealistic burdens on the plaintiff at the initial pleading stage.'"). Therefore, in pleading loss causation, "the complaint need only allege facts that support an inference that the Defendants' misstatements and omissions concealed the circumstances that bear upon the loss suffered such that Plaintiffs would have been spared all or an ascertainable portion of that loss absent the fraud." *Pub. Emps. Ret. Sys. of Mississippi, Puerto Rico Tchrs. Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 325 (5th Cir. 2014); *Ray v. Citigroup Glob. Markets, Inc.*, 482 F.3d 991, 995 (7th Cir. 2007) (explaining that one way that plaintiffs may show loss causation is to establish "that the defendants' alleged misrepresentations artificially inflated the price of the stock and that the value of the stock declined once the market learned of the deception.").

The defendants argue the proposed amended complaint fails to allege loss causation because it does not support an inference that: (1) Groupon's stock price was artificially inflated at the beginning of the class period; (2) Groupon corrected any misleading statements; or (3) that Groupon's price fell by 44 percent as a result of any corrected statements. Def.'s. Resp. Br. at 13.

The defendants' first argument regarding loss causation is unpersuasive. They argue that the July 30, 2019 letter did not mention Goods at all or only mentioned Select along with other initiatives. But as discussed throughout this opinion, the central

allegations in Rahal's complaint are, among other things, that the defendants that knew Select was over-indexing to Goods—an already underachieving business segment— instead of Local, and failed to disclose this fact. *See* 2d Amd. Compl. ¶¶ 71, 73, 75, 79, 82, 84–85, 87–89, 91, 93, 97, 99. The *omissions* of these facts are what Rahal alleges mislead investors about Select's performance and its relationship to Goods. *See id.* ¶¶ 71, 73, 75, 79, 82, 84–85, 87–89, 91, 93, 97, 99. So it is not fatal to Rahal's loss causation allegations that the earliest of the allegedly misleading statements do not place a particular emphasis on either Goods or are not solely focused on Select.

That said, it is worth noting that both of the July 30, 2019 statements address Select and its performance. *See id.* ¶¶ 70 (describing Select as the "best way to experience Groupon" and providing metrics for the program's performance); 71 (noting among the initiatives being developed and tested are the "paid membership program in North America, Groupon Select, which offers greater discounts on our offerings and other benefits" and explaining that Select and other "initiatives may be important drivers for increasing customer purchase frequency and growing our business over time"). Though the defendants argue that "[a]ny allegedly omitted information about Select members' product choices (Goods, Local, or Travel) as of July 30, 2019, could not possibly have artificially inflated Groupon's stock," that cursory argument, though boldly proclaimed, is only plausibly maintained. *See* Defs.' Resp. Br. at 14.

Maybe the connection between these allegedly misleading statements and the decline in the price of Groupon's stock will turn out to be too attenuated. If so, that conclusion is appropriate "at a later stage in litigation" and after "a highly fact intensive inquiry that need not be reached at this point." *See Amedisys, Inc.*, 769 F.3d at 325. At

this stage of the proceedings, it is enough that the plaintiff has alleged facts that support an inference that the allegedly misleading statements inflated the price of Groupon's stock.  *See Ray*, 482 F.3d at 995.

Next, the defendants argue that corrective disclosures identified in the proposed second amended complaint, are anything but corrective disclosures because they did not correct or reveal as deceptive any earlier information.  *See* Def.'s Resp. Br. at 14–15; *see also* 2d Amd. Compl. ¶¶ 103–12.  With regard to Select, the defendants essentially argue that their statements during the class period were forthright and that their later statements, rather than correcting earlier ones, disclosed new information.  *See* Def.'s Resp. Br. at 14.  But, as discussed earlier, truthful statements are still actionable under section 10(b) if they are misleading, which is exactly what Rahal alleges here.  *See Constr. Workers Pension Fund*, 114 F. Supp. 3d at 651.  It may be that the defendants' class period statements were not false in and of themselves.  But that is not the point.  If the statements were misleading because they omitted portions of already known material facts, any later disclosure that revealed the *whole truth* to investors is manifestly a corrective one.

The defendants advance a version of the same argument with regard to Goods. Here, though, the defendants contend that the disclosures could not have corrected any of their earlier statements because Rahal has failed to identify any misleading statements about Goods from the start of the class period.  But the crux of Rahal's allegations regarding Goods is that the defendants *omitted* information regarding Goods' overall performance and its performance in relation to Select.  The omission of this information is what Rahal alleges made the defendants statements misleading.  So

it is not fatal to Rahal's loss causation argument that the earliest of the allegedly misleading statements do not affirmatively mention Goods.

There is one additional basis for rejecting the defendants' second loss causation argument. As Rahal has noted, an argument that the "news of the truth credibly entered the market and dissipated the effects of the misstatement" is an argument for trial. *See In re Allstate Corp. Sec. Litig.*, No. 16 C 10510, 2020 WL 7490280, at \*7 (N.D. Ill. Dec. 21, 2020) (alterations accepted); *see also Asher*, 377 F.3d at 734 (7th Cir. 2004) ("A 'truth-on-the-market' defense is available in principle . . . but not at the pleading stage.'"). Thus, to the extent the defendants' argument is that investors were aware of the truth and that therefore their allegedly misleading statements were immaterial, that argument is inappropriate at the pleading stage.

There is one final argument to consider on this point. "The loss causation element of securities fraud claims requires plaintiffs to tether directly the fraudulent conduct to the harm." *Twin Master Fund, Ltd.*, 2020 WL 564222, at \*13 (alterations accepted) (internal quotation marks omitted). "A plaintiff can make this connection by alleging that a defendant's misrepresentations artificially inflated its stock price and that once the market learned of the deception, the stock value declined." *Id.* The defendants contend that Rahal's attempt to connect Groupon's stock price decline to alleged securities fraud is "illogical," given Select's "small size" and Groupon's "repeated warnings" that Select's costs might negatively affect 2019 results. Def.'s Resp. Br. at 15. Instead, the defendants posit that the fall in the stock price must have been because of its earnings miss. *See id.*

The Court is not persuaded. Whether plaintiff's theory of loss causation holds

water from a factual standpoint involves Select's materiality, and as indicated earlier materiality determinations are typically inappropriate on a motion to dismiss unless the allegedly misleading statements are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."  *See In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d at 815.  For the same reasons discussed above, the Court cannot conclude that is the case regarding the allegedly misleading statements cited here.  *See supra* at 14–16.

Also inappropriate at this stage of the proceedings is the defendants' assertion that Groupon's fall in the stock price must have been because of its earnings miss and not any corrective disclosures; that is a more appropriate subject for summary judgment or trial.  *See Holwill v. AbbVie Inc.*, No. 1:18 C 6790, 2020 WL 5235005, at *6 (N.D. Ill. Sept. 1, 2020) ("While Defendants may attempt to prove that AbbVie's stock price incorporated the information from information previously available and that the drop in AbbVie's stock price was in fact caused by some factor other than the publicity afforded to the filing of the California Department of Insurance's publicly available complaint, that is a proper subject for discovery and a motion for summary judgment or trial, not a motion to dismiss.").  What is more, Rahal's allegation that fraud contributed to the fall in value of Groupon's stock would not be negated even if there are other contributory causes; "it is possible for more than one cause to affect the price of a security and, should the case survive to that point, a trier of fact can determine the damages attributable to the fraudulent conduct."  *See Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 649 (7th Cir. 1997).

Finally, though defendants do no identify which of Groupon's "warnings" are

42

important for its argument, the Court assumes they are referring to the statements made in the company's Q2 2019 10–Q.  *See* 2d Amd. Compl. ¶ 72 (advising that given its current focus on efforts to grow customer awareness of the new product enhancements and "scaling the related merchant base," Groupon's "gross profit and operating income [could] be adversely impacted in the near term as [it focused] more on driving [its] strategic initiatives.").  For reasons already discussed, the Court is not persuaded that those warnings amount to cautionary language tailored to the specific predictions made in the allegedly misleading statements.  *See supra* at 22–26; *Desai*, 654 F. Supp. 2d at 845.

In short, Rahal has alleged that the decline in Groupon's stock price was a result of its disclosure of the "collapse of Goods, the unprofitability of Select, and the failure of both Goods and Select as drivers for Groupon's core Local business and overall gross profits."  2d Amd. Compl. ¶ 134.   That is sufficient at this stage; Rahal has provided the defendants with an indication of the loss and the causal connection that lies at the heart of the alleged loss.  *See Dura*, 544 U.S. at 347; *see also Twin Master Fund, Ltd.*, 2020 WL 564222, at *13.

## B.    Section 20(a) claim

Because Rahal has adequately stated a claim for his section 10(b) claim, he may move forward with his section 20(a) claim, as the defendants' argument for dismissal of the latter is reliant on the claimed nonviability of former.  *See Pugh,* 521 F.3d at 693 ("Thus, to state a claim under § 20(a), a plaintiff must first adequately plead a primary violation of securities laws—here, a violation of § 10(b) and Rule 10b–5.").

**C.      Defendants' supplemental authority**

The Court grants the defendants' motion for leave to file supplemental authority and has reviewed the Seventh Circuit's recent opinion in *City of Taylor Police & Fire Ret. Sys. v. Zebra Techs. Corp.*, — F.4th —, 2021 WL 3503430, at *1 (7th Cir. Aug. 10, 2021). That case is distinguishable from this one. At the outset, the allegations in this case are stronger than those in *City of Taylor.* The complaint of the plaintiff in *City of Taylor* was that the defendant corporation was not entirely transparent about the unforeseen troubles of a merger. *Id.* Rahal, by contrast, alleges that the defendants made the allegedly misleading statements already knowing the material adverse information.

There are other significant differences too. The plaintiff in *City of Taylor* alleged that the defendant's savings estimates were misleading because they were not coupled with information about the ongoing costs of integration with another company. *Id.* These were "one-time expenses" that the Seventh Circuit compared to "tangential" difficulties. *Id.* The present case involves an allegedly important aspect of Groupon's business and a program that was implemented to increase "customer purchase frequency" and thought to be the key to increasing Groupon's "business over time." *See* 2d Amd. Compl. ¶¶ 3, 4, 65, 72.

In addition, the plaintiff in *City of Taylor* complained that the defendant's profit-margin projection was misleading because the company achieved about one percentage point less than its guess—what the Seventh Circuit called "a near miss." *City of Taylor*, 2021 WL 3503430, at *2. Groupon's "miss," by contrast, was materially further off. Rather than a $270 million EBITDA, Groupon achieved a $227.2 million

EBITDA—almost 16 percent off the promised target.  *See* 2d Amd. Compl. ¶ 102.

Both the Seventh Circuit and the district court concluded that the statements proffered by the plaintiff in *City of Taylor* were not material falsehoods but instead clear examples of puffery and devoid of substantial factual information.  *See City of Taylor*, 2021 WL 3503430, at \*2; *City of Warren Police & Fire Ret. Sys. v. Zebra Techs. Corp.*, No. 19 C 5782, 2020 WL 6118571, at \*6 (N.D. Ill. Oct. 16, 2020).  By contrast, this Court is not able to conclude on the present motion that the matters alleged here are immaterial, devoid of significant factual information, or simple puffery.

Finally, the Seventh Circuit held that the plaintiff in *City of Taylor* failed to satisfy the PSLRA's requirement that plaintiffs state, with particularity, the facts that give rise to a strong inference of scienter, because the plaintiffs' inferences from the facts were less likely than any competing inference.  *City of Taylor*, 2021 WL 3503430, at \*2.  That conclusion make sense in that case, given that executives overseeing an "ongoing corporate consolidation . . .  possess only limited information about the internal operations of other corporations" and learn more only once consolidation is underway.  *Id.* at \*3.  In that situation, it is more plausible to believe that a corporation's earlier statements were the result of "limited knowledge and optimism" rather than knowing omissions or falsehoods.  *Id.* at \*2.

Here, by contrast, Rahal sufficiently and plausibly alleges the defendants knew the material adverse information at the time they made the allegedly misleading statements.  The Court acknowledges the defendants' contention that their statements were made during a developing process and are therefore afforded greater allowance for imprecision.  But this case, as it is alleged in the complaint, is not premised on

45

ongoing developments as in *City of Taylor*.  Rahal's inference from the facts is equally plausible as the defendants' contrary inference.

In sum, *City of Taylor* does not command a different outcome in this case.

### Conclusion

For the reasons stated above, the Court grants the plaintiff's motion for leave to amend [docket no. 66].  Plaintiff should now file the second amended complaint as its own docket entry.  The telephone status hearing set for August 13, 2021 is vacated and reset to August 27, 2021 at 9:15 a.m. to set any necessary schedules for further proceedings, using call-in number 888-684-8852, access code 746-1053.  Counsel should wait for the case to be called before announcing themselves.  Counsel are directed to confer regarding an appropriate discovery and pretrial schedule and are to file a joint status report on August 23, 2021 with a joint proposed schedule or separate proposals.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  August 11, 2021