**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| LAZAR MACOVSKI, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>GROUPON, INC., RICH WILLIAMS, and MELISSA THOMAS,<br><br>Defendants. | Case No. 1:20-cv-02581<br><br>SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>Honorable Matthew F. Kennelly<br><br><u>JURY TRIAL DEMANDED</u> |

# TABLE OF CONTENTS

I. NATURE OF THE ACTION AND OVERVIEW ..... 1

II. JURISDICTION AND VENUE ..... 5

III. PARTIES ..... 5

A. Lead Plaintiff ..... 5

B. Defendants ..... 5

IV. FACTUAL BACKGROUND ..... 7

A. Groupon's Basic Organization ..... 7

B. Relevant Dynamics Affecting Groupon's Operations ..... 8

1. Groupon's Recent Customer And Traffic Headwinds ..... 8

2. With Local As Groupon's Core, Defendants Claim to Retain Goods Because Of Its Ability To Drive Additional Local Business ..... 9

3. Defendants Identify Increasing Customers' Purchase Frequency As The Key To Unlocking Profit Growth ..... 10

4. Defendants Identify Select As The Key To Increasing Purchase Frequency, And Insist Select Was Doing So Profitably ..... 11

5. Groupon's 2019 Guidance ..... 15

C. Undisclosed Adverse Facts Known to Defendants During the Class Period ..... 16

1. In The Second Half Of 2019, Select "Over-Indexed" To Goods And As A Result Failed To Generate Local Business Traction Or Profit ..... 16

2. It Becomes "Abundantly Clear" To Defendants Midway Through The 4th Quarter Of 2019 That Goods Cannot Compete Effectively, Is Being Abandoned By Customers, And Is No Longer Driving Meaningful Business To Local ..... 19

V. DEFENDANTS' VIOLATIONS OF THE EXCHANGE ACT ..... 22

A. Defendants' Material Misstatements and Omissions Made with Scienter in Violation of the Exchange Act ..... 22

1. Defendants' July 30-31, 2019 Statements ..... 22

2. Defendants' November 4-5, 2019 Statements ..... 26

3. Williams' December 11, 2019 Statements ..... 36

B. Defendants' February 18-19, 2020 Disclosures Correct Prior Misstatements and Cause the Company's Shares to Lose Nearly Half of Their Remaining Value .......... 39

1. Groupon's Poor Fourth Quarter And Full Year 2019 Results .......... 39

2. Defendants' Corrective Disclosures Concerning Goods And Select .......... 40

a. Goods .......... 40

b. Select .......... 43

3. Groupon Shares Decline Materially Following The February 18-19, 2020 Corrective Disclosures .......... 44

C. Additional Scienter Allegations .......... 45

1. Goods And Select Were Core Operations For Groupon .......... 45

2. Defendants' Own Assertions That They Closely Monitored Select And Goods .. 46

3. Defendants' Claim that they Closely Monitored Both Select and Goods is Borne Out By The Mastery Of Details Displayed By Defendants In The Q2 2019 And Q3 2019 Conference Calls .......... 48

4. Defendants Attested To Their Data Driven Decision-Making Frameworks .......... 49

5. Executive Terminations Shortly After the Class Period Further Support an Inference of Scienter .......... 50

6. Groupon Acted With Corporate Scienter .......... 51

D. Additional Allegations Regarding Loss Causation .......... 51

E. Presumption Of Reliance .......... 52

1. General Allegations .......... 52

2. Class Period Analyst Reports Reflected And Transmitted Defendants' Misstatements .......... 54

a. Analyst Reports Following Defendants' Q2 2019 Statements .......... 54

b. Analyst Reports Following Defendants' Q3 2019 Statements .......... 56

c. UBS Upgrades Groupon to "Buy" on January 17, 2020 .......... 57

F. Defendants' Statements Regarding Goods and Select Were Material .......... 59

VI. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE .......... 61

VII. CLASS ACTION ALLEGATIONS .......... 62

VIII. CLAIMS FOR RELIEF .......... 64

IX. PRAYER FOR RELIEF .......... 68

X. JURY TRIAL DEMANDED .......... 69

# TABLE OF DEFINED TERMS

| | |
|---|---|
| Barclays Conference Presentation | Williams' oral presentation concerning Groupon at the December 11, 2019 Barclays Global Technology, Media and Telecommunications Conference, held in the Palace Hotel in San Francisco |
| Class | All persons and entities that purchased or otherwise acquired Groupon securities between July 30, 2019 and February 18, 2020, inclusive, and who were damaged thereby |
| Class Period | July 30, 2019 through February 18, 2020, inclusive |
| Company | Groupon |
| Credit Suisse Q2 Report | August 1, 2019 analyst report on Groupon titled "Investing to Accelerate Subscription Adoption," authored by Credit Suisse analyst Stephen Ju |
| Credit Suisse Q3 Report | November 6, 2019 analyst report on Groupon titled "Turning to Order Frequency and Conversion to Offset Ongoing Traffic Headwinds," authored by Credit Suisse analyst Stephen Ju |
| Defendants | Groupon, Thomas, and Williams |
| Exchange Act | Securities Exchange Act of 1934 |
| Goldman | Goldman Sachs & Co. LLC |
| Goods | Groupon's "Goods" business, offering discounted merchandise across multiple product lines, including electronics, sporting goods, jewelry, toys, household items and apparel |
| Groupon | Groupon, Inc. |
| Guidance | $270 million in 2019 adjusted EBITDA, first announced on February 12-13, 2019 and re-affirmed on July 30-31, 2019 and November 4-5, 2019 |
| Individual Defendants | Thomas and Williams |
| Item 303 | Item 303 of Regulation S-K ("Item 303"), 17 C.F.R. §229.303 |
| Lead Plaintiff | Fadi E. Rahal |
| Local | Groupon's "Local" businesses, including multiple product and service subcategories such as events and activities, beauty and spa, health and fitness, food and drink, and home and garden and automotive |
| MD&A | The section in certain Groupon SEC filings, including its filings on Form 10-Q and Form 10-K, titled "Management Discussion and Analysis of Financial Condition and Results of Operations" |
| Q1 2019 Conference Call | May 1, 2019 Groupon conference call with analysts and investors, in connection with Groupon's announcement of Q1 2019 results |
| Q2 2018 Conference Call | August 3, 2018 Groupon conference call with analysts and investors, in connection with Groupon's announcement of Q2 2018 results |
| Q2 2019 10-Q | Groupon's Form 10-Q for the second quarter of 2019, filed with the SEC on July 30, 2019 |

| | |
|---|---|
| Q2 2019 Conference Call | July 31, 2019 Groupon conference call with analysts and investors, in connection with Groupon's announcement of Q2 2019 results |
| Q2 2019 Letter | July 30, 2019 letter from Williams to Groupon shareholders |
| Q2 2019 Press Release | July 30, 2019 Groupon press release titled "Groupon Announces Second Quarter 2019 Results" |
| Q3 2019 10-Q | Groupon's Form 10-Q for the third quarter of 2019, filed with the SEC on November 4, 2019 |
| Q3 2019 Conference Call | November 5, 2019 Groupon conference call with analysts and investors, in connection with Groupon's announcement of Q3 2019 results |
| Q3 2019 Letter | November 4, 2019 letter from Williams to Groupon shareholders |
| Q3 2019 Presentation | November 5, 2019 Groupon presentation titled "3Q19 Earnings" |
| Q3 2019 Press Release | November 4, 2019 Groupon press release titled "Groupon Announces Second Quarter 2019 Results" |
| Q4 2018 Conference Call | February 13, 2019 Groupon conference call with analysts and investors, in connection with Groupon's announcement of Q4 and full-year 2018 results |
| Q4 2019 Conference Call | February 19, 2020 Groupon conference call with analysts and investors, in connection with Groupon's announcement of Q4 and full-year 2019 results |
| Q4 2019 Letter | February 18, 2020 letter from Williams to Groupon shareholders |
| Q4 2019 Presentation | February 18, 2020 Groupon presentation titled "4Q19 Earnings" |
| Q4 2019 Press Release | February 18, 2020 Groupon press release titled "Groupon Announces Fourth Quarter and Fiscal Year 2019 Results" |
| Randolfi | Michael Randolfi, Groupon's CFO from April 2016 until his August 23, 2019 resignation |
| SEC | Securities and Exchange Commission |
| Select | Groupon's loyalty program, Groupon Select, under which customers paid a $4.99 monthly membership fee and in exchange received various discounts on Groupon purchases (*e.g.*, 25% off Local purchases, 15% off Goods purchases, etc.) and other promotional benefits (*e.g.*, free shipping for Goods) |
| SEM | Search engine marketing |
| SEO | Search engine optimization |
| Thomas | Melissa Thomas, Groupon's interim CFO between August 23, 2019 and February 18, 2020 (and permanent CFO thereafter), and also Groupon's Chief Accounting Officer and Treasurer from November 2018 until approximately February 18, 2020 |
| UBS Conference Presentation | William's oral presentation concerning Groupon at the March 5, 2020 UBS Global Consumer & Retail Conference |
| UBS Q2 Report | July 31, 2019 analyst report on Groupon titled "Work in |

| | |
|---|---|
| | Progress; 2020 Is Key for Stock," authored by UBS analyst Eric J. Sheridan |
| UBS Q3 Report | November 5, 2019 analyst report on Groupon titled "Is the Plan Coming Together for 2020?," authored by UBS analyst Eric J. Sheridan |
| UBS Upgrade Report | January 17, 2020 analyst report on Groupon titled "Groupon on Sale," authored by UBS analyst Eric J. Sheridan |
| Wedbush | Wedbush Securities, Inc. |
| Williams | Richard Williams, Groupon's CEO throughout the Class Period (and at all times between November 2015 and March 25, 2020) |

Lead Plaintiff Fadi E. Rahal ("Lead Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Lead Plaintiff, which are alleged upon personal knowledge. The allegations herein are based upon, among other things, counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Groupon, Inc. ("Groupon" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Groupon; (c) review of reports issued by industry and securities analysts; and (d) review of other publicly available information concerning Groupon.

## I. NATURE OF THE ACTION AND OVERVIEW

1. This is a class action on behalf of persons and entities that purchased or otherwise acquired Groupon securities between July 30, 2019 and February 18, 2020, inclusive (the "Class Period"). Lead Plaintiff brings claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2. Groupon offers a marketplace that connects consumers to merchants through mobile applications and websites. Groupon has historically operated in three categories: i) Local, which provides experiences, including events and activities, health and beauty, food and drink, home and garden, and automotive; ii) Goods, which includes product revenue from merchandise inventory sold directly to customers and service revenue from third-party merchants who sell products using Groupon marketplaces; and iii) Travel, which offers hotels, airfare, and package deals at discounted and market rates.

3. Local's high gross margins (in the 80%-90% range) made it Groupon's primary profit driver, generating 73% of the Company's consolidated gross profits from only 40% of its consolidated revenues. Goods, by contrast, was a low-margin business. The low margins

prevailing in Goods (mostly in the 10%-20% range, and often less) meant that although Goods generated 55% of Groupon's total revenue, it yielded only 20% of the Company's gross profits. Yet, as Groupon repeatedly explained, Goods, despite its low margins, had value over and above the profits it directly produced, because Goods served to draw new customers to Groupon and drive engagement with the Company's higher-margin Local offerings. This boost to engagement was critical for the Company because prior to and throughout the Class Period, Groupon was experiencing severe "traffic headwinds" in two of its principal marketing channels (email and search engine marketing).[1]

4. During the second half of 2019, Groupon sought to further combat its so-called "traffic headwinds" and/or customer attrition by driving repeat customer engagement through a new program called Groupon Select. Groupon Select was a membership program that allowed members to receive, in exchange for a $4.99 monthly fee, various discounts on Groupon products as well as other benefits (detailed below). Select's goal was twofold: i) generate substantial increases in customers' purchase frequency; and ii) increase operating profitability, both overall and on a per-unit basis. Groupon Select was designed to attract customers that repeatedly turned to Groupon for experiences offered by the Local segment, as opposed to purchasing a one-off, discounted restaurant meal.

5. During the Class Period, Defendants repeatedly touted the purported success of Groupon Select in boosting purchase frequency and generating incremental profits, and suggested that this customer engagement strategy was on the cusp of returning the Company to profit growth.

6. This was not the case. Select's purported boost to customer purchase frequency,

[1] "Traffic" refers to visitors to Groupon's websites or mobile applications.

and its purported overall and per-unit profitability, were merely mirages. As Defendants failed to disclose until after the Class Period, throughout the Class Period, the highly touted Select program was in fact "over-indexing" to Groupon's Goods segment—*i.e.*, customers had been using Select primarily to make repeat low-margin Goods purchases, rather than higher-margin Local purchases. Simultaneously, and for the same reason, Select had not in fact been profitable: the discounts and other benefits available to Select members—including a 15% discount on all Goods purchases—entirely erased Groupon's already low margins on Goods purchases, so that Select purchases of Goods generated incremental losses rather than profits. As Defendants acknowledged publicly for the first time in Williams' February 19, 2020, Q4 2019 Letter to shareholders, Select, notwithstanding all of Defendants' positive statements during the Class Period, had failed to "address the core of [Groupon's] product or business model"—*i.e.*, Groupon's Local offerings—and so Defendants would discontinue enrolling new Select members.

7. Compounding this issue, Defendants also did not disclose, until after the Class Period, that Goods' deteriorating performance had been accompanied by a material diminishment in the business-driving benefits Goods had provided to Local, and had led the Company to decide to exit Goods entirely. As Williams disclosed in his Q4 2019 Letter, "[m]idway through the fourth quarter it became abundantly clear that we were not competing effectively in Goods. We saw far fewer customers engage with Goods in the fourth quarter than we anticipated, which impacted overall traffic to our site. The lower traffic ultimately impeded performance in all of our categories." Williams further explained, in the same Q4 2019 Letter, that Goods was no longer driving engagement with Local: "In 2019, we were devoting about 40% of our site impressions to a category that was only delivering about 20% of our gross profit

and no longer generating the cross-shopping behavior or customer activation activity to continue to justify this investment. In short, Goods has outlived its role as a business driver and has become a significant drag on our business."

8. Critically, the Company disclosed for the first time in the Q4 2019 Letter that "[o]ur management team and board have been evaluating the role of Goods in our ecosystem for some time," and that Groupon had decided to abandon the Goods segment. Yet, Groupon never previously disclosed the material negative trends affecting Goods, as required by SEC Regulation S-K Item 303, that ultimately led to Defendants' decision to exit the Goods business segment altogether.

9. During the February 19, 2020 Q4 2019 Conference Call, Defendant Thomas, discussing the failure of the Select program, admitted that "[t]he program also began over-indexing towards our Goods category in the second half of 2019." This acknowledgement that Select was merely driving customers to Goods contravened Defendants' repeated Class Period statements concerning Select's ability to deliver higher margin, repeat customers. Groupon continued to make these statements throughout the Class Period even though it was "abundantly clear" midway through Q4 2019 that Goods was no longer performing and the Company was considering exiting the segment entirely. To wit, the promise of Select sold to investors was little more than a bill of goods.

10. As a direct result of Defendants' material misrepresentations and omissions, the market was shocked when, on February 18-19, 2020, the Company disclosed this information. Investor confidence in Groupon was shattered and an immediate decline in the price of Groupon shares ensued. On February 19, 2020, Groupon shares fell by $1.35 per share, or more than 44%, on trading volume that was more than 25 times Groupon's average daily trading volume

during the Class Period.

## II. JURISDICTION AND VENUE

11. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

12. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

13. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this District.

14. In connection with the conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including U.S. mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

### A. Lead Plaintiff

15. Lead Plaintiff Fadi E. Rahal, as set forth in the certification he previously filed with the Court (ECF No. 17), which is incorporated by reference herein, purchased Groupon securities during the Class Period, and suffered damages due to Defendants' federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

### B. Defendants

16. Defendant Groupon is incorporated under the laws of Delaware with its principal

executive offices located in Chicago, Illinois. Groupon's common stock trades on the NASDAQ exchange under the symbol "GRPN."

17. Defendant Richard Williams ("Williams") was the Company's Chief Executive Officer ("CEO") and Director from November 2015 until approximately March 25, 2020, when Groupon announced a "management transition" in which it informed that Williams was "no longer serving as CEO" but would remain a Company employee. Prior to joining Groupon in 2011, Williams served in a variety of marketing leadership roles at Amazon.com, Inc. between 2008 and 2011, including most recently as Director, Paid Traffic. Before becoming CEO of Groupon in 2015, Williams served in a variety of roles: Chief Operating Officer (2015); President, North America (2014-2015); and Senior Vice President, Marketing (2011-2014).

18. Defendant Melissa Thomas ("Thomas") was the Company's "interim" CFO from August 23, 2019 until February 18, 2020, when she was named permanent CFO. From November 2018 through approximately February 18, 2020, Thomas also served as the Company's Chief Accounting Officer and Treasurer. Thomas first joined Groupon in June 2017 as Vice President of Commercial Finance. Previously, Thomas was Vice President of Finance at Surgical Care Affiliates and spent nearly nine years at Orbitz Worldwide in a variety of positions including Vice President of Finance. Thomas has also held positions with Equity Office Properties and PricewaterhouseCoopers.

19. Defendants Williams and Thomas (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases

alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, the Individual Defendants knew, or were reckless in disregarding, that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that Defendants' positive representations were materially false and/or misleading at the time they were made. The Individual Defendants are liable for the false statements and omissions of fact pleaded herein, as well as for any other statements or omissions that may be revealed as false or misleading with the benefit of further investigation and discovery.

## IV. FACTUAL BACKGROUND

### A. Groupon's Basic Organization

20. During the Class Period, Groupon operated under two geographical segments (North America and International) and three product categories: Local, Goods, and Travel.

21. The Local business was Groupon's original business, and by far the most significant contributor to Groupon's financial success, generating nearly 60% of the Company's total gross billings and more than 70% of its total gross profits. Local comprised multiple product and service subcategories, including events and activities, beauty and spa, health and fitness, food and drink, and home and garden and automotive, and included offerings from local as well as national merchants. Local product/service sales generally involve a customer's purchase of a voucher through one of Groupon's online marketplaces that can be redeemed with a third-party merchant for specified goods or services (or for discounts on specified goods or services). Groupon earns service revenues from such transactions—in effect, commissions for selling goods or services on behalf of third-party Local merchants. Although Groupon's Local inventory historically concentrated on "deep discount" offers, Groupon more recently sought to

expand its inventory through a "full funnel" approach that included moderate discount and market rate offers as well.

22. Groupon's Goods business offered discounted merchandise across multiple product lines, including electronics, sporting goods, jewelry, toys, household items and apparel. Groupon operated its Goods business on both a "first party" model, whereby Groupon earned product revenue from transactions in which it sold merchandise from its inventory directly to customers, and on a "third party" model, in which Groupon earned service revenue from transactions in which third-party merchants sold products to customers through Groupon's marketplaces. The Company stated on its Q4 2018 Conference Call that only 12% of its offers came from third parties.

23. Groupon's Travel business includes discount and market rate offers for hotels, airfare and package deals covering both domestic and international travel.

24. During 2017 and 2018, Goods generated approximately 31% of Groupon's gross billings and 56% of Groupon's total revenues, but only 20% of Groupon's gross profits. Local, on the other hand, generated approximately 58% of Groupon's gross billings, 40% of Groupon's total revenues and 73% of Groupon's gross profits.

**B. Relevant Dynamics Affecting Groupon's Operations**

**1. Groupon's Recent Customer And Traffic Headwinds**

25. Prior to and during the Class Period, Groupon's active customer count declined. For example, active customers declined from 49.5 million as of December 31, 2017 to 48.2 million as of December 31, 2018 and continued to decline to 47.2 million at the end of Q1 2019, 46.2 million at the end of Q2 2019, 45.3 million at the end of Q3 2019, and 43.6 million at the end of Q4 2019.

26. Defendants attributed these declines, and their associated downward pressure on

the Company's financial results (*e.g.*, gross billings, revenues, gross profit, adjusted EBITDA), to two primary factors: (1) the Company's strategic decision to focus on customers that offered higher potential for gross profit generation (versus unprofitable customers whose purchases Defendants characterized as "empty calories"); and (2) "ongoing headwinds" from the Company's email and SEM/SEO channels. Specifically, Defendants attributed the traffic headwinds to internet search engines changing their algorithms in a manner that negatively impacted how and where Groupon was displayed in search engine results, as well as email providers designating Groupon emails as promotional or customers designating them as spam, resulting in less traffic and fewer customers.

27. While such "headwinds" had negative impacts on the Company's financial results, Company executives represented that Groupon's recent strategic initiatives to increase purchase frequency and customer gross profit (such as Select) would substantially blunt those impacts. For example, former CFO Michael Randolfi ("Randolfi") explained on the February 13, 2019 Q4 2018 Conference Call that traffic headwinds related to email and search issues negatively impacted gross profit to the tune of $100 million in 2018, and that while this trend would continue into 2019, "increases in gross profit per customer should offset a meaningful portion of that customer decline." *See* Q4 2018 Conference Call, FactSet Transcript at 4.

**2. With Local As Groupon's Core, Defendants Claim to Retain Goods Because Of Its Ability To Drive Additional Local Business**

28. Prior to and during the Class Period, Defendants identified Groupon's Local business as the Company's fundamental core. Local was Groupon's original and largest business. Local was also more profitable than Goods. Gross margins on Local products were in the range of 80%-90%, far higher than those associated with its first-party Goods business, which averaged 10%-20% (but were in many cases lower or even negative).

29. Goods, however, provided Groupon with a crucial added value beyond the comparatively limited profits it produced: namely, Goods served as a substantial business driver for Local by drawing customers to Groupon's platform, where they could view (and purchase) Local offerings. In Defendants' terms, Goods generated "cross-shopping" opportunities for Local and generated significant "customer activation" for Local. Good's ability to get customers to engage with Groupon's higher margin areas (*i.e.*, Local) was critical in light of the customer and traffic headwinds Groupon was experiencing. As Wedbush Securities analyst Ygal Arounian explained in a September 13, 2018 analyst report on Groupon, Goods served "as an effective on-ramp for new customers" for the Company's "higher margin" Local business.

30. Defendants repeatedly explained that Goods was an integral part of Groupon because of its ability to pull additional customers to Groupon's Local offerings. For example, during a February 13, 2019 conference call to discuss Groupon's financial results for Q4 and FY 2019 (the "Q4 2018 Conference Call"), Wedbush analyst Ygal Arounian asked whether Defendants might consider selling off Groupon's Goods business in order to focus solely on Local. In response, Williams explained that Goods benefitted Groupon not only through the stand-alone profits it generated, but also because it was a "solid engagement driver" for Groupon's core Local operations.

### 3. Defendants Identify Increasing Customers' Purchase Frequency As The Key To Unlocking Profit Growth

31. Although Groupon had been losing customers, partly by design, Defendants repeatedly asserted that the most important key to returning Groupon to profit growth was not adding more customers, but rather increasing existing customers' purchase frequency—*e.g.*, getting Groupon customers to make four, rather than three, purchases per year. For example, as Williams stated in his November 4, 2019, Q3 2019 Letter to shareholders:

> . . . customer count declines in the quarter reflect our traffic headwind and our focus on increasing customer quality. That said, increasing purchase frequency and total unit volume are more important to us at this point than our customer counts, as they unlock the leverage in our model and an ability to profitably invest in growth as our marketplace evolves.

32. The following day, Williams further explained to analysts and investors that, "[i]f you think about it in a really simple way, with our roughly 45 million customers that are purchasing call it 3.5 times a year, one incremental purchase is massive, right? You're talking about 45 million extra units every year. . . So, that unlock is really, really significant." November 5, 2019, Q3 Conference Call.

33. Likewise, during his December 11, 2019 Barclays Conference Presentation, Williams asserted that: (i) "everything that we're doing is geared towards unlocking that extra unit of growth [] which is really about purchase frequency"; and (ii) "the core input to that, again, is customer quality, which is really about purchase frequency and gross profit per customer. So that's everything that we're doing, it's geared to unlocking that."

**4. Defendants Identify Select As The Key To Increasing Purchase Frequency, And Insist Select Was Doing So Profitably**

34. In light of Defendants' belief that their principal challenge was to increase purchase frequency, Defendants consistently claimed during the Class Period that Groupon's new "loyalty" program, Groupon Select, was the solution. Groupon's customers who joined Select paid a $4.99 monthly membership fee, in exchange for various discounts on Groupon products as well as other benefits. Specifically, Defendants made two critical and repeated assertions concerning Select: first, that it was generating substantial increases in purchase frequency; and second, that it was operating profitably, both overall and on a per-unit basis.

35. In his July 30, 2019, Q2 2019 Letter to shareholders, Williams spotlighted Select and its ability to spur purchase frequency:

> Last, while related to our initiative to improve the customer experience, I wanted to give some dedicated space to introduce a new program we launched over the last few quarters: an exciting new membership product in North America, called Groupon Select. Groupon Select amplifies the best of Groupon . . . .
>
> . . . Initial indicators are very positive with significantly improved purchase frequency, higher average order value and increased customer propensity to search for things to eat, see, do and buy.

36. As a result of Select's purported ability to spur purchase frequency, the following day Williams characterized Select, and Groupon's investment in it, as "critical to transforming the business." July 31, 2019 Q2 2019 Conference Call.

37. An analyst on the Q2 2019 Conference Call, noting that Select's discounts and incentives (such as free shipping) allowed customers to get 4-5 months of the subscription fee back with one decent-size purchase, asked if Select negatively impacted Groupon's margins and if the Company was subsidizing growth and purchase frequency. In response, the Company asserted that Select was not only increasing purchase frequency and average order value, but was doing so *profitably*, and assured that Select would "almost double the average gross profit per customer that we generate today." Q2 2019 Conference Call, FactSet transcript at 7.

38. Select's incentives were initially aligned with the Company's strategy to grow Local. Select initially provided members with a 25% discount on Local purchases, a 10% discount on Travel purchases, tickets and live events, and free shipping on products from Goods. However, on August 6, 2019, Groupon issued a press release titled "Groupon Launches Groupon Select – New Membership Program Providing Access to Exclusive Savings and Insider Perks," which stated that in addition to the previously offered benefits of membership, Select now offered members a 15% discount on Goods, which was already operating with low to no margins.

39. Groupon reported that Select was returning strong performance. For example,

after hosting Groupon CEO Rich Williams and interim CFO/CAO Melissa Thomas for investor meetings the prior week, Wedbush analyst Ygal Arounian issued a September 9, 2019 research report. Therein, Arounian reported, *inter alia*, that "[management] highlighted strong early signs from Select, noting the percentage of units coming [from Select] 'is not immaterial' and that purchase frequency/conversion is up 'significantly.'" Arounian added that "[m]anagement notes that Select is materially impacting behavior at every cohort level." Thus, Groupon framed the current performance and potential of Select to its investors as "material" to the Company's overall performance.

40. Defendants expressed the same optimism about Select's results to the broader market. In Williams' November 4, 2019, Q3 2019 Letter to shareholders, and during the Company's Q3 2019 Conference Call on November 5, 2019, Defendants repeatedly told analysts and investors that Select was succeeding on both relevant counts, sparking a 60% increase in purchase frequency (as well as a 20% increase in average order value), and operating profitably (generating "incremental gross profit . . .on membership-related transactions"). In the Q3 2019 Letter, Williams asserted that "we love how Select members continue to behave":

> It's still very early, but we're pleased with the results to date. We now have more than 260,000 paying Select members, up by over 100,000 in the quarter and nearly 200,000 since the beginning of the year. Membership gains are encouraging, and we love how Select members continue to behave. Currently, we're seeing a 60 percent increase in purchase frequency and a 20 percent jump in average order value. Though encouraging, we are still analyzing these early results -- our first small cohorts are barely through their first year with the program -- and we still have work to do to fully build out the infrastructure necessary for Select to run at scale.

41. During the Q3 2019 Conference Call, Williams described Select as one of Groupon's "key strategic priorities" and Thomas described being "really excited" by the "encouraging results" that Select had produced to date, including a 60% boost to purchase frequency.

42. After an analyst on the Q3 2019 Conference Call asked "why [Select is] gross profit neutral through the end of the year or, I guess, in fourth quarter," Thomas again asserted that Select was operating profitably on a per-unit basis ("earning incremental [gross profit] on the transactions") and overall (with operating profits offsetting investment and development costs for Select).

43. Likewise, during Williams' December 11, 2019 Barclays Conference Presentation, when an analyst asked about Select and "how should we think about [its] unit economics," Williams again assured that Select was not only boosting purchase frequency, but doing so profitably both on a per-unit basis ("we're making money on the units") as well as overall ("the total economics of the program are really compelling"):

> [WILLIAMS]: So, there is -- one of the things I'd say about Select, so two things. One, I'm most -- what I'm most excited about with Select is that, the demonstration that we can move purchase frequency up into the right. And that's historically I think for many business has been one of the most difficult things, if not, the most difficult thing to do is to move buying behavior and intensify it. We're showing with Select with 60% improvement in purchase frequency within the first six months, we're showing we can move that needle.
>
> ***
>
> The other piece on that program is, yes, our margins are such that we make money on the units . . . we're making money on the units as well as making money on the membership fees as well. So the total economics of the program are really compelling.

44. Although during portions of the Class Period Defendants acknowledged that Select was a relatively early-stage program to date, such acknowledgments were merely minor qualifications made in the context of touting Select's strong performance and future prospects. Furthermore, Defendants' own Class Period statements indicated that Select had outgrown its experimental beginnings to become a central focus for Groupon. For example, Defendant Williams described Select's "trial" phase in the past tense during the Q3 2019 Conference Call

and observed:

> It's important to remember, Select was an experiment, was a trial that we've iterated on and we continue to develop over time and we are excited by it. But we're excited about it in a way that we're feeling it needs to be part of Groupon. It can't just be the side; the side test for a group of people really needs to be – needs to permeate the Groupon customer experience, which we're starting to see.

45. Although Select enrolled a comparatively small number of Groupon's overall customer base, throughout the Class Period Defendants consistently emphasized Select's rapid customer growth and primary strategic importance. Defendants also emphasized how overall customer count was less important than the ability to increase purchase frequency. For example, Defendant Williams stated in the Q3 2019 Letter, "increasing purchase frequency and total unit volume are more important to us at this point than our customer counts."

**5. Groupon's 2019 Guidance**

46. On February 12-13, 2019, Groupon issued financial guidance for 2019 Adjusted EBITDA of $270 million (the "Guidance"). Adjusted EBITDA was Groupon's principal guidance metric, and was followed by analysts. Defendants reiterated this Guidance repeatedly during 2019, including when announcing Q1 2019 quarterly results on April 30-May 1, 2019, Q2 2019 quarterly results on July 30-31, 2019, and Q3 2019 quarterly results on November 4-5, 2019.

47. Defendants' July 30-31 and November 4-5, 2019 Guidance affirmations were issued in the context of mounting concerns that the Company would fall short of the Guidance. As an analyst noted during the November 5, 2019 Q3 2019 Conference Call, Groupon's financial results through the first three quarters of 2019 left the Company requiring a positive "inflection" during the fourth quarter in order to meet the Guidance. In this context, Defendants' affirmation of the Guidance indicated that such an inflection was materializing.

48. For example, Wedbush analyst Ygal Arounian's September 9, 2019 report after

hosting investor meetings with Defendants Williams and Thomas stated:

> We see investor concern that Groupon will be challenged to hit FY 2019 guidance, which implies 20%+ EBITDA growth in 4Q. Management stood by its guidance and the inputs that are driving the inflection point in 4Q, pointing to 2019 investments recouping in 4Q. While customer decline and traffic headwinds will persist into 2020, Groupon expects the phasing out of investments, Groupon Select ramping, and other key initiatives like universal shopping cart and guest checkout to have more near-term impacts than things like card-linked and bookability. Groupon also expects to see gains in marketing efficiency, and SG&A tailwinds as it enters 4Q19.
>
> ***
>
> Investor confidence in near-term estimates are not particularly high and the need to meet its FY and 2020 EBITDA targets are nearly make or break…. Mr. Williams noted that he sees the product initiatives as being in the first year of a multi-year effort, but is also fully confident in reaching FY targets based on some early return on the investments and cost initiatives playing out near-term.

September 9, 2019 Wedbush report, at 3.

49. Likewise, on November 6, 2019, after the Company had reported its 3Q 2019 results, Wedbush analyst Ygal Arounian issued a report stating:

> When Groupon first laid out its 2019 FY EBITDA target of $270mm, it included revenue guidance of $2.4B, and with revenue and GP [gross profit] coming in below expectations through 3Q so far (we now estimate $2.3B for the full year), there is a big implication that the key initiatives will lead to material improvement in GP and deliver further marketing leverage in 4Q.
>
> ***
>
> Investor confidence in near-term estimates are not particularly high and the need to meet its FY and 2020 EBITDA targets are nearly make or break…. Mr. Williams noted that he sees the product initiatives as being in the first year of a multi -year effort, but is also fully confident in reaching FY targets based on some early return on the investments and cost initiatives playing out near-term.

November 6, 2019 Wedbush report, at 1-2.

### C. Undisclosed Adverse Facts Known to Defendants During the Class Period

#### 1. In The Second Half Of 2019, Select "Over-Indexed" To Goods And As A Result Failed To Generate Local Business Traction Or Profit

50. During the second half of 2019, Defendants were aware of but failed to disclose

the known adverse trend that Select was being adopted disproportionately by customers in order to make low-margin Goods purchases, rather than more lucrative Local purchases—and consequently, that Select was not only failing to drive engagement with the Local business, but was unprofitable for Groupon.

51. At the end of the Class Period, Defendants publicly revealed on February 18-19, 2020 that Select had failed, and Defendants would discontinue enrolling new Select members. As Defendants Williams and Thomas then explained, at the root of Select's failure was that fact that, in Defendants' terminology, Select had "over-indexed to Goods"—meaning that Select was being used "disproportionately [by] customers purchasing goods vs. those transacting on our local platform," as Defendant Williams explained in the Q4 2019 Letter. According to Defendant Thomas' statements on the Q4 2019 Conference Call, Select's over-indexing to Goods occurred during "the second half of 2019."

52. Customers' disproportionate usage of Select for Goods, rather than Local, during the second half of 2019 was responsible for rendering Select—notwithstanding Defendants' glowing Class Period representations—a triple failure. *First*, Select had not been driving meaningful increases in purchase frequency for Groupon's core, *Local* offerings. Rather, the increases to purchase frequency had largely been circumscribed within Goods, and in fact were precisely the sort of "empty calorie" sales that Defendants had purportedly foresworn, because they generated little, no or negative profits. *Second*, and relatedly, because the Goods business had substantially lower profit margins than Local, and because the Select program's benefits (*e.g.*, free shipping, additional promotional customer acquisition costs, and a 15% discount on all Goods purchases since at least August 2019) sufficed to erase and reverse the Goods' segment's thinner margins, Select was not profitable for Groupon, either on a unit basis or overall, and was

not capable of generating any incremental gross profit growth. *Finally*, insofar as it was "abundantly clear" to Groupon by mid-Q4 2019 that Goods had deteriorated to the point where the Company had determined to exit the business, Defendants' discussions regarding the promise of Select were rendered materially misleading.

53. The omission of this known adverse trend was a material omission in and of itself. In addition, the omission of this known adverse trend rendered the many positive statements concerning Select that Defendants made during the Class Period—such as Defendants' assertions of "significantly improved purchase frequency" (*e.g.*, Q2 2019 Letter) and the oft-repeated "60 percent increase in purchase frequency" (*e.g.*, Q3 2019 Letter) generated by Select—materially misleading. The circumstances surrounding Defendants' admission that Select was over-indexing to Goods "during the second half of 2019" strongly indicate that Defendants knew of this trend when they made their July 30, 2019 false statements. For example, During the Q4 2019 Conference Call Defendant Thomas stated:

> Midway through the quarter, however, it became clear that we were not competing well in Goods, and November performance was particularly poor. . . The Select program was expected to be net neutral to gross profit in the fourth quarter. But the program underperformed due to higher than anticipated customer acquisition costs and a lower than expected number of enrollees converting to paid members. The program also began over-indexing towards our Goods category in the second half of 2019. This, coupled with results in the fourth quarter, led to our decision to discontinue new enrollments in our Select program.

54. Defendant Thomas' admission that Select was over-indexing to Goods during the "second half of 2019" was immediately preceded and followed by statements specifically discussing the "fourth quarter," and was made in close proximity to her discussion of even more precise intra-quarter time periods. Therefore, it is highly likely that Defendant Thomas' choice of contrasting language to describe the relevant time periods was intentional and meaningful, and that Select began over-indexing towards Goods early in the third quarter of 2019. Otherwise

Defendant Thomas would have said that Select's over-indexing was not apparent until Q4 2019, August 2019, or midway through 3Q 2019.

55. Moreover, the fact that Groupon enacted a 15% discount on all Select members' Goods purchases no later than August 6, 2019, indicates that Defendants were not only aware that Select members had already gravitated towards Goods at that time, but that their policy would exacerbate that trend by favoring Goods.

56. From the beginning of Select's over-indexing to Goods, this was a material, negative development. Whereas Local had average profit margins of approximately 80%-90%, Goods had average profit margins of approximately 10%-20%.

57. As Defendant Williams stated on the Q4 2019 Conference Call:

> Our management team and board have been evaluating the role of Goods for some time. Our fourth quarter performance and the challenges Goods has posed over the past few years have clarified our path forward. Delivering on our growth strategy requires total focus on capturing the local experiences opportunity. Over time, Goods has become a less meaningful driver of engagement and an increasingly inefficient use of our impressions.

Therefore, Defendants knew of problems with Goods, and the material negative effect that Select over-indexing towards Goods imposed, no later than their July 30, 2019 false statements, because Goods had posed challenges "over the past few years."

**2. It Becomes "Abundantly Clear" To Defendants Midway Through The 4th Quarter Of 2019 That Goods Cannot Compete Effectively, Is Being Abandoned By Customers, And Is No Longer Driving Meaningful Business To Local**

58. During the Class Period, Defendants knew but failed to disclose the known adverse trends that Goods was: (1) unable to compete effectively against other online retailers (*e.g.*, in terms of inventory breadth, shipping speed, etc.); (2) consequently, being abandoned by customers; and (3) relatedly and most importantly, no longer serving as a meaningful engagement tool for Local shoppers or generating meaningful Local customer activation.

59. Defendants revealed on February 18-19, 2020 that Groupon had decided to exit its Goods business in order to focus solely on Local. As Defendants then explained, the decision was rooted in the competitive deterioration of the Goods business and the related erasure of the cross-shopping / business-driver benefits that Goods had previously provided to Local.

60. Defendant Williams explained the decision to exit Goods in the Q4 2019 Letter:

> Midway through the fourth quarter it became abundantly clear that we were not competing effectively in Goods. We saw far fewer customers engage with Goods in the fourth quarter than we anticipated, which impacted overall traffic to our site. The lower traffic ultimately impeded performance in all of our categories. This was particularly notable in November, including during the holiday peak period when Goods engagement has historically been a business driver.

61. On the Q4 2019 Conference Call Defendant Williams similarly explained:

> Midway through the fourth quarter, it became clear, however, that we were seeing far fewer customers engaged with goods, and it impacted overall traffic to our site. The lower traffic ultimately impeded performance in all of our categories. This was particularly notable in November and affected our holiday peak period, when goods engagement has historically been a business driver.

62. The omission of these known adverse trends was a material omission in and of itself. In addition, the omission of these known adverse trends rendered Defendants' Class Period affirmative representations concerning Goods, in the context in which they were made, materially misleading.

63. The circumstances surrounding Defendants' admission that Goods was clearly unable to compete by "midway through the fourth quarter" of 2019 strongly indicate that Defendants knew of this trend no later than by the time they made their November 4, 2019 false statements, in the middle portion of the three-month long fourth quarter.

64. While Defendants explained that the failure of Goods had become "abundantly clear" to them by midway through the fourth quarter of 2019, this was in fact a long-term trend that Defendants had been evaluating for some time. As Defendant Williams stated on the Q4

2019 Conference Call:

> Our management team and board have been evaluating the role of Goods for some time. Our fourth quarter performance and the challenges Goods has posed over the past few years have clarified our path forward. Delivering on our growth strategy requires total focus on capturing the local experiences opportunity. Over time, Goods has become a less meaningful driver of engagement and an increasingly inefficient use of our impressions.

65. And Defendant Williams similarly explained in the Q4 2019 Letter:

> Our management team and board have been evaluating the role of Goods in our ecosystem for some time. Goods' contribution to gross profit has been declining for four quarters, but it has historically been a meaningful engagement tool for Local shoppers and its overall impact on the business extended beyond its direct contribution to gross profit. Recently we've seen engagement with our Goods inventory shift meaningfully lower, driven in large part by our inability to compete in a fiercely competitive, and in some cases, economically irrational retail landscape. In 2019, we were devoting about 40% of our site impressions to a category that was only delivering about 20% of our gross profit and no longer generating the cross-shopping behavior or customer activation activity to continue to justify this investment. In short, Goods has outlived its role as a business driver and has become a significant drag on our business.
>
> Our fourth quarter performance, and the challenges Goods has posed over the past few years, has clarified our path forward.

66. The middle month of Groupon's fourth quarter was November, and Defendants themselves stated in Groupon's Q4 2019 Letter that Goods' untenability "was particularly notable in November."

67. Furthermore, the fact that Defendants admitted that Goods' failure was "abundantly clear" and "particularly notable" by mid-way through Q4 2019 gives rise to a strong inference that this trend was at least reasonably clear and notable when Defendants spoke on November 4, 2019.

## V. DEFENDANTS' VIOLATIONS OF THE EXCHANGE ACT

### A. Defendants' Material Misstatements and Omissions Made with Scienter in Violation of the Exchange Act

#### 1. Defendants' July 30-31, 2019 Statements

68. Following market close on July 30, 2019, Defendants announced Groupon's Q2 2019 results, including, *inter alia,* through: (1) a press release titled "Groupon Announces Second Quarter 2019 Results" (the "Q2 2019 Press Release"); (2) a letter to shareholders from Williams (the "Q2 2019 Letter"); (3) a presentation titled 2Q19 Earnings; (4) a Form 10-Q signed by Randolfi and filed with the SEC (the "Q2 2019 10-Q"); and (5) on the morning of July 31, 2019, Groupon hosted a conference call with analysts and investors (the "Q2 2019 Conference Call").

69. Groupon's Q2 2019 results reflected double-digit percentage declines (versus the year-ago quarter) in most relevant financial and operational metrics, including revenues, gross profits, adjusted EBITDA, and total units sold, all of which the Company's Q2 2019 Press Release attributed to the same root cause: "fewer customers and lower traffic." However, Defendants' framing of Groupon's results was misleading because Defendants discussed those negative results within a narrative of improvement and progress on the Company's key strategic goal (increasing customer purchase frequency), driven by Groupon Select.

70. For example, in the Q2 2019 Letter Defendant Williams stated:

> In the second quarter, Groupon continued our relentless focus on becoming the daily habit in local commerce. We are transforming our brand, product and business, and ***we are making progress on the initiatives that we believe lay the foundation for long-term, profitable growth*** and a new Groupon for consumers, merchants and stockholders alike.
>
> ***
>
> Select is simply the best way to experience Groupon today, leveraging all of the work we're putting into voucherless while accelerating the savings for which

> we're best known. And it's only getting better. . . .
>
> ***More than 150,000 members have joined the program so far, and it is scaling quickly with both new and existing customers. Initial indicators are very positive with significantly improved purchase frequency, higher average order value and increased customer propensity to search for things to eat, see, do and buy.*** It's still early days, but given its promise and pace, we expect to invest more aggressively in Select over the coming quarters.[2]

71. Defendant Williams' statements that Groupon was "making progress on initiatives that we believe lay the foundation for long-term, profitable growth" for Groupon and that Select was purportedly driving "significantly improved customer purchase frequency, [and] higher average order value" were materially misleading. Defendant Williams' statements were knowingly or recklessly misleading at the time they were made because Defendant Williams was in possession of, but concealed and failed to disclose, material adverse information. Specifically, at the end of the Class Period Defendants admitted that they knew that Select was over-indexing to Goods starting in the *second half of 2019*, meaning that at the time Defendant Williams spoke on July 30, 2019, which was one month into the third quarter of 2019, he was aware of the over-indexing trend and therefore that Select was failing to meaningfully boost purchase frequency in the important Local category. And, as Defendant Williams admitted on the Q4 2019 Conference Call, by the second half of 2019 Defendants knew that Goods had long been underperforming, "the challenges Goods has posed over the past few years have clarified our path forward . . . . Over time, Goods has become a less meaningful driver of engagement and an increasingly inefficient use of our impressions." By knowingly omitting that Select was over-indexing to an admittedly underachieving business segment, Defendant Williams misled investors to believe that Select was more successful that it in fact was.

---

[2] All emphasis is added unless otherwise noted.

72. The Q2 2019 10-Q contained a section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations" (the "MD&A Section") in which Groupon, *inter alia*, presented and analyzed Groupon's results of operations for the second quarter of 2019. For example, the MD&A Section of the Q2 2019 10-Q stated, in part:

> . . . We are currently developing and testing a number of product enhancements intended to make our offerings easier to use for both customers and merchants and to improve purchase frequency, including cash back offers linked to customer credit cards, booking capabilities and a paid membership program in North America, Groupon Select, which offers greater discounts on our offerings and other benefits. ***We believe that those initiatives may be important drivers for increasing customer purchase frequency and growing our business over time.*** We are currently focusing our efforts on growing customer awareness of those products and scaling the related merchant base. As such, our gross profit and operating income may be adversely impacted in the near term as we focus more on driving our strategic initiatives.

73. Groupon's statement that Select "may be [an] important driver[] for increasing customer purchase frequency and growing our business over time" was materially misleading. This statement was knowingly or recklessly misleading because it was contradicted by the material negative information in Groupon's possession at that time, which it concealed and failed to disclose. Specifically, at the end of the Class Period Defendants admitted that they knew that Select was over-indexing to Goods starting in the second half of 2019, meaning that at the time of Groupon's July 30, 2019 statements, which was one month into the third quarter of 2019, Groupon knew of the over-indexing trend and therefore that Select was failing to meaningfully boost purchase frequency in the important Local category and instead was generating low-profit margin Goods purchases. And, as Defendant Williams admitted on the Q4 2019 Conference Call, by the second half of 2019 Defendants knew that Goods had long been underperforming, "the challenges Goods has posed over the past few years have clarified our path forward . . . . Over time, Goods has become a less meaningful driver of engagement and an increasingly inefficient use of our impressions."

74. The MD&A Section of Groupon's Q2 2019 10-Q was also materially misleading because Groupon was required under SEC Regulation S-K Item 303 ("Item 303") to disclose therein:

> any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that are reasonably likely to cause a material change in the relationship between costs and revenues (such as known or reasonably likely future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship must be disclosed.

17 C.F.R. § 229.303(b)(2)(ii).

75. At the time Groupon issued its Q2 2019 10-Q it knew, but failed to disclose as required by Item 303, that Select "began over-indexing towards our Goods category in the second half of 2019," as it ultimately admitted at the end of the Class Period. This material adverse trend, event, or uncertainty relating to Select was reasonably likely to cause a material change in the relationship between costs and revenues. Defendants had repeatedly represented Select as profitable on a per-unit basis: *i.e.*, that even after factoring in the discounts and other costs associated with Select, Select transactions were still generating incremental profits. However, because Select purchases were largely limited to the low-margin Goods business rather than the high-margin Local business, the adverted to relationship between costs and revenues did not in fact apply, and was in fact the opposite. For Goods, and thus for Select, costs (when Select-specific costs were added) rose higher than revenues, rather than remaining lower. Similarly, Groupon knew, but failed to disclose as required by Item 303, that Goods had largely ceased providing added value for Groupon by driving meaningful business to Local. As Defendant Williams admitted on the Q4 2019 Conference Call, "the challenges Goods has posed over the past few years have clarified our path forward . . . . Over time, Goods has become a less

meaningful driver of engagement and an increasingly inefficient use of our impressions." As Goods' ability to drive additional Local sales withered, Local revenues also suffered. In fact, Defendant Williams admitted during the Q4 2019 Conference Call that Groupon's "management team and board" had witnessed these trends developing "[o]ver time" as they had "been evaluating the role of Goods for some time."

**2. Defendants' November 4-5, 2019 Statements**

76. Following market close on November 4, 2019, Defendants announced Groupon's Q3 2019 results, including, *inter alia,* through: (1) a press release titled "Groupon Announces Third Quarter 2019 Results" (the "Q3 2019 Press Release"); (2) a letter to shareholders from Williams (the "Q3 2019 Letter"); (3) a presentation titled 3Q19 Earnings (the "Q3 2019 Presentation"); (4) a Form 10-Q signed by Thomas and filed with the SEC (the "Q3 2019 10-Q"); and (5) on the morning of November 5, 2019, Defendants Williams and Thomas hosted a conference call with analysts and investors to further discuss the Company's financial results and operations (the "Q3 2019 Conference Call").

77. Groupon's Q3 2019 results again reflected substantial percentage declines (versus the year-ago quarter) in most relevant financial and operational metrics, including revenues, gross profits, adjusted EBITDA and total units sold, all of which the Company attributed to the same root cause: "fewer customers and lower traffic." However, and similar to the Q2 2019 Letter, the Q3 2019 Press Release and to a greater extent the Q3 2019 Letter framed these financial and operational results within a narrative of improvement and progress on the Company's key strategic goal (increasing customer purchase frequency), driven by Groupon Select.

78. In the Q3 2019 Letter Defendant Williams misleadingly touted the purported benefits and success of Groupon Select, stating, in relevant part:

> Finally, I want to provide an update on Groupon Select -- our new membership program in North America that we announced last quarter. Groupon has always had membership-like behavior among our customers, and Select seeks to monetize that behavior so that Select customers get the very best deal on Groupon -- and in many cases -- anywhere.
>
> It's still very early, but we're pleased with the results to date. ***We now have more than 260,000 paying Select members, up by over 100,000 in the quarter and nearly 200,000 since the beginning of the year. Membership gains are encouraging, and we love how Select members continue to behave. Currently, we're seeing a 60 percent increase in purchase frequency and a 20 percent jump in average order value***. . .
>
> ***
>
> ***We are making consistent progress. I understand, however, that the improvements we are making are not always easy to see in our quarterly results and as such may not be as immediately meaningful to stockholders as they are to the teams driving them forward every day.*** Nevertheless, every day we see that these initiatives help us offset what amounts to over $100 million of annual traffic headwinds. . .

79. Defendant Williams' statements (i) touting Select's performance on the ground by stating that "we love how Select members continue to behave. . . we're seeing a 60 percent increase in purchase frequency and a 20 percent jump in average order value," and (ii) emphasizing Groupon's "consistent progress" and "improvements" despite poor quarterly results, were materially misleading. These statements were knowingly or recklessly misleading at the time Defendant Williams made them because he was in possession of, but concealed and failed to disclose, material adverse information. Specifically, Defendants admitted that, starting in the second half of 2019, they knew that Select was over-indexing to Goods, meaning that at the time Defendant Williams spoke on November 4, 2019, which was well into Q4 2019, he knew of the over-indexing trend and therefore that Select was failing to meaningfully boost purchase frequency in the important Local category. Defendant Williams' statements were further knowingly misleading because Defendants later admitted that "midway through the fourth quarter it became abundantly clear" that Groupon's Goods business was unsustainable,

and that this fact "was particularly notable in November," *i.e.*, when he spoke. This call took place midway through the 4th quarter. And even if the call occurred a few days before it "became abundantly clear" to Defendants that they could no longer compete in, and would therefore have to exit, a business that accounted for more than half of Groupon's revenue, a strong inference arises that this fact was at least "clear" to Defendants by November 4, 2019. By knowingly omitting that Select was over-indexing to a foundering business line that Groupon was on the verge of exiting, Defendant Williams misled investors by portraying Select's performance and prospects as more positive than they in fact were. Finally, Defendant Williams knowingly misled investors because he knew, but failed to disclose, that Groupon was exacerbating Select's over-indexing problem by enacting a 15% discount on all Select members' Goods purchases starting in August 2019.

80. The first two questions on the Q3 2019 Conference Call concerned the Company's customer and traffic declines, and what the Company was doing to counter them. In response to these questions, Defendant Thomas asserted that the Company's primary focus was on purchase frequency (which Groupon Select increased by 60%), as the Company viewed purchase frequency as the key to unlocking a return to growth, rather than on total customer numbers, and Defendant Williams again highlighted Groupon Select, and the 60% boost it had given to purchase frequency, as part of a materializing strategy that was beginning to turn around long-standing customer and unit declines.

81. On the Q3 2019 Conference Call Defendant Williams specifically explained:

> [WILLIAMS]: . . . People were excited about what we're seeing that's really encouraging, as Melissa mentioned, is that ***you're starting to see our strategy around the product and the investments that we've been making and it's just a better customer experience started to play its way through the local consumer***.
>
> And I think [ph] in that place (00:19:23) you're seeing things like guest checkout, like universal cart start to make an impact, and we talked about it before. . .

> ***Select as well is in there. Melissa mentioned, a 60% increase in purchase frequency is pretty significant, especially over the course of the first six months of membership***. So, that's a piece that's absolutely helping as we grow that customer base as well, as small as it is today. So you're really starting to see those pieces through. . .

82. Defendant Williams' statements touting Select's performance by stating that "a 60% increase in purchase frequency is pretty significant," and stating that Groupon's strategy (focused as it was on Select) was "play[ing] its way through the local consumer," were materially misleading. These statements were knowingly or recklessly misleading at the time Defendant Williams made them because he was in possession of, but concealed and failed to disclose, material adverse information. Specifically, Defendants admitted that starting in the second half of 2019 they knew that Select was over-indexing to Goods, meaning that at the time Defendant Williams spoke on November 5, 2019, which was well into Q4 2019, he knew of the over-indexing trend and therefore that Select was failing to meaningfully boost purchase frequency in the important Local category. Defendant Williams' statements were further knowingly misleading because Defendants later admitted that "midway through the fourth quarter it became abundantly clear" that Groupon's Goods business was unsustainable, and that this fact "was particularly notable in November," *i.e.*, when he spoke. By knowingly omitting that Select was over-indexing to a foundering business line, Defendant Williams misled investors by portraying Select's performance and prospects as more positive than they in fact were. Finally, Defendant Williams knowingly misled investors because at the time he spoke he knew, but failed to disclose, that Groupon was exacerbating Select's over-indexing problem by enacting a 15% discount on all Select members' Goods purchases starting in August 2019.

83. On the Q3 2019 Conference Call, in response to questions from Wedbush analyst Ygal Arounian concerning Select's profitability, Defendant Thomas and Defendant Williams said the following about Select:

> [THOMAS]: And then on the Select side there, just to give you a little bit of color on why essentially ***Select is – we expect it to be net neutral in the fourth quarter.*** There is a few elements I laid out in my prepared remarks that you need to take into consideration when we think about Select. So, we are making investments in Select and those do show up in terms of [gross profit], whether it be opportunity, costs, et cetera. However, those are offset by subscription fees that we are collecting. ***And then the important part to remember is that we are also earning incremental [gross profit] on the transactions and we're seeing a purchase frequency lift at 60% higher in that 180-day post-enrollment in the program.***
>
> ***
>
> [WILLIAMS]: . . . We see opportunity to increase enrollment and participation in the program. We like what we see in this early stage of development with purchase frequency and that just engagement behavior overall. We're going to continue to lean into that. If not at any cost, because we're – as I mentioned before and we mentioned a couple of times, we still have some investments to make there on this core infrastructure. And when I say that, it's really integrating it into the core of the Groupon experience.
>
> ***It's important to remember, Select was an experiment, was a trial that we've iterated on and we continue to develop over time and we are excited by it. But we're excited about it in a way that we're feeling it needs to be part of Groupon. It can't just be the side; the side test for a group of people really needs to be – needs to permeate the Groupon customer experience, which we're starting to see.*** You're starting to see, if you go to the desktop as an example, you're seeing Select pricing frontend center as a promotional item and as a reminder to our members that they get a unique benefit.

84. Defendant Thomas' statements touting Select's increased purchase frequency and emphasizing that "the important part to remember is that we are also earning incremental [gross profit] on the transactions," and Defendant Williams' statements indicating that Select had outgrown its experimental roots and "needs to permeate the Groupon customer experience, which we're starting to see," were materially misleading. These statements were knowingly or recklessly misleading at the time Defendants Thomas and Williams made them because they were in possession of, but concealed and failed to disclose, material adverse information. Specifically, Defendants admitted that starting in the second half of 2019 they knew that Select was over-indexing to Goods, meaning that at the time Defendants Thomas and Williams spoke

on November 5, 2019, which was well into Q4 2019, they knew of the over-indexing trend and therefore that Select was failing to meaningfully boost purchase frequency in the important Local category. Defendant Thomas' and Defendant Williams' statements were further knowingly misleading because Defendants later admitted that "midway through the fourth quarter it became abundantly clear" that Groupon's Goods business was unsustainable, and that this fact "was particularly notable in November," *i.e.*, when they spoke. By knowingly omitting that Select was over-indexing to a foundering business line, Defendants Thomas and Williams misled investors by portraying Select's performance and prospects as more positive than they in fact were. Finally, Defendants Thomas and Williams knowingly misled investors because at the time they spoke they knew, but failed to disclose, that Groupon was exacerbating Select's over-indexing problem by enacting a 15% discount on all Select members' Goods purchases starting in August 2019. In essence, Defendants Thomas and Williams were touting Select at a time when they knew that Select's customers were buying not just in the wrong business segment in terms of profit margins, but in a failing business segment.

85. Defendant Thomas' assertions that Select would have a "net neutral" impact on Groupon's gross profits during Q4 2019 were also materially misleading. These statements were knowingly or recklessly misleading at the time Defendant Thomas made them because they misleadingly implied that the subscription fees and operating profits Select generated would offset the cost of the investments the Company was making to develop Select, and that Select was indeed profitable on a unit-basis. In fact, at the time she spoke, Defendant Thomas knew that Select was not operating profitably because, as Defendants later acknowledged, they were aware by November 2019 that Select was over-indexing to Goods, Goods was a foundering, low profit margin business segment, and therefore the 15% discount Groupon offered starting in

August 2019 for Select members' Goods purchases cannibalized any profit margins.

86. Additionally, the MD&A Section of the Q3 2019 10-Q made multiple disclosures concerning Groupon Select and Goods. For example, the MD&A Section of the Q3 2019 10-Q stated, in relevant part:

> **Factors Affecting Our Performance**
>
> . . .
>
> *Growing Customer Value*. ***We are focused on increasing the long-term value of our customer base and increasing gross profit per customer in order to grow our business***. . . ***We expect our new products, such as*** voucherless offerings and ***Groupon Select,*** as well as other enhancements to the customer experience ***to improve engagement, promote increased purchase frequency and drive customer retention***. . .
>
> *Investing in Growth*. . . We are currently developing and testing a number of product enhancements intended to make our offerings easier to use for both customers and merchants and to improve purchase frequency, including cash back offers linked to customer credit cards, booking capabilities and Groupon Select. ***We believe that those initiatives may be important drivers for increasing customer purchase frequency and growing our business over time.*** We are currently focusing our efforts on growing customer awareness of those products and scaling the related merchant base. As such, our gross profit and operating income may be adversely impacted in the near term as we focus more on driving our strategic initiatives.

87. Groupon's statements indicating that Groupon would "increase[e] gross profit per customer" in part through the Select program, which may be an "important driver[] for increasing customer purchase frequency and growing our business over time" were materially misleading. These statements were knowingly or recklessly misleading because at the time Groupon spoke it knew, but concealed and failed to disclose, that: (i) Select was over-indexing to Goods in the second half of 2019, (ii) Groupon enacted a 15% discount on all Select members' Goods purchases no later than August 6, 2019, exacerbating the problem of Select's over-indexing to Goods and unprofitable sales made through Select, (iii) Groupon could no longer effectively compete in the Goods business segment, (iv) Select was failing to meaningfully boost

purchase frequency in the important Local category, and (v) as a result of the foregoing, Select was not operating profitably or generating incremental gross profit (as Groupon's thinner profit margins on Goods were turned negative by the discounts and customer acquisition costs accompanying Select).

88. The MD&A Section of Groupon's Q3 2019 10-Q was also materially misleading because Groupon failed to disclose information regarding Select that it was required to disclose under Item 303. For example, at the time of that filing, Groupon knew, but failed to disclose, that Select was over-indexing to Goods, and that this material adverse trend, event, or uncertainty relating to Select was reasonably likely to have a material unfavorable impact on net sales or income from continuing operations or cause a material change in the relationship between costs and revenues. Defendants had repeatedly represented Select as profitable on a per-unit basis: *i.e.*, that even after factoring in the discounts and other costs associated with Select, Select transactions were still generating incremental profits. However, because Select purchases were largely limited to the low-margin Goods business rather than the high-margin Local business, the adverted to relationship between costs and revenues did not in fact apply, and was in fact the *opposite*. For Goods, and thus for Select, costs rose higher than revenues (when Select-specific costs were added), rather than remaining lower. Furthermore, by November 2019 the negative trend of Select over-indexing to Goods had worsened as Defendants offered a 15% discount on Goods transactions beginning in August 2019, and by November 2019 it had become "abundantly clear" to Defendants that the Goods segment was not effectively competing.

89. The MD&A Section of Groupon's Q3 2019 10-Q was also materially misleading because Groupon knew at the time of that filing, but failed to disclose as required by Item 303, that Goods was no longer able to compete and had largely ceased providing added value for

Groupon by driving meaningful business to Local. The material adverse trend, event, or uncertainty concerning Goods was reasonably likely to have *double* material unfavorable impacts on Groupon's revenues (and consequently, income). First, Goods revenues themselves suffered material declines, as Goods' inability to compete effectively led to increasing customer abandonment. Second, as Goods' ability to drive additional Local sales withered, Local revenues also suffered. In fact, Defendants admitted at the end of the Class Period that (1) Goods' ability to generate Local benefits had long been in decline ("Over time, Goods has become a less meaningful driver of engagement. . ."), and (2) it was "abundantly clear" to Defendants no later than "[m]idway through the fourth quarter" that Groupon was unable to compete effectively in Goods, which was "particularly notable in November" 2019.

90. Lastly, Groupon, in the Q3 2019 Press Release and Q3 2019 Presentation, and Defendant Thomas in the Q3 2019 Conference Call, reaffirmed the Company's Guidance. In the Q3 2019 Press Release Groupon represented, concerning Groupon's "Outlook," that "***Groupon continues to expect Adjusted EBITDA of approximately $270 million***." Q3 2019 Press Release, at 2. In the Q3 2019 Presentation Groupon likewise and repeatedly affirmed the Guidance. *See* Q3 2019 Presentation, at 5 ("***2019 Guidance of ~$270 million***"); 6 (same). And during the Q3 2019 Conference Call, Defendant Thomas asserted:

> [THOMAS]: As we move into the fourth quarter, a very important time for us, we expect positive contribution from our conversion initiatives, which include our recent guest checkout and universal cart product launches. In addition, we expect marketing leverage to increase modestly from what we delivered in Q3. These factors, along with a continued momentum in North America Local including improved performance in units, give us confidence that ***we can drive sequential improvement in year-over-year gross profit trends and deliver approximately $270 million in adjusted EBITDA for full-year 2019***.

91. Groupon's and Defendant Thomas' statements affirming that "Groupon continues to expect Adjusted EBITDA of approximately $270 million" were materially misleading. Those

statements were knowingly or recklessly misleading at the time they were made because Defendants Groupon and Thomas knew, but concealed and failed to disclose, that: (i) by November 2019 it became "abundantly clear" that Groupon was "not competing effectively in Goods," (ii) by November 2019 "Goods has become a less meaningful driver of engagement" with Groupon's more profitable Local segment, and (iii) as a result of the foregoing, the Guidance was not achievable.

92. Furthermore, during the Q3 2019 Conference Call, after Goldman analyst Michael Ng noted that achieving the Guidance required an "implied EBITDA inflection in the fourth quarter" and inquired what would drive that inflection (and what effect Select would have), Defendant Thomas again affirmed the Guidance, adding that Select would have a "net neutral" impact on gross profits during the fourth quarter:

> [THOMAS]: . . . And then on your question on Select and the headwinds that we saw in Q3 and what we expect to see in Q4, what I'd say there is ***we've been really pleased with the trajectory in terms of our ability to improve member accounts and what we're seeing on the customer side from a frequency standpoint as well as average order values improving***. I'm not going to give specific impacts on Q3, but just to give you a flavor for Q4 what we're expecting to see, we are expecting to continue to invest in acquiring members within the program. But ***we expect overall the program to be net neutral impact on GP in Q4***.

93. Defendant Thomas' statements touting Select on the ground that "we've been really pleased with the trajectory in terms of our ability to improve member accounts," and indicating that Select would have a "net neutral impact on GP [gross profit] in Q4" were materially misleading. Defendant Thomas' statements were knowingly or recklessly misleading when she made them, because at that time Defendants knew, but concealed and failed to disclose, that: (i) Select was over-indexing to its low-margin Goods business segment in the second half of 2019 and was failing to boost purchase frequency in the more profitable Local segment; (ii) Groupon exacerbated this problem by enacting a 15% discount on all Select

members' Goods purchases starting in August 2019; (iii) by November 2019 it was apparent that Groupon could no longer successfully compete in the Good business segment; and (iv) as a result of the foregoing, Select was not operating profitably or generating incremental gross profit (as Groupon's thinner profit margins on Goods were turned negative by the discounts and customer acquisition costs accompanying Select). Without incremental profits on individual transactions, Select's only potential source of profits was membership fees, which would be insufficient to offset the expense of maintaining and trying to grow the program. These statements were additionally materially misleading because they were made in response to an analyst's question specifically seeking information about the contribution of Select to Groupon's earnings.

### 3. Williams' December 11, 2019 Statements

94. On December 6, 2019, Groupon issued a press release titled "Groupon to Participate in the Barclays Global Technology, Media and Telecommunications Conference," announcing that Defendants Williams and Thomas would attend the conference, held on December 11-12, 2019 at San Francisco's Palace Hotel, where (1) they would participate in "one-on-one and small group meetings" with institutional investors; and (2) Williams would "participate in a fireside chat at 2:30pm PST."

95. On December 11, 2019, as indicated by the Company's December 6, 2019 press release, Defendant Williams participated in the aforementioned "fireside chat," hosted by Barclays analyst Deepak Mathivanan (who covered Groupon and other companies in the mid-cap internet and online travel sectors), in which Defendant Williams presented on Groupon and answered questions from Mr. Mathivanan concerning Groupon's financial results, operations and strategy (the "Barclays Conference Presentation"). The Barclays Conference Presentation was webcast live on Groupon's investor relations website (and was available there in recorded form for the following 60 days) and was also transcribed and published by Bloomberg LP

("Bloomberg").

96. When asked during his Barclays Conference Presentation on Groupon's declining customer count, Williams explained:

> [WILLIAMS]: Yeah. It's a great question and I guess a lock-in on a couple of pieces of that. One is, ***we are focused on quality of customer more than anything else. And the biggest linchpin to quality for us is frequency*** . . .
>
> So everything that we're doing is geared towards unlocking that extra unit of growth and the next unit after that and the unit after that. Whether that's booking, size of the catalog, ***the work that we're doing with loyalty programs*** and repeat purchasing products that keep us in the mix over the long term between a merchant and a consumer, ***all of that is geared to unlocking that piece.*** When you unlock that piece, you also create more opportunity in the flywheel, right? So ***as gross profit per customer increases, so does our ability to go acquire more members into process and into the platform. But the core input to that, again, is customer quality, which is really about purchase frequency and gross profit per customer.*** So that's everything that we're doing, it's geared to unlocking that.

97. Defendant Williams' statements touting Groupon's focus on "customer quality" and "gross profit per customer" in the context of Groupon's "loyalty programs" (*i.e.*, Select), were materially misleading. Defendant Williams' statements were knowingly or recklessly misleading because, at the time he made them, he knew that: (i) Groupon could no longer effectively compete in Goods and would have to abandon that business segment, and (ii) the Select program was a failure because it over-indexed to Groupon's soon-to-be-abandoned Goods market. Indeed, at the end of the Class Period, Defendant Williams admitted that, by midway through the fourth quarter, *i.e.*, November 2019, he knew Groupon was not competing effectively in the Goods business, which was indisputably prior to his December 11, 2019 comments. Moreover, Defendants similarly admitted that Select's over-indexing to Goods became apparent during the second half of 2019, and therefore that information was well known to Defendant Williams when he spoke with only 20 days left in the second half of 2019. Additionally, and as such, Williams was well aware at the time he spoke that Select was not

meaningfully increasing customer frequency in a profitable segment of Groupon's business or increasing profits per customer.

98. During the same Barclays Conference Presentation, Williams was asked about the "unit economics" of Groupon Select and its ability to be "accretive to gross profit." Williams responded:

> [WILLIAMS]: So, there is -- one of the things I'd say about Select, so two things. One, I'm most -- what I'm most excited about with Select is that, the demonstration that we can move purchase frequency up into the right. And that's historically I think for many business has been one of the most difficult things, if not, the most difficult thing to do is to move buying behavior and intensify it. ***We're showing with Select with 60% improvement in purchase frequency within the first six months, we're showing we can move that needle. So that's the most exciting thing about that program*** . . .
>
> ***
>
> ***The other piece on that program is, yes, our margins are such that we make money on the units,*** because there is not -- we as a part of our normal promotional process, we're offering discounts on a regular basis, which is part of why -- and you can see that when we share order discounts data. We're one of the few retail oriented sites who shows order discounts and so you can kind of calc what the average discount is. So when you take that in consideration, plus our average margin, ***we're making money on the units as well as making money on the membership fees as well. So the total economics of the program are really compelling.*** But again, that's almost secondary at this point, that's really how do you maximize education and knowledge base, so that we can extend everywhere possible.

99. Defendant Williams' statements touting the performance of the Select program (*e.g.*, "60% improvement in purchase frequency"), and claiming that "we're making money on the units as well as making money on the membership fees as well. So total economics of the program are really compelling," were materially misleading. Defendant Williams' statements were knowingly or recklessly misleading because, at the time he made them, he knew that: (i) Groupon could no longer effectively compete in Goods and would have to abandon that business segment, and (ii) the Select program was a failure because it over-indexed to Groupon's soon-to-be-abandoned Goods market. Indeed, at the end of the Class Period, Defendant Williams

admitted that, by midway through the fourth quarter, *i.e.*, November 2019, he knew Groupon was not competing effectively in the Goods business, which was indisputably prior to his December 11, 2019 comments, which were made late in the 4th Quarter (*i.e.*, 72 days into the 92 day quarter). Moreover, Defendants similarly admitted that Select's over-indexing to Goods became apparent during the second half of 2019, and therefore that information was well known to Defendant Williams when he spoke with only 20 days left in the second half of 2019. Additionally, and as such, Williams was well aware at the time he spoke that Select was not meaningfully increasing customer frequency in a profitable segment of Groupon's business or increasing profits per customer.

### B. Defendants' February 18-19, 2020 Disclosures Correct Prior Misstatements and Cause the Company's Shares to Lose Nearly Half of Their Remaining Value

#### 1. Groupon's Poor Fourth Quarter And Full Year 2019 Results

100. Following market close on February 18, 2020, Defendants announced Groupon's financial results of operations for the fourth quarter and full year of 2019, and issued, *inter alia*: (1) a press release titled "Groupon Announces Fourth Quarter and Fiscal Year 2019 Results" (the "Q4 2019 Press Release"); (2) a letter to shareholders from Williams (the "Q4 2019 Letter"); (3) a presentation titled "4Q19 Earnings" (the "Q4 2019 Presentation"); and (4) a Form 10-K for the year ended December 31, 2019 filed with the SEC.

101. On the following morning of February 19, 2020, at 8:00 a.m. Eastern Standard Time and before the open of stock market trading, Defendants Williams and Thomas hosted a conference call with analysts and investors to further discuss the Company's financial results and operations (the "Q4 2019 Conference Call").

102. Groupon's fourth quarter results, rather than displaying any amelioration of Groupon's longstanding customer/traffic declines (*e.g.*, as a result of Groupon Select and other

strategic improvements), instead evidenced deepening customer, unit and gross profit declines, driven substantially, as discussed further below, by multiple matters centering on Goods of which Defendants had long been aware. In particular, these poor fourth quarter operational and financial results had in turn led the Company to report adjusted EBITDA of $227.2 million for the full year of 2019—significantly below Groupon's $270 million Guidance, which Defendants had affirmed and reiterated in their November 4-5, 2019 disclosures.

**2. Defendants' Corrective Disclosures Concerning Goods And Select**

103. As set forth immediately below, Defendants' February 18-19, 2020 disclosures corrected Defendants' prior Class Period statements concerning Goods and Select, in substantial part by revealing material adverse trends concerning Goods and Select that had existed, and were evident and known to Defendants, throughout the Class Period.

**a. Goods**

104. Defendants' February 18-19, 2020 disclosures included the revelation of a "transformational" new strategy to exit Groupon's Goods segment, in light of especially poor performance in that segment and in order to focus solely on Local. The Q4 2019 Press Release summarized, in relevant part:

> **Transformational Plan to Exit Goods and Focus on Our Local Experiences Marketplace**
>
> Following a comprehensive review of opportunities and strategic alternatives, we determined that a plan to exit the Goods category and focus on our local experiences marketplace best positions us for long-term and sustained growth. We believe this plan will allow us to devote the focused execution necessary to take share in the growing local experiences market. This market, which we estimate to be north of $1 trillion, is highly fragmented, growing, and migrating quickly from offline to online. Currently, we are a market leader, yet we have less than 1% market share. In addition, our 2019 Goods category performance, particularly in the fourth quarter, has made it increasingly clear that we are not well-positioned in a saturated retail market.

105. Defendants' Q4 2019 Letter provided a more fulsome explanation of the

Company's decision to exit Goods, noting, *inter alia*, that: (1) although Goods was less profitable than Local, both overall and on a unit basis, it had "historically been a meaningful engagement tool for Local shoppers and its overall impact on the business extended beyond its direct contribution to gross profit" (*i.e*., Groupon's Goods offerings had been serving, through "cross-shopping" and/or "customer activation," as a meaningful driver for Local traffic and sales); (2) this had changed no later than midway through the fourth quarter of 2019, as it had become "abundantly clear" to Defendants "[m]idway through the fourth quarter" that Groupon was unable to compete effectively in Goods, that customer engagement with Goods inventory had meaningfully declined, and that such decreased engagement with Goods was also translating into diminished customers, traffic and units for Groupon's core Local segment.

> Midway through the fourth quarter it became abundantly clear that we were not competing effectively in Goods. We saw far fewer customers engage with Goods in the fourth quarter than we anticipated, which impacted overall traffic to our site. The lower traffic ultimately impeded performance in all of our categories. This was particularly notable in November, including during the holiday peak period when Goods engagement has historically been a business driver.
>
> ***
>
> **PLAN TO EXIT GOODS**
>
> Our management team and board have been evaluating the role of Goods in our ecosystem for some time. Goods' contribution to gross profit has been declining for four quarters, but it has historically been a meaningful engagement tool for Local shoppers and its overall impact on the business extended beyond its direct contribution to gross profit. Recently we've seen engagement with our Goods inventory shift meaningfully lower, driven in large part by our inability to compete in a fiercely competitive, and in some cases, economically irrational retail landscape. In 2019, we were devoting about 40% of our site impressions to a category that was only delivering about 20% of our gross profit and no longer generating the cross-shopping behavior or customer activation activity to continue to justify this investment. In short, Goods has outlived its role as a business driver and has become a significant drag on our business.
>
> Our fourth quarter performance, and the challenges Goods has posed over the past few years, has clarified our path forward. What we've now realized is that too many of our efforts in the past, even good products like Select and Groupon+, didn't address the core of our product or business model, nor did they overcome

> the limitations in the legacy Groupon business.
>
> In order to deliver on our growth strategy to attack the large and growing market opportunity in local experiences, we have to be willing to walk away from any and all distractions. This is why we plan to exit Goods.

106. Defendants Williams and Thomas, in their introductory remarks during the Q4 2019 Conference Call, reiterated the above-mentioned explanations concerning the extent, effects and timing of the dramatic deterioration of the Goods Segment:

> [WILLIAMS]: . . . Midway through the fourth quarter, it became clear, however, that we were seeing far fewer customers engaged with goods, and it impacted overall traffic to our site. The lower traffic ultimately impeded performance in all of our categories. This was particularly notable in November and affected our holiday peak period, when goods engagement has historically been a business driver.
>
> Adding to these challenges, certain conversion initiatives in Select did not deliver on expectations. Our traffic declines and these other factors, which Melissa will discuss in greater detail, combined to create a headwind that we could not overcome during the fourth quarter. Before I discuss our strategy, let's touch on Goods.
>
> Our management team and board have been evaluating the role of Goods for some time. Our fourth quarter performance and the challenges Goods has posed over the past few years have clarified our path forward. Delivering on our growth strategy requires total focus on capturing the local experiences opportunity. Over time, Goods has become a less meaningful driver of engagement and an increasingly inefficient use of our impressions.
>
> It has effectively become a distraction, in which we can no longer compete and that we cannot afford, as it has taken roughly 40% of our impressions to deliver roughly 20% of our gross profit. This is the crux of our plan to exit Goods.
>
> ***
>
> [THOMAS]: . . . To give you insight into the trajectory within the quarter, first note that our plan, which considers historical buying patterns on our site, calls for a meaningful shift of impressions and other assets to the Goods category throughout the quarter. Midway through the quarter, however, it became clear that we were not competing well in Goods, and November performance was particularly poor.
>
> The lack of engagement with our Goods offering impacted the overall traffic to our site, and ultimately performance in all of our categories.

107. In the Q4 2019 Presentation, Defendants described Goods as "a headwind to performance," explaining that "[c]ross-shopping between Local and Goods continues to decline" and that although Goods was "[h]istorically an important Local engagement tool" its current impact on Local was "now minimal."

108. Defendant Williams further specified that Groupon had been unable to compete—*i.e.*, unable to meet customers' expectations (and competitors' provision)—with respect to "comprehensive inventory" and fast shipping. *See* Q4 2019 Conference Call, FactSet transcript at 12-13. Williams reiterated this explanation in later remarks made at UBS's March 5, 2020 Global Consumer & Retail Conference (the "UBS Presentation"), noting that "the e-commerce landscape fundamentally changed, in particular over the last couple of years," particularly with respect to the importance of shipping speed, which Groupon's management "had considered a lot" as they saw "that business shrinking" over "the last couple of years."

**b. Select**

109. In their February 18-19, 2020 disclosures, Defendants also announced that Groupon Select had failed and they would discontinue enrolling new members in Select. As Defendants revealed in these disclosures: (1) in the second half of 2019, Select, in Defendants' terminology, "over-indexed to Goods" (meaning that Select was being used "disproportionately [by] customers purchasing goods vs. those transacting on our local platform;" (2) Select had not generated meaningful change in customer behavior / purchase frequency with respect to Groupon's core Local business, and (3) Select was *unprofitable* for Groupon ("The Select program was expected to be net neutral to gross profit in the fourth quarter. But the program underperformed . . .").

110. With respect to Select, the Q4 2019 Letter stated:

While we saw strong performance from guest checkout, other conversion

> initiatives did not deliver on expectations. Groupon Select added to our challenges in the quarter as it over-indexed to Goods, pressured margins and drove higher than anticipated customer acquisition costs. This brings us to the future of Select. The program's fourth quarter performance showed that it cannot provide the ROI needed for it to be a key priority for us at this time. Select's current features began appealing disproportionately to customers purchasing goods vs. those transacting on our local platform. As a result, we will continue to provide Select benefits to current members, but we will not pursue new enrollees for the program.
>
> ***
>
> What we've now realized is that too many of our efforts in the past, even good products like Select and Groupon+, didn't address the core of our product or business model, nor did they overcome the limitations in the legacy Groupon business. . .

111. During the Q4 2019 Conference Call, Thomas provided additional disclosures and details concerning Select:

> [THOMAS]: . . . The Select program was expected to be net neutral to gross profit in the fourth quarter. But the program underperformed due to higher than anticipated customer acquisition costs and a lower than expected number of enrollees converting to paid members. The program also began over-indexing towards our Goods category in the second half of 2019.
>
> This, coupled with results in the fourth quarter, led to our decision to discontinue new enrollments in our Select program. . .

112. Select's unprofitability was a direct result of the fact, evident to Defendants in the second half of 2019, that it "over-indexed to Goods." Groupon's profit margins on Goods (averaging approximately 10-20%, and often near-zero, nonexistent or even negative) were materially lower than its 80-90% margins for Local. The benefits and discounts included with Select, such as free shipping and a 15% discount for Goods purchases, had the effect of entirely erasing—and/or turning negative—the Company's profit margins on Goods.

### 3. Groupon Shares Decline Materially Following The February 18-19, 2020 Corrective Disclosures

113. Following Defendant's above-detailed February 18-19, 2020 corrective

disclosures, Groupon shares, which had closed trading on February 18, 2020 at $3.05 per share—quite near to the Class Period high of $3.40 per share—fell sharply during February 19, 2020 to close at $1.70 per share—a decline of $1.35 per share, representing more than 44% of Groupon's market capitalization. Trading volume on February 19, 2020 was extreme: approximately 155.34 million Groupon shares traded hands, more than 25 times Groupon's average daily trading volume of 6.18 million shares during the Class Period. The price of Groupon shares did not meaningfully recover over subsequent trading sessions.

### C. Additional Scienter Allegations

114. As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As discussed above, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Groupon, during the Class Period (as they later admitted), their control over, and/or receipt and/or modification of Groupon's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Groupon, participated in the fraudulent scheme alleged herein. As set forth immediately below, Defendants' scienter is evidenced by several additional factors in addition to their February 2020 admissions of knowledge.

#### 1. Goods And Select Were Core Operations For Groupon

115. Defendants' above-detailed misstatements concerned two matters—Goods and Select—both of which constituted core operations for Groupon. Consequently, knowledge of the

fraud may be imputed to the Individual Defendants.

116. Goods was a substantially sizeable business for Groupon. Goods provided Groupon with approximately 31% of its gross billings, 56% of total revenues, and 20% of gross profits.

117. Although Select, as a new product launched in late 2018, did not rise to the same sheer size, Select still constituted a core operation for Groupon in light of its central strategic importance. Defendants had identified increasing customer purchase frequency as Groupon's foremost strategic concern and had represented Select as a primary means to address it. Consequently, in Defendants' view and Defendants' own words (as discussed on the Q2 2019 Conference Call and the Q3 2019 Conference Call), Select was "critical to transforming the business" and one of Groupon's "key strategic priorities."

**2. Defendants' Own Assertions That They Closely Monitored Select And Goods**

118. Defendants asserted, prior to their February 2020 corrective disclosures, and admitted as part of their February 2020 corrective disclosures, that they had long and closely monitored both Select and Goods.

119. As Select was intended and designed as a solution for what Defendants identified as Groupon's foremost strategic goal—increasing customers' purchase frequency, and thereby returning Groupon to gross profit growth—Defendants, by their own admission, thereafter monitored Select's operations and results closely. For example, during their May 1, 2019 conference call with analysts and investors in connection with Groupon's results of operations for the first quarter of 2019 (the "Q1 2019 Conference Call"), after B. Riley FBR, Inc. analyst Sameet Sinha asked for an early update on Select, Williams assured that "we're watching it really closely," and more specifically observed:

> [WILLIAMS]: …As far as Groupon Select, it's not something that we've discussed broadly. And I think that's just because it's very much in an experimental stage. It's very early. There's still a lot of folks who haven't been exposed to it, haven't seen it on the site or in our apps. We're very excited about that program. We think it has a lot of potential. But, again, it's a membership oriented program, so it's a little too early to start discussing what the potential of it is ultimately financially for the company and for customer accounts because as you know in membership it's really about continuity. And that's where it counts not just how many folks you can get in the program initially. So I'd say stay tuned on that one. We're watching it really closely. We are excited about it and as an early stage initiative, but we have a lot of wood to chop on that one.

120. During the Q3 2019 Conference Call, Thomas discussed the adoption of the Select program at length and described how "we've been really pleased with the trajectory in terms of our ability to improve member accounts and what we're seeing on the customer side from a frequency standpoint as well as average order values improving."

121. Similarly, during his Barclays Conference Presentation a month later, Williams detailed how he was pushing the team to develop more granular insights into how Select was performing. Specifically, he observed, "So we're really challenging our team to decompose the value and not just the value in aggregate, but what's meaningful to every group, what's meaningful to the first time buyer or the one-time buyer, versus the 12 time buyer. And can we use that to extend the program in different ways to evolve it in new ways."

122. Likewise, with respect to Goods, Defendants clearly articulated prior to the Class Period what they viewed as Goods' fundamental purpose—to generate profits, even if at a lower margin than Local, while driving further traffic to Local and spurring Local "customer activation" and "cross-shopping." Throughout the Class Period, they closely monitored Goods' decline on both these metrics. As Williams explained in his February 18, 2020, Q4 2019 Letter to shareholders:

> Our management team and board have been evaluating the role of Goods in our ecosystem for some time. Goods' contribution to gross profit has been declining for four quarters, but it has historically been a meaningful engagement tool for

> Local shoppers and its overall impact on the business extended beyond its direct contribution to gross profit. Recently we've seen engagement with our Goods inventory shift meaningfully lower, driven in large part by our inability to compete . . . In short, Goods has outlived its role as a business driver . . .

123. During the Q4 2019 Conference Call, both Williams and Thomas specifically acknowledged that Goods was engaging fewer customers "midway through the quarter." Williams stated that "[t]he lower traffic ultimately impeded performance in all of our categories. This was particularly notable in November," and Thomas conceded that "November performance was particularly poor."

124. Similarly, as Williams explained during the Q4 2019 Conference Call, Groupon's management and board had long been monitoring the deterioration of Goods and that "[o]ver time, Goods has become a less meaningful driver of engagement and an increasingly inefficient use of our impressions."

### 3. Defendants' Claim that they Closely Monitored Both Select and Goods is Borne Out By The Mastery Of Details Displayed By Defendants In The Q2 2019 And Q3 2019 Conference Calls

125. Defendants, during both the Q2 2019 Conference Call and the Q3 2019 Conference Call, demonstrated extremely detailed knowledge with respect to Select that extended deep into the technical minutiae of Select's operations, and of the strategic and product development considerations and decisions responsible for them.

126. For example, during the Q2 2019 Conference Call and in response to multiple questions from analysts concerning Select's operations and results, Defendant Williams discussed the detailed considerations relating to Select's product development, how Select was being technically presented on Groupon's websites and mobile applications to optimize customer enrollment, and how Groupon had been and would be testing such technical features, and considering the resulting customer response data, in order to continue to optimize Select:

> [WILLIAMS]: Yeah. I think that's right. And just to speak a little bit about the philosophy and where we are on it now, you asked whether we're thinking about it as a way to subsidize growth and frequency. That's not really how we're thinking about it.
>
> Ultimately, we're looking for a way to monetize what has historically been member-like behavior in our customer base. So we've had that member-like behavior for years, but we haven't had a member-like monetization model to go along with it. We saw an opportunity to do that and to build that.
>
> And we – really we set a philosophy for the program out of the gate to make it as incredibly compelling as we could, really to drive engagement and frequency and commitment to the platform and to Groupon over time more so than thinking about [ph] in a way as subsidiary of growth. And I think hopefully now as you've heard Mike walk through the economics of the program, you see there's really – there's not a 'subsidy' there more so than it is just making the core Groupon value prop even more compelling.
>
> And our goal pushing forward is to double down on what you mentioned now, which I think it is compelling today, but as we bring more features in, more partners in, and more unique experiences in, we think we have a program that starts to get into the no-brainer territory, the why wouldn't you territory, that ultimately over time can support higher membership fees.
>
> But today, our focus is entirely gain traction in the program, gain trial in the program, get as many of our customers into the Select experience as we possibly can so that we can continue to add value, share the economics with them, and build those healthier relationships over time.
>
> ***
>
> Over the next couple of quarters, a big part of our testing will be refining that checkout pipeline to make it as smooth and seamless for consumers as possible, and hopefully we can mitigate some of that conversion headwind that makes the compounding effect of the membership fees even more powerful as we go forward. But we have real work to do there over the next few quarters, and we have a team whose sole focus is really pushing on those elements.

### 4. Defendants Attested To Their Data Driven Decision-Making Frameworks

127. Groupon likens itself to a "massive data-driven experiment," that "has tweaked and tested every corner of its e-commerce platform to find out precisely what makes customers

click."[3] The Company's senior leadership, including the Individual Defendants, endorsed the development of data driven decision making processes. For example, during the Q2 2018 Conference Call held on August 3, 2018, Williams described how the Groupon used "machine learning to use that data advantage that we have in this space, use that huge corpus of intent data that we have to just better service the best possible offer instead of-- in many cases, the best possible discount."

128. Thus, when the Individual Defendants described how initiatives were being developed or deployed, they spoke based on their assessment of real time data analysis—and not mere anecdotal observation. For example, during the Q3 2019 Conference Call held on November 5, 2019, Thomas described how Groupon sought to improve marketing efficiency by "deploying marketing strategies that allow us to leverage data to better segment our customer base and personalize the overall Groupon experience. Our goal is to drive purchase frequency, particularly within the first 90 days post purchase." During the same call, Williams described how "the more intelligent use of data" was directed towards "really harnessing all that we know about customers. So, you're starting to see some of those pieces really work their way through that local customer experience, and we're seeing the impacts of that."

### 5. Executive Terminations Shortly After the Class Period Further Support an Inference of Scienter

129. On March 25, 2020, Groupon abruptly announced that its Chief Executive Officer, Williams, and its Chief Operating Officer, Steve Krenzer, were "no longer serving" in their roles, but would "continue as employees of the Company." The disclosure of the departures came approximately one month after the Company reported the failures of Goods and

[3] *See* "Groupon is a massive data-driven experiment—this team helps run it," *available at*: https://people.groupon.com/2018/groupon-data-driven-experiment-chicago/.

Select and the ensuing Guidance miss.

### 6. Groupon Acted With Corporate Scienter

130. Each of the Individual Defendants was a high-ranking management-level employee. The scienter of each of the Individual Defendants and of all other management-level employees of Groupon, including each high-ranking officer or director, is imputable to Groupon. The knowledge of each of these individuals should therefore be imputed to Groupon for the purposes of assessing corporate scienter.

131. Even aside from the scienter of the Individual Defendants, the facts alleged herein raise a strong inference of corporate scienter as to Groupon as an entity. Corporate scienter may be alleged independent of individual defendants where a statement would have been approved by corporate officials sufficiently knowledgeable about the company to know the statement was false. Here, the statements alleged were made to the investing public regarding Groupon's operations and profitability, one of Groupon's primary business segments (*i.e.*, Goods), and one of Groupon's key strategic initiatives (*i.e.*, Select)—all important topics that would necessarily require approval by appropriate corporate officers who, as alleged, had very different information in their hands at the time from what was disclosed to investors.

### D. Additional Allegations Regarding Loss Causation

132. Defendants' wrongful conduct as alleged herein directly and proximately caused the economic loss suffered by Lead Plaintiff and the Class.

133. During the Class Period, Lead Plaintiff and the Class purchased Groupon securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed or materialized, causing investors' losses.

134. Artificial inflation in Groupon's stock price was removed when the truth about the material misrepresentations and omissions was partially revealed to the public on February 18-19, 2020. Defendants' disclosures on those days revealed, *inter alia*, the collapse of Goods, the unprofitability of Select, and the failure of both Goods and Select as drivers for Groupon's core Local business and overall gross profits. These disclosures reduced the amount of inflation in the price of Groupon's publicly traded securities. Groupon's share price fell by more than 40%, on extraordinary trading volume, immediately after the previously-concealed information was disclosed, causing economic injury to Lead Plaintiff and other members of the Class.

**E. Presumption Of Reliance**

**1. General Allegations**

135. The market for Groupon's securities was open, well-developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Groupon's securities traded at artificially inflated prices during the Class Period. On January 21, 2020, following the misstatements complained of herein and shortly prior to Defendants' corrective disclosures, the Company's share price closed at $3.14 per share, just below the Class Period high of $3.40 reached on the first day of the Class Period (July 30, 2019). Lead Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Groupon's securities and market information relating to Groupon, and have been damaged thereby.

136. During the Class Period, the artificial inflation of Groupon's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Lead Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Groupon's business, operations and prospects. These

material misstatements and/or omissions created an unrealistically positive assessment of Groupon and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Lead Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

137. At all relevant times, the market for Groupon's securities was an efficient market for the following reasons, among others:

(a) Groupon shares met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, Groupon filed periodic public reports with the SEC and/or the NASDAQ;

(c) Groupon regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d) Groupon was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

138. As a result of the foregoing, the market for Groupon's securities promptly

digested current information regarding Groupon from all publicly available sources and reflected such information in Groupon's share price. Under these circumstances, all purchasers of Groupon's securities during the Class Period suffered similar injury through their purchase of Groupon's securities at artificially inflated prices and a presumption of reliance applies.

139. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

**2. Class Period Analyst Reports Reflected And Transmitted Defendants' Misstatements**

140. Defendants' misstatements concerning Select and Goods were considered and relied upon by securities analysts and featured in their Class Period published reports on Groupon.

**a. Analyst Reports Following Defendants' Q2 2019 Statements**

141. On July 31, 2019, UBS analyst Eric J. Sheridan published a report titled "Work in Progress; 2020 Is Key for Stock" (the "UBS Q2 Report") in which, after noting disappointing "headline [Q2 2019 numbers] on rev[enues] and bookings" that would "likely dominate the short-term narrative," he concluded that "management's strategy and focus is the correct

approach," and listed Select as the first "Q2 2019 Positive[]:"

> **Work In Progress; 2020 Is Key For Stock**
>
> **Transition Continues to Produce Volatility**
>
> While headlines #s on revs and bookings will likely dominate the short-term narrative, we were encouraged that GRPN management remains laser focused on the same 2020 re-alignment that has been the investor narrative over past few quarters. In our view, management's strategy and focus is the correct approach for 2020 and beyond to stabilize customer trends, align marketing channels against customer value and drive higher margin/FCF trajectory. In the interim, we stay on the sidelines as we look for signs of the strategy producing a possible inflection in forward estimates and see the stock stuck in its recent trading range ($3-4) until further evidence emerges.
>
> **Q2 2019 Positives & Negatives**
>
> Positives: a) Over 150k members joined 'Groupon Select' (new membership/subscription product) with initial indicators showing improved purchase frequency, higher AOV, and increased customer propensity to search for services/products; . . .

UBS Q2 Report, at 1.

142. On August 1, 2019, Credit Suisse analyst Stephen Ju published a report on Groupon titled "Investing to Accelerate Subscription Adoption" (the "Credit Suisse Q2 Report"), in which he focused on Select at length and described Select as "[t]he highlight this quarter:"

> **Investing to Accelerate Subscription Adoption**
>
> ***
>
> ■ Investment Case: The highlight this quarter was the strategic allocation of incremental marketing budgets and impressions towards driving membership of its recently-launched Groupon Select program in North America – which offers ~25% discounts on Local deals, free shipping within the Goods category, and an extra ~10% off travel and event purchases. Notably, in addition to a ~$5 monthly subscription fee, the company highlighted a significant increase in incremental repeat purchase rates and AOV resulting in higher annual gross profit per shopper. As a result, management expects to pull forward marketing to accelerate adoption of its Select program from ~150,000 members this quarter. That said, Groupon continues to experience headwinds due to ongoing traffic issues within its SEO and email marketing channels, weaker consumer demand in the UK, and increased competition in seasonal categories (e.g., Home & Garden). As a result

> we elect to maintain our wait-and-see Neutral stance as we anticipate the lapping of some of these headwinds as we exit FY19. As a reminder, management anticipates improving profitability in 2020 as it increases profitability per customer in its North American business and continues to rationalize OpEx.

Credit Suisse Q2 Report, at 1; *see also id.* at 3.

**b. Analyst Reports Following Defendants' Q3 2019 Statements**

143. On November 5, 2019, UBS analyst Eric J. Sheridan published a report on Groupon titled "Is the Plan Coming Together for 2020?" (the "UBS Q3 Report"), taking note of Groupon's continuing customer declines as well as Groupon's "key" strategies to counter such declines, including Select, whose purported progress, as represented by Defendants (*i.e.*, that Select was growing fast and producing significant increases in purchase frequency and average order value), he deemed as the foremost "positive" among the Company's Q3 2019 results disclosures:

> **Is The Plan Coming Together for 2020?**
>
> **Is 2020 The Year GRPN's Plan Begins To Bear Fruit?**
>
> While some investors focused on declining active users (not a driver mgmt is focused on) and/or revenue volatility, GRPN mgmt is steadily building the strategy around a few key themes into 2020 - effective marketing with defined pay back periods, broadening out available inventory (especially thru distribution partners), driving higher levels of shopping velocity per user and driving better output in terms of gross profit per user growth. As we look into 2020, the key question is likely to remain how effectively GRPN mgmt can execute against these themes. . . .
>
> **Q3 2019 Positives & Negatives**
>
> Positives: a) +260k members joined 'Groupon Select' (+100k QoQ) w/ initial indicators showing 60% increase in purchase frequency & 20% higher AOV; b) Positive mgmt commentary on product enhancements intended to improve conversion and card- linked & booking initiatives (e.g., -65% of food & drink inventory is now bookable in Intl & rolled out bookings software in NA); & c) Repurchased 5m+ shares for -$15m (-$44m YTD).

UBS Q3 Report, at 1.

144. On November 6, 2019, Credit Suisse analyst Stephen Ju published a report on Groupon titled "Turning to Order Frequency and Conversion to Offset Ongoing Traffic Headwinds" (the "Credit Suisse Q3 Report"), in which—as in his Credit Suisse Q2 Report—he focused on Select. Ju renewed his prior quarter's assessment that Select was Groupon's "highlight" for the prior quarter. He specifically observed, "The highlight this quarter was continued traction in the NA rollout of Groupon Select—with subscribers growing by ~100k in 3Q19 to reach ~260k; with the company indicating that Select members are transacting at a +20%/+60% lift to AOV/order frequency resulting in higher annual gross profit per shopper." Credit Suisse Q3 Report, at 1; *see also id*. at 3.

**c. UBS Upgrades Groupon to "Buy" on January 17, 2020**

145. On January 17, 2020, following—and reflecting—Defendants' Class Period misstatements as set forth herein, UBS analyst Eric J. Sheridan upgraded Groupon to "Buy" (from his prior "Neutral" recommendation) and published a lengthy report on Groupon, titled "Groupon on Sale" (the "UBS Upgrade Report") setting forth the basis for his upgrade. In essence, Sheridan credited Defendants' representations concerning the purported progress they had been making in "core initiatives," such as Select, intended to counter the Company's continued customer declines and return it to profit/EBITDA growth, and cited as "evidence" that such initiatives were working Defendants' Class Period assertions concerning the effects of Select (*i.e.,* a purported 60% increase in purchase frequency and 20% increase in average order value):

> **Groupon on Sale**
>
> **2020 – GRPN's Mgmt Should Begin To Deliver On The Plan**
>
> While GRPN's stock remained volatile throughout 2019 on the back of user growth narratives, we think that momentum has been building against mgmt long term objectives to focus on a) user growth wrapped around "quality" not

"quantity"; b) framing and allocating mkting against payback ROI targets & c) positioning GRPN for success in a mobile first world. In addition, initiatives aimed at broadening out available inventory (esp. thru distribution partners) & driving higher levels of shopping velocity per user and driving better output in terms of gross profit per user growth. Looking forward, we see GRPN as compellingly cheap with an asymmetric risk/reward profile from current levels. As a result, we upgrade our rating to Buy and maintain our $3.50 PT but see a 2:1 skew in risk/reward between our upside & downside cases.

**What Are The Initiatives That Will Drive The Narrative Forward?**

Throughout the course of 2019, Groupon has focused on a few key strategic initiatives to drive higher purchase frequency, conversion, and gross profit per customer growth. Specifically, management has invested in: a) voucherless coupons (in the form of card-linked offers & bookability); b) an enhanced mobile experience; & c) subscription-based program (Groupon Select). Collectively, we see these initiatives reducing consumer shopping friction, reducing consumer churn & improving ROI as inventory and choice scales (especially thru distribution partner agreements). We expect Groupon's strategic investments in Groupon Select, mobile experience, & voucherless transition to drive sustained YoY growth for TTM gross profit per active customer in 2020 and beyond.

***

**PIVOTAL QUESTIONS**

***

**Q: Can Groupon maintain steady user growth to drive top line momentum?**

Yes. While we expect 2019 to result in customer net losses (due to traffic headwinds in NA & softened consumer environment in UK), we model ~400-900k in annual net adds in FY20 & beyond. As the company shifts to target high value users and forego low value customers, we see medium-to-long term momentum on the back of an improved user experience and growing international contribution.

**Q: Will core initiatives re-position Groupon for sustained adj. EBITDA growth?**

Yes. We expect GRPN to grow gross profit dollars at a ~3% CAGR ('19- '24E) for the next 5 years with potential upside from deepening personalization and further reducing customer friction. Against company guidance for the long-term, our estimates might prove to be conservative. We see increasing flow through to bottom line, driving ~8% ('19-'24E CAGR) adj. EBITDA growth runway.

**UBS VIEW**

> Groupon has formulated a focused turnaround strategy (centered on voucherless, local offerings, & driving GP dollar per customer) and executed steadily in the past few qtrs. While there is still a long road ahead in strengthening the company's positioning in the local ad and/or local eCommerce mkt in the face of competitive threats from large internet companies, we are constructive on GRPN shares at current levels as we see a + skew (2:1) in our upside/downside skew given better line of sight on GP & EBITDA growth (in terms of business momentum as an output of 2019 investments).
>
> **EVIDENCE**
>
> Anchored to its new focus on maximizing profit and de-emphasizing low ROI customer adds, GRPN was able to achieve GP per customer growth over the past 3 yrs w/ 2019 invtmts displaying + initial results (e.g., Select members have seen a ~60% increase in purchase frequency & ~20% higher AOV).
>
> **WHAT'S PRICED IN**
>
> By applying a 11.0x EV/(FCF-SBC), the market is assuming ~28% FY19-FY21 FCF-SBC CAGR (vs. UBSe ~38.7%). We view this as conservative given the potential for GRPN to scale Groupon Select & gross profit dollar growth on the back of 2019 investments.

UBS Upgrade Report, at 1-2.

146. Sheridan counted Select as one of three "key strategic initiatives" that Groupon had focused on through the court of 2019 "to drive higher purchase frequency, conversion, and gross profit per customer growth." UBS Upgrade Report, at 3 *et seq*. Sheridan believed that as Select was still "in early phases," the market was "not factoring in the opportunity this initiative presents in terms of enhancing the gross margin per customer profile." *Id.* at 3. Sheridan then depicted the opportunity presented by Select, principally by amalgamating and reflecting Defendants' above-detailed Class Period representations concerning Select, including its purported 60% boost to purchase frequency and its overall and per-unit profitability. *Id.* at 5-6.

### F. Defendants' Statements Regarding Goods and Select Were Material

147. Both the nature of Groupon's business as well as Defendants' and market observers' comments during the Class Period amply demonstrate the materiality of Defendants'

misrepresentations regarding its Goods business and Select program.

148. For example, during the Class Period, Groupon's Goods division generated over 50% of the Company's total revenue and 20% of its gross profits. Given the obvious importance of that business segment to Groupon's future performance, Groupon's share price dropped precipitously when it announced that it was exiting the Goods marketplace.

149. With respect to Select, throughout the Class Period, Groupon touted how Select was critical to the Company's success. For example, during the Q2 2019 conference call, Select was pitched as: (i) "critical to transforming [Groupon's] business"; and (ii) able to offset customer losses by "almost doubl[ing] the average gross profit per customer."

150. Against this backdrop, Defendants repeatedly emphasized Select's rapid customer growth and stressed that Select's overall customer count was less important than the program's ability to increase purchase frequency. For example, Defendants bragged that during the short period since Select's inception, "more than 150,000 members have joined the program . . . and its scaling quickly," and that the Company's "focus is entirely to gain traction in the program."

151. Indeed, even as late as December 11, 2019, Defendant Williams favorably framed Select's performance and stressed that "the total economics of the program are really compelling."

152. Unsurprisingly, given Defendants unbridled boosterism regarding Select, many analysts saw that program as pivotal to Groupon's future success. For example, after meeting with Groupon management, Wedbush analyst Ygal Arounian issued a September 9, 2019 report, noting that: (i) "[management] highlighted strong early signs from Select, noting the percentage of units coming from Select 'is not immaterial' and that purchase frequency/conversion is up 'significantly'"; and (ii) "[m]anagement notes that Select is materially impacting behavior at

every cohort level."

153. Similarly, UBS upgraded Groupon from "Neutral" to "Buy," due in part to Select's purported success, and identified Select as one of Groupon's "three key strategic initiatives."

154. Finally, and further cementing Select's status as highly material to Groupon's business and investors' expectations, Groupon's share price declined dramatically when the Company revealed in early 2020 that Select was, in fact, a failure and that Groupon would no longer be enrolling new customers into the program.

## VI. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE

155. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Groupon who knew that the statement was false when made.

156. Defendants' purported "cautionary" disclosures do not protect the allegedly false

statements pleaded in this Complaint to the extent that such cautionary disclosures merely repeated generic disclosures first made before the Class Period, and therefore were not substantive or tailored to the adverse developments arising during the Class Period. For example, Groupon's Q2 2019 10-Q stated that:

> forward-looking statements involve risks and uncertainties that could cause our actual results to differ materially from those expressed or implied in our forward-looking statements. Such risks and uncertainties include, but are not limited to, . . . execution of our business and marketing strategies; retaining existing customers and adding new customers; . . . [and] competing successfully in our industry. . .

However, this information was repeated nearly verbatim in pre-Class Period filings such as Groupon's 2018 Form 10-K:

> forward-looking statements involve risks and uncertainties that could cause our actual results to differ materially from those expressed or implied in our forward-looking statements. Such risks and uncertainties include, but are not limited to, . . . execution of our business and marketing strategies; retaining existing customers and adding new customers; . . . [and] competing successfully in our industry. . .

## VII. CLASS ACTION ALLEGATIONS

157. Lead Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Groupon securities between July 30, 2019 and February 18, 2020, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

158. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Groupon's common shares actively traded on the NASDAQ. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at

least hundreds or thousands of members in the proposed Class. Millions of shares of Groupon common stock were traded publicly during the Class Period on the NASDAQ. As of July 26, 2019, Groupon had 567,619,924 shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by Groupon or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

159. Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

160. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

161. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the Company's business, operations, and prospects;

(c) whether Defendants made false and/or misleading statements;

(d) whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of circumstances under which they were made, not misleading; and

(e) to what extent the members of the Class have sustained damages and the proper measure of damages.

162. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VIII. CLAIMS FOR RELIEF

### FIRST CLAIM
### Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

163. Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

164. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; and ii) cause Lead Plaintiff and other members of the Class to purchase Groupon's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each defendant, took the actions set forth herein.

165. Defendants (i) employed devices, schemes, and artifices to defraud; ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to

maintain artificially high market prices for Groupon's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

166. Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Groupon's financial well-being and prospects, as specified herein.

167. Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Groupon's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Groupon and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

168. Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's internal budgets,

plans, projections and/or reports; iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports, and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

169. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Groupon's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

170. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Groupon's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information

that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiff and the other members of the Class acquired Groupon's securities during the Class Period at artificially high prices and were damaged thereby.

171. At the time of said misrepresentations and/or omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Lead Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Groupon was experiencing, which were not disclosed by Defendants, Lead Plaintiff and other members of the Class would not have purchased or otherwise acquired their Groupon securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

172. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

173. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM
## Violation of Section 20(a) of The Exchange Act
## Against the Individual Defendants

174. Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

175. Individual Defendants acted as controlling persons of Groupon within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the

Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

176. In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the alleged securities violations, and exercised the same.

177. As set forth above, Groupon and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## IX. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

(a) determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of

Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) such other and further relief as the Court may deem just and proper.

## X. JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury.

Dated: August 12, 2021

GLANCY PRONGAY & MURRAY LLP
*/s/ Kara M. Wolke*
Robert V. Prongay (admitted *pro hac vice*)
Kara M. Wolke (admitted *pro hac vice*)
Christopher Fallon (admitted *pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Email: rprongay@glancylaw.com
cfallon@glancylaw.com

KIRBY MCINERNEY LLP
Ira M. Press (admitted *pro hac vice*)
Andrew M. McNeela (admitted *pro hac vice*)
Thomas W. Elrod (admitted *pro hac vice*)
250 Park Avenue, Suite 820
New York, NY 10177
Telephone: (212) 371-6600
Email: ipress@kmllp.com
telrod@kmllp.com

*Counsel for Lead Plaintiff and Lead Counsel for the Proposed Class*

POMERANTZ LLP
Patrick V. Dahlstrom
Louis C. Ludwig
10 South LaSalle Street, Suite 3505
Chicago, IL 60603
Telephone: (312) 377-1181
Email: pdahlstrom@pomlaw.com
lcludwig@pomlaw.com

*Liaison Counsel for Lead Plaintiff and the Proposed Class*

# PROOF OF SERVICE

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On August 12, 2021, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Northern District of Illinois, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 12, 2021.

*s/ Kara M. Wolke*
Kara M. Wolke