**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| LAZAR MACOVSKI, Individually and On Behalf of All Others Similarly Situated, | Case No. 1:20-cv-02581 |
| Plaintiff, | Honorable Matthew F. Kennelly |
| v. | |
| GROUPON, INC., RICH WILLIAMS, and MELISSA THOMAS, | |
| Defendants. | |

**JOINT DECLARATION OF LEANNE H. SOLISH AND THOMAS W. ELROD IN SUPPORT OF: (I) LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; AND (II) LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES**

**TABLE OF CONTENTS**

I.      Introduction ................................................................................................................. 1

II.     Lead Plaintiff's Compliance With The Court's Preliminary Approval Order Requiring
        Issuance Of Notice ...................................................................................................... 4

III.    Prosecution of the Action ............................................................................................ 7

        A.      Factual Background and Summary of Allegations ................................................ 7

        B.      Commencement of the Instant Action ................................................................ 11

        C.      Lead Counsel's Investigation, First And Second Amended Complaints And
                Defendants' Motion To Dismiss ........................................................................ 11

        D.      Discovery Efforts .............................................................................................. 14

        E.      The Mediation Process, Which Included Discovery And Substantial Briefing,
                Ultimately Results In A Settlement .................................................................... 17

        F.      Preliminary Approval of the Settlement ............................................................. 18

IV.     The Settlement Is Reasonable In Light Of The Potential Recovery In The Action ......... 19

V.      The Risks Of Continued Litigation .............................................................................. 21

        A.      Risks To Proving Liability ................................................................................. 21

        B.      Risks To Proving Loss Causation And Damages ................................................ 23

        C.      Other Risks, Including Trial And Appeals .......................................................... 24

VI.     Allocation Of The Proceeds Of The Settlement ........................................................... 26

VII.    Lead Counsel's Application for an Award of Attorneys' Fees and Reimbursement of
        Expenses, and Request for Service Award for Lead Plaintiff .......................................... 27

        A.      Lead Counsel's Qualifications and Work to Date ............................................... 27

        B.      Lead Counsel's Request for an Award of Attorneys' Fees and Litigation
                Expense Reimbursement ..................................................................................... 30

                1.      Lead Counsel's Request for a 33⅓% Fee Award ...................................... 30

                2.      Lead Counsel's Request for Litigation Expense Reimbursement ............... 35

                3.      The Reaction Of The Lead Plaintiff And The Settlement Class To The Fee
                        And Expense Application ....................................................................... 36

     C.     Lead Counsel's Request Service Award For The Lead Plaintiff .......................... 37

VIII.    Additional Exhibits ...................................................................................................... 38

IX.     Conclusion ..................................................................................................................... 38

## TABLE OF EXHIBITS

| Exhibit | Description |
|---|---|
| 1 | Declaration Of Jessie Mahn Regarding: (I) Mailing Of Notice And Proof Of Claim Form; (II) Publication Of Summary Notice; (III) Call Center Services; (IV) The Settlement Website; And (V) Requests For Exclusion And Objections Received To Date ("Mailing Declaration") |
| 2 | Declaration Of Fadi E. Rahal In Support Of: (1) Lead Plaintiff's Motion For Final Approval Of Class Action Settlement And Plan Of Allocation; And (2) Lead Counsel's Motion For An Award Of Attorneys' Fees And Reimbursement Of Litigation Expenses |
| 3 | Declaration Of Leanne H. Solish, Esq. In Support Of Lead Counsel's Motion For An Award Of Attorneys' Fees And Reimbursement Of Litigation Expenses Filed On Behalf Of Glancy Prongay & Murray LLP |
| 4 | Declaration Of Thomas W. Elrod, Esq. In Support Of Lead Counsel's Motion For An Award Of Attorneys' Fees And Reimbursement Of Litigation Expenses Filed On Behalf Of Kirby McInerney LLP |
| 5 | Declaration Of Louis C. Ludwig, Esq. In Support Of Lead Counsel's Motion For An Award Of Attorneys' Fees And Reimbursement Of Litigation Expenses Filed On Behalf Of Pomerantz LLP |
| 6 | Excerpts From Janeen McIntosh And Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2021 Full-Year Review*, NERA Economic Consulting (2022) |
| 7 | Excerpts From Laarni T. Bulan & Laura E. Simmons, *Securities Class Action Settlements 2021 Review and Analysis*, Cornerstone Research (2022) |
| 8 | Excerpts From *Securities Class Action Filings: 2020 Year in Review*, Cornerstone Research (2021) |
| 9 | Table compiled by Lead Counsel collecting Seventh Circuit cases with 33% or higher fee awards |
| 10 | Table compiled by Lead Counsel with: (1) billing rates for plaintiffs' firms in cases involving securities and other comparable complex class actions; and (2) billing rates of law firms that regularly defend securities and comparable class actions from fee applications submitted by such firms |
| 11 | Compendium of unreported cases and documents, in alphabetical order by case name, cited in the accompanying final approval settlement brief, fee brief, and this declaration |

We, Leanne H. Solish and Thomas W. Elrod, declare, pursuant to 28 U.S.C. § 1746, as follows:

## I. Introduction

1. We, Leanne H. Solish and Thomas W. Elrod, are partners in the law firms of Glancy Prongay & Murray LLP ("Glancy Prongay & Murray") and Kirby McInerney LLP ("Kirby McInerney"), respectively. Glancy Prongay & Murray and Kirby McInerney are the Court-appointed Lead Counsel ("Lead Counsel") for the Court-appointed Lead Plaintiff Fadi E. Rahal in this matter ("Lead Plaintiff" or "Plaintiff").[1] We have personal knowledge of the matters set forth herein based on our participation in the prosecution and settlement of the claims asserted on behalf of the Settlement Class in this Action.

2. We respectfully submit this Declaration in support of Lead Plaintiff's motion, pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, for final approval of the proposed $13,500,000 settlement (the "Settlement") that the Court preliminarily approved by Order dated July 6, 2022 (the "Preliminary Approval Order") (ECF No. 113); as well as of the proposed plan for allocating the proceeds of the Net Settlement Fund to eligible Settlement Class Members (the "Plan of Allocation") (collectively, the "Final Approval Motion").

3. We also respectfully submit this Declaration in support of Lead Counsel's motion, on behalf of all Plaintiff's Counsel,[2] for an award of attorneys' fees amount of 33⅓% of the Settlement Fund, which equates to $4,500,000, plus interest earned at the same rate as the Settlement Fund; reimbursement of Lead Counsel's out-of-pocket expenses in the amount of $250,227.53; and an award in accordance with the Private Securities Litigation Reform Act of

---

[1] Unless otherwise defined, all capitalized terms herein have the same meanings as set forth in the Stipulation and Agreement of Settlement dated June 24, 2022 (the "Stipulation"). ECF No. 110-1.

[2] Plaintiff's Counsel consists of Lead Counsel as well as Court-appointed Liaison Counsel Pomerantz LLP.

1

1995 ("PSLRA") for costs and expenses, including lost wages, incurred by Lead Plaintiff Fadi E. Rahal of $5,000 related to his representation of the Settlement Class (the "Fee and Expense Application").

4.      The proposed Settlement now before the Court provides for the resolution of all claims in the Action in exchange for a cash payment of $13,500,000.  As detailed below, Lead Plaintiff and Lead Counsel respectfully submit that the Settlement represents a favorable result for the Settlement Class, especially when juxtaposed against the significant risks of continued litigation.  In fact, the maximum potential damages potentially recoverable for the Settlement Class, *if* Plaintiff fully prevailed on each of his claims at both summary judgment and after a jury trial, and *if* the Court and jury fully accepted Plaintiff's loss causation and damages arguments— *i.e.*, Plaintiff's *best-case scenario*—is approximately $140 million for purchasers of Groupon Common Stock during the Settlement Class Period.  Under this best-case scenario, the $13.5 million Settlement Amount represents approximately 9.6% of the total maximum damages potentially recoverable in this Action.  Of course, Defendants had advanced, and would continue to advance, serious arguments with respect to liability, loss causation, and damages.  If any of these arguments were accepted, Plaintiff's potential recovery would have been substantially reduced or completely eliminated.

5.      As explained in greater detail herein, this Settlement was reached only after comprehensive inquiry into the merits of the claims alleged and the likely damages that could be recovered by the Settlement Class, and arm's-length bargaining by experienced and knowledgeable counsel on both sides, under the supervision of a respected mediator, which resulted in a fair and reasonable Settlement for the Settlement Class.  The Settlement confers a substantial immediate benefit to the Settlement Class and is eminently fair, reasonable, and

adequate given the legal hurdles and risks involved in proving liability and damages. The Settlement also avoids the further risk, delay, and expense had this case continued through class certification, discovery, summary judgment, and to trial. Lead Counsel respectfully submits that under the circumstances, the Settlement is in the best interest of the Settlement Class and should be approved.

6. As discussed below, the requested fee represents a fair market rate for Plaintiff's Counsel's services and is further supported by the contingent risk borne by Lead Counsel and the result obtained. The fee is the figure proposed in the Notice available to the Settlement Class and is well within the parameters recognized as appropriate in federal securities class actions such as this litigation, both under a percentage of recovery analysis and under a lodestar cross-check analysis. The out-of-pocket expenses incurred were all reasonable and necessary for the prosecution of the Action and are considerably less than the maximum figure proposed in the Notice available to the Settlement Class.

7. Lead Plaintiff and Lead Counsel vigorously litigated this case on behalf of the Settlement Class since its inception. During that time, Lead Counsel committed a substantial amount of time and resources to this case. Lead Counsel reviewed thousands of pages of relevant public documents concerning Groupon to develop the facts and file the detailed amended complaints in this Action, one of which withstood Defendants' futility arguments in opposition to Lead Plaintiff's motion for leave to amend the complaint. Lead Counsel also conducted substantial legal research and consulted with experts in the fields of accounting and damages. Lead Counsel's thorough factual investigation provided the foundation to pursue targeted discovery into Groupon's operations during the Settlement Class Period. Over the course of discovery, Lead Counsel reviewed and analyzed more than 90,000 pages of documents produced by Defendants

and third parties. Additionally, as part of the Settlement, Defendants agreed to provide Lead Counsel with the opportunity to engage in confirmatory discovery, namely the interview of a senior Groupon finance executive. The confirmatory discovery coupled with the arguments raised during the mediation process enabled Lead Counsel to fully assess the strengths and weaknesses of the Litigation and to conclude that settlement is appropriate here.

8. Lead Counsel prosecuted this Action on a wholly contingent basis and, by doing so, assumed the risk of an unfavorable result. The nature of the alleged improprieties underlying the alleged securities violations here have been analyzed and developed by Lead Counsel. This fee request of 33⅓% of the Settlement Fund is appropriate in light of the benefits conferred to the Settlement Class, the nature of the legal services performed, and the contingent risk undertaken.

9. Significantly, following the dissemination of over 8,647 Notice Packets to potential Settlement Class Members, no objections have been filed to date to any aspect of the Settlement, Plan of Allocation, or Lead Counsel's fee request. Additionally, to date, there have been no requests for exclusion from the Settlement Class. The deadline for Settlement Class Members to file objections to and requests for exclusions from the Settlement is September 22, 2022.

10. For these reasons and those discussed below, Lead Counsel respectfully submits that the $13.5 million Settlement is an excellent result for the Settlement Class and should be approved as fair, reasonable, adequate, and worthy of approval, that the proposed Plan of Allocation is equitable and just, and that the requested attorneys' fees of 33⅓% of the $13.5 million Settlement Fund and reimbursement of Litigation Expenses should be awarded in full.

## II. Lead Plaintiff's Compliance With The Court's Preliminary Approval Order Requiring Issuance Of Notice

11. The Preliminary Approval Order found Lead Plaintiff's proposed method of notice to be adequate (ECF No. 113 at ¶ 8), and directed that the Notice Packet, comprised of the Notice

and the Claim Form, be disseminated to all Settlement Class Members who could be identified with reasonable effort, as well as brokerage firms and other nominees. The Preliminary Approval Order also found the contents of the Notice to be adequate because it set forth the ability and process for Settlement Class Members to submit objections to the Settlement, Plan of Allocation and/or the Fee and Expense Application or to request exclusion from the Settlement Class. The Preliminary Approval Order also set the deadline for both objections and exclusion for September 22, 2022 and set a final fairness hearing date of October 13, 2022. ECF No. 113 at ¶¶ 5, 17.

12. Pursuant to the Preliminary Approval Order, Lead Counsel instructed Epiq Class Action & Claims Solutions, Inc. ("Epiq"), the Court-approved Claims Administrator, to disseminate copies of the Notice and Claim Form (together, the "Notice Packet") and to publish the Summary Notice. Contemporaneously with the mailing of the Notice Packets, Lead Counsel instructed Epiq to post downloadable copies of the Stipulation, Notice and Claim Form online at www.GrouponSecuritiesSettlement.com (the "Settlement Website"). The Notice contains, among other things, a description of the Action; the definition of the Settlement Class; a summary of the terms of the Settlement and the proposed Plan of Allocation; and a description of Settlement Class Members' rights to participate in the Settlement, object to the Settlement, the Plan of Allocation and/or the Fee and Expense Application or exclude themselves from the Settlement Class. The Notice also informed Settlement Class Members of Lead Counsel's intention to apply for an award of attorneys' fees in an amount not to exceed 33⅓% of the Settlement Fund, and for reimbursement of Litigation Expenses in an amount not to exceed $350,000.

13. To disseminate the Notice, Epiq obtained from Groupon's agent lists containing the names and addresses of record holders ("Record Holder List") who purchased or otherwise acquired Groupon Common Stock during the Settlement Class Period. *See* Exhibit 1 (Declaration

of Declaration Of Jessie Mahn Regarding: (I) Mailing Of Notice And Proof Of Claim Form; (II) Publication Of Summary Notice; (III) Call Center Services; (IV) The Settlement Website; And (V) Requests For Exclusion And Objections Received To Date ("Mailing Declaration")) at ¶ 5. In addition, Epiq maintains a proprietary list with names and addresses of known broker firms, dealers, banks, and other institutions involving publicly-traded securities (the "Broker Mailing Database"). *Id.* at ¶ 6. On August 3, 2022, Epiq. disseminated copies of the Notice Packet to the 1,190 potential Settlement Class Members contained in the Record Holder List and the Broker Mailing Database by first-class mail. *See id.* at ¶ 7.

14.     As of September 6, 2022, Epiq received an additional 2,642 names and addresses of potential Settlement Class Members from individuals or brokerage firms, banks, institutions, and other nominees.  Epiq also received requests from brokers and other nominee holders for 4,815 Notice Packets to be forwarded by the nominees to their customers.  *See id.* at ¶ 9.

15.     As of September 6, 2022, a total of 8,647 Notice Packets have been mailed to potential Settlement Class Members and their nominees.  *See id.* at ¶ 10.

16.     On August 15, 2022, in accordance with the Preliminary Approval Order, Epiq caused the Summary Notice to be published in *Investor's Business Daily* and to be transmitted once over the *PR Newswire*.  *See id.* at ¶ 12.

17.     It should also be noted that the Settlement Website allows for the submission of a claim online, and includes downloadable copies of the Second Amended Complaint, Motion for Preliminary Approval, Stipulation and Preliminary Approval Order. *Id.* at ¶¶ 16-18.  Additionally, Lead Counsel caused Epiq to establish a case-specific, toll-free telephone helpline to accommodate potential Settlement Class Members with questions about the Action and the Settlement and/or request a Notice and Claim Form. *Id.* at ¶¶ 13-15.

6

18.     The deadline for Settlement Class Members to file objections to the Settlement, Plan of Allocation and/or the Fee and Expense Application, or to request exclusion from the Settlement Class is September 22, 2022.  To date, not a single request for exclusion has been received by the Claims Administrator.  *Id.* at ¶ 20.  Epiq will submit a supplemental affidavit after the deadline addressing any requests for exclusion, if received.  To date, no objections to the Settlement, the Plan of Allocation or the maximum amounts listed in the Notice that Lead Counsel would seek for an award for attorneys' fee and reimbursement of Litigation Expenses has been received by the Claims Administrator, Plaintiff's Counsel, or filed with the Court.  *Id.* at ¶ 22. Lead Counsel will file papers on October 6, 2022, that will address any requests for exclusion and any objections that may be received.

## III.     Prosecution of the Action

### A.     Factual Background and Summary of Allegations

19.     Groupon is a Delaware corporation headquartered in Chicago, Illinois, which operates an e-commerce platform designed to connect consumers with merchants.  Second Amended Class Action Complaint for Violations of the Federal Securities Laws, ECF No. 80 ("Second Amended Complaint" or "SAC") at ¶ 16.  During the Settlement Class Period, Groupon operated under two geographical segments (North America and International) and three product categories: Local, Goods, and Travel.  SAC at ¶ 20.  The Company's Local business segment was by far the most significant contributor to Groupon's financial success, generating nearly 60% of the Company's total gross billings and more than 70% of its total gross profits.  Local is comprised of multiple product and service subcategories, including events, activities, and a myriad of other services.  SAC at ¶ 21.  Groupon's Goods business segment offered discounted merchandise across multiple product lines, including electronics, sporting goods, jewelry, toys, household items, and apparel.  SAC at ¶ 22.

20.     During 2017 and 2018, Goods generated approximately 31% of Groupon's gross billings and 56% of Groupon's total revenues, but only 20% of Groupon's gross profits.  SAC at ¶ 24.  Local, on the other hand, generated approximately 58% of Groupon's gross billings, 40% of Groupon's total revenues, and 73% of Groupon's gross profits.  *Id.*

21.     *Groupon retains the Goods category because of its purported ability to drive additional Local business.*  Prior to and during the Settlement Class Period, Goods purportedly provided Groupon with a crucial added value beyond its comparatively limited profits: namely, Goods served as a substantial business driver for Local by drawing customers to Groupon's platform, where they could view (and purchase) Local offerings.  SAC at ¶ 29.  In Defendants' terms, Goods generated "cross-shopping" opportunities for Local and generated significant "customer activation" for Local.  Goods' ability to get customers to engage with Groupon's higher margin Local business was critical in light of the customer and internet traffic "headwinds" Groupon was experiencing.  *Id.*  As Wedbush Securities analyst Ygal Arounian explained in a September 13, 2018 report, Goods served "as an effective on-ramp for new customers" for the Company's "higher margin" Local business.  *Id.*

22.     Defendants repeatedly explained that Goods was an integral part of Groupon because of its ability to pull additional customers to Groupon's Local offerings.  For example, during a February 13, 2019 conference call to discuss Groupon's financial results for Q4 and FY 2018 (the "Q4 2018 Conference Call"), Wedbush analyst Arounian asked whether Defendants might consider selling off Groupon's Goods business in order to focus solely on Local.  SAC at ¶ 30.  In response, Williams explained that Goods benefitted Groupon not only through the stand-alone profits it generated, but also because it was a "solid engagement driver" for Local.

23.     *Groupon touts Select's purported ability to increase purchase frequency.*  Groupon

8

Select was the "loyalty" program that the Company pitched as the solution to increasing customer purchase frequency. In concept, Groupon's customers who joined Select paid a $4.99 monthly membership fee in exchange for discounts on Groupon products and other benefits. SAC at ¶ 34. Defendants made two critical and repeated assertions concerning Select: first, that it was generating substantial increases in purchase frequency; and second, that it was operating profitably, overall and on a per-unit basis. *Id.* As a result of Select's purported ability to spur purchase frequency, Williams characterized Select, and Groupon's investment in it, as "critical to transforming the business" and aligned with the Company's strategy to grow Local. SAC at ¶¶ 36-38.

24. *Groupon's 2019 AEBITDA Guidance.* On February 12-13, 2019, Groupon issued financial Guidance for 2019 Adjusted EBITDA ("AEBITDA") of $270 million (the "Guidance"). AEBITDA was Groupon's principal guidance metric and was followed by analysts. SAC at ¶ 46. Critically, this Guidance figure was "flat" to the Company's 2018 performance, when the Company missed its annual AEBITDA by 7%, despite reaffirming that Guidance just seven weeks earlier. As such, analysts and shareholders paid close attention to statements concerning Groupon's ability to achieve that Guidance. Defendants reiterated Groupon's $270 million AEBITDA Guidance repeatedly during 2019, including when announcing Q1'2019 quarterly results on April 30-May 1, 2019, Q2'2019 quarterly results on July 30-31, 2019, and Q3'2019 quarterly results on November 4-5, 2019. Defendants' July 30-31 and November 4-5, 2019, Guidance affirmations were issued in the context of mounting concerns that the Company would fall short of the Guidance. SAC at ¶ 47.

25. *Groupon's end of Class Period disclosures and stock price reaction.* On February 18 and 19, 2020, Defendants made a series of disclosures concerning Groupon's decisions to exit

9

Goods and discontinue enrollments in Select, as well as its Guidance miss, which disclosures caused the price of Groupon shares to plummet.

26.     *Groupon decides to exit Goods.*  Defendants disclosed that "[m]idway through the fourth quarter [of 2019] it became *abundantly clear* that [they] were not competing effectively in Goods."  SAC at ¶ 104.  This failure to compete reduced Groupon's Goods revenue and also "impacted overall traffic to [Groupon's] site" and "ultimately impeded performance in all of [Groupon's] categories."  *Id.*  While the failure of Goods became "*abundantly* clear" by midway through the fourth quarter of 2019—*i.e.*, by November 2019—this was a long-term trend that had been under review by Defendants for some time.  SAC at ¶¶ 104-109.

27.     *Groupon's decision to stop enrollments in Select.*  Groupon also announced that it would "discontinue new enrollments" in the Select program.  SAC at ¶ 109.  Specifically, Defendants admitted that "[t]he [Select] program . . . began over-indexing towards our Goods category in the second half of 2019," meaning that Select was being used disproportionately for low-margin Goods purchases rather than high-margin Local purchases.  SAC at ¶¶ 109-112.  Despite discussing Select's performance in detail and heralding Select as pivotal to Groupon's future (*see, e.g.*, SAC at ¶¶ 34-45), Groupon determined that Select could not provide the return on investment "needed for it to be a key priority," as the program did not "address the core of [Groupon's] product or business model, nor [did it] overcome the limitations in the legacy Groupon business."  SAC at ¶ 110.

28.     *Groupon missed forecasted AEBTIDA Guidance by ~16%.*  Based on Groupon's Q4 2019 performance, Groupon reported 2019 AEBITDA of $227.2 million, which was significantly below the $270 million figure that Defendants affirmed as recently as November 2019.  This Guidance miss directly related to the Company's inability to execute its strategy and

evidenced deepening customer, unit, and gross profit declines. SAC at ¶ 102.

29.     *The price of Groupon's shares plummet in response to disclosures.*  Following Defendants' February 18-19, 2020 disclosures, Groupon shares, which had closed trading on February 18, 2020, at $3.05 per share fell sharply on February 19, 2020, to close at $1.70—a decline of $1.35 per share, or more than 44%.  SAC at ¶ 113.  Trading volume on February 19, 2020 was more than 25 times Groupon's average daily trading volume during the Class Period. *Id.*  Class members who purchased Groupon shares during the Class Period, at prices artificially inflated by Defendants' material misrepresentations and omissions, were damaged as a result.

**B.     Commencement of the Instant Action**

30.     On April 28, 2020, Lazar Macovski commenced a securities class action in this Court against Defendants asserting securities fraud claims during the period between November 4, 2019 and February 18, 2020, inclusive (the "Initial Class Period").  *See* ECF No. 1.

31.     On July 24, 2020, the Court appointed Fadi E. Rahal as Lead Plaintiff. *See* ECF No. 38.  The Court also appointed the law firms of Glancy Prongay & Murray LLP and Kirby McInerney LLP as Lead Counsel and Pomerantz LLP as Liaison Counsel.  *Id.*

**C.     Lead Counsel's Investigation, First And Second Amended Complaints And Defendants' Motion To Dismiss**

32.     Lead Counsel conducted an extensive detailed investigation prior to filing the first and second amended complaint.  Following Lead Counsel's appointment, counsel conducted a comprehensive investigation into Groupon's allegedly wrongful acts, which included, among other things: (1) reviewing and analyzing (a) Groupon's filings with the U.S. Securities and Exchange Commission ("SEC"), (b) public reports, including research reports prepared by securities and financial analysts, as well as news articles concerning the Company, (c) Groupon's investor call transcripts, and (d) other publicly available material related to Groupon and the Individual

11

Defendants; and (2) retaining and working with private investigators who conducted numerous interviews of former Company employees and other sources of relevant information. Lead Counsel also consulted with accounting, loss causation and damages experts.

33. On September 22, 2020, Lead Plaintiff filed and served his Amended Class Action Complaint for Violation of the Federal Securities Laws (the "First Amended Complaint") asserting claims against all Defendants under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, and against the Individual Defendants under Section 20(a) of the Exchange Act. Among other things, the First Amended Complaint alleged that Defendants made statements that omitted material adverse information concerning: (i) Groupon's Goods division; (ii) Groupon's Select loyalty program; and (iii) Groupon's overall financial performance. The First Amended Complaint further alleged that the prices of Groupon's publicly-traded securities were artificially inflated as a result of Defendants' allegedly false and misleading statements, and declined when the truth was revealed. ECF No. 43. In addition, the First Amended Complaint expanded the Initial Class Period (which had covered the period between November 4, 2019 and February 18, 2020, inclusive) to include all purchases of Groupon common stock during the period between July 30, 2019, and February 18, 2020, inclusive (previously defined as the "Class Period" or "Settlement Class Period").

34. On November 23, 2020, Defendants moved to dismiss the First Amended Complaint. ECF Nos. 48-49. On December 23, 2020, Lead Plaintiff filed his opposition to the motion to dismiss (ECF No. 55) and, on January 13, 2021, Defendants filed a reply in further support of their motion to dismiss (ECF No. 56).

35. On April 28, 2021, the Court granted Defendants' motion to dismiss, but permitted Lead Plaintiff to file a motion for leave to amend that included a proposed second amended

complaint that met the PSLRA's pleading requirements.  ECF No. 64.

36.  On May 19, 2021, Lead Plaintiff filed and served a motion for leave to amend the First Amended Complaint along with a [Proposed] Second Amended Class Action Complaint for Violation of the Federal Securities Laws.  ECF Nos. 66-68.  The proposed Second Amended Complaint attempted to strengthen the allegations of securities fraud by juxtaposing Defendants' specific Class Period misstatements against Defendants' end-of-Class Period admissions, and attempted to demonstrate with temporal precision that Defendants learned of material adverse internal information before they made their challenged statements, and therefore knowingly or recklessly misled shareholders.

37.  On June 23, 2021, Defendants filed and served an opposition to Lead Plaintiff's motion for leave to amend.  ECF No. 70.

38.  On June 28, 2021, Lead Plaintiff filed and served a motion for leave to file a reply brief in support of his motion for leave to amend the Fist Amended Complaint (ECF Nos. 71-72), which Defendants opposed on June 29, 2021 (ECF No. 73).  The Court granted Lead Plaintiff's motion for leave to file a reply in support of their motion to amend on June 30, 2021 (ECF No. 74), and on July 9, 2021, Lead Plaintiff filed his reply in support of his motion for leave to amend the First Amended Complaint (ECF No. 75).

39.  On August 11, 2021, the Court granted Lead Plaintiff's motion for leave to file the [Proposed] Second Amended Class Action Complaint for Violation of the Federal Securities Laws.  ECF No. 79.  In so ruling, the Court determined that the proposed Second Amended Complaint satisfied the PSLRA's heightened pleading standards.  *Id.*  On August 12, 2021, Lead Plaintiff filed and served the Second Amended Complaint again asserting claims under the Exchange Act and Rule 10b-5 against Defendants based upon a similar set of allegations as the First Amended

13

Complaint. ECF No. 80.

40. On September 24, 2021, Defendants filed and served an answer to the Second Amended Complaint. ECF No. 86. In addition to denying the allegations in the Second Amended Complaint, the answer asserted that Defendants would expect to raise multiple defenses, including, but not limited to, the truthfulness of the alleged misstatements, the immateriality of the alleged misrepresentations and omissions, the nonexistence of allegedly omitted information, the reasonable basis upon which forward-looking statements were made, the lack of requisite scienter, and the lack of a legal duty to disclose allegedly withheld, later-discovered information. Moreover, to the extent Lead Plaintiff's case rests primarily on allegations related to Select, Defendants argued that they would be able to show that Select was an early-stage loyalty program with a membership of well less than 1% of Groupon's customer base.

### D. Discovery Efforts

41. With the automatic discovery stay imposed by the PSLRA having been lifted following the Court's order denying the motion to dismiss the Second Amended Complaint, discovery began promptly. The Parties exchanged their initial disclosures on October 1, 2021. In addition, the Parties held a Rule 26(f) conference, and filed a Joint Initial Status Report. ECF No. 87. Further, the Parties negotiated proposed stipulations governing the production of discovery and a confidentiality protocol, which were approved by the Court. ECF Nos. 88-91.

42. From October 2021 through April 2022, counsel for Lead Plaintiff and Defendants engaged in fact discovery. Lead Plaintiff propounded Requests for Production of Documents on Defendants. Lead Plaintiff also served seven (7) third-party subpoenas for production of documents on various third parties, including, *inter alia*, investment research analyst firms that provided research on Groupon securities in addition to Groupon's external service providers. For example, Lead Counsel served a third-party subpoena on a management consulting firm that

Groupon retained during the Class Period. The more than six thousand documents produced by this management consulting firm provided additional insight into Groupon's ongoing business practices as well as strategic alternatives considered by the Company during the Class Period. Over the course of discovery, Lead Counsel reviewed and analyzed more than 90,000 pages of documents produced by Defendants and third parties.

43. Lead Plaintiff also responded to Defendants' Requests for Production of Documents and Interrogatories. With the assistance of Lead Counsel (and their discovery consultant), Lead Plaintiff forensically collected discovery materials and produced responsive, non-privileged materials to Defendants. Lead Counsel respectfully submits that by willingly discharging his discovery efforts Lead Plaintiff underscored his adequacy and typicality as a class representative.

44. On June 15, 2022, Lead Counsel conducted an in-person confirmatory interview of David Belmont, VP, Finance. This interview was conducted after the Term Sheet was executed, but prior to the execution of the Stipulation. *See* Section III.E, *infra*. The interview was conducted at defense counsel's Chicago, Illinois office and lasted approximately three hours.

45. Prior to the interview, Lead Counsel identified topics and related discovery materials produced by Defendants and third parties that they planned to discuss with Mr. Belmont. Those topics included, *inter alia*, the following: (i) Groupon Goods, (ii) Groupon Select, and (iii) the Company's 2019 ABITDA Guidance. Defendants challenged Lead Plaintiff's characterization of Defendants' Class Period statements concerning these subjects at the pleading stage as well as throughout discovery and during the mediation process. With respect to Goods, Lead Counsel addressed: (i) the segment's performance during the Class Period; and (ii) the timing of and factors influencing Groupon's decision to exit the Goods segment. With respect to Select,

Lead Counsel addressed: (i) the perceived materiality of Select to investors; (ii) whether Select purchases "over-indexed" to the lower margin Goods segment as opposed to the higher margin Local segment; (iii) Groupon's evaluation of Select's financial impact on the Company's overall financial results; and (iv) the Company's decision to discontinue new enrollment in Select at the end of the Class Period. Finally, with respect to Guidance, Lead Counsel addressed; (i) Groupon's internal processes for establishing and tracking Guidance during the Settlement Class Period; and (ii) Groupon's decision to reaffirm Guidance of 2019 Adjusted EBITDA of $270 million on July 30-31 and November 4-5, 2019.

46.     During this interview, Lead Counsel had the opportunity to engage Mr. Belmont in a full and frank discussion about the Lead Plaintiff's factual allegations and the foregoing topics. Among other things, Mr. Belmont maintained that it first became clear to Defendants that Groupon could no longer compete effectively in Goods following what Groupon traditionally viewed as the "peak portion" of the 4th quarter - *i.e.*, "Black Friday" and "Cyber Monday" after Thanksgiving. This period ended on December 2, 2019, which means that it postdated any of the alleged misrepresentations about the performance of Goods that were pled in the Second Amended Complaint. Mr. Belmont also maintained that Groupon's Select program was a relatively small and new initiative. Moreover, according to Mr. Belmont, the fact that Select purchasers were indexing to Goods purchases was not viewed as a problem prior to the time that Groupon determined that it could no longer compete effectively in Goods. Further, Mr. Belmont maintained that Groupon's Guidance reaffirmations during the Class Period were justified and consistent with the Company's forecasting procedures.

47.     Following this interview, Lead Counsel continue to believe that there is strong evidence to support Plaintiff's claims. However, Lead Counsel also recognize that there is a

substantial risk that a jury, upon hearing Defendants' complete testimony and seeing the evidence that Defendants would proffer, would conclude that many, if not all, of Defendants' Class Period statements were not materially misleading at the time they were made and/or that Defendants did not act with scienter.

**E.  The Mediation Process, Which Included Discovery And Substantial Briefing, Ultimately Results In A Settlement**

48.  The Parties selected Jed D. Melnick, Esq. of JAMS ADR, one of the leading neutrals in the country, as mediator and scheduled a mediation session for a full-day virtual Zoom mediation session on March 15, 2022.

49.  Following the Parties' pre-mediation document productions and review of the productions (*see* Section III.D, *supra*), the Parties exchanged and provided to the mediator detailed mediation statements and exhibits that addressed the issues of liability, loss causation and damages.  Prior to the mediation, Lead Plaintiff was prepared to file a class certification motion on or before April 1, 2022.  *See* ECF No. 82 (Joint Status Report setting forth litigation deadlines).

50.  On March 15, 2022, Plaintiff's Counsel and Defendants' Counsel participated in a full-day mediation session Mr. Melnick.  The session ended without an agreement being reached.

51.  While a settlement was not reached at the mediation itself, the Parties continued to explore the possibility of a settlement and continued negotiations with the assistance of Mr. Melnick for the next few weeks.  During these settlement talks, the Parties continued to litigate the Action while agreeing to extend certain litigation deadlines.  *See* ECF No. 100; s*ee* Section III.D, *supra.*  These further discussions culminated in a mediator's recommendation to resolve the Action for $13,500,000 in cash for the benefit of the Settlement Class.  The Parties accepted Mr. Melnick's recommendation on April 21, 2022.

52.  On May 6, 2022, the Parties thereafter memorialized the settlement in a confidential

Term Sheet to Settle Class Action (the "Term Sheet") executed on May 6, 2022. The Term Sheet sets forth, among other things, the Parties' agreement to settle and release all claims asserted against Defendants in the Action in return for a cash payment by or on behalf of Defendants of $13,500,000 for the benefit of the Settlement Class, subject to certain terms and conditions and the execution of a customary "long form" stipulation and agreement of settlement and related papers.

53. On May 9, 2022, the Parties reported to the Court that they reached a tentative class-wide settlement. *See* ECF No. 102. On May 10, 2022, the Parties held a telephonic status conference during which a briefing schedule for the motion for preliminary approval of the settlement was set, *see* ECF No. 103, and which was extended by one week at the request of the Parties. *See* ECF No. 105.

54. On June 24, 2022, the Parties executed the Stipulation, which was filed with the Court, along with Plaintiff's motion seeking preliminary approval of the Settlement, on June 27, 2022. ECF Nos. 108-110.

### F. Preliminary Approval of the Settlement

55. On June 24, 2022, the Parties executed the Stipulation (ECF No. 110-1), which was filed with the Court, along with Lead Plaintiff's motion seeking preliminary approval of the Settlement, on June 27, 2022 (ECF No. 108).

56. On July 5, 2022, the Court held oral argument on the preliminary approval motion. *See* ECF No. 112.

57. On July 6, 2022, the Court entered the Preliminary Approval Order, directing notice of the Settlement to be disseminated to potential members of the Settlement Class. ECF No. 113.

58. The Settlement Class is defined as:

[A]ll persons and entities who or that, between July 30, 2019, and February 18, 2020, inclusive (the "Settlement Class Period"), purchased or otherwise acquired Groupon common stock and were damaged thereby. Excluded from the Settlement

18

Class are: (i) Defendants; (ii) any person who served as a control person, executive officer and/or director of Groupon during the Settlement Class Period, and members of his or her Immediate Family; (iii) present and former parents, subsidiaries, assigns, successors, affiliates, and predecessors of Groupon; (iv) any entity in which Defendants have or had a controlling interest during the Settlement Class Period; (v) any trust of which any Individual Defendant is the settlor or that is for the benefit of any Individual Defendant and/or member(s) of his or her Immediate Family; and (vi) the legal representatives, heirs, successors, and assigns of any person or entity excluded under provisions (i) through (v) hereof. Also excluded from the Settlement Class are any persons and entities who or that validly exclude themselves by submitting a request for exclusion that is accepted by the Court.

*Id.* at 1.

## IV. The Settlement Is Reasonable In Light Of The Potential Recovery In The Action

59. The Settlement is fair and reasonable in light of the potential recovery of available damages. If Lead Plaintiff had fully prevailed on his claims at both summary judgment and after a jury trial, if the Court certified the Settlement Class, and if the Court and jury accepted Lead Plaintiff's damages theory, including proof of loss causation for all of stock price drop dates alleged in this case—*i.e.*, Lead Plaintiff's ***best-case scenario***—the estimated total ***maximum*** damages would be approximately $140 million for purchasers of Groupon Common Stock. Thus, the $13,500,000 Settlement Amount represents approximately 9.6% of the total ***maximum*** damages potentially available in this Action. This amount compares favorably to other securities class action settlements, and indeed, is an excellent recovery for the Settlement Class. *See, e.g.*, Ex. 6 (excerpt from Janeen McIntosh and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2021 Full-Year Review* (NERA Jan. 25, 2022) at p. 24, Fig. 22 (median recovery in securities class actions in 2021 was approximately 1.8% of estimated damages). In addition, the "median ratio of settlement value to . . . Investor Losses" was 2.8% for cases with investor losses between $100 million and $199 million for cases filed and settled between December 2012–December 2021. *Id.* at p. 23, Fig. 21.

19

60.     Additionally, in securities class actions in 2021 where estimated damages were between $75 million and $149 million, the median recovery was only 7.4% of estimated damages, and 4.9% for the years between 2012-2020. *See* Ex. 7 (excerpt from Laarni T. Bulan & Laura E. Simmons, Securities Class Action Settlements 2021 Review and Analysis, Cornerstone Research (2022), at p. 6, Fig. 5; *id.* at 19, Appendix 3 (reporting that the median recovery from 2012 – 2021 was 3.9% of damages for Section 10(b) class action cases in the Seventh Circuit)).

61.     In contrast, Defendants would have contended that Lead Plaintiff's damages were greatly overstated.  As noted below, Lead Plaintiff believes that Defendants could put forward several damages and loss causation arguments that, if accepted, would have greatly reduced, or even eliminated, recoverable damages.  For example, Defendants argued or would have argued, that Lead Plaintiff's proposed Class Period was overly broad.  Specifically, Defendants argued that their statements on July 30 and 31 either were immaterial statements of optimism or objectively true.  Further, Defendants challenged the actionability of the November 4 and 5, 2019 statements by suggesting that they adequately disclosed Goods' third quarter 15% decline in gross profit and were not yet aware of the significant drop off in Goods' performance that would occur during the last week of November and first week of December.  Estimated class-wide damages would decrease materially had Defendants successfully narrowed the scope of the Class Period to the periods starting on either November 4 or December 11, 2019, or had they succeeded in eliminating all claims based on misrepresentations about Select or Goods.

62.     Likewise, Defendants argued, or would have argued, that despite Plaintiff's allegations that Defendants made overly optimistic statements on July 31, November 5, and December 11, 2019, there is no evidence of price impact attributable to those statements. Groupon's stock price *declined* in a statistically significant manner on July 31 and December 11,

20

and was flat on November 5. Lead Plaintiff respectfully disagrees with Defendants' characterization of his factual allegations. However, under a price maintenance theory, Defendants argued that Lead Plaintiff would have faced significant difficulties showing that the stock price would have behaved differently on these dates had Groupon disclosed information Plaintiff alleges was contemporaneously available.

63. Accordingly, Lead Counsel's efforts have resulted in a recovery of approximately 9.6% of the "best case" Settlement Class's Common Stock damages totaling $140 million.

64. The foregoing numbers, however, tell only part of the story. As summarized in the next section, there were very real additional risks that could have resulted in a much smaller recovery (or none at all), if the case had proceeded through formal discovery, class certification, summary judgment, trial, and likely appeal. The Settlement, however, eliminates those risks and provides an immediate, substantial benefit to the Settlement Class.

## V. The Risks Of Continued Litigation

### A. Risks To Proving Liability

65. Lead Plaintiff and Lead Counsel recognized that this Action presented a number of substantial risks to establishing liability.

66. Defendants forcefully argued in their motion to dismiss and opposition to Lead Plaintiff's motion for leave to amend, and undoubtedly would continue to argue at summary judgment and trial, that each of the alleged misstatements was not actionable because it was either true when made, was a non-actionable expression of optimism, or was a forward-looking statement with a reasonable basis. Specifically, Defendants would continue to challenge whether any of the three categories of alleged misstatements – *i.e.*, those concerning: i) Select; ii) Goods; and iii) Guidance – were actionable. With respect to Goods, Defendants would continue to argue that Groupon previously disclosed in 2019 that one of the reasons Goods underperformed was because

of steep competition from other e-commerce retailers. Defendants would also argue that Lead Plaintiff's arguments were flawed insofar as the severity of Goods' issues did not begin to materially affect Groupon's results until after the November 4 reaffirmation of full-year guidance. With respect to Select, Defendants would continue to argue that Select's performance was immaterial to Groupon's overall results and in any event that Select *did not* "over-index" to Goods at any time during 2019, or if it did "over-index," and even if it did "over-index" earlier, Defendants had no reason to believe that was a problem at any time prior to their realization of the extent of the problems in the Goods division. Finally, with respect to Groupon's AEBITDA Guidance, Defendants would argue that Groupon not only consistently disclosed the issues in Goods, but discovery will show that Groupon's internal forecasts supported the Company's Q3 2019 guidance reaffirmation.

67. Even if Lead Plaintiff could demonstrate falsity, Defendants would have continued to argue that there was no intent to deceive or scienter. Specifically, Defendants would continue to argue that Defendants were not aware of adverse information at the time of the alleged misstatements because no contemporaneous information contradicting their truthful statements existed. Defendants instead would argue that Defendants Williams and Thomas timely disclosed the adverse information at the end of the Class Period. Additionally, Defendants would continue to argue that Lead Plaintiff would be unable to point to any evidence (*e.g.*, stock trading) to establish a motive for Defendants to commit securities fraud.

68. Indeed, despite believing this Action is meritorious, Lead Plaintiff and Lead Counsel were well aware of the high hurdle they would have to surmount in order to successfully prove Defendants acted with the requisite mental state of scienter—*i.e.*, an intent to deceive or extreme recklessness—to ultimately prove Defendants' liability under the federal securities laws.

22

B.      **Risks To Proving Loss Causation And Damages**

69.      Even assuming that Lead Plaintiff overcame the risk of establishing Defendants' liability, as discussed above, Lead Plaintiff would have confronted considerable challenges in establishing loss causation and class-wide damages.

70.      Pursuant to *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), it is Lead Plaintiff's burden to prove loss causation and damages. This would require Lead Plaintiff to proffer expert testimony as to: (a) what the "true value" of Groupon securities would have been had there been no alleged material misstatements or omissions; (b) the amount by which Groupon securities shares were inflated (or deflated) by the alleged material misstatements and omissions; and (c) the amount of artificial inflation removed by the purported corrective disclosures. Defendants almost certainly would have presented their own damages expert(s) to present conflicting conclusions and theories as to the reasons for the declines in Groupon securities on the alleged disclosure dates. For example, Defendants also argued or would have argued, *inter alia*, that the decline in Groupon's stock price following the alleged disclosures on February 18-19, 2020, was not caused by disclosures that corrected any of the alleged misrepresentations, but rather by disclosures of disappointing results in business units that were unrelated to Plaintiff's claims. Thus, any stock price decline flowing from Plaintiff's alleged fraud would need to be disaggregated from other confounding news. At bottom, the burden of proving loss causation and damages would require a jury to decide the "battle of the experts"—an expensive and intrinsically unpredictable process.

71.      Moreover, expert testimony can often rest on many assumptions, any of which risks being rejected by a jury. A jury's reaction to such expert testimony is highly unpredictable, and Lead Plaintiff recognizes that, in a such a battle, there is the possibility that a jury could be swayed by Defendants' expert(s) and could find that only a fraction of the amount of damages Lead

23

Plaintiff contended were suffered by the Settlement Class. Thus, the amount of damages that the Settlement Class would actually recover at trial, even if successful on liability issues, was uncertain. Similarly, there was no assurance that Lead Plaintiff's key evidence and testimony relating to liability and damages would be admitted as evidence by the Court at trial. These issues could have seriously affected Lead Plaintiff's ability to successfully prosecute this Action.

72. In sum, had any of Defendants' loss causation and damages arguments been accepted at summary judgment or trial, they could have dramatically limited—if not eliminated— any potential recovery by the Settlement Class.

**C.      Other Risks, Including Trial And Appeals**

73. In addition, any future recovery would require Lead Plaintiff to prevail at several later stages of the litigation, each of which presents significant risks in complex class actions such as this. For example, Lead Plaintiff would have to move to certify the class, which, if granted, would likely result in Defendants filing a Rule 23(f) petition for appellate review. As there was only one plaintiff, if Defendants were able to demonstrate that he was atypical in any way, it could put the entire case into jeopardy.

74. Lead Plaintiff would also have to complete substantial fact and expert discovery, which would entail, among other things, document production, review and analysis of documents produced by Defendants and third parties, taking and/or defending percipient and expert depositions, propounding and responding to interrogatories and requests for admission, and defending Lead Plaintiff's deposition. The costs of each of these tasks would assuredly be high, and the fruits of each endeavor would be highly uncertain. Furthermore, Lead Plaintiff would have to successfully navigate and prevail against Defendants' anticipated motion(s) for summary judgment, as well as at trial. And finally, even if Lead Plaintiff prevailed on all of those stages, he would have to succeed on any appeals that would surely follow. This process could extend for

years and might ultimately lead to a smaller recovery, or no recovery at all. Indeed, even prevailing at trial would not guarantee a recovery larger than the $13,500,000 Settlement.[3]

75.     Lead Counsel know from experience that despite the most vigorous and competent efforts, success in complex litigation such as this case is never assured. In fact, within the last couple of years, Glancy Prongay & Murray recently lost a six-week antitrust jury trial in the Northern District of California after five years of litigation, which included many overseas depositions, the expenditure of millions of dollars of attorney and paralegal time, and the expenditure of more than a million dollars in hard costs. *See In re: Korean Ramen Antitrust Litigation*, Case No. 3:13-cv-04115 (N.D. Cal.). Glancy Prongay & Murray also litigated a securities class action in the Southern District of New York for approximately five years, and, after surviving a motion to dismiss, successfully obtaining class certification and undertaking significant discovery efforts, which included depositions throughout the U.S. and in the U.K. and substantial document review, summary judgment was entered for defendants, and the judgment was affirmed on alternative grounds on appeal to the Second Circuit. *Gross v. GFI Grp., Inc.*, 784 F. App'x 27, 29 (2d Cir. 2019). Likewise, in recent years, Kirby McInerney lost a two-week bench trial in the Southern District of New York following four years of hard-fought litigation even after plaintiff's claims arising under Investment Company Act of 1940 had survived motions to dismiss and for summary judgment. *Chill ex rel. Calamos Growth Fund v. Calamos Advisors LLC*, 417 F. Supp. 3d 208 (S.D.N.Y. 2019). Put another way, complex litigation is uncertain, and success in cases like this one is never guaranteed.

---

[3] *See also Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) (reversing jury verdict of $81 million for plaintiffs); *In re BankAtlantic Bancorp, Inc. Sec. Litig.*, 2011 WL 1585605 (S.D. Fla. Apr. 25, 2011) (granting defendants' motion for judgment as a matter of law following plaintiffs' verdict); *In re Apple Computer Sec. Litig.*, 1991 WL 238298 (N.D. Cal. Sept. 6, 1991) (overturning jury verdict for plaintiffs after extended trial).

76.     In sum, having evaluated the relative strengths and weaknesses of the Action in light of Defendants' arguments, and considered the very real risks presented by the significant hurdles of class certification, summary judgment, trial and any eventual appeals that lie ahead, it is the informed judgment of Lead Counsel, based upon all of the proceedings to date and their extensive experience in litigating class actions under the federal securities laws, that the proposed Settlement is fair, reasonable, and adequate and in the best interests of the Settlement Class.

77.     Lead Counsel's conclusion that the Settlement is fair, reasonable, and adequate is also supported by Lead Plaintiff.

**VI.     Allocation Of The Proceeds Of The Settlement**

78.     The proposed Plan of Allocation is detailed in the Notice.  *See* Mailing Declaration, Ex. 1-A (Notice) at 9-12.  The Notice was posted on, and is downloadable from, the Settlement Website, and has been mailed to Settlement Class Members.

79.     As set forth in the Notice, under the proposed Plan of Allocation, each Authorized Claimant will receive their *pro rata* share of the Net Settlement Fund, which is the Settlement Fund (*i.e.*, the $13,500,000 Settlement Amount plus any and all interest earned thereon) less any: (a) Taxes; (b) Notice and Administration Costs; (c) Litigation Expenses awarded by the Court; and (d) attorneys' fees awarded by the Court.  Specifically, an Authorized Claimant's *pro rata* share shall be the Authorized Claimant's Recognized Claim divided by the total of Recognized Claims of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund.[4]

80.     The proposed Plan of Allocation reflects, and is based upon, Lead Plaintiff's allegation that the price of Groupon Common Stock was artificially inflated during the Settlement

---

[4] If the amount to be distributed to an Authorized Claimant calculates to less than $10.00, no such distribution will be made to the Authorized Claimant.

26

Class Period due to Defendants' alleged materially false and misleading statements. The Plan of Allocation is based on the generally accepted concept that the losses of shareholders are reflected in the difference between estimated artificial inflation per share present on the date of purchase and estimated artificial inflation per share present following a corrective disclosure or date of sale.

81. Lead Counsel believe that the Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund among Settlement Class Members who suffered losses as result of the conduct alleged in the Complaint.

82. Moreover, to date, there has not been a single objection to the Plan of Allocation from any of the Settlement Class Members. Accordingly, Lead Counsel respectfully submit that the Plan of Allocation is fair and reasonable and should be approved by the Court.

## VII. Lead Counsel's Application for an Award of Attorneys' Fees and Reimbursement of Expenses, and Request for Service Award for Lead Plaintiff

83. For their efforts on behalf of the Settlement Class, Lead Counsel seek an award of attorneys' fees of 33⅓% of the Settlement Fund (*i.e.*, $4,500,000) to compensate them for the services they have rendered on behalf of the Settlement Class. *See* Section VII.B.1, *infra*. Lead Counsel also requests reimbursement of expenses incurred in connection with the prosecution of this Action in the amount of $250,227.53. *See* Section VII.B.2, *infra*. Finally, pursuant to 15 U.S.C. § 78u-4(a)(4), Lead Counsel are requesting a service award to Lead Plaintiff of $5,000 for costs, including lost wages, incurred in representing the Settlement Class. *See* Section VII.C, *infra*. The legal authorities supporting the requested fee and reimbursement of Litigation Expenses are set forth in the concurrently-filed Fee and Expense Application. The primary factual bases for the requested fee and reimbursement of Litigation Expenses are summarized below.

### A. Lead Counsel's Qualifications and Work to Date

84. Lead Counsel Glancy Prongay & Murray and Kirby McInerney are both law firms

with extensive experience in complex class action litigation, including securities litigation. Those credentials are set forth in Lead Counsel's firm resumes. *See* Exhibit 3-C (Glancy Prongay & Murray declaration) and Ex. 4-C (Kirby McInerney declaration). Likewise, court-appointed Liaison Counsel Pomerantz has extensive experience in complex class action litigation, including securities litigation, as set forth in its declaration attached hereto. *See* Ex. 5-C.

85. From the outset, Lead Counsel understood that they were embarking on a complex, expensive, and lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require. In undertaking that responsibility, Lead Counsel ensured that sufficient resources were dedicated to the prosecution of the Action, and that funds were available to compensate staff and to cover the considerable litigation costs that a case like this requires. With an average lag time of several years for the securities class actions cases to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis. Indeed, Lead Counsel received no compensation during the course of the Action and have collectively incurred significant Litigation Expenses in prosecuting the Action for the benefit of the Settlement Class.

86. Here, Lead Counsel represented the Settlement Class on a wholly contingent-fee basis for over two years, not receiving any payment for their services or the expenses incurred in prosecuting this Action against Defendants and negotiating the Settlement. Throughout this time, Lead Counsel's dedication to recovering a favorable result for the Settlement Class has been expensive and challenging. Lead Counsel also bore the risk that no recovery would be achieved. As discussed above, from the outset, this case presented multiple risks and uncertainties that could have prevented any recovery whatsoever. Lead Counsel knows from experience that the commencement of a class action does not guarantee a settlement. To the contrary, it takes hard

28

work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to induce sophisticated defendants to engage in serious settlement negotiations at meaningful levels.

87. For this reason, courts have repeatedly recognized that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320 n.4 (2007) ("private securities litigation is an indispensable tool with which defrauded investors can recover their losses – a matter crucial to the integrity of domestic capital markets.") (internal quotation marks omitted). As recognized by Congress through the passage of the PSLRA, vigorous private enforcement of the federal securities laws can only occur if private investors take an active role in protecting the interests of shareholders. If this important public policy is to be carried out, the courts should award fees that adequately compensate plaintiffs' counsel, taking into account the risks undertaken in prosecuting a securities class action.

88. As discussed above, Lead Counsel prosecuted the Litigation vigorously against Defendants and expended substantial time and resources litigating this case. *See* Sections III.B-F, *supra.* Lead Counsel further worked diligently to finalize and document the Settlement through negotiations with Defendants, the motion for preliminary approval, and the motion for final approval. Lead Counsel also oversaw the Claims Administrator and the notice process. Furthermore, Lead Counsel will be appearing at the final Settlement Hearing and will continue to oversee the administration of the Settlement.

89. The quality of Lead Counsel's work in attaining the Settlement is notable in light of the quality of the opposition. Defense Counsel was equally well-informed regarding the case, and their representation of Defendants was no less rigorous than Lead Counsel's representation of

29

the Settlement Class. Defendants in this Action were represented by Skadden, Arps, Slate, Meagher & Flom LLP and Affiliates ("Skadden"). Skadden is a prominent international defense-oriented firm with offices worldwide and over 1,700 attorneys. Skadden touts on its website that the firm "has represented defendants in more federal securities cases and defended clients in more federal securities class actions in the U.S. than any other firm," between 2019 and July 2022. In the face of this experienced and formidable opposition of these defense firms, Lead Counsel was nonetheless able to develop a case that was sufficiently strong to survive Defendants' motion to dismiss and persuade the Defendants to settle the case on terms favorable to the Settlement Class.

**B.      Lead Counsel's Request for an Award of Attorneys' Fees and Litigation Expense Reimbursement**

### 1.      Lead Counsel's Request for a 33⅓% Fee Award

90.      Lead Counsel requests that the Court award a fee of 33⅓% of the Settlement Fund, or $4,500,000.

91.      Lead Counsel intends to share part of any attorneys' fees awarded by the Court with other counsel in accordance with their level of contribution to the initiation, prosecution, and resolution of the Action, as provided for in paragraph 17 of the Stipulation. Specifically, Lead Counsel intends to compensate Court-appointed Liaison Counsel, Pomerantz LLP, for its contributions to the litigation. *See* Ex. 5 (Pomerantz Declaration).

92.      Annexed hereto as Exhibit 3 is the Declaration of Leanne H. Solish in Support of Lead Counsel's Motion for Attorneys' Fees and Reimbursement of Litigation Expenses filed on behalf of Glancy Prongay & Murray LLP with Exhibits A (lodestar report), B (expense report), and C (firm resume) ("Solish Declaration").

93.      Annexed hereto as Exhibit 4 is the Declaration of Thomas W. Elrod in Support of Lead Counsel's Motion for Attorneys' Fees and Reimbursement of Litigation Expenses filed on

Behalf of Kirby McInerney LLP with Exhibits A (lodestar report), B (expense report), and C (firm resume) ("Elrod Declaration").

94. Annexed hereto as Exhibit 5 is the Declaration of Louis C. Ludwig, Esq. in Support of Lead Counsel's Motion for Attorneys' Fees and Reimbursement of Litigation Expenses filed on behalf of Pomerantz LLP with Exhibits A (lodestar report), B (expense report), and C (firm resume) ("Ludwig Declaration").

95. As set forth in their Declarations, Plaintiff's Counsel's lodestar figures for time submitted in connection with the attorneys' fee request are based upon the firms' current billing rates (subject to annual increases) and do not include charges for expense items. *See Mo. v. Jenkins by Agyei*, 491 U.S. 274, 283-86 (1989); *Mathur v. Bd. of Trustees of S. Ill. Univ.*, 317 F.3d 738, 744-45 (7th Cir. 2003) (to adjust for delay in payment, trial courts may calculate lodestars using "either current rates or past rates with interest"). For personnel who are no longer employed by the firms, the lodestar calculation is based on the billing rates for such personnel in his or her final year of employment by the firm. Billing rates for document review attorneys have also been capped at the reduced rate of $400 per hour. In addition, time expended on Lead Counsel's application for attorneys' fees and reimbursement of litigation expenses has also been excluded. Each firm also reviewed its time and expenses for accuracy, necessity, and reasonableness. *See* Exs. 3-5 (Plaintiff's Counsel's declarations).

96. The declarants from each firm comprising Plaintiff's Counsel attest that the hourly rates for the attorneys and professional support staff are in line with the rates by other lawyers at law firms handling large, complex class action litigation and/or which have been accepted in other complex or class action litigation, subject to subsequent annual increases.[5]

---

[5] Courts have found analysts to be compensable in lead counsel's fee award. *See Destefano v. Zynga, Inc.*, No. 12 Civ. 4007, 2016 WL 537946, at *19 (N.D. Cal. Feb. 11, 2016) ("As part of their attorneys' fee

97.     The following chart summarizes the aggregate hours, lodestar, and expenses of Plaintiff's Counsel set forth in the attached declarations.  *See* Exs. A and B in each of Plaintiff's Counsel's attached declarations (Exs. 3-5).[6]

| Table 1: Plaintiff's Counsel Summary of Hours, Lodestar, and Expenses | | | |
|---|---|---|---|
| **Firm Name** | **Hours** | **Lodestar** | **Expenses** |
| Glancy Prongay & Murray LLP | 2,439.75 | $1,523,301.25 | $130,024.95 |
| Kirby McInerney LLP | 2,099.40 | $1,340,694.50 | $120,143.04 |
| Pomerantz LLP | 84.00 | $61,320.00 | $59.54 |
| **Total:** | **4,623.15** | **$2,925,315.75** | **$250,227.53** |

98.     From inception of the Action, the total number of hours expended by Plaintiff's Counsel is 4,623.15 hours.  The total lodestar is $2,925,315.75, consisting of $2,793,284.50 for attorneys' time and $132,031.25 for professional support staff time.  *See* Table 1, *infra*; Exs. 3-A, 4-A, 5-A.  The requested fee of $4,500,000 (or 33⅓% of the Settlement Fund) results in a multiplier

---

award, Lead Counsel here also seek an award covering the cost of financial analysts and related professionals, which courts have also found compensable as part of the fee award."); *see also In re Extreme Networks, Inc. Sec. Litig.*, No. 15 Civ. 4883, 2019 WL 3290770, at *11 (N.D. Cal. July 22, 2019) (granting lead counsel's fee request) and ECF 174-4 (finding rate of $550 per hour for financial analyst as reasonable); *Woburn Ret. Sys. v. Salix Pharm., Ltd.*, No. 14 Civ. 8925, 2017 WL 3579892, at *7 (S.D.N.Y. Aug. 18, 2017) (granting lead counsel's fee request) and ECF No. 225-4 (finding hourly rates for financial analysts ranging from $325-$500 as reasonable); *Lazan v. Quantum Corp. et al.*, No. 18 Civ. 00923, ECF No. 69 at ¶15 (N.D. Cal. Nov. 27, 2019) (approving Kirby McInerney's fee request) and ECF No. 63-8 (finding analyst rates between $275 and $475 reasonable); *In re AudioEye, Inc., Sec. Litig.*, No. 15 Civ. 00163, ECF No. 100 at 8 (D. Ariz. May 8, 2017) (awarding Kirby McInerney's, as lead counsel, 33-1/3% fee request in full) and ECF No. 96-2 (finding senior analyst rates ranging from $250-$400 as reasonable); *Esposito*, No. 16 Civ. 11797, ECF No. 106 at 6-7 (ECF No. 106) (D. Mass. June 15, 2018) (awarding Kirby McInerney's, as lead counsel, 33% fee request in full) and ECF No. 103-3 (finding analyst rates between $275-$450 as reasonable).  Courts also found paralegals to be compensable when awarding fees. *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732, 784 (S.D. Tex. 2008) ("'increasingly widespread custom of separately billing for the services of paralegals and law students who serve as clerks.'") (citing *Jenkins*, 491 U.S. at 285-86*)*; *In re SCANA Corp. Sec. Litig.*, No. 17 Civ. 2616, ECF No. 240 (D.S.C. July 23, 2020) and ECF No. 229-6 (finding paralegal rates between $325 and $335 reasonable); *Glock v. FTS Int'l, Inc.*, No. 4:20-CV-03928, 2021 WL 1422714, at *1–2 (S.D. Tex. Apr. 13, 2021) and ECF No. 23-1 (finding paralegal rates between $275 and $350 reasonable); *Rougier v. Applied Optoelectronics, Inc. et al.*, No. 17 Civ. 2399, ECF No. 156 (S.D. Tex. Nov. 24, 2020) and ECF No. 150-5) (finding paralegal rates between $265 and $325 reasonable).

[6] Time expended in preparing Plaintiff's Counsel's request for fees and expenses has not been included in the collective total lodestar.

of approximately 1.54 to Plaintiff's Counsel's total submitted lodestar of $2,925,315.75. Additional time will be expended during the administration of the Settlement; however, Plaintiff's Counsel will not seek a fee for that work.

99.     Based upon the attached declarations, we believe that Lead Counsel's requested fee award is fair, reasonable, and justified, whether calculated as a percentage of the fund or as a multiple of counsel's lodestar.

100.     As discussed in Lead Counsel's Fee and Expense Application, filed concurrently herewith, the requested fee is within the range of reasonable fees awarded in common-fund cases, and is in accordance with the precedents of the United States Supreme Court and the United States Court of Appeals for the Seventh Circuit. *See, e.g.*, *Taubenfeld v. Aon Corp.*, 415 F.3d 597, 599-600 (7th Cir. 2005) (noting "awards made by courts in other class actions" which "amount[ed] to 30-39% of the settlement fund"). In addition, Lead Plaintiff entered into a contingent fee agreement with Kirby McInerney that provided for attorneys' fees—subject to Court approval—of up to 33⅓% of any recovery, plus expenses. The requested fee 33⅓% of the Settlement is also strongly supported and should be approved based on the facts of this case, including the superb result achieved for the Settlement Class, the skill required, the quality of work performed, and the risk of pursuing claims on a contingency basis.

101.     As set forth in the accompanying Fee and Expense Application, the percentage method is the best method for determining a fair attorneys' fee award because, unlike the lodestar method, it aligns the lawyers' interest with that of the Settlement Class. *See* Fee and Expense Application at Sections II.A-B. The lawyers are motivated to achieve maximum recovery in the shortest amount of time required under the circumstances. This paradigm minimizes unnecessary drain on the Court's resources. Moreover, the percentage-of-the-fund method most closely mimics

33

the market for complex class action litigation—where almost all litigation is conducted on a contingency fee basis. *See Kirchoff v. Flynn*, 786 F.2d 320, 324 (7th Cir. 1986) ("When the 'prevailing' method of compensating lawyers for 'similar services' is the contingent fee, then the contingent fee *is* the 'market rate'" (emphasis in original)); *Gaskill v. Gordon*, 160 F.3d 361, 362 (7th Cir. 1998) ("When a class suit produces a fund for the class, it is commonplace to award the lawyers for the class a percentage of the fund . . . in recognition of the fact that most suits for damages in this country are handled on the plaintiff's side on a contingent-fee basis"); *see also McKinnie v. JP Morgan Chase Bank, N.A.*, 678 F. Supp. 2d 806, 816 (E.D. Wis. 2009) ("percentage of the fee method is preferable because it more closely replicates the contingency fee market rate for counsel's legal services.").

102. Based on the quality of the result achieved, the extent and quality of the work performed, the significant risks of the litigation, and the fully contingent nature of the representation, Lead Counsel respectfully submit that the requested fee award is fair and reasonable and should be approved. As discussed in the Fee Memorandum, a 33⅓% award is well within the range of percentages awarded in complex class actions with comparable settlements in this Circuit. *See* Fee and Expense Application Section III.C.1.; *see also* Ex. 9 (collecting Seventh Circuit cases with 33% or higher fee awards). In addition, the requested fee award was approved by Lead Plaintiff. *See* Ex. 2, ¶¶ 9-10.

103. As noted in the Fee and Expense Application, a lodestar analysis is not required. Nonetheless, Lead Counsel's requested attorneys' fee is also reasonable under the lodestar method. The requested 33⅓% attorneys' fee (which equates to $4,500,000) represents a 1.54 multiplier on the base lodestar value of Plaintiff's Counsel's time. This multiplier is well within the range of multipliers regularly awarded in securities class actions and other comparable litigation in the

34

Seventh Circuit and elsewhere. *See, e.g.*, *Harman v. Lyphomed, Inc.*, 945 F.2d 976 (7th Cir. 1991) (stating that multipliers of up to 4.0 have been approved); *Hale v. State Farm Mut. Auto. Ins. Co.*, 2018 WL 6606079, at *1 (S.D. Ill. Dec. 16, 2018) (multiplier of 2.83 on lodestar cross-check confirms reasonableness of percentage award); *see also In re Sumitomo Copper Litig.*, 74 F. Supp. 2d 393, 399 (S.D.N.Y. 1999) ("'In recent years multipliers of between 3 and 4.5 have been common' in federal securities cases.") (citation omitted); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051 n.6 (9th Cir. 2002) (finding multipliers ranged as high as 19.6, though most run from 1.0 to 4.0). Accordingly, where (as here) the requested fee amounts to a 1.54 multiplier on Plaintiff's Counsel's total lodestar, the cross-check fully supports the requested fee.

104. Annexed hereto as Exhibit 10 is a table created to reflect billing rates for partners and non-partners for plaintiffs' firms in cases involving securities and other comparable complex class actions. The information in this chart is taken from court records in the cases referenced in the chart.

105. Exhibit 10 also includes a table created to reflect billing rates of law firms that regularly defend securities and comparable class actions compiled by Settlement Class Counsel from fee applications submitted by such firms. This chart includes rates for attorneys employed by Skadden (Defendants' counsel in this Action).

### 2. Lead Counsel's Request for Litigation Expense Reimbursement

106. Our statements and summaries in this section are based on the Declarations set forth in Exhibits 3 through 5. Throughout the pendency of this Action, Lead Counsel has sought to ensure that sufficient resources were dedicated to prosecuting Lead Plaintiff's and the Settlement Class's claims. Lead Counsel advanced the litigation expenses required to pursue and complete such complex litigation with no guarantee of repayment. Plaintiff's Counsel have incurred a total of $250,227.53 in unreimbursed expenses in connection with prosecuting this Action. We believe

these expenses were reasonably necessary to the prosecution of this Action and are of the type that Plaintiff's Counsel normally incurs in litigation and that would be reimbursed by clients under fee arrangements where the client was paying expenses.

107.    The following schedule was prepared from Exhibit B in each of the attached declarations.

| Table 2: Cumulative Expenses by Category | |
|---|---|
| **Expense Category** | **Cumulative Expense** |
| Court Filing Fees | $1,510.00 |
| Document Management | $13,733.52 |
| Experts Accounting | $11,744.00 |
| Experts Damages | $18,860.00 |
| Experts Market Efficiency and Plan of Allocation | $139,673.50 |
| Investigations | $33,833.45 |
| Mediation | $17,260.28 |
| Online Research | $8,743.28 |
| Service of Process | $1,060.80 |
| Telephone | $8.00 |
| Travel Airfare | $1,616.60 |
| Travel Auto | $457.34 |
| Travel Hotel | $1,691.70 |
| Travel Meals | $35.06 |
| **Total Expenses:** | **$250,227.53** |

### 3.    The Reaction Of The Lead Plaintiff And The Settlement Class To The Fee And Expense Application

108.    As set forth in the declaration submitted by Lead Plaintiff, Lead Plaintiff concluded that the requested fees and expense reimbursement is fair and reasonable based on the work performed by Plaintiff's Counsel, the recovery obtained, and the risks of the Action. Ex. 2 at ¶¶ 9-11. Lead Counsel represented Lead Plaintiff throughout the litigation. Lead Plaintiff has been intimately involved in this case since its earliest stages, and his endorsement of the fee request supports the reasonableness of the request and should be given weight in the Court's consideration of the fee award.

109.     The Notice informed Settlement Class Members that Class Counsel would apply for attorneys' fees in the amount of thirty-three and one-third percent (33⅓%) of the Settlement Fund, plus reimbursement of expenses up to $350,000.  Mailing Decl. Ex. 1-A, (Notice) at ¶¶ 5, 69.  As noted above, as of September 6, 2022, a total of 8,647 copies of the Notice Packet have been mailed advising Settlement Class Members of the Settlement in which Lead Counsel, on behalf of all Plaintiff's Counsel, would apply for an award of attorneys' fees in an amount not to exceed 33⅓% of the Settlement Fund.  In addition, the Court-approved Summary Notice has been published in *Investor's Business Daily* and transmitted over the *PR Newswire*.

110.     To date, no Settlement Class Member has objected to the attorneys' fee requested or the maximum amount of Litigation Expenses disclosed in the Notice.  Meanwhile, the fee application does not exceed the maximum amount set forth in the Notice, and the expense application is below the $350,000 that Settlement Class Members were notified could be sought. The deadline for Settlement Class Members to file objections is September 22, 2022.  As discussed above, Lead Counsel will address any objections filed by Settlement Class Members in connection with the Reply Papers.

**C.     Lead Counsel's Request Service Award For The Lead Plaintiff**

111.     Lead Counsel are respectfully requesting a $5,000 service award for Lead Plaintiff Fadi E. Rahal to be paid from the Settlement Fund.  To date, no member of the Settlement Class has objected to the amount of the proposed incentive award, which was described in the Settlement Notice.  *See, e.g.*, Mailing Decl. ¶ 22 and Ex. A (Notice) at ¶¶ 5, 69.

112.     To the best of our knowledge, we believe that the Mr. Rahal consistently contributed time for the benefit of the Settlement Class.   In particular, Mr. Rahal: (a) communicated with Lead Counsel regarding the posture and progress of the case; (b) compiled his trading data and completed his certification in connection with his motion to be appointed Lead

37

Plaintiff; (c) reviewed significant pleadings and other papers filed in this Action; (d) responded to written discovery requests and interrogatories; (e) produced documents in response to Defendants' discovery requests; (f) consulted with Lead Counsel regarding the settlement negotiations and mediation; and (g) evaluated and approved the proposed Settlement. *See* Lead Plaintiff Decl. ¶¶ 4-8. Mr. Rahal, in the opinion of Lead Counsel, is deserving of the requested incentive award having worked with Lead Counsel to obtain a terrific result which warrants approval of the requested award.

## VIII. Additional Exhibits

113. Annexed hereto as Exhibit 11 is a compendium of unreported cases and documents, in alphabetical order by case name, cited herein and in the accompanying final approval settlement brief and fee brief.

## IX. Conclusion

114. In view of the recovery to the Settlement Class and the substantial risks of this Action, Lead Counsel respectfully submit that: the Settlements should be approved as fair, reasonable and adequate; the Plan of Allocation should be approved as fair and reasonable; and the Settlement Class should be certified for settlement purposes.

115. Lead Counsel, on behalf of all Plaintiff's Counsel, respectfully seek an award of attorneys' fee in the amount of 33⅓% of the Settlement Fund ($13,500,000) and reimbursement of litigation expenses in the amount of $250,227.53. We also respectfully request a service award of $5,000 for the Lead Plaintiff to be paid from the Settlement Fund.

We certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 8, 2022.

*/s/ Leanne H. Solish*
Leanne H. Solish

Executed on September 8, 2022.

*/s/ Thomas W. Elrod*
Thomas W. Elrod

39

## CERTIFICATE OF SERVICE

I hereby certify that on September 8, 2022, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all registered ECF participants.


*s/ Leanne H. Solish*
Leanne H. Solish