**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| LAZAR MACOVSKI, Individually and On Behalf of All Others Similarly Situated,<br><br>                        Plaintiff,<br><br>        v.<br><br>GROUPON, INC., RICH WILLIAMS, and MELISSA THOMAS,<br><br>                     Defendants. | Case No. 1:20-cv-02581<br><br>Honorable Matthew F. Kennelly |

**DECLARATION OF JESSIE MAHN IN SUPPORT OF LEAD PLAINTIFF'S MOTION**
**FOR DISTRIBUTION OF CLASS SETTLEMENT FUNDS**

I, Jessie Mahn, declare and state under penalty of perjury as follows, pursuant to 28 U.S.C. § 1746:

1.      I am a Project Manager employed by Epiq Class Action & Claims Solutions, Inc. ("Epiq").[1] I am over 21 years of age and am not a party to the above-captioned action (the "Action"). The following statements are based on my personal knowledge and information provided by Epiq employees working under my supervision, and if called on to do so, I could and would testify competently thereto.

2.      Epiq was retained by Lead Counsel to serve as Claims Administrator in connection with the Settlement of this Action. Pursuant to the Court's Order Preliminarily Approving Settlement and Providing for Notice dated July 6, 2022 (ECF No. 113, the "Preliminary Approval Order"), the Court approved Epiq as the Claims Administrator in connection with the Settlement. On October 28, 2022, the Court entered the Order and Final Judgment Approving Class Action Settlement (ECF No. 127, the "Final Judgment") and the Order Approving the Plan of Allocation (ECF No. 128, the "Plan of Allocation"). Pursuant to the Settlement, $13,500,000 in cash was deposited into the Escrow Account for the Settlement Class's benefit. The Effective Date of the Settlement has occurred, and the Net Settlement Fund may be distributed to Authorized Claimants pursuant to the Order of this Court. *See* Stipulation, ¶26.

3.      As Claims Administrator, Epiq has, among other things: (i) mailed the Notice of (I) Pendency of Class Action, Certification of Settlement Class, and Proposed Settlement; (II) Settlement Fairness Hearing; and (III) Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Notice") and the Proof of Claim and Release Form

---

[1] Unless otherwise defined herein, all capitalized terms shall have the meaning ascribed to them in the Stipulation and Agreement of Settlement, dated June 24, 2022 (ECF No. 110-1, the "Stipulation").

(together with the Notice, the "Notice Packet") to Settlement Class Members, brokers, and other nominees; (ii) created and continues to maintain a toll-free helpline for inquires during the course of the administration; (iii) created and continues to maintain a case website and posted case-specific documents on it; (iv) caused the Summary Notice to be published; (v) provided, upon request, additional copies of the Notice Packet to Settlement Class Members, brokers, and other nominees; and (vi) received and processed Claims.

4.      In accordance with the terms of the Stipulation and the Court-approved Plan of Allocation set forth in the Notice, Epiq has completed the processing of the 4,405 Claims received as of May 31, 2023, and hereby submits its administrative determinations accepting or rejecting the Claims in preparation for a distribution of the Net Settlement Fund to Authorized Claimants. Epiq also presents this Declaration in support of Lead Plaintiff's Motion for Approval of Distribution Plan.

## DISSEMINATION OF THE NOTICE

5.      As more fully described in the Declaration of Jessie Mahn Regarding: (I) Mailing of Notice and Proof of Claim Form; (II) Publication of Summary Notice; (III) Call Center Services; (IV) the Settlement Website; and (V) Requests for Exclusion and Objections received to Date dated September 7, 2022 (ECF No. 121-1, the "Initial Mailing Declaration") and the Supplemental Declaration of Jessie Mahn Regarding: (I) Mailing of Notice and Proof of Claim Form; (II) Call Center Services; (III) the Settlement Website; and (IV) requests for Exclusion and Objections Received to Date dated October 6, 2022 (ECF No. 122-1, the "Suppl. Mailing Declaration"), Epiq had mailed 15,654 Notice Packets to potential Settlement Class Members, brokers, and other nominees. Suppl. Mailing Decl. ¶6; *see also* Initial Mailing Decl. ¶10. Since the date of the Supplemental Mailing Declaration, 29,491 additional mailed Notice Packets have been mailed. In

total, Epiq has mailed 45,145 Notice Packets to potential Settlement Class Members, brokers, and other nominees that may have purchased Groupon Common Stock on behalf of Settlement Class Members. A copy of the Notice Packet is attached as Exhibit A.

6.      Epiq has re-mailed 308 Notice Packets to persons whose original mailing was returned by the U.S. Postal Service and for whom updated addresses were provided to Epiq by the Postal Service.

7.      Epiq established and continues to maintain the Settlement Website (www.GrouponSecuritiesSettlement.com) dedicated to this Action, and a toll-free helpline, (866) 991-0893, to assist potential Settlement Class Members. The Settlement Website (which provides access to important documents relevant to the Settlement) and the telephone helpline enable Settlement Class Members to obtain information about the Settlement. In connection with establishing and maintaining the Settlement Website and toll-free telephone helpline, Epiq, among other things, formulated a system to ensure that proper responses were provided to all telephonic and electronic inquiries. That work included training telephone agents to respond to Settlement-specific inquiries; developing a series of commonly asked questions and the answers thereto, known as Frequently Asked Questions, or "FAQs;' uploading key documents to the Settlement Website; and programming the Settlement Website to permit the viewing and downloading of those documents.

8.      In accordance with Paragraph 7(d) of the Preliminary Approval Order, on August 15, 2022, Epiq caused the Summary Notice to be published in the *Investor's Business Daily* and released via *PR Newswire*. Initial Mailing Decl., ¶12.

**PROCEDURES FOLLOWED IN PROCESSING CLAIMS**

9. Under the provisions of the Preliminary Approval Order and as set forth in the Notice, each Settlement Class Member who wished to be eligible to receive a distribution from the Net Settlement Fund was required to complete and submit to Epiq a properly executed Claim Form postmarked no later than December 1, 2022, together with adequate supporting documentation for the transactions and holdings reported therein. Through May 31, 2023, Epiq has received and fully processed 4,405 Claim Forms.

10. In preparation for receiving and processing claims, Epiq: (i) conferred with Lead Counsel to define the project guidelines for processing claims; (ii) created a unique database to store claim form details and images of claim forms and supporting documentation; (iii) trained staff in the specifics of the project so that claims would be properly processed; (iv) formulated a system so that telephone and email inquiries would be properly responded to; (v) developed various computer programs and screens for entry of claimants' identifying information, as well as their transactional information; and (vi) developed a proprietary "calculation module" that would calculate Recognized Loss Amounts pursuant to the Court-approved Plan of Allocation set forth in the Notice.

11. Settlement Class Members, and their banks, brokers, and other nominees, seeking to share in the Net Settlement Fund were directed in the Notices Packet to submit their Claim Forms to the post office box address specifically designated for the Settlement, to submit claims online using the case website, or to submit claims to the Epiq team that handles large electronic claims (the "Securities Team"). Any correspondence received at the post office box was reviewed and, where necessary, appropriate responses were provided to the senders.

4

## PROCESSING PAPER AND ONLINE CLAIM FORMS

12.     Of the 4,405 Claim Forms received by Epiq through May 31, 2023, 426 were paper Claim Forms or claims submitted online through the Settlement Website.  Once received, paper claims were opened and prepared for scanning.  This process included unfolding documents, removing staples, copying nonconforming sized documents, and sorting documents.  This manual task of preparing the paper claims is laborious and time-intensive.  Once prepared, the paper claims were scanned into a database together with all submitted documentation.

13.     Each paper and online Claim Form was assigned a unique claim number.  The information from each Claim Form, including the claimant's name, address, account number/information from his, her or its supporting documentation, and the purchase/acquisition transactions, sale transactions, and holdings listed on the claim form, was entered into the database developed by Epiq to process claims submitted for the Settlement.  Next, the documentation provided by each claimant in support of his, her or its claim form was reviewed to determine: (i) whether the claimant traded in Groupon Common Stock during the Settlement Class Period; (ii) whether the transaction information entered on the claim form was supported by the documentation; (iii) that the claimant did not have any additional trades not reflected on his, her, or its claim form; (iv) that the name of the claimant matched the information on the trade documentation, or additional documentation was provided to support any name changes; and (v) that the beneficial owner on the trade documentation, or a valid representative, was the person who signed the claim form.

14.     In order to process the claims, Epiq utilized internal codes to identify and classify any deficiency or ineligibility conditions that existed within the claims.  The appropriate codes were assigned to the claims as they were processed.  For example, where a claim form was

submitted by a claimant who did not have any eligible transactions in Groupon Common Stock during the Settlement Class Period (e.g., the claimant purchased Groupon Common Stock only before or after the Settlement Class Period), that claim would receive a defect code that denoted ineligibility. Similar defect codes were used to denote other ineligible conditions, such as duplicate claims. These message codes would indicate to Epiq that the claimant is not eligible to receive any payment from the Net Settlement Fund with respect to that claim unless the deficiency was cured in its entirety. Examples of conditions of ineligibility are as follows:

| | |
|---|---|
| ND | No Documentation Submitted for the Entire Claim |
| MD | Inadequate Documentation |
| DP | Duplicate Claim |
| PO | No Eligible Purchase During the Settlement Class Period |
| SG | No Signature |
| ZR | No Recognized Loss Under the Plan of Allocation |
| ZD | No Recognized Loss Due to Other Defects |

15. Because a claim may be deficient only in part, but otherwise acceptable, Epiq utilized codes that were only applied to specific transactions within a claim. For example, if a claimant submitted a claim form which, in addition to having eligible documented purchases, also listed shares that were transferred into the account but no supporting documentation demonstrating that the transferred shares had been purchased during the Settlement Class Period was provided, that transfer transaction would receive a transaction-specific defect code. That code indicated that the shares transferred into the account were not eligible, unless the defect was cured, but the claim was otherwise eligible for payment based on the other transactions. Thus, even if the deficiency

6

was never cured, the claim could still be partially accepted. A few examples of transaction-specific message codes are as follows:

| | |
|---|---|
| BL | Claim Did Not Balance/Trade Discrepancy |
| PR | Partial Documentation |
| RC | Received Shares (i.e., shares transferred into an account but not "purchased") |
| DV | Delivered Shares (i.e., shares transferred out of an account but not "sold") |
| EN | No Proof of End Holdings |
| IS | Ineligible Security |
| MR | Missing Information |

### PROCESSING ELECTRONICALLY FILED CLAIM FORMS

16. Of the 4,405 claims received by Epiq through May 31, 2023, 3,979 were filed electronically ("Electronic Claims"). Electronic Claims are typically submitted by, or on behalf of, institutional investors who may have hundreds or thousands of transactions during the Settlement Class Period. Rather than provide reams of paper requiring data entry, the institutional investors or representatives filing Electronic Claims either mail a computer disc or electronically submit a file to Epiq so that Epiq may electronically upload all transactions to its proprietary database developed for the Settlement.

17. Epiq maintains a Securities Team to coordinate and supervise the receipt and handling of all Electronic Claims. In this case, the Securities Team reviewed and analyzed each electronic file to ensure that it was formatted in accordance with Epiq's required format, and to identify any potential data issues or inconsistencies within the file. If any issues or inconsistencies

7

arose, Epiq notified the sender. If the electronic file was deemed to be in an acceptable format, it was then loaded to Epiq's database.

18. Once the file was loaded, the Electronic Claims were coded to identify them as Electronic Claims and message codes were applied to denote any deficiencies or ineligible conditions that existed within them. These message codes are similar to those applied to paper and online Claim Forms. In lieu of manually applying message codes, the Securities Team performed programmatic reviews of the Electronic Claims to identify deficiency and ineligibility conditions (such as, but not limited to, price per share/net amount validation issues, out of balance conditions, and transactions outside the Settlement Class Period, etc.). The output was thoroughly verified and confirmed as accurate.

19. The review process also included flagging any Electronic Claims that were not accompanied by a signed claim form, which serves as a "Master Proof of Claim Form" for all accounts referenced on the electronic file submitted. This process was reviewed by Epiq's Securities Team and, where appropriate, Epiq contacted the institutional filers whose electronic files were missing information. This ensures that all claims are submitted by properly authorized representatives of the claimants.

20. Finally, at the end of this process, Epiq performed various targeted reviews of the Electronic Claims. Specifically, Epiq used criteria such as the calculated Recognized Loss Amounts and other criteria to flag a sampling of electronic filers in order to request additional information, such as that specific purchases, sales and holdings selected by Epiq be documented with confirmation slips or other transaction-specific supporting documentation. These targeted reviews help to ensure that electronic data supplied by claimants does not contain inaccurate

information.  As set forth below, Epiq also performed additional quality assurance reviews in connection with the largest claims.

## EXCLUDED PERSONS

21.     Epiq also reviewed all claims to ensure that they were not submitted by or on behalf of "Excluded Persons," to the extent that the identities of such persons or entities were known to Epiq through the list of Defendants and other excluded persons and entities set forth in the Stipulation and Agreement of Settlement and in the Notice, and through the claimants' certifications on the claim forms.

## ADDITIONAL COMPLEXITIES ENCOUNTERED IN CLAIMS PROCESSING

22.     Many of the claims Epiq received were deficient or ineligible for one or more reasons and, therefore, were subjected to the additional processing, correspondence and telephonic communications described in the sections below entitled "The Deficiency Process for Paper and Online Claims" and "The Deficiency Process for Electronic Claims."

23.     During the processing of claims, Epiq also encountered "non-conforming" claims, which, in general, require significantly more work than ordinary claims because of the information contained in or missing from the claims or the way the claims were completed.  Non-conforming claims include, among other conditions, missing pages, no name or address, claim forms that are blank but submitted with documentation for Epiq to complete, and claim forms that are so materially deficient as to make what is being claimed unrecognizable.

## THE DEFICIENCY PROCESS FOR PAPER AND ONLINE CLAIMS

24.     Of the 426 paper and online Claims received as of May 31, 2023, 335, or approximately 79% of them, were incomplete or had one or more defects or conditions of ineligibility, such as the claim form not being signed, not being properly documented, or indicating

9

no eligible transactions in Groupon Common Stock during the Settlement Class Period.  Much of

Epiq's efforts in handling an administration involve claimant communications so that all claimants

have a sufficient opportunity to cure any deficiencies and file a complete claim.  The "Deficiency

Process," which involved contacting claimants and responding to inquiries from claimants either

by telephone or email, was intended to assist them in properly completing their otherwise deficient

submissions so that they would be eligible to participate in the Settlement.

25. If a claim was determined to be defective or ineligible, a Notice of Incomplete Proof

of Claim Submission ("Deficiency Notice") was sent to the claimant describing the defect(s) or

condition(s) of ineligibility in his, her or its claim and what was necessary to cure any "curable"

defect(s) in the claim.  The Deficiency Notice advised the claimant that the submission of the

appropriate information and/or documentary evidence to complete the claim had to be sent within

20 days from the date of the letter.  The Deficiency Notice further advised that if the appropriate

information was not submitted in this timeframe, the claim would be recommended for rejection

to the extent the deficiency or condition of ineligibility was not cured.  The Deficiency Notice also

advised claimants that if they desired to contest the administrative determination, they were

required to submit a written statement to Epiq requesting Court review of the determination and

setting forth the basis for their request.  Attached hereto as Exhibit B is an example of the

Deficiency Notice.

26. Claimants' responses to the Deficiency Notices were scanned into Epiq's database

and associated with the corresponding claim form.  The responses were then carefully reviewed

and evaluated by Epiq's team of processors. If a claimant's response corrected the defect(s), Epiq updated the database manually to reflect the change in status of the claim.

## THE DEFICIENCY PROCESS FOR ELECTRONIC CLAIMS

27. Of the 3,979 electronic claims received, 2,607, or approximately 65% of them, were deficient or ineligible. Epiq used the following process to inform Electronic Claim filers that their electronic submissions were deficient. Each filer was sent an email attaching a Transaction Report that listed the specific claims that were deficient or ineligible, along with a list of the specific portions of the claims that were deficient or ineligible.

28. With respect to the Electronic Claims, the Transaction Reports:

(a) were sent electronically to filers who submitted deficient or ineligible Electronic Claims;

(b) identified individual transactions and entire Electronic Claims that were found to be deficient or ineligible so that the filer had the opportunity to correct the deficient condition or contest the determination of ineligibility;

(c) stated that any deficient transactions or Electronic Claims that remain uncured after 20 days, as well as any transactions or Electronic Claims that were identified as ineligible were rejected;

(d) notified the filer that, within 20 days, it could request that the Court review Epiq's administrative determinations if it wished to contest the rejection of any transactions or Electronic Claims; and

(e) provided Epiq's contact information if the filer had any questions or required assistance.

Attached hereto as Exhibit C is an example of the Transaction Report.

11

29. Responses to the Transaction Reports were reviewed by Epiq's Securities Team, scanned and/or loaded into Epiq's database, and were associated with the corresponding Electronic Claim. If the response corrected the defect(s) or affected the Electronic Claim's status, Epiq manually and/or programmatically updated the database to reflect the change in status of the Electronic Claim.

## DISPUTED CLAIMS

30. As noted above, filers were advised that they had the right to contest Epiq's administrative determinations of deficiencies or ineligibility within 20 days from the date of notification and that they could request that the dispute be submitted to the Court for review. More specifically, such persons were advised in the Deficiency Notice or the Transaction Reports that if they disputed Epiq's determinations, they had to provide a statement of reasons indicating the grounds for contesting the rejection, along with supporting documentation.

31. Epiq received nine requests for review by the Court of the administrative determination made by Epiq. To resolve the disputes without the Court's intervention, Epiq attempted to contact all of the claimants requesting Court review in order to answer all of their questions, fully explain Epiq's determination of the claims' status, and facilitate the submission of missing information or documentation where applicable. As a result of these efforts, all nine claims for which Court review had been requested have either been cured or the request for Court review has been retracted. Accordingly, there are no outstanding requests for Court review.

## LATE BUT OTHERWISE ELIGIBLE CLAIMS

32. Through May 31, 2023, Epiq received 1,248 claims that were postmarked or received after the December 1, 2022 claim submission deadline established by the Court. Epiq has fully processed these claims. Of the late claims, 380 have been found to be otherwise eligible

in whole or in part (the "Late But Otherwise Eligible Claims"). Epiq has not rejected any claim solely based on its late submission, and Epiq believes no delay has resulted from the provisional acceptance of these Late But Otherwise Eligible Claims. To the extent they are eligible but for the fact that they were late, they are recommended herein for payment.

33. However, there must be a final cut-off date after which no more claims will be accepted so that there may be a proportional distribution of the Net Settlement Fund and the distribution may be accomplished. Accordingly, and in consultation with Lead Counsel, Epiq recommends that no claim form received or adjusted after May 31, 2023, be eligible for payment.

## QUALITY ASSURANCE

34. An integral part of all Epiq's settlement administration projects is its Quality Assurance reviews. These reviews are also labor intensive and time consuming. Specifically, Epiq's personnel worked throughout the entire administration to ensure that claims were processed properly; that deficiency and ineligibility message codes were properly applied to claims; that deficiency notices were mailed to the appropriate claimants; and that Epiq's computer programs were operating properly.

35. In support of the work described above, Epiq staff designed, implemented and tested and reviewed the following programs for this administration: (i) data entry screens that store claim information (including all transactional data included in each claim and in any supporting documentation), attach message codes and, where necessary, apply text to denote conditions existing within the claim; (ii) screens for the analyst to review images of the claim form and any supporting documentation provided; (iii) programs to load and analyze transactional data submitted electronically for all Electronic Claims (a load program converts the data submitted into the format required by the calculation program, and an analysis program determines if the data is

13

consistent and complete); (iv) a program to compare the claimed transaction prices against the reported market prices of Groupon Common Stock to confirm that the claimed transactions were within an acceptable range of the reported market prices; (v) a calculation program to analyze the transactional data for all claims, and calculate the Recognized Loss Amounts based on the Court-approved Plan of Allocation; and (vi) programs to generate various reports throughout and at the conclusion of the administration, including lists of all eligible and ineligible claims.

36.     Epiq's Securities Team also performed a final quality control check once all the accepted Claims were processed, deficiency notices were mailed, and deficiency responses were reviewed and processed, to ensure the correctness and completeness of all of the processed claims before Epiq prepared its final reports to Lead Counsel. Here, in connection with this Quality Assurance wrap-up, Epiq: (i) confirmed that the claims that are being recommended for approval have no message codes denoting ineligibility; (ii) confirmed that claims that are being recommended for rejection have message codes denoting ineligibility; (iii) confirmed that all claims requiring "deficiency" notices were sent such notices; (iv) performed a sample review of deficient claims; (v) reviewed a sampling of claims with high Recognized Loss Amounts to confirm Epiq's determinations; (vi) sampled claims that had been determined to be ineligible, including those with no Recognized Loss Amounts calculated in accordance with the Plan of Allocation, in order to verify that all transactions had been captured correctly; and (vii) retested the accuracy of the loss calculation program.

37.     As part of its due diligence in processing the claims, Epiq also conducted a Questionable Claim Filer search of all paper, online, and Electronic Claims filed in the Settlement as follows. Epiq maintains a database of known questionable filers. This database contains names, addresses, and aliases of individuals who have been investigated by government agencies for

14

fraudulent claim filing, as well as the names and contact information compiled from previous settlements that Epiq has administered where fraudulent claims were received. Epiq updates the database on a regular basis. The database for the Settlement was searched for all individuals identified in our Questionable Claim Filer Database. Epiq performed searches based on name, aliases, address, and city/zip code. In addition, all Epiq's claim processors are trained to identify any potentially inauthentic documentation when processing claims, including for claims submitted by claimants not previously captured in our database as Questionable Claim Filers. Processors are instructed to flag claims as Questionable Claims and route them to the Project Manager and Securities Team for review. Two Claims were located, and rejected for not providing acceptable documentation. The claimants have not disputed the rejection of the claims.

**RECOMMENDATION FOR APPROVAL AND REJECTION OF CLAIM FORMS**

38. Epiq has completed the processing of the 4,405 claims that were postmarked or received through May 31, 2023 and has determined that 1,151 are acceptable in whole, 70 are acceptable in part, and that 3,184 should be wholly rejected because they are either ineligible, wholly deficient, or have no Recognized Loss Amount when calculated in accordance with the Court-approved Plan of Allocation.

39. A list of the claims and Epiq's recommendations as to their disposition is contained in the Claims Administrator's Report attached hereto as Exhibit D. Exhibit D-1, entitled "Timely Eligible Claims," lists all timely filed, accepted claims, and states their Recognized Loss Amounts. Exhibit D-2, entitled "Late But Otherwise Eligible Claims," lists all late filed, accepted claims, and states their Recognized Loss Amounts. Exhibit D-3, entitled "Rejected Claims," lists all wholly rejected claims, and states the reason for their rejection. For privacy reasons, Exhibit D

15

provides only the claimant's Claim Number and Recognized Loss Amount or Reason for Rejection (no names, addresses, Taxpayer ID, Social Security or Social Insurance Numbers are disclosed).

### A. Eligible Claims

40. Epiq has determined that 1,221 claims should be accepted. The claims recommended for acceptance represent a total Recognized Loss Amount of $61,344,590.79 under the Court-approved Plan of Allocation. Of that total, $40,223,379.76 is for Timely Eligible Claims and $21,121,211.04 is for Late But Otherwise Eligible Claims.

41. According to the Court-approved Plan of Allocation, each Authorized Claimant will be allocated a pro rata share of the Net Settlement Fund based on his, her or its Recognized Loss Amount in comparison to the total Recognized Loss Amount of all Authorized Claimants.

### B. Rejected Claims

42. The 3,184 wholly rejected claims are recommended for rejection by the Court for the following reasons:

**Summary of Rejected Claims**

| Reason for Rejection | Number of Claims |
|---|---|
| No Eligible Purchases During the Settlement Class Period | 1,203 |
| Claim Did Not Result in a Recognized Loss Amount | 711 |
| Deficient Claim with Condition of Ineligibility Never Cured | 73 |
| Duplicate Claim | 6 |
| Claim Withdrawn/Voided by Request | 1,191[2] |
| **TOTAL** | **3,184** |

---

[2] One of the nominees submitted 1,179 Claims with post-split data instead of pre-split data as required under the Plan of Allocation. These 1,179 Claims were then withdrawn by the nominee and replaced with 1,179 Claims with the data correct.

**FEES AND DISBURSEMENTS**

43.     Epiq agreed to be the Claims Administrator for the Settlement in exchange for payment of its fees and expenses.  Lead Counsel received regular reports of and invoices for all of the work Epiq performed with respect to provision of notice and the administration of the Settlement and authorized the claims administration work performed herein.  Attached as Exhibit E are copies of all Epiq invoices for this matter.

44.     As set forth in the attached invoices, the cost of the administration of the Settlement through June 30, 2023 totals $184,166.73 and has been paid. Additionally, Epiq has estimated that the cost of conducting the initial distribution of the Settlement, which will be reserved prior to the initial distribution, is $16,216.25. Accordingly, Epiq requests payment in the amount of $16,216.25 for the estimated cost of conducting the initial distribution.  Should the estimate of fees and expenses to conduct the initial distribution exceed the actual fees and expenses, Epiq will refund the difference to the Net Settlement Fund once the initial distribution is completed.

**DISTRIBUTION PLAN FOR THE NET SETTLEMENT FUND**

45.     Should the Court concur with Epiq's determinations concerning the accepted and rejected claims, including the Late But Otherwise Eligible Claims, Epiq recommends the following distribution plan (the "Distribution Plan"):

(a)     Epiq will conduct an initial distribution (the "Initial Distribution") of the Net Settlement Fund, after deducting the payments previously allowed and requested herein, and after payment of any Taxes, the costs of preparing appropriate tax returns, and any escrow fees as follows:

(i) Epiq will calculate award amounts to all Authorized Claimants by calculating their *pro rata* share of the Net Settlement Fund in accordance with the Plan of Allocation.

(ii) Epiq will, pursuant to the terms of the Plan of Allocation, eliminate from the Initial Distribution any Authorized Claimant whose pro rata share of the Net Settlement Fund, as calculated under subparagraph (a)(i) above, is less than $10.00. Such claimants will not receive any distribution from the Net Settlement Fund and Epiq will send letters to those Authorized Claimants advising them of that fact.

(iii) After eliminating claimants who would have received less than $10.00, Epiq will calculate the *pro rata* share of the Net Settlement Fund for Authorized Claimants who would have received $10.00 or more pursuant to the calculations described in subparagraph (a)(i) above ("Distribution Amount").

(iv) In order to encourage Authorized Claimants to promptly deposit their payments, all distribution checks will bear a notation "DEPOSIT PROMPTLY, VOID AND SUBJECT TO RE-DISTRIBUTION IF NOT NEGOTIATED WITHIN 90 DAYS OF ISSUE DATE."

(v) Authorized Claimants who do not cash their Initial Distribution checks within the time allotted will irrevocably forfeit all recovery from the Settlement. The funds allocated to all such stale-dated checks will be available to be re-distributed to other Authorized Claimants in the Second Distribution as discussed below. Similarly, Authorized Claimants who

18

do not cash their second or subsequent distributions (should such distributions occur) within the time allotted will irrevocably forfeit any further recovery from the Net Settlement Fund.

(b)     After Epiq has made reasonable and diligent efforts to have Authorized Claimants cash their Initial Distribution checks, but no earlier than nine months after the Initial Distribution, Epiq, following consultation with Lead Counsel and determining that it is economically feasible to do so, will conduct a second distribution of the Net Settlement Fund (the "Second Distribution") in which any unclaimed amounts remaining in the Net Settlement Fund after the Initial Distribution, after deducting Epiq's fees and expenses incurred in connection with administering the Settlement for which it has not yet been paid (including the estimated costs of such Second Distribution), and after the payment of any Taxes, the costs of preparing appropriate tax returns, and any escrow fees, will be distributed to all Authorized Claimants in the Initial Distribution who cashed their Initial Distribution check and would receive at least $10.00 from such distribution based on their pro-rata share of the remaining funds.

(c)     Additional re-distributions, after deduction of costs and expenses as described above and subject to the same conditions, may occur thereafter until Lead Counsel, in consultation with Epiq, determines that further re-distribution is not cost-effective.  At that point, and as set forth in the Stipulation and Agreement of Settlement and in the Notice, the residual balance shall be contributed to non-sectarian, not-for-profit organization(s), to be recommended by Lead Counsel and approved by the Court.

(d)     No new claim forms nor adjustments to claim forms, which would result in an increased Recognized Loss Amount, may be accepted after May 31, 2023.  Should an

adjustment be received that results in a lower Recognized Loss Amount, that adjustment will be made and the Recognized Loss Amount will be reduced accordingly.

46.     Unless otherwise ordered by the Court, one year after the final distribution, or, if there are no additional distributions, two years after the Initial Distribution, Epiq will destroy the paper and electronic copies of the claim forms and all supporting documentation.

## CONCLUSION

47.     Epiq respectfully submits this declaration in support of Lead Plaintiff's motion for the Court to enter an Order approving Epiq's administrative determinations accepting and rejecting the Claims submitted and approving the proposed Distribution Plan. Epiq further respectfully submits this Declaration in support of a determination that its fees and expenses for completing the Initial Distribution should be approved for payment from the Settlement Fund.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on July 20, 2023, in Seattle, WA.

_____
Jessie Mahn

## CERTIFICATE OF SERVICE

I hereby certify that on July 27, 2023, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all registered ECF participants.

_s/ Leanne H. Solish_
Leanne H. Solish